

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 6, 2014

**VIA ECF AND HAND**

Honorable Robert W. Sweet
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

       Re: United States v. Bladimir Rigo, 13 Cr. 897 (RWS)

Dear Judge Sweet:

       We write in advance of the hearing to be held October 7, 2014 in the above-captioned matter pursuant to *United States* v. *Fatico*, 579 F.2d 707 (2d Cir. 1978). At issue in the hearing is the loss amount attributable to the offense conduct to which the defendant Bladimir Rigo (the "defendant") has already pled guilty. *See generally* U.S.S.G. § 2B1.1(b)(1).

       By way of background, defendant was charged by criminal complaint in September 2013 with conspiring to commit health care fraud, among other offenses. A copy of the criminal complaint is attached hereto as Exhibit A. In November 2013, a grand jury returned indictment 13 Cr. 897 (RWS) similarly charging the defendant with one count of conspiracy to commit healthcare fraud and one count of conspiring to commit adulteration and unlawful wholesale distribution of prescription medications. As detailed further in the criminal complaint and below, the charges stem from the defendant's participation in a large-scale prescription drug scheme which principally involved the unlawful distribution and resale of prescription medications used to treat HIV/AIDS. On April 23, 2014, the defendant appeared before the Hon. Kevin N. Fox to plead guilty to both counts of the Indictment without an agreement with the Government. The Government did prepare a *Pimentel* letter which reflected the Government's view that the loss amount attributable to the defendant was more than $7 million but less than $20 million.

       **I.**     **The Scheme to Defraud**

       As noted, Count One of the Indictment charged the defendant with conspiring to engage in a scheme or artifice to "defraud any health care benefit program." *See* 18 U.S.C. §§ 1347(a), 1349. The term "health care benefit program" is defined by statute to include "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is

provided to any individual." 18 U.S.C. § 24(b). One common example of such a program is the Medicaid program.

The conduct giving rise to both Counts One and Two involves the defendant's agreement to participate in a scheme to obtain various prescription medications—typically those prescribed to treat HIV and AIDS—which had previously been dispensed to individuals in the Southern District of New York and elsewhere, and then to attempt to cause these bottles to be re-dispensed as "new" to unsuspecting patients.

The drugs involved in this scheme were not drugs of abuse—*i.e.*, controlled substances—but rather are brand name pharmaceuticals used exclusively by patients with valid prescriptions and for which the price tags, almost always paid by insurance programs such as Medicaid, ran into the thousands of dollars per bottle. Indeed, to reap maximum profits, the participants in the scheme generally targeted some of the most expensive drugs currently on the market, including: Atripla ($1,879/bottle); Trizivir ($1,563/bottle); Zyprexa ($1,286/bottle); Truvada ($1,149/bottle); Prezista ($1,129/bottle); Reyataz ($1,065/bottle); Isentress ($1,015/bottle); Intelence ($871/bottle); Kaletra ($768/bottle); and Sustiva ($644/bottle).[1]

To effectuate the scheme, the lowest level participants in the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs at pharmacies throughout the New York City area. The drugs were dispensed in sealed manufacturer bottles with patient labels affixed by pharmacies. The Insurance Beneficiaries were typically HIV or AIDS patients who paid little or no money of their own for the drugs in question because their insurance plans, typically Medicaid, footed the bill. The Insurance Beneficiaries then sold their bottles of medications—rather than taking them as prescribed—to other participants in the scheme ("Collectors") for cash at locations like street corners and bodegas in and around New York City. Collectors, in turn, sold the second-hand bottles they collected to other participants in the scheme ("Aggregators"), who typically bought large quantities of second-hand drugs from multiple Collectors. Eventually, the second-hand drugs made their way to pharmacies (such as the defendant's) willing to re-dispense these "second-hand" drugs to unsuspecting consumers.

Because the drugs involved in the scheme were not drugs of abuse salable on the streets to users and addicts, the bottles' high value depended on their appearing to contain new, legitimate drugs that could be re-dispensed by a pharmacy. Accordingly, scheme participants took great lengths to make the previously dispensed manufacturer bottles appear to be "new" by, among other things, carefully "cleaning" off patient labels affixed by the pharmacy when the drugs were initially dispensed. Scheme participants did so using lighter fluid and other

---

[1] The figures above represent the 2011 Medicaid Reimbursement value for each drug in question. By law, Medicaid cannot independently negotiate the prices it pays for any particular pharmaceutical drug but instead pays a fixed percentage of the manufacturer's listed price. *See generally* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Medicaid-Drug-Rebate-Program.html (last visited May 3, 2013). As such, and particularly given the market share held by Medicaid and related Government programs, the "Medicaid reimbursement value" is a commonly used measure of the common cost of a prescription drug.

dangerous chemicals so as to avoid damaging the bottles or leaving any trace that the initial patient labels had ever been affixed.

