Approved: _____    13 MAG 2193
          JASON A. MASIMORE/RUSSELL CAPONE/EDWARD B. DISKANT
          Assistant United States Attorneys

Before:   HONORABLE ANDREW J. PECK
          United States Magistrate Judge
          Southern District of New York

------------------------------------x
                                    :
UNITED STATES OF AMERICA            :    SEALED COMPLAINT
                                    :
        - v. -                      :    Violation of
                                    :    18 U.S.C. § 1349
BLADIMIR RIGO,                      :
    a/k/a "Bladi"                   :
                                    :
          Defendant.                :    COUNTY OF OFFENSE:
                                    :    NEW YORK
                                    :
------------------------------------x

STATE OF NEW YORK              ) ss:
SOUTHERN DISTRICT OF NEW YORK  )

     ANTONIO RAO, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation, and
charges as follows:

                           COUNT ONE

              (Conspiracy to Commit Health Care Fraud)

     1.    From at least in or about 2000 up to and including in
or about September 2013, in the Southern District of New York
and elsewhere, BLADIMIR RIGO, a/k/a "Bladi," the defendant, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate and agree together and with each other to
violate Title 18, United States Code, Section 1347.

     2.    It was a part and an object of the conspiracy that
BLADIMIR RIGO, a/k/a "Bladi," the defendant, and others known
and unknown, willfully and knowingly would and did execute and
attempt to execute a scheme and artifice to defraud a health
care benefit program, and to obtain, by means of false and
fraudulent pretenses, representations, and promises money owned
by and under the custody and control of a health care benefit

                                1

program in connection with the delivery of and payment for
health care benefits, items, and services, in violation of Title
18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge of the foregoing charge is, in
part, as follows:

3.   I am a Special Agent with the Federal Bureau of
Investigation, and have been so since 2007.   I am presently
assigned to Squad C-33, which is within the FBI's Health Care
Fraud Task Force ("HCFTF"). As a Special Agent in the HCFTF, I
have conducted numerous investigations into federal crimes
relating to mail fraud, wire fraud, health care fraud,
prescription drug diversion, unlawful drug trafficking and money
laundering, among other things.   During that time, I have, among
other things, conducted or participated in surveillance, the
execution of search warrants, debriefings of informants,
confidential sources, and cooperating witnesses, reviews of
recorded conversations and drug records, and the interception of
wire and electronic communications.

4.   I have been personally involved in the investigation
of this matter.   This affidavit is based on my personal
observations and participation during the investigation, my
conversations with other law enforcement officers and agents, my
interviews of witnesses, my execution of search warrants and
seizure of evidence, and my examination of evidence, documents,
reports and other records.   Because this affidavit is submitted
for the limited purpose of establishing probable cause, it does
not include all facts that I have learned during the course of
my investigation.   Where the contents of documents and the
actions, statements, and conversations of others are reported
herein, they are reported in substance and in part, except where
otherwise indicated.

5.   Through my training, education, experience and
participation in the investigation resulting in the filing of
this complaint, I have become familiar with the following scheme
involving the unlawful diversion and trafficking of prescription
drugs that previously had been dispensed to health care benefit
program enrollees, including Medicaid recipients ("second-hand"
drugs) in a national, underground market:

a.   The prescription drugs involved in this scheme
are not drugs of abuse, but rather are drugs designed to treat

2

various illnesses, including, for example, HIV, schizophrenia, and asthma.  These second-hand drugs are originally dispensed to health care benefit plan enrollees, including Medicaid recipients, in the New York City area who then sell the drugs into collection and distribution channels that ultimately end at pharmacies that re-sell the second-hand drugs to unsuspecting consumers.

      b.   Through the methods described herein, the participants profit by exploiting the difference between the cost to the patient of obtaining bottles of prescription drugs through their health insurance providers, including Medicaid – which typically is zero – and the hundreds of dollars per bottle that pharmacies pay to purchase those drugs to distribute to their customers.  To reap maximum profits, the participants target the most expensive drugs, including, but not limited to, the following drugs (with the corresponding approximate Medicaid reimbursement values per bottle): Atripla ($1,879/bottle); Trizivir ($1,563/bottle); Zyprexa ($1,286/bottle); Truvada ($1,149/bottle); Prezista ($1,129/bottle); Reyataz ($1,065/bottle); Isentress ($1,015/bottle); Intelence ($871/bottle); Kaletra ($768/bottle); and Sustiva ($644/bottle).