Health care benefit programs, such as Medicaid, were generally defrauded twice with respect to each bottle dispensed in the scheme: on the front end, a health care benefit program was fraudulently induced into paying for these drugs under the false representation that these drugs are for the sole intended use of the program beneficiary—*i.e.*, the insured patient. Indeed, the requirement that that all treatment/medication paid for by the plan be for the sole use of the insured is so integral that it is against New York state law to sell them to others. *See* N.Y. Social Services Law § 146.[2] Similarly, the standard Medicaid beneficiary card, for example, prominently states that "fraudulent use of this card is a punishable offense." Simply put, Medicaid and other health care benefit programs would not have paid for the drugs in question if they knew that the recipients—the Insurance Beneficiaries—had no intention of taking the drugs themselves but instead had been induced by other scheme participants to sell these drugs on street corners. As such, every single bottle resold as part of this scheme – including all of the bottles ultimately purchased by the defendant – represents a total loss to Medicaid of its reimbursement value.

The scheme participants then seek to defraud health care benefit programs again on the back end of the scheme: by taking great pains to fraudulently conceal (1) the true and illegitimate source of the bottles, and (2) the fact that the bottles have been previously dispensed, the scheme participants attempt to have the bottles re-dispensed as new, legitimately obtained drugs by pharmacies – including the defendant's pharmacy – thereby fraudulently inducing health care benefit programs like Medicaid to pay for the *exact same bottles* a second time. Once again, Medicaid and other health care benefit programs would not have paid pharmacy owners like the defendant for the drugs in question had they knew the truth—that the bottles had previously been dispensed to others, treated with lighter fluid and other dangerous chemicals, and/or stored in hazardous and uncontrolled conditions.

In this case, the defendant was a large-scale aggregator based in the Newark, New Jersey Area. As detailed in the criminal complaint, between at least 2000 and his arrest in 2013, the defendant purchased these bottles from multiple collectors – that is, scheme participants who, in turn, had bought these bottles from Medicaid patients on the streets of Newark, Manhattan, and the Bronx, among other areas. As the defendant detailed in his guilty plea allocution, a copy of which is attached as Exhibit B, after obtaining them from Medicaid patients, Rigo and the others cleaned the patient labels off of the prescription pill bottles to make them look new, and sold them into channels of distribution that resulted in their being re-sold to pharmacies and, presumably, re-dispensed to patients. (Ex. B at 15-16.)

---

[2] *See also* New York State Office of the Medicaid Inspector General, Examples of Enrollee Fraud ("Examples of Enrollee fraud could include: . . . Re-selling items provided by the Medicaid program."), available at http://www.omig.ny.gov/fraud/fraud-abuse (last visited Oct. 6, 2014).

**B. The *Fatico* Hearing**

After entering his plea, the defendant provided timely notice to the Government of his intent to put the Government to its burden with respect to the issue of the loss amount properly attributable to his offense conduct for purposes of correctly calculating the advisory, applicable Guidelines range. Pursuant to U.S.S.G. § 2X1.1(a), the base offense level is calculated by taking the "base offense level from the guidelines for the substantive offense [here Section 2B1.1], plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Pursuant to Section 2B1.1, the Court should make a reasonable estimate of the reasonably foreseeable pecuniary harm to benefit programs that resulted from the offense, by a preponderance of the evidence. *Accord United States* v. *Savarese*, 404 F.3d 651, 655-56 (2d Cir. 2005).

At the hearing, the Government intends to call two federal agents who participated in the investigation of the defendant as well as a cooperating witness, Arcadio Reyes-Arias, who helped the defendant obtain these second-hand medicines from Medicaid Beneficiaries for over a decade prior to his own arrest in December 2012. In particular, the Government expects to establish that the defendant was involved in purchasing and re-selling substantial quantities of these second-hand medicines beginning in at least the late 1990s and continuing up through his arrest in 2013. Reyes-Arias, for example, is expected to testify that while working for Rigo from approximately the late 1990s until 2005, Reyes-Arias purchased approximately 100 bottles of these medicines or more each week for Rigo – bottles which each frequently had Medicaid reimbursement values of $1,000 or more – which Rigo then resold to others. Reyes-Arias is also expected to testify to that after ceasing to work for the defendant in 2005, he continued to sell significant quantities of these second-hand medicines to the defendant on a regular basis up until the time of his own arrest in December 2012.

The Government also expects to offer the transcript of a Spanish-language recording between the defendant and another Government cooperating witness, Hermendigildo Fernandez, made in September 2012, in which the defendant discusses, among other things, prior deals involving second-hand medications the defendant has done as well as the possibility of doing additional, substantial deals with Fernandez who was himself a very substantial figure in the prescription drug scheme before his own arrest in June 2012.

Finally, the Government expects to offer pages from a series of "ledgers" recovered from the defendant's bedroom at the time of his arrest. These pages document deals involving dozens of bottles of these second-hand medications with a combined Medicaid reimbursement value of approximately $2.4 million.

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney

           by: \_\_\_\_\_/s/_____
                Edward B. Diskant/Jason A. Masimore
                Assistant United States Attorney
                (212) 637-2294/2580

Cc:   Joanna Hendon, Esq.  (via electronic mail)