      c.   To effectuate the fraudulent scheme, the lowest level participants in the scheme (the "Insurance Beneficiaries") fill prescriptions for month-long supplies of drugs at pharmacies throughout the New York City area and beyond, using health insurance benefits to pay the cost.  The Insurance Beneficiaries are typically AIDS patients or individuals who suffer from other illnesses and who sell their medications rather than use them for treatment.  Insurance Beneficiaries sell their bottles of drugs to other participants in the scheme ("Collectors") at locations like street corners and bodegas in and around New York City, including in the Washington Heights neighborhood of Manhattan and in the Bronx.  Collectors sell the second-hand bottles they collect to other participants in the scheme ("Aggregators"), who typically buy large quantities of second-hand drugs from multiple Collectors.  Aggregators sell the second-hand drugs to other Aggregators higher up the chain, who typically buy large amounts from multiple Aggregators. Eventually, the second-hand drugs make their way to the highest-level Aggregators involved in the scheme, who sell the second-hand drugs into distribution channels ultimately leading to pharmacies that dispense the second-hand drugs to unsuspecting consumers.

3

d.    These distribution channels involve individuals in Texas, Florida, Nevada, Utah, Alabama, and elsewhere, who operate wholesale prescription drug distribution companies ("Corrupt Distribution Companies"), which sell the second-hand drugs to pharmacies and other wholesale prescription distribution drug companies in New York, New Jersey, Massachusetts, Pennsylvania, Illinois, South Carolina, Mississippi, Arizona, Kentucky, Minnesota, Washington, Hawaii, Puerto Rico, and elsewhere.  The Corrupt Distribution Companies are designed to conceal the fact that the drugs being sold to the pharmacies are second-hand drugs.

e.    Pharmacies dispense the drugs to Insurance Beneficiaries in original, sealed, manufacturers' bottles.  Each bottle comes from the manufacturer bearing a label (the "manufacturer's label") that indicates, among other things, the identity of the manufacturer; the brand of drug; the strength of drug; the required storage conditions (such as temperature); the lot number tracking the actual tablets, pills or capsules contained in the bottle back to the place, date and time of their manufacture; and the expiration date of the drugs.  Prior to dispensing each bottle, pharmacies affix to the bottle, on top of the manufacturer's label, a separate, adhesive label ("patient label") that includes additional information, such as the name and address of the pharmacy, the name of the patient, information indicating that the drug was obtained through Medicaid, and dosage instructions.  After purchasing the second-hand bottles originally dispensed to Insurance Beneficiaries, Collectors and Aggregators use lighter fluid and other potentially hazardous chemicals to dissolve the adhesive on the patient labels, and remove the patient labels and all traces of the adhesive from the bottles.  Through this process, the Collectors and Aggregators make the bottles appear new for the purpose of concealing the fact that they had already been dispensed, so that they eventually can be re-sold to unsuspecting consumers.

f.    Because the prescription drugs involved in the scheme are not drugs of abuse, the bottles' high value depends on their appearing to contain new, unexpired drugs that legitimately have been obtained directly from manufacturers through authorized and licensed wholesale distributors.

g.    The scheme itself is potentially dangerous to the unwitting consumers of second-hand prescription drugs.  As described above, the bottles have been treated with potentially hazardous chemicals, and the drugs themselves may have expired. Additionally, the participants in the scheme store the drugs in

4

uncontrolled conditions, such as car trunks, residences and rented storage facilities, which may not be sufficient to maintain the medical efficacy of such drugs over time.  For example, many HIV medications require constant storage in conditions between 25 and 30 degrees Celsius to maintain their efficacy.  Moreover, in some instances, by the time Aggregators obtain the bottles of second-hand drugs, some of the bottles contain drugs or doses different from what is indicated on the manufacturers' labels.

h.   This scheme also involves material misrepresentations and omissions both on the front end, when Insurance Beneficiaries initially obtain prescription drugs, and on the back end, when the second-hand drugs are dispensed to unwitting consumers filling their prescriptions.  On the front end of the scheme, the defendants rely on the fact that the Insurance Beneficiaries fill their prescriptions for little or no cost with the intention of selling the drugs into the underground market rather than taking them as prescribed to treat their illnesses.  While the terms of policies offered by different health care benefit programs vary, each policy requires, in sum and substance, that benefits obtained pursuant thereto be for the sole use of the insured.  The health care benefit programs, which would not have paid such benefits on behalf of the Insurance Beneficiaries if the Insurance Beneficiaries had disclosed that they were selling the drugs to others, unwittingly fund the scheme.

i.   On the back end of the scheme, the conspirators purposeful obfuscation of the true source of the second-hand drugs defrauds legitimate consumers who unknowingly have their prescriptions filled with second-hand drugs that have been sold back to pharmacies as part of the scheme.  Legitimate consumers would not knowingly fill their prescriptions with second-hand drugs, and legitimate consumers' insurance companies and other health care benefit programs would not knowingly reimburse pharmacies the cost of second-hand drugs.  In fact, the scheme was designed for health care benefit programs to be defrauded multiple times, as the same drugs that came from Insurance Beneficiaries in the first place could be dispensed to different, insured patients on the back end.

## The Dissemination of Second-Hand Prescription Drugs by BLADIMIR RIGO a/k/a "Bladi"

6.   As detailed further below, based on my investigation to date, I know that since in or around 2000, BLADIMIR RIGO, a/k/a "Bladi," the defendant, has been involved in the

fraudulent scheme described above.  Specifically, RIGO has operated as a high-level aggregator of second-hand prescription medications, purchasing and reselling thousands of bottles of second-hand prescription medications over more than a ten-year period.  During this time, RIGO has operated principally out of several bodegas he owns in the Newark, New Jersey area, employing numerous individuals as street-level collectors, including one or more individuals currently cooperating with the Government's investigation, and selling to higher level aggregators in Miami, Florida, including one or more individuals who has already pleaded guilty to his involvement in this scheme.

7.  On or about December 20, 2012, I and other law enforcement agents arrested an individual charged with participating in the fraudulent scheme described above, who began providing information to law enforcement in the hope of receiving lenient treatment in connection with his prosecution ("CW-1").  Information that CW-1 has provided has been corroborated by other information, including but not limited to, evidence seized and surveillance conducted during the investigation, documents and records recovered during the investigation, and certain consensually recorded calls and conversations.[1]  Based on debriefings of CW-1 by myself and other law enforcement agents, I have learned the following, in substance and in part:

a.  CW-1 was involved in buying and reselling second-hand medications as part of the fraudulent scheme described above from in or around 2000 until his arrest in December 2012. During that time period, CW-1 worked primarily as a "collector," purchasing thousands of bottles of medications from numerous Insurance Beneficiaries who filled their prescriptions at pharmacies located in New York, New York and Newark, New Jersey before reselling those medications to RIGO, among others.

b.  CW-1 first became involved in the scheme while employed by BLADIMIR RIGO, a/k/a "Bladi," the defendant in a bodega owned by RIGO on Orange Street in Newark, New Jersey. CW-1 was initially hired by RIGO in or around 1998 and, according to CW-1, became involved in purchasing second-hand medications at RIGO's direction in or around 2000 from Insurance Beneficiaries who would come to RIGO's bodega to sell their medications.

---

[1]  On or about August 14, 2013, CW-1 pleaded guilty to charges stemming from his participation in this fraudulent scheme pursuant to a cooperation agreement with the Government.

c.   According to CW-1, he and another bodega worker ("CC-1") would purchase these medications on a daily basis at prices set by RIGO and according to lists created by RIGO.  CW-1 and CC-1 would purchase up to 100 bottles of these second-hand medications each week, and RIGO would then collect the bottles purchased by CW-1 and CC-1 for resale to higher level aggregators and other co-conspirators.

d.   On several occasions, CW-1 traveled with RIGO to meet with one of RIGO's customers, who worked at a Pharmacy in Elizabeth, New Jersey.  Specifically, on at least two occasions, RIGO took CW-1 with him to the pharmacy, which was on East Jersey Street, in Elizabeth, New Jersey, to collect money RIGO was owed for second-hand medications.  On each of these occasions, CW-1 stayed in the car while RIGO entered the pharmacy to collect the money owed.

e.   In or around 2005, CW-1 stopped working for RIGO and instead opened his own bodega in Newark.  CW-1 continued to purchase second-hand medications from Insurance Beneficiaries, however, and would sell those medications to RIGO as well as to another high-level aggregator operating in the Newark area, who had been introduced to CW-1 by RIGO and who, as detailed further below, is now also cooperating with law enforcement ("CW-2").

f.   Specifically, between in or around 2005 and CW-1's arrest in December 2012, CW-1 sold second-hand medications to RIGO on a regular basis – approximately once every other month.  These sales would occur in CW-1's bodega in Newark and would generally consist of 70-80 bottles of second-hand medications which CW-1 would sell to RIGO for approximately $7,000 to $8,000.

g.   Virtually all of the bottles purchased by CW-1 still bore their original patient labels at the time they were resold to RIGO.  According to CW-1, many of these bottles were dispensed by pharmacies in the Newark area, while others were initially dispensed by pharmacies in Manhattan and the Bronx.

h.   As part of the scheme, CW-1 was aware that RIGO and others would "clean" the bottles – that is, use lighter fluid and other chemicals to carefully remove these patient labels so the bottles could be redispensed as "new."  CW-1 also sometimes "cleaned" the bottles himself but, according to CW-1, was not very good at it and so did not do so frequently.

i.   CW-1 continued selling to RIGO on a regular basis until his arrest in December 2012.  CW-1's last sale to RIGO

occurred approximately one month prior to CW-1's arrest and consisted of several hundred bottles of medication which CW-1 sold to RIGO for approximately $30,000.

8.     As detailed above, in addition to BLADIMIR RIGO a/k/a "Bladi," the defendant, CW-1 also sold to another high-level aggregator operating in the Newark area, CW-2, whom CW-1 met through RIGO.  On or about June 5, 2012, law enforcement agents arrested CW-2 for his participation in the fraud scheme described above.  Concurrent with that arrest, the FBI executed a search warrant at a storage facility in North Bergen, New Jersey rented and operated by CW-2, for prescription drug diversion related offenses.

9.     During the search, agents recovered approximately 10,369 bottles of prescription drugs, worth at least approximately $6.1 million in Medicaid reimbursement value, many thousands of loose pills, and hundreds of counterfeit prescription drug manufacturers' labels.  The prescription drugs recovered appeared to be part of the fraudulent scheme described above.  Specifically, many of the bottles still had patient labels on them, some of which indicated that the bottles had been dispensed by pharmacies in New York, New York.  On a table in the storage facility were several second-hand bottles of prescription drugs in the process of having their patient labels removed and containers of hazardous chemicals being used to remove the patient labels.

10.    Since the arrest of CW-2 and the search of CW-2's storage facility, CW-2 began providing information to law enforcement in the hope of receiving lenient treatment in connection with CW-2's prosecution.  Information that CW-2 has provided has been corroborated by other information, including, but not limited to information provided by other cooperating witnesses, consensually recorded calls and conversations,[2] and documents recovered during the search and public records.[2]  I know the following from reviewing reports by agents present during debriefings of CW-2 and speaking to those agents:

a.    ˙ For at least five years prior to his arrest in June 2012, CW-2 participated in the fraudulent scheme described above.  Specifically, CW-2 was a high-level aggregator of second-hand medications, which CW-2 purchased from various individuals, including CW-1 and CC-1.  According to CW-2, he

_____

[2]    On or about February 6, 2013, CW-2 pleaded guilty to charges stemming from his participation in this fraudulent scheme pursuant to a cooperation agreement with the Government.

purchased approximately $10,000 to $15,000 worth of second-hand medications – with a Medicaid reimbursement value considerably in excess of that – every few weeks from CW-1 and CC-1 for resale to other co-conspirators, including an individual based in Miami, Florida ("CC-2").[3]

b.     As part of his involvement in the scheme, CW-2 also worked with other high-level aggregators, including BLADIMIR RIGO, a/k/a "Bladi," the defendant.  Specifically, CW-2 worked with RIGO to identify buyers for second-hand medications and fill orders placed by those buyers.  On several occasions, CW-2 and RIGO sold second-hand medications directly to each other, generally to help fill orders placed by other co-conspirators, including CC-2.

c.     Because CW-2 and RIGO both sold to many of the same individuals, CW-2 and RIGO at times functioned as competitors.  According to CW-2, in or around 2011, CW-2 and RIGO had a conversation about sales of second-hand medications to CC-2.  During that conversation, RIGO expressed displeasure that CW-2 was now selling to CC-2, further indicating that many of CW-2's prices for the second-hand medications were lower than those charged by RIGO.

11.   On or about July 27, 2012, and after CW-2 began working with law enforcement, BLADIMIR RIGO, a/k/a "Bladi," the defendant contacted CW-2 by phone.  During this conversation, which occurred after CW-2's arrest, RIGO indicated that he had a significant quantity of second-hand medications and wanted to know if CW-2 was interested in purchasing these medications.

12.   On or about August 28, 2012, at the direction of law enforcement, CW-2 met with BLADIMIR RIGO, a/k/a "Bladi," the defendant, at a restaurant in North Bergen, New Jersey.  During this meeting, which was consensually recorded, RIGO and CW-2 discussed, among other subjects, their involvement in the fraudulent scheme described above and their sales of second-hand medications to other individuals, including CC-2. Specifically, based on my review of the recorded conversation as well as my debriefing of CW-2, I know that during this meeting, CW-2 and RIGO discussed the prices at which each had sold various second-hand medications, including Singular, Atripla, and Truvada.

---

[3]    As discussed further below, CC-2 was arrested and charged with certain crimes based on his participation in this scheme in July 2012.  CC-2 pleaded guilty to these charges on August 16, 2013.

RIGO and CW-2 also discussed having previously purchased these medications from CW-1.

13. During this meeting, BLADIMIR RIGO, a/k/a "Bladi," and CW-2 also discussed the fact that CC-2 had recently been arrested as a result of his participation in this scheme. Specifically, RIGO and CW-2 engaged in the following exchange:

> RIGO:   They arrested [CC-2] and the people from New York were all arrested.
>
> CW-2:   Yes! Yes I heard something.
>
> RIGO:   44 were brought in from Florida. . . [T]hey are having their trial here.[4]
>
> CW-2:   Oh-oh!
>
> RIGO:   Well that is why [I] got afraid. . . . They are looking for big players from over here in New Jersey.
>
> CW-2:   Yes.
>
> RIGO:   I think it's us.

14. During the same meeting, BLADIMIR RIGO, a/k/a "Bladi," the defendant and CW-2 also discussed additional future sales of second-hand medications. Specifically, RIGO proposed doing joint sales with CW-2 of medications that RIGO and CW-2 could purchase from CW-1 and CC-1:

> RIGO:   Listen, listen, listen, if I go and see [CW-1]. [CW-1] has $20,000.00 worth of medication and [CC-1] has 5, that's 25. Okay?
>
> CW-2:   Ah.
>
> [ . . .]

---

[4]     On or about July 17, 2012 - or approximately one month prior to the recorded meeting described above - this Office charged approximately 48 individuals, including CC-2, with conspiracy to commit wire and health care fraud, among other offenses, as a result of their participation in this scheme. See United States v. Viera et al., 11 Cr. 1072 (DLC).

RIGO:     If on this purchase of twenty-five gave us a
          profit of $25,000, then $12,500 for you and
          $12,500 for me.  You don't have to put
          anything [in], I will put the money.  You
          only have to [find] the customer.

CW-2:     Eh, that's all right.  Let's see then . . .
          you'll clean them?

RIGO:     No, no, I - I will do it all, I will do it
          all.

CW-2:     You clean the merchandise.

RIGO:     I will do it all, I will clean the
          merchandise, I will do it all.

CW-2:     All right, I will let you know if anything
          [happens] over the week.  I 'm going to try
          to see . . .

   15.  As described above, and based on my participation in
this investigation, as well as my debriefings of CW-2, I know
that "clean[ing] the merchandise" referred to the act of using
chemicals such as lighter fluid to remove the original patient
labels from the bottles of second-hand medications so they could
be resold as part of the conspiracy.  Based on my conversations
with both CW-1 and CW-2, I know that BLADIMIR RIGO, a/k/a
"Bladi," the defendant had experience with and was capable of
"cleaning" the bottles of second-hand medications involved in
this scheme.

WHEREFORE, deponent asks that a warrant be issued for the arrest of BLADIMIR RIGO, a/k/a "Bladi," and that he be imprisoned, or bailed, as the case may be.

ANTONIO RAO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
9th day of September, 2013.

THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

12