Ea79righ

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        13 CR 897 (RWS)

 5   BLADIMIR RIGO,

 6              Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          October 7, 2014
 9                                        10:17 a.m.

10
     Before:
11
                        HON. ROBERT W. SWEET
12
                                          District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     JASON MASIMORE
17   EDWARD DISKANT
          Assistant United States Attorneys
18
     SPEARS & IMES
19        Attorneys for Defendant
     JOANNA C. HENDON
20   ALICIA K. AMDUR
     SHARANYA SAI MOHAN
21

22   ALSO PRESENT:

23   MIRTA HESS
     ISOLINA BERNHARDT,
24   MARIA ELENA ALVARDO
     CRISTINA WEISZ
25   Spanish Interpreters
```

Ea79righ

```
1              (In open court; case called)
2              MR. DISKANT:  Good morning, your Honor.
3              Edward Diskant and Jason Masimore for the government.
4    With us at counsel table is Danielle Craig, a paralegal in our
5    office.
6              MS. HENDON:  Good morning, Judge.
7              Joanna Hendon for Mr. Rigo who is here at counsel
8    table and my colleagues Alicia Amdur and Sai Mohan are going to
9    be participating today as well.
10             THE COURT:  Good.  Thank you.
11             MS. HENDON:  Your Honor, I have one order of business,
12   if I may.
13             Ms. Amdur is a 2011 summa cum laude graduate of the
14   Cornell Law School.  She was scheduled to be admitted into the
15   district.
16             THE COURT:  She is admitted.
17             MS. HENDON:  Okay.  Thank you.
18             Thank you, your Honor.
19             THE COURT:  Yes.  Let's get to work.
20             MR. MASIMORE:  Well, your Honor, the government calls
21   Detective Anthony Romero.
22     ANTHONY ROMERO,
23         called as a witness by the Government,
24         having been duly sworn, testified as follows:
25             MR. MASIMORE:  May I proceed, your Honor?
```

Ea79righ

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | MR. MASIMORE:  Thank you. |
| 3 | DIRECT EXAMINATION |
| 4 | BY MR. MASIMORE: |
| 5 | Q.  How are you employed? |
| 6 | A.  New York City Police Department. |
| 7 | Q.  What's your position at the NYPD? |
| 8 | A.  I'm a detective with the healthcare task force with the |
| 9 | FBI. |
| 10 | Q.  How long have you been a detective with the healthcare |
| 11 | fraud task force? |
| 12 | A.  I've been a detective for 17 years.  I've been with the |
| 13 | task force four years. |
| 14 | Q.  You mentioned you're involved in a task force with the FBI. |
| 15 | How does that work? |
| 16 | A.  I am assigned with four other detectives to two FBI teams |
| 17 | and we investigate healthcare fraud. |
| 18 | Q.  What are your duties and responsibilities as a detective in |
| 19 | this healthcare fraud task force? |
| 20 | A.  Conducting investigations. |
| 21 | Q.  Into what types of crimes? |
| 22 | A.  Medicare fraud, pill diversion, sale of controlled |
| 23 | substance. |
| 24 | Q.  I'd like to direct your attention to around 2010.  Did you |
| 25 | become involved in an investigation concerning HIV and other |

Ea79rig1                          Romero - direct

1   noncontrolled prescription drug diversion?

2   A.  Yes, I did.

3   Q.  What was the nature, the general nature of the scheme you

4   investigated?

5   A.  HIV patients would obtain the medicine through their

6   Medicaid and Medicare benefits.  From there it would be bought

7   from someone on the street known as a collector.  They would

8   pay pennies on the dollar of what medicine is worth.

9          From there it would be sold to another level where the

10  pills -- bottles would be what we call cleaned, which is taking

11  the actual patient label off so it looks like it's back from

12  the factory condition.  And the bottle must be sealed and in

13  new condition.

14  Q.  You mentioned the factory bottle.  When the HIV patients

15  who obtained these with their benefits, obtained them from the

16  pharmacy, generally speaking, what did these bottles look like?

17  A.  Like any medication that any one of us would receive.  It

18  would have your name, your doctor's name on a label put over

19  the factory label.

20  Q.  So were these dispensed in those amber vials we typically

21  see or were they dispensed in another type of bottle?

22  A.  No.  Because of the volume that they're dispensing it's

23  from the factory.  It's usually a clear -- sorry, solid white

24  container with the factory label on the bottle.

25  Q.  So there's a factory label and then on top of that there's

Ea79rig1                          Romero - direct

1    a patient label?

2    A.   Correct.

3    Q.   You mentioned cleaning.  What does that refer to?

4    A.   Cleaning is when they take lighter fluid, they dab it on

5    top of the label and they let it soak and you're able to peel

6    the label off cleanly without disrupting the factory label

7    underneath.

8    Q.   So which label is being cleaned off?

9    A.   The patient label.

10   Q.   What, if anything, remains after the patient label is

11   cleaned off with lighter fluid?

12   A.   The bottle then looks like it was shipped from the factory.

13   It has the factory label on it with the seal on top.

14   Q.   I'd like to direct your attention to in or about June 2012.

15   As part of this investigation you've been talking about did you

16   come to arrest somebody named Hermenegildo Fernandez?

17   A.   Yes, I did.

18   Q.   Did Mr. Fernandez go by any other names?

19   A.   Yes, sir.  Poncho.

20   Q.   Could you please pull out Government Exhibit 102.  I'm

21   going to ask if you recognize that photograph.

22        You know what, if it saves time and with the Court's

23   permission could we just display it on the --

24        THE COURT:  Sure.

25   Q.   Do you recognize the person in the photograph, Government

Ea79rig1                          Romero - direct

1   Exhibit 102?

2   A.  Yes, Mr. Fernandez, also known as Poncho.

3   Q.  How did it come to be that you arrested Mr. Fernandez or

4   Poncho?

5   A.  We made a purchase.  We sold him.  We sold to him through

6   an FBI undercover.

7   Q.  What types of things, generally speaking, did you sell to

8   him?

9   A.  HIV medication.

10  Q.  After Mr. Fernandez was arrested, did he cooperate?

11  A.  Yes, he did.

12  Q.  What sorts of activities did he engage in as part of his

13  cooperation with the government?

14  A.  He gave us information on numerous people.  He did recorded

15  meetings, telephone calls.

16  Q.  You mentioned recorded meetings.  Directing your attention

17  to September 28, 2012.  Did there come a time that

18  Mr. Fernandez participated in a recorded meeting?

19  A.  Yes, he did.

20  Q.  Can you describe to the court how that meeting took place

21  and how it was arranged.

22  A.  He made a phonecall to Mr. Rigo and they agreed to meet at

23  the diner in New Jersey.

24          Poncho got there first and he waited.  And I watched

25  both of them go into the diner.  And we listened to the meeting

Ea79rig1                        Romero - direct

1   through a device in a vehicle.

2              MR. MASIMORE:  Just a housekeeping matter.  The

3   government offers Government Exhibit 102.

4              THE COURT:  It's admitted.

5              (Government's Exhibit 102 received in evidence)

6   Q.  Was Mr. Fernandez or Poncho provided with anything before

7   the meeting?

8   A.  Yes, he was.  Audio and video device.

9   Q.  And while this audio and video device was being operated

10  could agents monitor what was being said at the time?

11  A.  Yes.

12  Q.  Did there come a time where you learned the identity of the

13  other participant in this meeting with Mr. Fernandez?

14  A.  Yes, we did.

15  Q.  How did you learn of the identity?

16  A.  Well, we ran the license plate of the vehicle he drove to

17  the meeting and it came back registered to him.  We obtained a

18  DMV picture from the State of New Jersey.  And from -- matched

19  it up to the person we saw go into the restaurant and meet with

20  Poncho.

21  Q.  Do you see the person that met in the restaurant with

22  Poncho or Mr. Fernandez in the courtroom today?

23  A.  Yes.  He's sitting in the second row.

24              MR. MASIMORE:  Indicating the defendant, your Honor.

25              THE COURT:  Yes.

Ea79rig1                        Romero – direct

1    Q.  You have in front of you what's been marked for

2    identification as Government Exhibit 211.  It's a CD.

3    A.  Yes.

4    Q.  Do you recognize that CD?

5    A.  Yes.  It's got my initials and yesterday's date on it.

6    Q.  And what is on that CD?

7    A.  That is a recording of the meeting.

8    Q.  Does that CD contain a true and accurate recording and

9    video recording, both audio and video of the meeting between

10   Mr. Fernandez and the defendant on September 28, 2012?

11   A.  Yes, it does.

12           MR. MASIMORE:  Government offers 211.

13           THE COURT:  It's admitted.

14           (Government's Exhibit 211 received in evidence)

15   Q.  Was a transcript and translation prepared of the meeting

16   between Mr. Fernandez and the defendant?

17   A.  Yes, it was.

18   Q.  Do you have Government Exhibit 211T in front of you?

19   A.  Yes, I do.

20   Q.  Do you recognize that?

21   A.  Yes.  This is the translation.

22   Q.  Is this a true and substantially accurate transcript and

23   translation of the meeting including with correct voice

24   attributions?

25   A.  Yes, it is.

Ea79rig1                    Romero - direct

1                MR. MASIMORE:  Government offers 211T.

2                THE COURT:  It's admitted.

3                (Government's Exhibit 211T received in evidence)

4    Q.  I'd like to focus now on page 1 of 211T, please.

5                You'll see at the top half it has a list of

6    participants, Bladimir LNU, confidential human source, and Juan

7    LNU.

8                Do you see that, Detective Romero?

9    A.  Yes, I do.

10   Q.  As an initial matter what does LNU mean?

11   A.  Last name unknown.

12   Q.  And who is the participant identified in this transcript as

13   Bladimir LNU?

14   A.  Mr. Rigo.

15   Q.  The defendant?

16   A.  Yes.

17   Q.  The next participant listed is confidential human source.

18   In this transcript who is the individual who is identified each

19   time as confidential human source?

20   A.  That would be Poncho.

21   Q.  That's Mr. Fernandez?

22   A.  Correct, sir.

23   Q.  And lastly there's a Juan LNU.  He appears very briefly at

24   the beginning of the transcript.  Who is that?

25   A.  That's Poncho's son, stepson.  He drove him to the meet.

Ea79rig1                    Romero - direct

1    Q.  Was he in the meeting with Mr. Fernandez and Mr. Rigo?

2    A.  No.  He stayed in the car.

3    Q.  I'd like now to direct your attention to pages 12 and 13 of

4    211T.  We'll pull it up here on the screen but certainly you

5    have it in front of you if it's easier to read.

6         What I'd like to do is read a very brief portion and

7    then ask you a few questions about the excerpt.

8         So I'm going to read page 12 and then down to page 13

9    and then I'll ask you some questions.

10        So at the top Mr. Fernandez or confidential human

11   source says:  So then what?  What do you -- so then what do you

12   want?

13        And the defendant answers:  No, no, you buy whatever

14   it is you damn well please.

15        Mr. Fernandez replies:  Well, but do you want to buy

16   or do you want to sell?

17        The defendant responds:  Well, what I want is for you

18   not to be taking care of people.  And I'll talk to you.  And

19   I'll take care of them.  And, and, and we'll split whatever we

20   make down the middle.

21        The confidential source says:  Uh.

22        The defendant says:  And you don't, and you, if you.

23        And then later on the defendant continues:  If you're

24   not in -- now you have to call everyone for me and say:  All

25   right, look, this is like this, and like this, and like this.

Ea79rig1                          Romero - direct

1    And every time that I deliver one to him, I'll bring you the

2    list.  And I'll say to you:  Look, this costs so much and the

3    profit is so much.

4           And Mr. Fernandez responds:  Oh.  Is that what you

5    want?

6           And the defendant says:  Okay.  If you can --

7           And Mr. Fernandez replies:  But you can -- but can

8    you --

9           And then the defendant replies:  Listen to me.  Listen

10   to me.  If I go to Chino and Chino has $20,000 in medicine --

11          Mr. Fernandez says:  Yes.

12          And the defendant continues:  And if Rogelio has 5,

13   that makes 25.  Okay.

14          And the confidential -- and Mr. Fernandez says:

15   Right.

16          And the defendant continues:  So then you will set the

17   prices that you're going to sell it for.  And the price -- you

18   know what they sell it for.

19          Mr. Fernandez replies:  Yes.

20          The defendant says:  If this purchase of $25 netted

21   25,000, then it's 12,500 for you and 12,500 for me.

22          Mr. Fernandez agrees.

23          And then the last thing I'll read is the defendant

24   replies:  You don't have to put up anything.  I'll put up the

25   money.  You just give me the customer.

Ea79rig1                          Romero – direct

1          Directing your attention to the top of page 13.  Do

2    you see where the defendant referred to somebody named Chino?

3    A.  Yes, sir.

4    Q.  Did there come a time when you arrested somebody who went

5    by the name Chino in connection with your investigation into

6    HIV diversion?

7    A.  Yes.  Arcadio Reyes.

8    Q.  I'd like to show you Government Exhibit 103.  If you could

9    just pull it up on the screen please.

10         Do you recognize the person depicted in photograph

11   Government Exhibit 103?

12   A.  Yes.  That's Mr. Reyes.

13         MR. MASIMORE:  Government offers Government 103.

14         THE COURT:  It's admitted.

15         (Government's Exhibit 103 received in evidence)

16   Q.  How did it come to be that you arrested Mr. Reyes Arias?

17   A.  We did controlled buys with Poncho from Mr. Reyes.

18   Q.  So government cooperator Mr. Fernandez or Poncho purchased

19   HIV medications from this individual?

20   A.  Correct, sir.

21   Q.  Now going back to Government Exhibit 211T at page 13 there

22   was another reference there to somebody named Rogelio.

23         This is near the top of the page that's being

24   highlighted now.

25         Did there come a time during the course of your

Ea79rig1                        Romero - direct

1    investigation where you arrested an individual name Rogelio?

2    A.  Yes, we did.

3    Q.  Who was that?

4    A.  Rogelio Leyba.

5    Q.  Could we show you, please, what's been marked for

6    identification as Government Exhibit 104.

7         Do you recognize the individual in that photograph?

8    A.  Yes.  That's Rogelio Leyba.

9         MR. MASIMORE:  Government offers Government 104.

10        THE COURT:  It's admitted.

11        (Government's Exhibit 104 received in evidence)

12   Q.  How did the government come to Rogelio Leyba?

13   A.  We also did a controlled buy with Mr. Fernandez from him.

14   Q.  If we could return to Government Exhibit 211T.  This is the

15   meeting between Mr. Fernandez and the defendant.

16        I'd like to focus on a brief portion of the meeting

17   starting at the bottom half of page 20.  It's actually sort of

18   in the middle.

19        This is where the defendant is talking and again I'll

20   just read you a brief portion here and then ask you some

21   questions.

22        In the middle of the page the defendant says:  And the

23   people from New York, all of them got picked up.

24        And Mr. Fernandez replies:  Really?  Yes.  I heard

25   something to that effect.

Ea79rig1                              Romero - direct

1              And the defendant responds:  They brought 44 people

2    arrested from Florida and they're going to trial here.

3              Mr. Fernandez replies:  From Florida?

4              The defendant responds:  Yes.  They're bringing them

5    here for their trial.

6              And Mr. Fernandez replies:  Really?

7              And then the defendant says:  They're having their

8    trial here.

9              Detective Romero, in connection with your

10   investigation did the healthcare fraud task force arrest and

11   then prosecute about four dozen defendants before this meeting

12   took place?

13   A.  Yes, we did.

14   Q.  I'd like to show you what's been marked as Government

15   Exhibit 203.

16             Pull up the first page here.  The full document is in

17   front of you but do you recognize this document?

18   A.  Yes.  That's complaint in the case.

19   Q.  And more specifically is this the superseding indictment S2

20   11 CR 1072?

21   A.  Yes, it is.

22             MR. MASIMORE:  Government offers Government Exhibit

23   203.

24             THE COURT:  It's admitted.

25             (Government's Exhibit 203 received in evidence)

Ea79rig1                          Romero - direct

1   Q.   Does this indictment charge individuals from New York City

2   and from Florida?

3   A.   Yes, New York, New Jersey, Florida, Texas.

4   Q.   And it charges at least four dozen different people?

5   A.   Yes, sir.

6   Q.   I'd like to go back to the meeting now.  This is Government

7   Exhibit 211T.  We're going to go back to page 20.  I'd like to

8   read a little portion just above where I started the last time

9   and ask you a few questions about that.  And about an excerpt

10  on page 29 relating to the same subject.

11            So on page 20 of 211T at the top.

12            The defendant says:  You knew that Negro got arrested,

13  right?

14            And Mr. Fernandez replies:  Which Negro do you mean?

15            The defendant responds:  Negro, that guy Negro from,

16  that guy, the one from Miami, he got arrested.  That guy got

17  arrested during the last raid.

18            Mr. Fernandez says:  Yes, that's right.  What's his

19  name, that guy's name?

20            And the defendant replies:  Conrado.

21            And Mr. Fernandez says:  Oh, uh, Conrado?

22            And the defendant says:  Conrado got arrested.

23            Just if we could look at page 29 of 211T.  This is

24  about a quarter of the way down.

25            The defendant starts:  So then, uh.

Ea79rig1                          Romero - direct

1          Then he continues:  Between Conrado and my, and my

2     brother-in-law, they stole from me.  They stole from me almost

3     $200,000.

4          Mr. Fernandez says:  They did?

5          And the defendant says:  Yeah, right then and there

6     with those two I was done.

7          And Mr. Fernandez says:  And it was your

8     brother-in-law?

9          And the defendant says:  Yes, the guy who used to hang

10    out with Conrado was my brother-in-law.

11          Are you aware of whether somebody named Conrado was

12    arrested in connection with the four dozen case?

13    A.  Yes.  It was Conrado Vazquez was one of the defendants.

14          MR. MASIMORE:  If we can pull up Government Exhibit

15    203, which is in evidence, page two.

16    Q.  At the bottom there, the third name from the bottom, do you

17    recognize the name Conrado Vasquez?

18    A.  Yes.

19    Q.  Are you aware of how the case against Conrado Vazquez

20    resolved itself?

21    A.  Yes.  Mr. Vazquez pled guilty.

22    Q.  How did you know that?

23    A.  I was at his plea.

24    Q.  I'd like to show you what's been marked as Government

25    Exhibit 208.  You have it in front of you but here's the first

Ea79rig1                          Romero - direct

1   page displayed.

2           Do you recognize this document?

3   A.  Yes.

4   Q.  What do you recognize it to be?

5   A.  It's a transcript of his plea.

6   Q.  The plea of Conrado Vazquez?

7   A.  Yes.

8           MR. MASIMORE:  Government offers Government Exhibit

9   208.

10          THE COURT:  It's admitted.

11          (Government's Exhibit 208 received in evidence)

12  Q.  I'd like to go back please to page 21 of Government Exhibit

13  211T.

14          This is -- I'm going to read a portion that's a

15  continuation of the conversation about the defendants being

16  arrested and going to trial in the New York area.

17          But on page 21, about a quarter of the way down from

18  the top the defendant says:  I said to myself, well, that must

19  be that Panchito got scared about doing this.

20          And Mr. Fernandez says:  Well, yes, I heard about

21  something and --

22          And the defendant says:  So then uh --

23          And Mr. Fernandez says:  And since --

24          And the defendant says:  Uh, they're looking for two

25  big people here in New Jersey.

Ea79rig1                         Romero - direct

1                   And Mr. Fernandez replies:  They are?

2                   And the defendant says:  I think that's you and me.

3                   Do you see there where the defendant refers to himself

4       and Mr. Fernandez as two big people in New Jersey?

5       A.  Yes, sir.

6       Q.  Did there come a time when the FBI searched a storage

7       facility maintained by Mr. Fernandez?

8       A.  Yes, we did.

9       Q.  What state was that located in?

10      A.  New Jersey.

11      Q.  I'd like to show you what's been marked as Government

12      Exhibit 105.  It's a series of photographs.  I believe it has

13      about 14 pages.

14                  Do you have that in front of you?

15      A.  Yes.

16      Q.  What do you recognize those photos to be?

17      A.  (No response).

18      Q.  This is 105.

19      A.  These are the pictures of the contents of Mr. Fernandez's

20      storage room.

21      Q.  Are those true and accurate depictions of the storage

22      facility of Mr. Fernandez on or about the day that the search

23      was conducted?

24      A.  Yes.

25                  MR. MASIMORE:  The government offers Government

Ea79rig1                        Romero - direct

1    Exhibit 105.

2              THE COURT:  It's admitted.

3              (Government's Exhibit 105 received in evidence)

4              MR. MASIMORE:  If we could bring up the first page,

5    please.

6    Q.  So what does page one of 105 depict?

7    A.  That is a view from the hallway looking into the room.

8    Q.  And what's inside the room?

9    A.  Those are all prescription medications in the bottles and

10   boxes.

11             MR. MASIMORE:  Could we go to page 2 of 105, please.

12   Q.  And what does that depict?

13   A.  All prescription medication.

14   Q.  And, again, does this depict manufacturers' bottles or

15   patient bottles or what type of bottles are those?

16   A.  That's manufacturers' bottles.  Those are the manufacturer

17   labels on them.

18             MR. MASIMORE:  Page three, please.

19   Q.  What does this depict?

20   A.  Same thing, bottles with the labels -- the patient labels

21   removed and manufacturers' labels on them.

22             MR. MASIMORE:  Page four please.

23   Q.  Again another picture of manufacturer bottles of

24   prescription drugs?

25   A.  Correct.  And you can see the seals on the bottles.

Ea79rig1                          Romero - direct

1              MR. MASIMORE:  Page five.

2   Q.  What does that depict?

3   A.  A lot of prescription medication.

4              MR. MASIMORE:  Page six.

5   Q.  Same thing?

6   A.  Yes, sir.

7              MR. MASIMORE:  Page seven?

8   Q.  What's this depict?

9   A.  More prescription medication being boxed ready to sell.

10  Q.  Page 8.

11  A.  More prescription meds.

12  Q.  Page nine?

13  A.  Those are pills without the bottles.  They're just separate

14  pills.

15  Q.  Page ten?

16  A.  More bottled prescription meds.

17             MR. MASIMORE:  Page 11.

18  Q.  So this is a picture -- can you tell the Court where this

19  photograph was taken?

20  A.  That was taken back at the FBI building.  That is the

21  complete inventory as it's being even inventoried.

22             MR. MASIMORE:  And if we can look at page 12, please.

23  Q.  So what's depicted in page 12?

24             MR. MASIMORE:  If we can zoom in a little bit on this

25  tub.

Ea79rig1                          Romero - direct

A.   Those bottles are soaking in lighter fluid.   These are

bottles that probably when they removed the labels still had

glue on them or they couldn't get the label off cleanly so they

soak it to get all the glue off.

Q.   So at the bottle of the bin what can you see under the

bottles?

A.   It's lighter fluid.

          MR. MASIMORE:   If we could go to the next page.   This

is page 13.

Q.   It depicts a box.   What sorts of things are in this box?

A.   Those are all the items that they would use to clean and

separate the bottles.   You have Ziploc bags for the pills that

are individuals.   Sometimes when they are expired they take

them out of the bottle so they don't have an expiration date.

You see the bottle of lighter fluid in the middle.

Q.   Are you referring to the bottle that has a red cap towards

the top of the photograph?

A.   Yes, sir.

          MR. MASIMORE:   If we could go to the last picture,

please.   Page 14.

Q.   This photograph here depicts a table and some bottles.

What's on the table?

A.   Prescription meds, cleaning fluid.   That Goo Be Gone takes

off the heavy glue also.   This is all part of the cleaning

process and packaging.

Ea79rig1                          Romero - direct

1              MR. MASIMORE:  If we could zoom in to the top middle

2      of the photograph to the bottles that in that tray next to the

3      hefty bags.  If you could zoom in there.

4      Q.  What, if anything, do you see on those bottles that we're

5      looking at now?

6              Again these are some bottles that are sticking out of

7      a clear tray with either a blue or a purple lid, I'm color

8      blind, but --

9      A.  Those are the bottles still with the patient label on it.

10     You could see the one that's on the right has the patient name,

11     has the pharmacy name.  Those are the labels that they take off

12     with the lighter fluid.

13     Q.  Now, I'd like to refer to the transcript, 211T.  The bottom

14     of page 13 to the very top of page 14.

15             At the very, very bottom page 13 on 211T Mr. Fernandez

16     says:  Uh, all right, for -- we'll see then and you clean it

17     up.

18             Going on page 14.  The defendant says:  I'll put it

19     up.  I will -- I will -- I -- I --

20             And Mr. Fernandez says:  You clean it up.

21             And the defendant says:  I'll do everything.  I'll do

22     everything.

23             And again Mr. Fernandez says:  You do -- you clean up

24     the merchandise.

25             And the defendant says:  I'll do it all, I'll clean up

Ea79rig1                          Romero - direct

1    the merchandise and I'll do everything.

2          Based on your search of Mr. Fernandez's storage shed

3    and the photographs we just discussed do you have an

4    understanding of what the defendant and Mr. Fernandez meant by

5    cleaning up the merchandise?

6    A.   Yes.  Putting the product so they could sell it, so which

7    means removing the label and putting it back in factory

8    condition.

9    Q.   And that was with what, lighter fluid?

10   A.   Yes.

11   Q.   Did there come a time when you participated in the arrest

12   of the defendant?

13   A.   Yes, I did.

14   Q.   Where did that arrest take place?

15   A.   At his residence in New Jersey.

16   Q.   During the arrest of the defendant at his residence in

17   New Jersey did you recover anything?

18   A.   Yes.  Notebooks.

19   Q.   Approximately how many notebooks?

20   A.   I believe there was four of them.

21   Q.   Where did you find these notebooks in the defendant's

22   residence?

23   A.   On top of the dresser in his bedroom when we brought him in

24   there to dress him.

25   Q.   When you arrested the defendant, were you aware of who, if

Ea79rig1                         Romero – direct

1    anyone else, lived at the house?

2    A.  I knew his son lived there and his –– I believed his wife

3    lived there from surveillance.

4    Q.  You have in front of you what's been marked for

5    identification as Government Exhibits 204, 205, 206, and 207.

6    Do you see those in the folder?

7    A.  Yes.

8    Q.  Do you recognize those documents?

9    A.  These are the books that were recovered at time of arrest.

10   Q.  The ones you just referred to from the defendant's house?

11   A.  Yes, sir.

12        MR. MASIMORE:  The government offers Government

13   Exhibits 204, 205, 206, and 207.

14        THE COURT:  They're admitted.

15        (Government's Exhibits  204, 205, 206 and 207 received

16   in evidence)

17        MR. MASIMORE:  May I have one moment, your Honor,

18   please?

19        (Pause)

20        Nothing further.  Thank you.

21        MS. HENDON:  May I just have one moment, your Honor.

22        THE COURT:  Sure.

23        (Pause)

24        MS. MOHAN:  Good morning, your Honor.

25        (Continued on next page)

Ea79rig1                          Romero - direct

1    CROSS-EXAMINATION

2    BY MS. MOHAN:

3    Q.   Good morning, Agent Romero.

4    A.   Good morning.   It's detective.

5    Q.   Detective Romero.   Apologies.

6            Now you've been involved in the investigation of this

7    prescription drug conspiracy since 2010, correct?

8    A.   Yes, ma'am.

9    Q.   And you've been involved in the investigation of Mr. Rigo

10   since 2012, correct?

11   A.   Yes.

12   Q.   And you were involved in the investigation of Mr. Fernandez

13   or Poncho, correct?

14   A.   That's correct, yes.

15   Q.   And you were involved in the investigation of

16   Mr. Reyes Arias or Chino, correct?

17   A.   Correct.

18   Q.   And you were involved in the investigation of Mr. Leyba,

19   correct?

20   A.   Yes, ma'am.

21   Q.   And of those individuals I just listed, the first to be

22   arrested was Mr. Fernandez, correct?

23   A.   That is correct.

24   Q.   And he was arrested in June of 2012?

25   A.   I believe so.

Ea79rig1                          Romero - cross

1   Q.  And he was arrested after making two undercover sales of

2   prescription drugs, correct?

3   A.  That's correct.

4   Q.  And upon his arrest Mr. Fernandez became a cooperating

5   witness, correct?

6   A.  That is correct.

7   Q.  And as part of his cooperation Mr. Fernandez agreed to

8   reach out by telephone to people who had worked in the

9   prescription drug business with him, correct?

10  A.  That is true.  Yes.

11  Q.  And Mr. Fernandez called Mr. Leyba, correct?

12  A.  Yes.

13  Q.  And on August 14, 2012 Mr. Leyba met Mr. Fernandez in

14  person to sell him drugs, correct?

15  A.  It was in August.  I'm not sure exactly if it was the

16  14th, but yes.

17  Q.  61 bottles worth of drugs?

18  A.  Yes.

19  Q.  And on November 30, 2012 Mr. Leyba again sold Mr. Fernandez

20  drugs, correct?

21  A.  Correct.

22  Q.  60 bottles this time?

23  A.  I'm not sure of the exact, counsel.

24  Q.  And as part of his cooperation Mr. Fernandez also called

25  Mr. Reyes Arias, correct?

Ea79rig1                          Romero - cross

1    A.   That is correct.

2    Q.   And on October 12, 2012 Mr. Reyes Arias met with

3    Mr. Fernandez and sold him 42 bottles of prescription drugs,

4    correct?

5    A.   Correct.  I'm not sure, once again, the number of bottles.

6    Q.   And on December 3, 2012 Mr. Reyes Arias again sold

7    Mr. Fernandez drugs, correct?

8    A.   Correct.

9    Q.   52 bottles?

10   A.   Once again, I'm not sure of the inventory.  But I was there

11   for the buy.

12   Q.   And in the same period Mr. Fernandez reached out to my

13   client to transact business, correct?

14   A.   That is correct.

15   Q.   And you testified that Mr. Fernandez met with my client in

16   September of 2012, correct?

17   A.   Correct.

18   Q.   But that was a mistake, correct?

19   A.   (No response).

20   Q.   Wasn't it August 2012?

21   A.   I'm not sure of the day -- exact date.  I could look back

22   at the transcript.  But it was raining that day.

23   Q.   And Mr. Fernandez reached out to my client because he hoped

24   to set up an undercover drug transaction with my client,

25   correct?

Ea79rig1                         Romero - cross

1    A.  That is correct.

2    Q.  But that didn't happen, right?

3    A.  Not the first time, no, he didn't show.

4    Q.  Instead they met to have lunch, correct?

5    A.  They had a conversation about having a transaction, yes.

6    Q.  They met at a restaurant?

7    A.  At a diner, yes.

8    Q.  And they did discuss the prescription drug business,

9    correct?

10   A.  Yes, they did.

11   Q.  And they discussed doing business in the future, correct?

12   A.  That is correct.

13   Q.  But there was no drug transaction that day?

14   A.  No, there was not.

15   Q.  And my client wasn't arrested for another full year,

16   correct?

17   A.  That's correct.

18   Q.  Not until September 2013?

19   A.  Correct.

20   Q.  And between the August 2012 meeting and September 2013 my

21   client never bought drugs from or sold drugs to Mr. Fernandez,

22   correct?

23   A.  That's correct.

24   Q.  Now after his arrest Mr. Leyba tried to cooperate with the

25   government as well, correct?

Ea79rig1                          Romero - cross

1    A.   That's correct.  He met with us.

2    Q.   And Mr. Leyba participated in more than 20 phonecalls with

3    government targets, correct?

4    A.   I'm not sure of the number of phonecalls.

5    Q.   But not a single one of these phonecalls yielded any

6    evidence of criminal activity involving my client, correct?

7    A.   That's correct.

8    Q.   Now, Agent Romero -- I'm sorry.  Detective Romero.

9    Apologize.  You testified earlier about the search at

10   Mr. Fernandez's storage facility; is that correct?

11   A.   That is correct.

12   Q.   The search took place on or about June 5, 2012?

13   A.   If that was the date of arrest.

14   Q.   And the agents recovered over 10,000 bottles of

15   prescription drugs from that warehouse, correct?

16   A.   That's correct.

17   Q.   And the pictures we saw of Government Exhibit 105, those

18   were pictures of bottles, bags, supplies that were recovered

19   from that search, correct?

20   A.   That's correct.

21   Q.   And you found no evidence during that search connecting

22   Mr. Rigo to the storage facility, correct?

23   A.   That is correct.

24   Q.   And isn't it true that you found no evidence since the

25   June 2012 search until now connecting Mr. Rigo to that storage

Ea79rig1                    Romero - cross

1   facility?

2   A.  That's correct.

3   Q.  And the storage facility, in fact, belonged to

4   Mr. Fernandez, correct?

5   A.  That is correct.

6   Q.  And after his arrest Mr. Fernandez became a cooperating

7   witness, correct?

8   A.  Yes, ma'am.

9   Q.  And didn't he tell you during one of his meetings that he

10  did business with Mr. Rigo on only one occasion ever?

11  A.  Well, they were competitors.

12  Q.  Just to -- if you could answer my question.

13  A.  I believe they only had one transaction between the two of

14  them.

15  Q.  And Mr. Fernandez told you, Agent Romero, that Mr. Rigo had

16  never seen his storage facility, correct?

17  A.  I believe so.  He didn't know where it was.

18  Q.  And Mr. Fernandez told you that he and Mr. Rigo spoke very

19  little before that August 2012 meeting, correct?

20  A.  For a short period of time.  Previously they spoke a lot.

21  If that's what you're talking about.

22  Q.  Well did he or did he not tell you that he spoke very

23  little?

24  A.  He hadn't spoken to him recently.

25  Q.  And when Mr. Reyes Arias met with Agents Lau and yourself

Ea79rig1                        Romero – cross

1     in April of 2013 he told you that the last time my client did

2     business with Mr. Fernandez was two to three years before that

3     meeting, correct?

4     A.  I believe so.

5     Q.  So that would be 2010 or 2011?

6     A.  Correct.  Like I said they were competition so they didn't

7     sell to each other.

8           MS. MOHAN:  Thank you very much.  No more questions at

9     this time.

10          MR. MASIMORE:  Nothing further.

11          Thank you, your Honor.

12          THE COURT:  Thank you, Detective.

13          (Witness excused)

14          MR. DISKANT:  Your Honor, the government calls Arcadio

15    Reyes Arias.

16          (Interpreter Cristina Weisz sworn)

17     ARCADIO REYES ARIAS,

18        called as a witness by the Government,

19        having been duly sworn, testified through

20        the Spanish interpreter as follows:

21          MR. DISKANT:  Your Honor, may I inquire?

22          THE COURT:  Yes.

23    DIRECT EXAMINATION

24    BY MR. DISKANT:

25    Q.  Good morning, Mr. Reyes Arias.

1    A.  Good morning.

2    Q.  Mr. Reyes Arias, where do you currently reside?

3    A.  At MDC in Brooklyn.

4    Q.  How long have you resided there?

5    A.  I've been residing there for approximately

6    twenty-one-and-a-half months.

7    Q.  What happened twenty-one-and-a-half months ago?

8    A.  I was arrested for buying and selling medicines.

9    Q.  What sorts of medicines were you buying and selling?

10   A.  I was buying several types of medicines, but mostly

11   HIV/AIDS.

12   Q.  Were you buying and selling those medicines alone or with

13   others?

14   A.  No.  With others.

15   Q.  Do you see any of the other people you bought and sold

16   medicines with in the courtroom today?

17   A.  Yes.

18   Q.  Who do you see?

19   A.  The gentleman who is over there with the glasses on.

20            MR. DISKANT:  Indicating the defendant.

21   Q.  Do you know his name?

22   A.  Yes.

23   Q.  What is his name?

24   A.  Bladimir.

25   Q.  When did you first meet Bladimir?

Ea79rig1                          Reyes Arias – direct

1   A.  I met Bladimir approximately around '96.  That's when I met

2   him.

3   Q.  How did you meet him at that time?

4   A.  Through my brother who used to work at a bodega with him.

5   Q.  And did you develop any sort of a relationship with

6   Bladimir?

7   A.  Yes.  A little while after that I started to work at the

8   bodega.

9   Q.  At his bodega?

10  A.  Yes.

11  Q.  Now you mentioned a few moments ago your involvement and

12  buying and selling HIV medicines.  When did that begin?

13  A.  Sometime after I started to work with Bladimir.

14  Q.  Can you give us roughly a sense of when that was?

15  A.  It was approximately around '97; '97, '98.

16  Q.  What was your involvement at that time?

17  A.  I was buying medicines for him.

18  Q.  By "for him" you mean for Bladimir?

19  A.  Yes.

20  Q.  Where did you buy these medicines?

21  A.  At the bodega.

22  Q.  What bodega?

23  A.  Bladimir's.

24  Q.  Where was that bodega located?

25  A.  267 Orange Street in Newark.

Ea79rig1                    Reyes Arias - direct

1   Q.  And at that time approximately how many bottles of this

2   medicine were you buying on any given week?

3   A.  I was able to buy a hundred; between a hundred and two

4   hundred a week.

5   Q.  A hundred and two hundred bottles?

6   A.  Yes, around a hundred a week.

7   Q.  And how did you know which bottles to buy?

8   A.  Because he will always give me lists with the name of those

9   that I had to buy.

10  Q.  Who is he?

11  A.  Bladimir.

12  Q.  So Bladimir would give you a list with names of medicines?

13  A.  Yes.

14  Q.  Were these typewritten lists or handwritten lists?

15  A.  They were handwritten.

16  Q.  And did you have -- where did you buy these bottles from?

17  A.  People that were coming from the street.

18  Q.  Did you have an understanding of where they were getting

19  the bottles from?

20  A.  Yes.

21  Q.  What was your understanding?

22  A.  Medicaid or -- was giving it to them.

23  Q.  So they were getting the bottles through Medicaid and then

24  selling them to you?

25  A.  Yes, sir.

Ea79rig1                         Reyes Arias – direct

1    Q.   What did you do after buying the bottles?

2    A.   I was gathering and putting them in a bag.

3    Q.   And after you gathered them and put them in a bag, what did

4    you do with the bag?

5    A.   Bladimir will take them.

6    Q.   Did you have an understanding of what Bladimir did with

7    these bottles after he took them from you?

8    A.   He'll sell them.

9    Q.   Did you have an understanding of who he sold them to?

10             MS. HENDON:  Your Honor, could I just ask for

11   clarification that we're still in 1997?

12             THE COURT:  I'm sorry?

13             MS. HENDON:  May I ask for clarification that we are

14   still in 1997 and 1998?

15             THE COURT:  Yes.  Sure.

16             MR. DISKANT:  I can ask the question differently, your

17   Honor.

18   BY MR. DISKANT:

19   Q.   Mr. Reyes Arias, you testified that you started buying and

20   selling medicines in approximately 1997, 1998?

21   A.   Yes.

22   Q.   And at that time you mentioned you were working for

23   Bladimir in his bodega?

24   A.   Yes.

25   Q.   How long did you work for Bladimir in his bodega?

Ea79rig1                          Reyes Arias - direct

1    A.  Approximately six or seven years.

2    Q.  So, if I'm doing the math correctly that's until about 2005

3    or thereabouts?

4    A.  2005 or approximately or 2004.

5    Q.  So between the time period when you first began handling

6    the medicines in 1997 or '98 and when you left Bladimir's

7    bodega in 2004, 2005 were there any periods where you were not

8    involved in buying medicines for Bladimir?

9    A.  I always bought medicines.

10   Q.  And you testified a few moments ago that you were buying

11   about a hundred bottles a week when you first began.  Were

12   there any times during that period between 1997 and 2005 where

13   you were buying a lot more or a lot less?

14   A.  About -- before I left I was selling less.

15   Q.  So in the time shortly before you stopped working for him

16   the number of bottles per week you bought dropped?

17   A.  Yes.  A little -- some short time before I stopped working

18   for him it had decreased.

19   Q.  And during that period of time when it decreased

20   approximately how many bottles were you buying on any given

21   week?

22   A.  Approximately 60, 70, 80 were bought, more or less.

23   Q.  So 60 to 70 to 80 bottles per week?

24   A.  Yes.

25   Q.  During the time period you were working for Bladi between

Ea79rig1                          Reyes Arias - direct

1   1997 and 2004, 2005, during that time period did you have an

2   understanding of whether there were any other people buying

3   medicine for him?

4   A.   Yes.  Rogelio was working.

5   Q.   Who is Rogelio?

6   A.   One that was working together with me.  He was working at

7   the nextdoor bodega.

8   Q.   Bladimir's bodega?

9   A.   Yes.

10  Q.   And showing you what's in evidence as Government Exhibit

11  104.  Do you recognize that individual?

12  A.   Yes.

13  Q.   Who is that?

14  A.   Rogelio.

15  Q.   Now you mentioned that Rogelio was another person buying

16  medicine for Bladi?

17  A.   Yes.

18  Q.   How did you know that?

19  A.   Because we were working together and we were -- we worked

20  together.

21  Q.   Okay.  Fair to say you talked about him?

22  A.   Yes.

23  Q.   During the time period you were working for the defendant

24  between again 1997 and approximately 2005 did you have an

25  understanding during that time period of who the defendant was

Ea79rig1                          Reyes Arias - direct

1   selling these medicines to?

2   A.   Yes.  He was selling to a gentleman called Manuel.

3   Q.   Anyone else?

4   A.   Minaya.

5        THE INTERPRETER:  For the record M-I-N-A-Y-A.

6   Q.   Did you ever help Bladimir deliver medicine?

7   A.   One day I went to Elizabeth with him to deliver medicine.

8   Q.   Where did you go in Elizabeth to make that delivery?

9   A.   It was a pharmacy.

10  Q.   To pharmacy?  That's where you delivered the medicines?

11  A.   He did.  I remained in the van.

12  Q.   We've been talking about the fact that you stopped working

13  for Bladimir in approximately 2004, 2005.  After that time

14  period, what did you do?

15  A.   I went out on my own to buy medicine.  I would buy them on

16  the street.

17  Q.   What sorts of medicines were you buying?

18  A.   The same ones I was buying at the bodega.

19  Q.   HIV and AIDS medicines?

20  A.   There were other sorts but mostly HIV.

21  Q.   And who were you buying these medicines from?

22  A.   People from the street.  The same people that were going to

23  Bladimir's bodega.

24  Q.   Did you have an understanding of how they had gotten the

25  bottles?

Ea79rig1                         Reyes Arias - direct

1    A.  Yes.

2    Q.  What was that understanding?

3    A.  Medicaid was giving it to them.

4    Q.  How long did you buy and sell medicines on your own?

5    A.  Until I was arrested.

6    Q.  That was in approximately December of 2012?

7    A.  Yes.

8    Q.  So between the time when you first went out on your own in

9    approximately 2005 and your arrest in December of 2012 who did

10   you sell the medicines you were buying to?

11   A.  I was selling to Bladimir.  And to Poncho.

12   Q.  And Bladimir is the individual in the courtroom today?

13   A.  Yes, sir.

14   Q.  Let's talk about him first.  Between that period in 2005

15   and your arrest in 2012 approximately how frequently would you

16   sell medicines to Bladimir?

17   A.  Once a month, approximately.

18   Q.  And when you made these sales to him once a month,

19   approximately how much medicine would you sell at a time?

20   A.  From 3,000 to 8,000, 9,000.  Approximately.

21   Q.  So Bladimir would buy three thousand dollars to eight or

22   nine thousand dollars worth at a time?

23   A.  Yes.

24   Q.  And how would Bladimir pay for these medicines?

25   A.  (In English) Cash.

Ea79rig1                        Reyes Arias – direct

1    Q.   Where did you conduct these transactions?

2    A.   In my bodega.

3    Q.   Where was that located?

4    A.   286 Sussex Avenue.

5    Q.   What was the largest sale you ever did to Bladimir during

6    this period of time that is 2005 to your arrest in 2012?

7    A.   It was one for $30,000 or a little bit over that.

8    Q.   And when was this $30,000 sale to Bladimir?

9    A.   About two weeks prior to my arrest.

10   Q.   So also in approximately December 2012?

11   A.   Mm-hmm.

12   Q.   At the time you were arrested had Bladimir paid you for

13   those drugs?

14   A.   No.

15   Q.   How much money sitting here today does Bladimir owe you?

16   A.   Approximately $40,000.

17   Q.   So he owes for more than just that last $30,000 sale?

18   A.   Yes.  Yes.

19   Q.   Were there any time periods during 2005 to your arrest in

20   2012 when you weren't selling to Bladimir?

21   A.   Yes.  Everything stopped for about two or three months.

22   Nothing got sold.

23   Q.   When was that?

24   A.   That was around 2010, 2011 when it started to -- it looked

25   like people got arrested and so there were not many sales.

Ea79rig1                          Reyes Arias – direct

1    Q.  Other than that time period were there any periods of time

2    where you stopped doing business with Bladimir?

3    A.  No.

4    Q.  Now, you testified that another individual you sold these

5    medicines to was someone you called Poncho?

6    A.  Yes, sir.

7    Q.  Who is Poncho?

8    A.  Poncho is a gentleman that I used to sell medicine to.

9    Q.  How did you first meet Poncho?

10   A.  I met Poncho at Bladimir's bodega.

11   Q.  So back when you were still working for Bladimir?

12   A.  Yes.

13          MR. DISKANT:  Now, Ms. Craig, if we could bring up

14   what's in evidence as Government Exhibit 102.

15   Q.  Do you recognize that individual?

16   A.  Yes.

17   Q.  Who is that?

18   A.  That's Poncho.

19   Q.  When did you first start selling to Poncho?

20   A.  I was still at Bladimir's bodega when I started selling to

21   Poncho, the first time that I sold to him.

22   Q.  After you left Bladimir's bodega and started buying and

23   selling on your own, did you continue selling to Poncho?

24   A.  Yes.

25   Q.  How frequently did you sell to Poncho?

Ea79rig1                         Reyes Arias - direct

1    A.   I would easily sell to him twice a week -- twice a month or

2    three times a month sometimes.

3    Q.   And how much medicine would you sell to Poncho on each

4    occasion?

5    A.   I would sell him five or six thousand dollars or eight

6    thousand, depending on how much I had.

7    Q.   On each sale?

8    A.   Mm-hmm.

9    Q.   So between Bladimir and Poncho did you sell more or less to

10   one or the other?

11   A.   I used to sell more to Poncho.  I did more business with

12   Poncho.

13   Q.   During this time period to your knowledge were other people

14   selling to Bladimir and to Poncho?

15   A.   Rogelio used to sell to Poncho.

16   Q.   That the same Rogelio we were talking about before,

17   Government Exhibit 104?

18   A.   Yes.

19   Q.   How did you know that?

20   A.   Because we would communicate all the time.

21   Q.   Returning to Poncho for just a moment.  You're aware

22   sitting here today that some of your sales to Poncho were

23   recorded?

24   A.   Yes.

25   Q.   And you've had a chance to review those recordings?

Ea79rig1                         Reyes Arias - direct

1   A.  Yes.

2   Q.  You obviously know you were arrested shortly thereafter?

3   A.  Yes.

4   Q.  Since you've been arrested have you pled guilty to certain

5   crimes?

6   A.  Yes.

7   Q.  What have you pled guilty to?

8   A.  To purchase and sale of medicines.  Submitting a false

9   application to a bank for a loan to buy a house.  And

10  cockfighting.  I had roosters for cockfights.

11  Q.  So the medicine crime that you pled guilty to, is that the

12  scheme that we've been talking about?

13  A.  Yes.

14  Q.  And you mentioned you also pled guilty to submitting a

15  false loan application to a bank?

16  A.  Yes.

17  Q.  Can you tell the court very briefly what you did that made

18  you guilty of that crime.

19  A.  Of which one?

20  Q.  The bank fraud crime.

21  A.  Yes.  I submitted a false application to a bank for a loan

22  to buy a house.

23  Q.  Did you know at the time that what you were doing was wrong

24  and illegal?

25  A.  Yes.

Ea79rig1                          Reyes Arias - direct

1   Q.  You mentioned you also pled guilty to your participation in

2   cockfights or cockfighting?

3   A.  Yes.

4   Q.  You knew at the time that what you were doing was wrong and

5   illegal there too?

6   A.  Yes.

7   Q.  What's the maximum term of imprisonment you face as a

8   result of pleading guilty to these crimes?

9   A.  Sixty years.

10  Q.  Have you been sentenced yet?

11  A.  No.

12  Q.  At the time you pled guilty did you have an agreement with

13  the government?

14  A.  Yes.

15  Q.  Was it an oral agreement or a written agreement?

16  A.  Written.

17          MR. DISKANT:  Your Honor, may I approach?

18          THE COURT:  Yes.

19  Q.  Mr. Reyes Arias, I've just handed you what's been marked

20  for identification purposes as Government Exhibit 220.  Do you

21  recognize that?

22  A.  Yes.

23  Q.  What is it?

24  A.  What I pled guilty to.

25  Q.  Is that your cooperation agreement with the government?

Ea79rig1                          Reyes Arias - direct

1   A.  Yes.

2   Q.  Can you turn to the last page of that document.

3           Whose signature appears there?

4   A.  Mine.

5   Q.  Do you remember signing that document?

6   A.  Yes.

7   Q.  When you signed that agreement, what was your understanding

8   of what you agreed to do?

9   A.  That I had to tell the truth.

10  Q.  Anything else?

11  A.  And to not commit any new crimes after that.

12  Q.  Are you testifying here today as a condition of the

13  agreement?

14  A.  Yes.

15  Q.  And what's your understanding of what the government will

16  do if you do all of the things required of you in that

17  document?

18  A.  Send a letter to the judge.

19  Q.  Do you know what that letter is called?

20  A.  5K1.

21  Q.  What's your understanding of what's going to go in the 5K1

22  letter?

23  A.  It will tell the judge the good and the bad that I've done

24  in this case.

25  Q.  Has the government promised you a particular sentence in

Ea79rig1                           Reyes Arias – direct

1     return for your cooperation?

2     A.  No.

3     Q.  Has anyone promised you a sentence?

4     A.  No.

5     Q.  Is the government going to recommend a particular sentence?

6     A.  No.

7     Q.  Do you hope to get a lower sentence because you cooperated?

8     A.  Yes.

9     Q.  In addition to a period of incarceration you understand you

10    may face immigration consequences as a result of your guilty

11    plea?

12    A.  Yes.

13    Q.  Has the government made you any promises with respect to

14    deportation?

15    A.  No.

16    Q.  What happens if you don't tell the truth?

17    A.  The letter will be torn up.

18            MR. DISKANT:  Your Honor, at this time the government

19    would offer Government Exhibit 220.

20            THE COURT:  It's admitted.

21            (Government's Exhibit 220 received in evidence)

22    Q.  Mr. Reyes Arias I, want to return for a moment to lists.

23    You testified a little while ago that Bladimir would give you

24    handwritten lists of medicines.

25    A.  Yes.

Ea79rig1                              Reyes Arias – direct

1    Q.  Were there ever any times where you gave lists to Bladimir?

2    A.  Yes.

3    Q.  Why did you give lists to Bladimir?

4    A.  With the names of the medications that I had to sell to

5    him.

6    Q.  Medicines you were offering for sale?

7    A.  Yes.

8             MR. DISKANT:  If we could bring up page 3 of

9    Government Exhibit 202 just so we can all read it together.

10   Zoom in.

11   Q.  Do you recognize the handwriting on this page?

12   A.  Yes.

13   Q.  Whose handwriting is that?

14   A.  Mine.

15   Q.  Is all of it yours?

16   A.  No, not all of it.

17   Q.  Which of it is yours?

18   A.  Where the letters are and then the numbers that are right

19   after the letters.

20   Q.  So let's start, for example, with the second line.  It

21   appears to say Atripla.  What is Atripla?

22   A.  It's an AIDS medication.

23   Q.  And actually if we could just go down two more lines.  It

24   appears to say Kaletra.  What is Kaletra?

25   A.  It's also an AIDS medication.

Ea79rig1                          Reyes Arias - direct

1   Q.   You testified a moment ago that the word Kaletra is your

2   handwriting?

3   A.   Yes.

4   Q.   And the next column over is the number 2, followed by the

5   letter X.

6            MR. DISKANT:  Ms. Craig, if we could just zoom that

7   out a little bit.

8   Q.   Whose handwriting is that?

9   A.   That's mine.

10  Q.   So what did you mean when you wrote Kaletra 2X?

11  A.   I have two bottles of that.

12  Q.   And the next column over is the number 60 equals 120.

13  Whose handwriting is that?

14  A.   Bladimir's.

15  Q.   How do you know that's Bladimir's handwriting?

16  A.   I know his handwriting because he would always make lists

17  for me too.

18  Q.   And what Bladimir writes "60 equals 120," what was your

19  understanding of what he meant?

20  A.   That there were two bottles at 60 would be 120.

21  Q.   So he was going to pay you $60 per bottle for the Kaletras?

22  A.   Yes.

23           MR. DISKANT:  If we could zoom back all the way out

24  just a moment.

25  Q.   It's looks like the total amount for the sale is

Ea79rig1                              Reyes Arias - direct

1   approximately $11,605?

2   A.  Yes.

3   Q.  That's the amount that Bladimir would pay you for these

4   medicines?

5   A.  Yes.

6          MR. DISKANT:  Your Honor, may I have just a moment?

7          (Pause)

8          MR. DISKANT:  Nothing further.  Thank you.

9          MS. HENDON:  May I proceed, your Honor?

10         THE COURT:  Yes.

11         MS. HENDON:  Thank you.

12  CROSS-EXAMINATION

13  BY MS. HENDON:

14  Q.  Good morning, Mr. Arias Reyes.

15  A.  Good morning.

16  Q.  Now, before you got arrested in this case in December 2012

17  you made two undercover sales of medicines to a cooperating

18  witness that was Poncho, correct?

19  A.  Yes.

20  Q.  Poncho called you up and on October 12, 2012.  You met with

21  him and you sold him medicine, right?

22  A.  I don't know if that's the exact date.  But I did do

23  business twice with Poncho.

24  Q.  And at the time you did that business you didn't know that

25  Poncho was cooperating with the government, right?

1    A.  No.

2    Q.  The first time you sold to him, October 12, 2012, you sold

3    him 42 bottles of medicine, correct?

4    A.  I sold him medicine, yes.

5    Q.  And then about two months later he called up again to do

6    business again and you sold him, in December 2012, 52 bottles

7    of medicine, right, Mr. Arias Reyes?

8    A.  I don't remember the date.  I don't remember if it was in

9    December.  But I did sell him a second time.

10   Q.  The agents got a warrant to search your apartment above the

11   grocery store, right, after that sale?

12   A.  Yes.

13   Q.  This is all in 2012 prior to your arrest, sir, correct?

14   A.  Yes.

15   Q.  And from your apartment the agents recovered 481 bottles of

16   medicine, correct?

17   A.  No.

18   Q.  Some of the prescription bottles were empty and some were

19   full, correct?

20   A.  Yes.  But I don't think there were 480 bottles of medicine,

21   no.

22   Q.  How many do you think there were, Mr. Arias Reyes?

23   A.  (No response).

24   Q.  What is your recollection on that point, sir?

25   A.  There weren't that many bottles of medicine.  There were

Ea79rig1                          Arias Reyes – cross

1   boxes of patches, many boxes of patches, but.

2   Q.  So, sir, I'm asking you about events two years ago now,

3   correct?

4   A.  Yes.

5   Q.  I'm asking you about bottles that were in your apartment,

6   your own apartment, correct?

7   A.  Yes.

8   Q.  Do you remember or do you not remember how many bottles

9   were in your apartment on that date?

10  A.  I don't remember how many bottles of medication there were

11  but there were not 480 bottles.

12  Q.  Were there one hundred?

13  A.  I don't have the exact number but I do know that there

14  wasn't that much medication there.

15  Q.  So give me your best recollection, please, sir, of the

16  number of prescription bottles taken from your home just before

17  your arrest in this case.

18  A.  I had sold almost everything that I had to Bladimir.  I had

19  taken almost all of them to him.

20  Q.  Sir, do you understand my question?

21  A.  Yes.

22  Q.  There were prescription bottles taken from your home

23  shortly before your arrest, true?

24  A.  Yes.

25  Q.  Can you tell us, yes or no, approximately how many bottles

Ea79rig1                    Arias Reyes - cross

1    were in your home at that time?

2    A.  I don't know how many bottles there were.

3    Q.  How many different types of medicine did you have in your

4    home at that time?

5    A.  There was asthma medicine.

6    Q.  Anything else?

7    A.  AIDS.

8    Q.  Anything else?

9    A.  There were boxes of patches.  There were quite a few of

10   those.

11   Q.  Anything else?

12   A.  There was Percocet.  And HIV medicine.  That's what there

13   was.

14   Q.  Weren't there 34 different types of medicines taken from

15   your home prior to your arrest, sir?

16   A.  I don't know.  I can't tell you.  I have no idea about how

17   many different types of medication there were.

18   Q.  Do you have any recollection at all of how many types of

19   medicine were taken from your home just two years ago, sir?

20   A.  No, because I never wrote down medication like that.

21   Q.  And without writing it down, sir, you don't have a

22   recollection of that fact?  Is that your testimony?

23   A.  Can you repeat the question.

24   Q.  Are you somebody that needs to write things down in order

25   to remember them, Mr. Arias Reyes?

Ea79rig1                          Arias Reyes - cross

A.  No.  It's not like that.  But I just don't know -- I'm

trying to remember the types of medications that there were.

But you're telling me that there's 34 different types?  I

don't --

Q.  Well I'm asking you, sir, if it's not 34 can you give the

Court an estimate as to how many different types of medicine

you were keeping in your house, in your inventory, just before

your arrest in this case.

A.  It's because I bought AIDS medication.  I bought asthma

medication.  And some medication for blood pressure.  That's

what I bought.

Q.  That's what you remember today, correct?

A.  Yes.

        MS. HENDON:  Thank you.

Q.  Now the government in this case showed you several pieces

of paper with handwritten lists and notes on them before you

came to testify today, right?

A.  Yes.

Q.  And before you came to testify you sat down with

prosecutors, you went through those pages trying to identify

Mr. Rigo's handwriting on them, correct?

A.  Yes.

        MS. HENDON:  And I wonder if the prosecution would

help us by putting Government Exhibit 202 up on the screen.

        Thank you.

Ea79rig1                        Arias Reyes - cross

1    Q.  I'm going to ask you about three pages right now,

2    Mr. Arias Reyes, okay.

3    A.  Yes.

4           MS. HENDON:  If you could please show page 5 of this

5    exhibit, I'd be grateful.

6    Q.  Mr. Arias Reyes, this is one of the pages where you looked

7    at the handwriting on the left-hand side and you said that

8    belonged to Mr. Rigo; is that right?  Did you tell the

9    prosecutor that?

10          THE INTERPRETER:  The interpreter requests a

11   repetition.

12   Q.  Mr. Arias Reyes this is one of the pages that you told the

13   prosecutors contained Mr. Rigo's handwriting for the list of

14   drugs, not just the numbers on the right-hand side but the

15   actual list of drugs, correct?

16   A.  Yes.

17          MS. HENDON:  And if you could please put up page 11 of

18   the exhibit.

19   Q.  This is another page where you identified for the

20   prosecution what you say is handwriting of Mr. Rigo; is that

21   right?

22   A.  (No response).

23   Q.  Not just the numbers but the drug list.

24   A.  (No response).

25   Q.  Did you tell Mr. Diskant that?

Ea79rig1                        Arias Reyes – cross

1   A.  Yes.  The names at the bottom, not the ones on top are his.

2   Q.  And how about -- so two people wrote on this piece of

3   paper?  That would be your testimony?

4   A.  Yes.  The name of the medicines, yes.

5   Q.  If you could just turn now to page 12 of that exhibit.

6           MS. HENDON:  Thank you so much for putting that up.

7   Q.  This is another list that you told the prosecution was done

8   in my client's handwriting, correct?

9   A.  Yes.

10  Q.  Now, what was the first date you sat down with the

11  prosecution to look at these pieces of paper and see whether

12  you saw Mr. Rigo's handwriting, any of them on Exhibit 202?

13  When did you first do that?

14  A.  The first time.  Approximately three weeks ago.

15  Q.  Are you sure it wasn't one week ago on September 30?

16  A.  (No response).

17  Q.  Mr. Arias Reyes?

18  A.  Not the first time.

19  Q.  So, three weeks ago was the first time the government asked

20  for your help identifying handwriting on these documents,

21  right?

22  A.  Yes.

23  Q.  But you're not a handwriting expert, Mr. Arias Reyes,

24  correct?

25  A.  No.  I'm not an expert but I do know his handwriting.

Ea79rig1                        Arias Reyes - cross

1   Q.  And that's from dealing with Mr. Rigo over the years and
2   knowing him for so long, correct?
3   A.  Yes.
4   Q.  So, it's your testimony that you might recognize the way he
5   makes certain letters; is that right, sir?
6   A.  Yes.
7           MS. HENDON:  You can take that down, please.  Thank
8   you.
9           May I approach, your Honor?
10          THE COURT:  Yes.
11  Q.  I've put before you the three pages of Government Exhibit
12  202 that we've just shown up on the screen because I thought it
13  might be easier to do it this way.  Do you have those,
14  Mr. Arias Reyes?
15  A.  Yes.
16  Q.  And I put my handwritten numbering, page 5, page 11, and
17  page 12 on those three sheets.
18          Do you see that?
19          So I'd ask you to have those three pages handy.  I'm
20  going to ask you some questions now, Mr. Arias Reyes, all
21  right?
22          If you look at page 12, I'd like you to look at the
23  fourth entry from the bottom.  It says Epzicon.  Let me know if
24  you see that.
25  A.  Yes.

Ea79rig1                        Arias Reyes - cross

1   Q.  Now next to it I'd like you to take page five and look at

2   the fifth entry from the top, Epzicon.

3   A.  Yes.

4   Q.  Do you see that the Es in those two entries are shaped

5   differently, sir?

6   A.  Yes.

7   Q.  The one on page 5 is a rounder E, right?

8   A.  Yes.

9   Q.  And the Zs are different also in that word, right?

10  A.  Yes.

11  Q.  The Z that you see on page 12 has a line through the middle

12  and the one on page 5 does not, right?

13  A.  Mm-hmm.

14  Q.  If you turn back to page 12 I'm going to ask you now to

15  look at the second entry from the bottom for Spiriva.

16  A.  Yes.

17  Q.  Now the writing for that word looks different too, doesn't

18  it?

19  A.  Yes.

20  Q.  The R in Spiriva on page 5 looks very different from the R

21  in Spiriva on page 12, correct?

22  A.  Yes.

23  Q.  The one on page 12 is a big capital letter R, right?

24  A.  (No response).

25  Q.  And the one on page 5, the R looks like a little loop,

1  | doesn't it?

2  | A.   Yes.

3  | Q.   In fact, on page 5 all of the Rs look like that?  They have

4  | a little loop for an R, right?

5  | A.   (No response).

6  | Q.   And if you look at page 12, look at the Rs on that page,

7  | sir.  None of the Rs has a little loop, does it?

8  | A.   Ah huh.

9  | Q.   Mr. Arias Reyes it looks like two different people wrote

10 | those two lists, doesn't it?

11 | A.   Yes.

12 | Q.   So now I'd like you to take page 11 -- we're not going to

13 | do too much more of this, I promise.  Just one more.

14 |        Can you tell me again which part of this do you say

15 | Mr. Rigo wrote?  Which of the lists; the top, or the bottom, or

16 | both?

17 | A.   The bottom one.

18 | Q.   So if you just look at the bottom of that list, look at the

19 | entry for Rayataz.  That's the last entry on the list.

20 | A.   Yes.

21 | Q.   You see those Zs there with the line through them?  Just

22 | like we saw on page 12, correct?

23 | A.   Yes.

24 | Q.   Actually, withdrawn.

25 |        MS. HENDON:  Withdrawn, your Honor.

Ea79rig1                        Arias Reyes - cross

1          I'm going to move on.  Thank you, Mr. Arias Reyes.

2    Q.  Now you testified you sold drugs to -- withdrawn.

3          Just to be clear these documents that are part of

4    Exhibit 202 those were not recovered from you or your premises,

5    correct?

6    A.  Which documents?

7    Q.  The pieces of paper we just looked at and that the

8    government showed you as part of Exhibit 202.

9    A.  You mean the one that was shown to me up there, the list?

10   Q.  Yes.  Those documents were not taken from you or from your

11   home?  They came from somewhere else in the investigation,

12   correct?

13   A.  Yes.  The government showed them to me.

14   Q.  Before I move away from these documents I just want to be

15   clear about one thing.  Is it correct --

16          MS. HENDON:  If we could put up page 4 of the exhibit.

17   Q.  Is it correct, sir, that you told the government you didn't

18   recognize the handwriting on the far left column for this

19   exhibit?  You didn't know whose handwriting that was?

20   A.  I didn't recognize that handwriting, no.

21   Q.  And if we could put up next page 6, please.

22          You also told the government that you did not

23   recognize the handwriting in the far left column on this page,

24   correct?

25   A.  Mm-hmm.

Ea79rig1                         Arias Reyes - cross

1  Q.  And if we could put up page 9, please.

2           Same question, Mr. Arias Reyes.  You told the

3  prosecutions that you did not recognize the handwriting on the

4  far left column of this exhibit, correct?

5  A.  That's right.

6  Q.  And the last one, page 13, please.  I'll ask you the same

7  question, sir.

8           You told the prosecutors that you could not say whose

9  handwriting was on the far left column of this document, page

10 68, also known as page 13, of Exhibit 202?

11 A.  Ah huh.

12 Q.  That's correct?  That's a yes, right?

13 A.  Yeah.  I don't know that handwriting.  I don't.

14           MS. HENDON:  Thank you, Mr. Arias Reyes.  We can put

15 those records away.

16 Q.  Now you testified that you sold medicines to Mr. Rigo, my

17 client, between 2005 and 2012, correct?

18 A.  Yes.

19 Q.  And at earlier times too, right?

20 A.  Not prior, no.

21 Q.  In earlier times you would bring him drugs that he would

22 deliver to other people?  You didn't sell them?  Is that my

23 mistake?

24 A.  That time, no.  At that time I was working for him.

25 Q.  Now, did I hear you say in this courtroom that after 2005,

Ea79rig1                    Arias Reyes - cross

1   sir, you sold drugs to Mr. Rigo every month for each year until

2   2012?

3   A.   Yes.  I was selling him approximately once a month.

4   Q.   Except you said for like a three-month period when people

5   got arrested, right?

6   A.   No.  Not three months.

7   Q.   Didn't you tell Agent Roa in 2013 that you sold drugs to

8   Mr. Rigo every other month or half as frequently?

9   A.   I don't understand the question.

10  Q.   Didn't you tell Agent Roa as part of your cooperation in

11  2013 that you had been selling drugs to Mr. Rigo all those

12  years every other month, not every month?

13  A.   No.  Normally once a month.  That would be the normal

14  thing.

15  Q.   I'm asking you now what you told Agent Roa in 2013, sir.

16  Do you understand that?

17  A.   Who is Agent Roa?

18  Q.   He's the case agent in this case who sits with you when you

19  meet with the prosecutors.

20  A.   I don't remember having said that to him, no.

21  Q.   So if he testified to that under oath in this building that

22  you told him that, he would be mistaken; is that right?  Agent

23  Roa would be mistaken?

24  A.   Yes.

25  Q.   He would be off by 50 percent in terms of assessing the

Ea79rig1                        Arias Reyes – cross

1  number of medicines you sold to my client; is that right?

2  A.  If it was like that, yes.

3  Q.  So you never told anyone from the FBI or the government

4  that you sold drugs to Mr. Rigo every other month between 2005

5  and 2012?

6  A.  It was a regular thing, once a month.

7  Q.  And you testified earlier today the regular thing was a

8  hundred bottles every sale, right?

9           MR. DISKANT:  Could we have a clarification as to

10  time?

11  A.  No.

12  Q.  Between 2005 and 2012 is it your testimony you were selling

13  to my client a hundred bottles of medicine when you sold to

14  him?

15  A.  No.

16  Q.  Again, it was every week for seven years without any break?

17  Is that your testimony?

18           MR. DISKANT:  Again if we could have a clarification

19  as to time period.

20           THE COURT:  Sustained.

21  Q.  Between 2005 and 2012 you sold medicine to my client every

22  week without any break other than the period when the arrest

23  took place?  Is that your testimony?

24           MR. DISKANT:  Your Honor, I believe the question

25  mischaracterizes the testimony.  The witness has already said

Ea79rig1                        Arias Reyes - cross

1   as much.

2           THE COURT:  Overruled.

3           THE WITNESS:  Not every week.

4   Q.  Between -- so whatever business you were doing or you say

5   you were doing with my client in that time period,

6   Mr. Arias Reyes, there are no records -- you have no records of

7   any business with my client, correct?

8   A.  That's true.  But I did sell to him regularly, once a

9   month.

10  Q.  And when the agents searched your apartment they didn't

11  find any evidence there connecting your business to Mr. Rigo,

12  correct?

13  A.  But he knows.  And I know it too.

14  Q.  Sir, are you aware of a single piece of paper in this case

15  that was taken from your home or your person that connects your

16  drug business to Mr. Rigo?

17  A.  There must be lists somewhere.  There must be lists because

18  we made lists.

19  Q.  So if there were lists taken from your apartment that

20  connected you to Mr. Rigo, those would be turned over to

21  Mr. Rigo in this case, right?

22          MR. DISKANT:  Your Honor, how would the witness

23  possibly know the answer to that.

24          THE COURT:  Sustained.

25  Q.  Has anyone from the government's table -- other than these

Ea79rig1                          Arias Reyes - cross

1    pieces of paper we've talked about today, has anyone from the

2    government's table shown you any record seized from your

3    apartment, any piece of paper connecting your business to my

4    client?

5    A.  There's a list there that has my handwriting and his.

6    Q.  That wasn't taken from your apartment, was it, sir?

7    A.  (No response).

8    Q.  You've already testified to that, sir.

9            Anything other than that one piece of paper

10   Mr. Diskant showed you that you know didn't come from your

11   apartment that connects your business to Mr. Rigo?

12   A.  No.

13   Q.  So your testimony today about your business dealings with

14   Mr. Rigo, it's based on your memory?  Is that fair?

15   A.  Yes.  And then the list that's there too.

16   Q.  You're talking about the one list, sir, that Mr. Diskant

17   showed you on your direct exam?

18   A.  Yes.

19   Q.  That did not come from your house, right?

20   A.  I don't know where they found it.  I don't know if it was

21   in my house.

22   Q.  That you saw for the first time three weeks ago.

23   A.  Yes.

24   Q.  Now you've been incarcerated in this case since

25   December 2012; is that right?

Ea79rig1                         Arias Reyes - cross

1   A.  Yes.

2   Q.  Now I'm going to ask you some questions about your life

3   before you were incarcerated, Mr. Arias Reyes, okay.

4           At the time of your arrest in this case you had a

5   serious drinking problem, did you not?

6   A.  Yes.  I used to drink.

7   Q.  You were addicted to alcohol at the time of your guilty

8   plea in this case, correct?

9   A.  No.

10  Q.  Sir, when you stood before Judge Gardephe and pled guilty

11  he asked you questions about health problems and any treatment

12  for health problems.  Do you remember that?

13  A.  Yes.

14  Q.  And did he ask you this question and did you give this

15  answer at page 3503-31, page 6, lines 12 through 17.

16  "Q.  Have you ever been addicted to any drugs or alcohol or

17  been treated for any type of addiction?

18  "A.  Alcohol."

19  A.  Yes.

20  Q.  And you had been an alcoholic for a very long time,

21  correct?

22  A.  Yes.  I always used to drink.

23  Q.  You are 43-years-old now, sir?

24  A.  Yes, ma'am.

25  Q.  And you've been -- you were addicted to alcohol from the

Ea79rig1                         Arias Reyes - cross

1   time that you were 18 or 19 until your incarceration in this

2   case helped you stop drinking, right?

3   A.  I would drink at times.  It wasn't that I was an alcoholic

4   of the sort that drinks daily.

5   Q.  So Judge Gardephe asked you over what period of time you

6   were addicted to alcohol, didn't he?  Do you recall that?

7   A.  I would drink like once a week.  And sometimes a month

8   would go by and I wouldn't drink.  It wasn't a thing where I

9   would drink daily.

10  Q.  Were you asked this question and did you give this answer

11  at 3503-31, page 6, lines 15 through 17.

12  "Q.  When were you addicted to alcohol?

13  "A.  Since I was -- I used to drink.  Since I was very young I

14  was drunk, since I was 18 or 19 years old."

15          Did you give that testimony to Judge Gardephe, sir?

16  A.  Yes.  I used to drink.  But when I was addicted -- I was

17  not -- I used to drink but I was not an addict.

18  Q.  So when you testified under oath to Judge Gardephe that you

19  were addicted to alcohol, you were lying to Judge Gardephe; is

20  that correct?

21          MR. DISKANT:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  I've always said that I used to drink

24  but not an addiction like that, that I would have to drink

25  daily.  I don't have to drink daily.

Ea79rig1                          Arias Reyes - cross

1   Q.  Now, Judge Gardephe asked you if you had ever been treated

2   for your condition, your addiction to alcohol, did he not?

3   A.  Yes, he did.

4   Q.  And you told him that you had gone into several alcohol

5   rehab programs but that none had worked, correct?

6   A.  I did go to some places to get better.

7   Q.  You went to several alcohol rehab programs, correct?  For

8   alcohol addiction, sir?  Yes or no?

9   A.  I did go to -- I did go to a program because I was caught

10  driving when I had been drinking and so the Court made me go.

11  Q.  Were you asked this question and did you give this answer

12  before Judge Gardephe under oath, sir at 3503-31, page 6, lines

13  18 to 25.

14  "Q.  Have you ever been treated for that condition?"

15          Referring to alcohol addiction.

16  "A.  Yes.  I went to several programs because I was drinking

17  and so on.

18  "Q.  And did that help you with the alcohol problem or not?

19  "A.  No.  It didn't help me much because in any case I

20  continued drinking."

21          Did you give that testimony, sir?

22          THE INTERPRETER:  Excuse me.  The interpreter requires

23  you to -- can you do that again, please.

24  "Q.  Have you ever been treated for that condition, referring

25  to alcohol addiction?

Ea79rig1                        Arias Reyes - cross

1    "A.  Yes.

2              MS. HENDON:  Forgive me.

3    "A.  Yes.  I went to several programs because I was drinking

4    and so on.

5    "Q.  And did that help you with the alcohol problem or not?

6    "A.  No.  It didn't help me much because in any case I

7    continued drinking."

8    Q.  Did you give that testimony under oath to Judge Gardephe?

9    A.  Yes.

10   Q.  Now, you lost your license because of alcohol abuse,

11   correct?

12   A.  Yes.

13   Q.  You were in accidents driving your car when you were drunk,

14   correct?

15   A.  No.  I didn't have accidents.  No.

16   Q.  And between 2005 and 2012 there were times when you were

17   passed out drunk for days at a time, correct?

18   A.  No.

19   Q.  Your drink -- the drink -- the alcohol that you abused

20   primarily was whiskey and rum, correct?

21   A.  I would drink more beer.

22   Q.  And sometimes people would come looking for you when you

23   didn't show up for work and your wife would say he's passed

24   out, he's been passed out for days from drinking, correct?

25   A.  Not for days.  I just wouldn't show up for work that day.

Ea79rig1                          Arias Reyes - cross

1   Q.  Sometimes you blacked out from drinking, right,

2   Mr. Arias Reyes?

3            You're under oath, sir.  Do you understand that?

4   A.  Under oath?

5   Q.  Sometimes you passed out from drinking, correct?

6   A.  I would drink a lot but I wouldn't passout from drinking.

7   Q.  Never passed out?

8   A.  (No response).

9   Q.  From drinking?

10  A.  No.

11  Q.  How many DWIs did you have before your license was taken

12  away for your drunk driving, sir?

13  A.  I have three.

14  Q.  Now at the MDC are you enrolled in any drug or alcohol

15  program?

16  A.  No.

17  Q.  Wasn't that recommended as part of your incarceration?

18  A.  They haven't talked to me about that.

19  Q.  Now, you told Judge Gardephe that you had been in and out

20  of several rehab programs, correct?

21  A.  Twice.

22  Q.  You told Judge Gardephe several, correct?

23  A.  Twice.

24  Q.  And were any of those court-ordered?  Were you required to

25  attend any of those because a court directed you to?

Ea79rig1                          Arias Reyes - cross

1    A.   Yes.

2    Q.   But as you told Judge Gardephe none of them helped, you

3    kept on drinking, right?

4    A.   Yes.

5    Q.   Your drinking has caused you a lot of problems in your

6    life, fair?

7    A.   Yes.

8    Q.   And the reason you kept drinking was not because you

9    thought drinking was good for you, right?

10   A.   Drinking is not good for anyone.

11   Q.   The reason you kept drinking, sir, is because you had an

12   addiction?  You couldn't stop?  Fair?

13   A.   I thought that an addict was someone who drank everyday and

14   I never drank everyday.

15   Q.   So prolonged alcohol abuse, Mr. Arias Reyes, over many

16   years can impair the way your brain works, right?

17   A.   Yes.

18   Q.   They have said that to you in rehab, right?

19   A.   Yes.

20   Q.   And prolonged alcohol abuse over many years, it can

21   contribute to dementia or serious brain problems, right?

22   A.   I haven't felt those problems.

23   Q.   Prolonged alcohol abuse over many years, you'd agree with

24   me, it can affect a person's memory, right?

25            MR. DISKANT:  Objection.

Ea79rig1                    Arias Reyes - cross

1              THE COURT:  Overruled.

2              THE WITNESS:  Yes.

3   Q.  It can impair a person's memory, right?

4   A.  Yes.

5   Q.  Now, when the agents questioned you in this case after your

6   arrest, you decided to cooperate and try to be helpful to them,

7   right?

8   A.  Not the same day of my arrest.

9          When do you mean?

10  Q.  Shortly after.

11  A.  After I came to talk to the government was the time.

12  Q.  And you made a decision that the best thing for your case

13  would be to try and do what you could to help the government,

14  right?

15  A.  Yes.

16  Q.  And they made crystal clear to you that they would only

17  work with you if you committed to be absolutely truthful with

18  them, right?

19  A.  Yes.

20  Q.  And you took that seriously, right?

21  A.  Yes.

22  Q.  And every time you met with them you did your best to

23  truthfully answer their questions?

24  A.  Yes.

25  Q.  And some things they asked you, you were sure you knew the

Ea79rig1                           Arias Reyes – cross

1  answer, correct?

2  A.  Yes.

3  Q.  And other things they asked you about, you were unsure,

4  fair?

5  A.  I'm always sure.  Sometimes what I don't know is maybe the

6  dates or the timeline.  That's the only thing.

7  Q.  And if you were unsure about something you would tell the

8  prosecutors in substance:  I think it happened this way but I'm

9  unsure.

10 A.  Yes.

11 Q.  And you were always doing your best to be truthful and

12 helpful, right?

13 A.  I always told the truth.

14 Q.  And you knew all along that your main customer throughout

15 your business dealings was Poncho, Mr. Fernandez, right?

16 A.  Yes.

17 Q.  But you also knew that you did business with Mr. Rigo over

18 the years, correct?

19 A.  Yes.

20 Q.  But you were clear when you spoke to the agents that you

21 did more business with Poncho than you did with Mr. Rigo,

22 correct?

23 A.  Yes.

24 Q.  Didn't you tell the agents that you sold to Bladimir not

25 too frequently?

Ea79rig1                          Arias Reyes - cross

1    A.   Yes.

2    Q.   And didn't you tell the agents that you sold to Poncho more

3    frequently?

4    A.   Yes.

5    Q.   And you -- withdrawn.

6            In fact, over the years Poncho usually bought out your

7    whole inventory, correct?

8    A.   Not all of it.

9    Q.   He usually bought out your whole inventory, correct?

10   That's a fact, right?

11   A.   Not all of it.

12   Q.   Usually.  I'm not asking you about always, sir.  I'm saying

13   usually would you agree with me that Poncho usually purchased

14   your entire inventory.  Not always.

15   A.   Yes.  I was selling Poncho more.  Yes.

16   Q.   Okay.  One more time, Mr. Arias Reyes.

17           Isn't it a fact that Poncho would usually purchase

18   your entire inventory over the 2005 to 2012 time period we're

19   talking about?

20   A.   Yes.  He was buying me more than Bladimir.

21   Q.   Now, when you pled guilty in this case before Judge

22   Gardephe you told Judge Gardephe you only had one customer,

23   right?

24   A.   No.

25   Q.   Judge Gardephe put you under oath.  Do you remember that?

Ea79rig1                         Arias Reyes - cross

1    A.   Yes.

2    Q.   And he asked you:  "Tell me in your own words what you

3    did."

4              Right?

5    A.   Yes.

6    Q.   And you were under oath before a judge so you gave a

7    truthful answer, right?

8    A.   Yes.

9    Q.   And were you asked these questions and did you give these

10   answers during your guilty plea, 3503-31, page 20, line 24

11   through page 21, line 8.

12             Question from the judge:  "And what did you do with

13   these prescription drugs after you bought them from the people

14   who would obtain them from pharmacies?

15   "A.   Well, I collected or put it together.  Then I sold it to

16   one person, all of it.

17   "Q.   And what was your understanding of what was going to

18   happen to these prescription drugs after you sold them to the

19   person you've made reference to?

20   "A.   Well, I sold it to him.  I think he just sold it on, sold

21   it somewhere else."

22             Were you asked those questions?  Did you give those

23   answers, sir?

24   A.   I don't remember having given the answers as you have

25   mentioned them.

Ea79rig1                          Arias Reyes - cross

1   Q.  But if you -- when you were asked questions by Judge

2   Gardephe -- well, withdrawn.

3        You remember your guilty plea, right?  That's a

4   memorable day.

5   A.  Yes.

6   Q.  And you know you were put under oath, right?

7   A.  Yes.

8   Q.  And you can assure the Court that whatever you said that

9   day under oath to Judge Gardephe was the truth, correct?

10  A.  Yes.

11       MS. HENDON:  Judge, I have a bit more.  I can keep

12  going.  I don't know when the Court wants to --

13       THE COURT:  Give me a guess.

14       MS. HENDON:  I'm thinking maybe a half-hour, tops.

15       THE COURT:  We'll resume at quarter of two.

16       MS. HENDON:  And the witness is sequestered because

17  he's on cross, I take it, your Honor.

18       THE COURT:  Yes.

19       MS. HENDON:  Thank you.

20       (Luncheon recess)

21

22

23

24

25

ea79rig2

```
 1                        AFTERNOON SESSION

 2                            1:45 p.m.

 3             ARCADIO REYES ARIAS, resumed

 4             THE COURT:  Yes, ma'am.

 5             MS. HENDON:  Thank you, judge.

 6             Your Honor, I just wanted to put on the record,

 7   because there is discrepancy in page numbering, that when I was

 8   referring to pages 5, 11, and 12 of Government Exhibit 202, on

 9   that exhibit the page numbers that you actually see are pages

10   60, 66, and 67.

11             THE COURT:  Say it again.

12             MS. HENDON:  On Government Exhibit 202.

13             THE COURT:  Yes.

14             MS. HENDON:  The page numbers that are actually

15   reflected on that exhibit that I was referring to are pages 60,

16   66, and 67.

17             THE COURT:  Okay.  Thank you.

18   CROSS-EXAMINATION CONTINUED

19   BY MS. HENDON:

20   Q.  So, Mr. Arias Reyes, you pled guilty in this case on

21   July 31, 2013; is that right?

22   A.  I don't remember exactly the date on which I pled guilty.

23   Q.  And you know -- you know that when you pled guilty Mr. Rigo

24   had not yet been arrested by the agents, correct?

25   A.  I didn't know anything.
```

EA79RIG2                          Reyes Arias - cross

1   Q.  And at the time you pled guilty and you told Judge Gardephe

2   that you sold drugs "to one person, comma, all of it," you were

3   referring to Poncho, correct?

4   A.  I did not sell everything to one person.

5   Q.  When you said to judge -- when you told Judge Gardephe you

6   sold to one person, you were referring to Poncho, correct?

7   A.  It's just that I didn't tell the judge that I had sold

8   everything to just one person.

9   Q.  Now, focusing you on the seven years prior to your arrest

10  in this case, 2012 back to 2005, there were times when the

11  demand for medicines was very high, right?

12  A.  Yes.

13  Q.  And there were times when the demand for medicines was

14  lower on the street, right?

15  A.  Yes.

16  Q.  So your business rose and fell at different times over the

17  seven years, correct?

18  A.  It would go up and down, yes.

19  Q.  And the amount of medicine you were selling to your

20  customers would vary, depending on whether demand was up or

21  down, correct?

22  A.  Yes.

23  Q.  And in that seven-year period there were times when you

24  left the country and you weren't selling at all, correct?

25  A.  Yes.  I would sometimes leave the country.  I would go out.

EA79RIG2                          Reyes Arias - cross

1    Q.   What countries did you travel to in the seven-year period?

2    I know it's a long time, Mr. Arias Reyes, but if you could let

3    us know what countries you visited in that time period I'd be

4    appreciative.

5    A.   Only the Dominican Republic.

6    Q.   You went there after your dad died, right?

7    A.   Yes.

8    Q.   When was that?

9    A.   It's going to be five years, more or less.

10   Q.   You have family in the Dominican Republic, correct?

11   A.   My family is already here, my sisters and my mother.

12   Q.   But you've traveled to the Dominican Republic more than

13   once in the past seven years, correct?

14   A.   Yes.

15   Q.   How many times?  More than five times?

16   A.   Yes.  I would travel every year or every two years.  So

17   maybe four or five times.  I think maybe four times.

18   Q.   And how about travel within the United States,

19   Mr. Arias Reyes?  Did you ever travel to Miami between 2005 and

20   2012?

21   A.   Yes.  I went to Miami -- no, to Orlando.  I went to

22   Orlando.

23   Q.   And you went to Florida more than once in that seven-year

24   period, right?

25   A.   I haven't traveled to Florida.  Only Orlando I went twice.

EA79RIG2                           Reyes Arias - cross

1    Q.  And how about to Texas?  Did you travel to Texas between

2    2005 and '12?

3    A.  No.

4    Q.  California?

5    A.  No.

6    Q.  Anywhere else in the United States?

7    A.  No.

8    Q.  Anywhere else in the world other than the Dominican

9    Republic?

10   A.  No.  No.

11   Q.  And when you were out of New Jersey, in Orlando or in the

12   Dominican Republic, you were not selling drugs to Mr. Rigo,

13   correct?

14   A.  No.  But I went to Orlando overnight.  I didn't go to stay

15   there.

16   Q.  In what month and year did you go to Orlando on those two

17   occasions you mentioned?

18   A.  One of them was in December.  I think it was in 2008.

19   Q.  But you're not sure about that, right?

20   A.  And the other one I don't know the exact date.  I never

21   write down dates.

22   Q.  And I think you said -- you'll correct me -- that you went

23   to the Dominican Republic, did you say four or five times in

24   the seven-year period?

25   A.  Yes.

EA79RIG2                         Reyes Arias - cross

1   Q.  Other than the time you went in connection with your

2   father's death, can you tell us the month and year that you

3   traveled to the Dominican Republic?

4   A.  No.  I don't have the dates for that.  No.

5   Q.  Can you even tell us the year of one of those trips?

6   A.  The last time I went was in 2011.

7   Q.  Are you sure about that?

8   A.  Yes.

9   Q.  How about the time before that?

10  A.  I can't remember the date of that other time, no.

11  Q.  Now, when you spoke to the agents and the prosecutors in

12  this case one of the things you had a hard time remembering was

13  the volume of medicine that you sold to Mr. Rigo, correct?

14  A.  Yes.

15  Q.  You knew you did business with him, right?

16  A.  Yes.

17  Q.  And you knew you did business with him for a number of

18  years, right?

19  A.  Yes.

20  Q.  But the details of how often you did business with

21  Mr. Rigo, you weren't sure of?

22  A.  Yes.  I was sure of that.

23  Q.  Well, you knew that you did more business with -- pardon

24  me.  You knew, sir, that you did more business with my client

25  on those occasions when Poncho was away or out of town, right?

EA79RIG2                         Reyes Arias - cross

1    You were sure about that?

2    A.   Poncho disappeared for a few months.  That was already at

3    the end.  It wasn't --

4    Q.   You sold more medicine to Mr. Reyes when Poncho was out of

5    town, right or wrong?

6    A.   Not to Mr. Reyes.

7    Q.   Let me try that again since you're Mr. Reyes.

8         You -- when you spoke to the agents you were -- it was

9    clear in your mind that you did more business with Mr. Rigo

10   when Mr. Poncho was not around, right?

11   A.   Yes.

12   Q.   And you were also clear with the agents that sometimes five

13   or six months could go by when you did not do business with

14   Mr. Rigo, correct?

15   A.   Not so many would go by, no, not like that.

16   Q.   Three or four months?

17   A.   That was at the end.  The first few years it was once a

18   month that I sold to him.

19   Q.   Well didn't you tell the agents in this case that you were

20   unsure of the volume of medicine that you were selling to

21   Mr. Rigo?  Did you tell the agents that or not, sir?

22   A.   Volume?  Like what do you mean?

23   Q.   The number of bottles you were selling to Mr. Rigo.  You

24   were unsure about that.  Isn't that what you told the agents on

25   June 17, 2013 when you met with them?

EA79RIG2                          Reyes Arias - cross

1   A.  No.  I never knew the amount of bottles that I sold to him.

2   I don't have that written down.  I don't keep that register.

3   Q.  Right.  So you were making an estimate based on your memory

4   for the agents, right?

5   A.  I told them more or less approximately the amount of times

6   I sold to him.

7   Q.  Now, just -- excuse me one minute, Mr. Reyes.

8          Now is it your testimony today that it was a hundred

9   bottles a month that you sold to my client?

10          MR. DISKANT:  Can we have a time period?

11          THE COURT:  Overruled.

12          THE WITNESS:  No.  No.  That I used to buy for him

13   when I was working at the bodega.

14   Q.  Did you tell the agents on June 17, 2013 that maybe you

15   were providing Mr. Rigo with a hundred bottles per week?

16   A.  No.

17   Q.  Now, while you were actively involved in the medicine

18   business, Mr. Arias Reyes, did you keep records and ledgers of

19   your business?

20   A.  No.

21   Q.  Now, Mr. Hernandez, you testified on direct examination

22   when Mr. Distant asked you how many customers you had, you told

23   him you had two, right?

24   A.  Who is Mr. Hernandez?  Where is he?

25   Q.  You told the Court under oath on direct examination today

EA79RIG2                         Reyes Arias - cross

1   that Poncho and Mr. Rigo were your customers, right?

2   A.  They were my clients, yes.

3   Q.  You had other clients between 2005 and 2012, right?

4   A.  Yes.

5   Q.  You had a client who you sold medicine to called Mr. Omega,

6   right.

7   A.  Yes.

8   Q.  And you had a client known as Mr. Edwin or Edwin, correct?

9   A.  Yes.

10  Q.  And from time to time in that seven-year period you had

11  other clients that came and went, correct?

12  A.  Yes.

13  Q.  Do you have any records today of your dealings with any of

14  those customers?

15  A.  No.  I have no record.

16  Q.  If I were to ask you how often you provided drugs to

17  Mr. Omega you would do your best to answer my question

18  truthfully, right?

19  A.  Yes.

20  Q.  You did -- but without your records or anything you wrote

21  down you wouldn't be able to tell me with certainty how much

22  business you did with Mr. Omega, right?

23  A.  It was very few times with Mr. Omega, no.

24  Q.  Whenever it was, without having written it down, you can't

25  testify with certainty about the number of times you've dealt

EA79RIG2                          Reyes Arias - cross

1    with Mr. Omega?  Fair?

2    A.  Yes.  That's logical.

3    Q.  And the same is true for your dealings with Edwin, right?

4    A.  Yes.

5    Q.  You could try to give me your best estimate but without

6    having it written down you couldn't be sure that you were

7    correct, right?

8    A.  (No response).

9    Q.  Sir?

10   A.  That's right.

11   Q.  Now, could you please tick off for me on your fingers

12   either the names of your other customers, people that came and

13   went over the years or the way you might identify them if you

14   don't remember their names.

15   A.  Omega, Edwin, Manuel.  And I don't remember the other ones.

16   I think there aren't other ones.

17   Q.  You don't think you had other customers in that seven-year

18   period that you transacted business with, sir?

19   A.  Herberto.

20   Q.  Any others?

21   A.  I can't remember other ones, no.

22   Q.  Now, even if you don't remember their names, just by the

23   way they looked, or, you know, an accent that they had.  Can

24   you remember anything else about the other customers beyond the

25   ones you've told me about?

EA79RIG2                         Reyes Arias - cross

1    A.   No.

2    Q.   Now, you've been incarcerated since December 2012 when you

3    were arrested, right?

4    A.   Yes.

5    Q.   Are you aware -- and if you're not you can just tell me --

6    but are you aware that Mr. Poncho was never detained or

7    incarcerated?  He's out on bail?

8    A.   I didn't know that.

9    Q.   And were you aware, just let me know yes or no, that

10   Mr. Rogelio, the very dark-skinned gentleman we saw a picture

11   of, Mr. Rogelio was never detained on bail?  In fact, he's been

12   sentenced and he's out?

13              MR. DISKANT:  Your Honor, relevance.

14              THE COURT:  Overruled.

15              THE INTERPRETER:  I'm sorry.  Could you repeat the

16   end.

17              MS. HENDON:  I'm asking whether the witness is aware

18   that Mr. Rogelio was never detained or incarcerated before his

19   sentence or after.

20              THE WITNESS:  Rogelio was arrested with a friend.

21   They brought them together the same day.

22   Q.   Now, Mr. Arias Reyes, you have legal status in this

23   country, right?  Do you have a green card?

24   A.   Yes.

25   Q.   And you don't have much of a criminal history, do you?

EA79RIG2                              Reyes Arias - cross

1   Your rap sheet is very, very short.

2   A.  That's right.

3   Q.  And I know the agents found 120 fighting chickens in your

4   apartment but they didn't find any weapons or guns, right?

5   A.  There were no guns, no.

6   Q.  But is it your understanding, sir, that you were detained

7   in this case because the Court found that you were not reliable

8   in terms of your likelihood of showing up for your next court

9   appearance?

10  A.  I didn't ask for bail ever.

11  Q.  And you have a very small rap sheet, right?

12  A.  (No response).

13  Q.  You have legal status in this country, right?

14  A.  Yes.

15  Q.  You had the fighting chickens but no weapons, right?

16  A.  I had no gun, no.

17  Q.  What is your understanding -- well, withdrawn.

18          You never asked for bail in this case; is that right?

19  A.  No.

20  Q.  Is that because there's -- you have no family or ties to

21  the community other than through your medicine business?

22  A.  No.  I don't like -- the thing is that I didn't have money

23  for bail.  And the money that I was supposed to have, it was

24  owed to me by Bladimir and I didn't want to bother anyone to

25  ask them to lend me money.

EA79RIG2                    Reyes Arias - cross

1   Q.  So it's not that someone made a finding, a judge made a

2   finding that you were a risk of flight; is that correct?

3   A.  No.

4   Q.  Now I want to ask you about that money that you say my

5   client owed you, that $30,000, okay.

6   A.  Yes.

7   Q.  Actually I'm going to ask you something else first.

8           So you started cooperating with the agents in this

9   case pretty soon after you were arrested, right?

10  A.  What do you mean by fast or pretty soon?

11  Q.  Let me think about that.  Within two months.

12  A.  Yes.  More or less.  Yes.

13  Q.  And you testified on direct examination that you pled

14  guilty to bank fraud, right?

15  A.  Yes.

16  Q.  And when Mr. Diskant asked you questions about it you

17  testified about having submitted a fraudulent application for a

18  mortgage, right?

19  A.  It was a loan to buy a house.

20  Q.  You didn't just submit the application, right?  You

21  actually got the loan and bought the house, correct?

22  A.  Yes.

23  Q.  And the fraudulent part of this was that the seller had

24  given you the cash you needed in order to show, as the buyer,

25  to show the bank that you had the wherewithal to buy the house,

EA79RIG2                        Reyes Arias - cross

1   right?

2   A.  He put money in the bank for closing expenses and things

3   like that.

4   Q.  Right.  But the point of the seller putting money in the

5   bank was so it would appear to be a credit to you, right?  You

6   were trying to make the bank believe it was your assets, right?

7   A.  Yes.

8   Q.  And you talked on your direct examination about being

9   exposed to 60 years in prison under the statutory maximums in

10  this case; is that right?

11  A.  Yes.

12  Q.  And you've had conversations with at least some of the

13  government agents or prosecutors about how the guidelines would

14  apply to your case, right?

15  A.  Could you please repeat the question.

16  Q.  You've had conversations with at least some of the

17  prosecutors or agents about how the sentencing guidelines will

18  likely affect your case?

19  A.  I don't understand the question well.

20  Q.  Do you know what the term "time served" means?

21  A.  Yes.

22  Q.  What does that mean?

23  A.  Time served means the sentence is finished.

24  Q.  And you're supposed to be -- your original sentencing date

25  or your most recent sentencing date was tomorrow, right?

EA79RIG2                          Reyes Arias - cross

1    A.  No.

2    Q.  It's soon, right?  Very soon?

3    A.  I don't have a certain date yet.

4    Q.  Is it like in one month or is it like in six months?

5    A.  I wouldn't be able to tell you that.  I wouldn't be able to

6    answer you that.

7    Q.  You have no idea when you're getting sentenced, sir?

8    A.  No.  I don't have any idea.  I don't.

9    Q.  Now you're hoping to get time served in this case, right?

10   A.  That's what I hope.

11   Q.  And you understand that's possible because you're a

12   cooperator, right?

13   A.  Yes.

14   Q.  And you've had conversations about that either with the

15   agents or the prosecutors, correct?

16   A.  Yes.  But the government has not offered me any certainty

17   about that.

18   Q.  I know.  But you've told them what you would like to have

19   happen, right?

20   A.  Yes.

21   Q.  And they never told you that's impossible, forget about it,

22   did they?

23   A.  What they told me was that the judge is the one who has the

24   last word on that.

25   Q.  Now let's go back to December 2012, please.  Did you tell

EA79RIG2                    Reyes Arias – cross

1    the prosecutor last month in a meeting that come 2012 Mr. Rigo

2    started buying drugs from you twice a month?

3    A.  Yes.  At the end it was twice a month.

4    Q.  And you told Mr. Diskant that started when those arrests

5    happened in June or July 2012, right?

6    A.  Could you please repeat the question.

7    Q.  You told Mr. Diskant last month when you met with him that

8    starting in June or July of 2012 when there were so many

9    arrests in this investigation that Mr. Rigo was coming around

10   to see you twice a month?

11   A.  That was the last month.  Those were the last two sales I

12   made to Mr. Rigo.

13   Q.  Yes or no, sir.  Did you tell Mr. Diskant on September 19

14   when you met with him that starting with the 2012 arrests in

15   this case Mr. Rigo was coming to buy drugs from you two times a

16   month?

17   A.  Once a month.

18   Q.  That would be false if you had said he was buying drugs

19   from you two times a month?  That would be a lie, right?

20   A.  Yes.  It was only at the end that it was twice, as I said

21   before.

22   Q.  Isn't it a fact, Mr. Arias Reyes, that every time you sit

23   down with agents or prosecutors you tell a different story

24   about how frequently you've dealt with Mr. Rigo or how many

25   bottles you sold him when you dealt with him?

EA79RIG2                          Reyes Arias - cross

1  A.  I never told them the amount of bottles I was selling him.

2  Q.  Now isn't it true that in terms of this -- the

3  December 2012 sales, you don't have any record to prove that

4  Mr. Rigo bought drugs from you in December 2012, right?

5              MR. DISKANT:  Your Honor, this has been asked and

6  answered many times.

7              THE COURT:  Sustained.

8  Q.  Isn't it true that in December 2012 you hadn't seen

9  Mr. Rigo in a long time?

10  A.  I sold medicines to Bladimir in December.

11  Q.  In December 2012 you were not transacting any business with

12  Mr. Rigo; isn't that correct?

13  A.  I did business with Bladimir in December.

14              MS. HENDON:  Sorry, your Honor.  Just a moment,

15  please.

16              (Pause)

17  Q.  Do you remember -- withdrawn.

18              You testified on direct examination that you had

19  listened to the tape recordings of your dealings with Poncho of

20  those undercover buys that you participated in that led to your

21  arrest, correct?

22  A.  Yes.

23  Q.  And on December 3, 2012 you sold drugs to Poncho not

24  knowing that he was working undercover, right?

25  A.  I did sell to Poncho but I don't recall if it happened in

EA79RIG2                          Reyes Arias - cross

1    December -- I believe so.  I think so.

2    Q.  And on the December 3, 2012 sale with Poncho it was tape

3    recorded, right?

4    A.  Yes.

5    Q.  You didn't know that but it was tape recorded, right?

6    A.  Yes.

7    Q.  And on that tape Poncho asked you:  This guy doesn't get

8    anymore from you.

9          And you said:  Bladimir?  Bladimir hasn't been around

10   here anymore.

11         Right?

12   A.  I didn't want Poncho to know that I was selling to Bladi as

13   well, Bladimir as well.

14   Q.  But you told Poncho on that date:  Bladimir hasn't been

15   around here anymore.

16         Right?  And that's tape recorded?

17   A.  I don't remember well.  Maybe I did tell that to Poncho.

18   Q.  Okay.  Well could you take that black book right there on

19   the witness box, please, Mr. Arias, and turn to the red page

20   and that is 3503-09.

21         Mr. Arias, I don't know if you've actually seen the

22   transcript here.

23         MS. HENDON:  Your Honor, do you have a copy?

24   Q.  You have 3503-9 there?

25         Do you have that in front of you, sir?

EA79RIG2                          Reyes Arias - cross

1    A.  3503-9, yes.

2    Q.  And you see that that is -- well, I won't talk about it.

3    I'm just going to ask you if something refreshes your

4    recollection.  How's is that?

5            MR. DISKANT:  Your Honor, I don't believe the witness

6    reads English.

7            MS. HENDON:  I'm going to ask for the interpreter's

8    assistance here.

9            THE INTERPRETER:  One second, please.  Let me get my

10   glasses.

11   Q.  I'm going to ask you to turn to the green tab, please.

12   Which should be page 5 of this exhibit.  Little number 5 at the

13   bottom.

14   A.  Yes.

15   Q.  And I circled some language there at the bottom of the

16   page.  The English starts with:  "AR.  I stopped buying it" and

17   runs down to the second-to-last line and I'd just like if you

18   could read that to the witness in Spanish, please.

19           Does that refresh your memory that you told Poncho on

20   December 3 that Bladimir hasn't been around here anymore,

21   Mr. Arias Reyes?

22   A.  That doesn't mean that that is true.

23           MS. HENDON:  I have no further questions, your Honor.

24           (Continued on next page)

25

EA79RIG2                        Reyes Arias – cross

1    REDIRECT EXAMINATION

2    BY MR. DISKANT:

3    Q.   Mr. Reyes Arias sticking with the transcript you were just

4    asked about.  You said just a moment ago you didn't want Poncho

5    to know you were selling to Bladi.  Why was that?

6    A.   That's true.

7    Q.   Right.  Why didn't you want Poncho to know you were selling

8    to Bladi?

9    A.   Because then he would feel bad and I wanted to keep them

10   both.

11   Q.   They were competitors, right?

12   A.   Yes.

13   Q.   Both in the same business?

14   A.   Yes.

15   Q.   And you sold to both, right?

16   A.   Yes.

17   Q.   Now you were asked a lot of questions on cross-examination

18   about the number of times and the frequency with which you sold

19   to Bladimir.

20        Do you remember those questions?

21   A.   Yes.

22   Q.   And just to be clear.  On direct examination you talked

23   about two different time periods.  Do you remember those two

24   different time periods we talked about?

25   A.   Yes.

EA79RIG2                          Reyes Arias - redirect

1    Q.  The first time period we talked about was the time period

2    between about 1997 and about 2005 when you were working in

3    Bladimir's bodega; is that right?

4    A.  Yes.

5    Q.  During that time period approximately how many bottles of

6    medicine were you buying from Bladimir?

7            MS. HENDON:  Your Honor, I don't mind listening to

8    this.  I'm not sure it's proper redirect.  He's going over

9    direct.

10           THE COURT:  Overruled.

11           THE INTERPRETER:  Can you repeat the question please.

12           MR. DISKANT:  Certainly.

13   Q.  During that time period 1998 to 2005 when you were working

14   in Bladimir's bodega approximately how many bottles of medicine

15   were you buying a week?

16   A.  A hundred and more.  Up to two hundred.

17   Q.  A hundred bottles a week or more?

18   A.  Mm-hmm.

19   Q.  Is that a specific number or an estimate?

20   A.  It's approximate.

21   Q.  So sometimes it would have been more; sometimes it would

22   have been less?

23   A.  Yes.

24   Q.  The second time period we talked about was between 2005 and

25   your arrest in 2012 when you were working on your own.

EA79RIG2                          Reyes Arias – redirect

1           Do you remember that time period?

2    A.  Yes.

3    Q.  And I believe you testified on direct examination that

4    during that time period you sold anywhere from three thousand

5    dollars worth of medicine up to eight or nine thousand dollars

6    worth of medicine; is that right?

7    A.  Yes.

8    Q.  Again, are those definite numbers or approximate numbers?

9    A.  They're approximate.

10   Q.  And you were also asked on direct examination about how

11   frequently you sold to Bladimir.  And I believe your answer on

12   direct examination was approximately once a month.

13          Is that right?

14   A.  Yes.

15   Q.  And you were asked about how frequently you sold to Poncho

16   as well.  And I believe your answer was two to three times a

17   month.

18          Is that right?

19   A.  Mm-hmm.

20   Q.  So when you told the government at one point that you sold

21   more frequently to Poncho, what did you mean?

22   A.  Yes.  Poncho would come over more than Bladimir.

23   Q.  So when you said you sold not as frequently to Bladimir,

24   what did you mean?

25   A.  That I sold to him once a month.

EA79RIG2                          Reyes Arias – redirect

1    Q.  You were asked a number of questions about alcohol on

2    cross-examination.

3            Do you remember those questions?

4    A.  Yes.

5    Q.  You've been living at the MDC for approximately 22 months

6    at this point?

7    A.  Yes.  I've been living there.

8    Q.  And during that time period have you had any drinks, any

9    alcohol?

10   A.  No.

11   Q.  Sitting here today is your mind clear?

12   A.  Yes.

13   Q.  Do you understand the questions you're being asked?

14   A.  Yes.

15           MR. DISKANT:  Thank you, your Honor.  Nothing further.

16           MS. HENDON:  No recross, Judge.

17           THE COURT:  Pardon me.

18           MS. HENDON:  No recross.

19           THE COURT:  Thank you.

20           (Witness excused)

21           MR. DISKANT:  Your Honor the government has one final

22   witness, Special Agent Tony Roa with the FBI.

23     ANTONIO RAO,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

EA79RIG2                    Reyes Arias – redirect

1    DIRECT EXAMINATION

2    BY MR. DISKANT:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  Are you currently employed?

6    A.  Yes I am.

7    Q.  Where do you work?

8    A.  Federal Bureau of Investigation.

9    Q.  If you could just keep your voice up, I'd appreciate it.

10   A.  Okay.

11   Q.  What's your current title?

12   A.  Special agent.

13   Q.  How long have you been a special agent with the FBI?

14   A.  Seven-and-a-half years.

15   Q.  Are you currently assigned any particular group or unit?

16   A.  I am.

17   Q.  What's that group?

18   A.  Healthcare task force.

19   Q.  What sort of work does the healthcare task force do?

20   A.  All aspects of healthcare fraud and drug diversion.

21   Q.  And with respect to drug diversion in particular, are you

22   familiar with an HIV/AIDS medication diversion scheme?

23   A.  Yes, I am.

24   Q.  You participated in an investigation of that scheme?

25   A.  Yes, I have.

EA79RIG2                          Rao - direct

1    Q.  During the course of that investigation did you become

2    familiar with someone named Bladimir Rigo?

3    A.  Yes, I have.

4    Q.  How did you become familiar with him?

5    A.  I arrested him.

6    Q.  Just to be clear, so we're all on the same page, do you see

7    Mr. Rigo in the courtroom today?

8    A.  Yes, I do.

9    Q.  Can you identify him with an article of clothing?

10   A.  He's sitting in the back, right wearing a dark-colored

11   suit.

12            MR. DISKANT:  Indicating the defendant.

13   Q.  Has Mr. Rigo been arrested as part of this case?

14   A.  Yes, he has.

15   Q.  When did that arrest occur?

16   A.  September 17, 2013.

17   Q.  Did you participate in that arrest?

18   A.  Yes, I did.

19   Q.  Where did it occur?

20   A.  At his residence in Newark, New Jersey.

21   Q.  And at the time of his arrest was anything recovered from

22   the residence?

23   A.  Yes.

24   Q.  What was recovered?

25   A.  Four journals.

EA79RIG2                        Rao - direct

1   Q.  I'm going to hand you -- I apologize.

2           I'm going to show you in just a moment a number of

3   items that are already in evidence as Government Exhibits 204,

4   '5, '6, and '7.

5           MR. DISKANT:  Your Honor, may I approach?

6           THE COURT:  Yes.

7   Q.  Do you recognize those?

8   A.  Yes, I do.

9   Q.  What are they?

10  A.  These are the journals that were seized during his arrest.

11  Q.  Do you know where they were recovered from?

12  A.  Yes, I do.

13  Q.  Where?

14  A.  His bedroom dresser.

15  Q.  Since recovering those ledgers or books have you had a

16  chance to review them?

17  A.  Yes, I have.

18  Q.  What have you found?

19  A.  I found a number of lists that contain HIV medication and

20  dollar amounts.

21          MR. DISKANT:  If we can bring up, Ms. Craig, what's

22  been marked for identification purposes as Government Exhibit

23  202.

24  Q.  As part of your investigation, have you removed or copied

25  some of the pages from these ledgers?

EA79RIG2                          Rao - direct

1   A.  Yes, I have.

2   Q.  Do you recognize Government Exhibit 202 as those pages?

3   A.  Yes.  That's one of the pages.

4   Q.  Are they fair and accurate copies of those pages?

5   A.  Yes, it is.

6           MR. DISKANT:  The government offers 202.

7   Q.  Did you take any further investigative steps --

8           MR. DISKANT:  Your Honor, is government 202 received.

9           THE COURT:  Yes.

10          (Government's Exhibit 202 received in evidence)

11  Q.  Approximately how many pages does government 202 consist

12  of?

13  A.  Approximately twelve pages.

14  Q.  And did you take any further investigative steps with

15  respect to these pages?

16  A.  Yes, I did.

17  Q.  What did you do?

18  A.  I looked up the drug in question.  So, for example, Atripla

19  I looked at the Medicaid reimbursement value chart.  And then

20  multiplied the amount of drugs times the value for that drug.

21  Q.  We're going to go through that a little bit more slowly but

22  let me ask first:  Why were you doing that?

23  A.  To determine the value for the items on the list.

24  Q.  Are you familiar with the term "Medicaid reimbursement

25  value"?

EA79RIG2                          Rao - direct

1  A.  Yes.

2  Q.  What is that?

3  A.  That is the value that Medicaid pays pharmacies for said

4  drug.

5  Q.  So every time the bottle is dispensed, if Medicaid is being

6  billed for it, that's what they're paying for it?

7  A.  Correct.

8  Q.  You talked about a Medicaid price list or chart.  I'm

9  handing you what's been marked for identification purposes as

10  Government Exhibit 201.

11          Do you recognize that?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  This is the 2012 Medicaid reimbursement chart.

15  Q.  Where was that obtained?

16  A.  New York State Department of Health.

17  Q.  Did you obtain it?

18  A.  Yes, I did.

19  Q.  Is that a fair and accurate copy of the information you

20  obtained from the New York State Department of Health?

21  A.  Yes.

22          MR. DISKANT:  The government offers 201.

23          THE COURT:  Admitted.

24          (Government's Exhibit 201 received in evidence)

25  Q.  Now you were talking just a moment ago about drug the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EA79RIG2                          Rao - direct

1  Atripla?  You notice that on the first page of the ledger?

2  A.  Yes, I do.

3  Q.  What is Atripla?

4  A.  Atripla is a HIV medication.

5  Q.  How do you know that?

6  A.  I've handled the drug.

7  Q.  Is it one of the drugs involved in this scheme?

8  A.  Yes, it is.

9  Q.  If you were to seek to determine the Medicaid reimbursement

10  value of a bottle of Atripla, how would you go about doing

11  that?

12  A.  I would look at the Medicaid reimbursement chart, find

13  Atripla on the chart, and then multiply the amount of pills

14  times the Medicaid reimbursement value.

15         MR. DISKANT:  So, Ms. Craig, if we could bring up page

16  34 of Government Exhibit 201.

17  Q.  So this is a page from the Medicaid chart in front of you.

18  If we could focus in on Atripla.  It's about halfway down.

19         It looks like the price per tablet for Atripla is

20  about $62.36 or thereabouts?

21  A.  That's correct.

22  Q.  What do you do with that price?

23  A.  I multiply the $62.35 times the amount of pills that I

24  have.

25  Q.  How many pills are in a bottle of Atripla?

EA79RIG2                          Rao - direct

1   A.  Thirty.

2   Q.  How do you know that?

3   A.  Because I've handled bottles of Atripla.

4           MR. DISKANT:  So if we can go back, Ms. Craig, to the

5   first page of 202.

6   Q.  So this is one of the pages from the ledger recovered in

7   the defendant's residence at the time of his arrest?

8   A.  Okay.  Yes.

9   Q.  So 35 Atripla.  What do you do next?

10  A.  I multiple the 35 times 30.  And then multiply that total

11  times the $62.35.

12          MR. DISKANT:  Ms. Craig if we could swap the top one

13  out.  If we could go to page 3 of Government Exhibit 202.

14          Could you make that a lot bigger.

15  Q.  So we've heard a little bit of testimony about this

16  particular page.  Do you recognize Atripla here?

17  A.  Yes, I do.

18  Q.  And next to it is the number 12?

19  A.  Yes.

20  Q.  What do you understand that to mean?

21  A.  I believe "12" to be 12 bottles.

22  Q.  Could it be 12 pills?

23  A.  I don't believe so.

24  Q.  Why not?

25  A.  Because 12 pills of Atripla times the Medicaid

EA79RIG2                          Rao - direct

1    reimbursement value would be about $700.  And to the right of

2    12X is 2400.

3    Q.  So your understanding is that the 12 refers to 12 bottles?

4    A.  Correct.

5    Q.  Using that information, were you able to determine, along

6    with the Medicaid chart in front of you, the Medicaid

7    reimbursement value of the 12 bottles of Atripla?

8    A.  Yes.

9    Q.  And following that process were you able to tally up the

10   Medicaid reimbursement value of the various pages from the

11   ledgers recovered from the defendant's residence?

12   A.  Yes.

13   Q.  What was the total approximate Medicaid reimbursement value

14   of all of these medicines?

15   A.  2.1 million.

16   Q.  Let me show -- have you created any sort of a chart or

17   summary of that?

18   A.  I did.

19   Q.  And let me direct your attention -- actually we'll just

20   bring it up.  I think it may be easier.

21          MR. DISKANT:  Government Exhibit -- bear with me for

22   just a moment.

23          (Pause)

24          212.  If we could bring up Government Exhibit 212.

25   Q.  Do you recognize that Special Agent?

EA79RIG2                        Rao - direct

1   A.  Yes, I do.

2   Q.  What is it?

3   A.  That is the spreadsheet that I created.  It's a summary of

4   the Medicaid reimbursement values for the twelve pages that I

5   reviewed.

6   Q.  The twelve pages from the ledgers recovered from the

7   defendant's residence?

8   A.  Yes.

9   Q.  And what is this information based on?

10  A.  This is based on the Medicaid reimbursement values and the

11  amount of pills in the ledger.

12  Q.  So is it a fair and accurate summary of the information

13  contained from those two items of evidence?

14  A.  Yes, it is.

15          MR. DISKANT:  Government offers 212.

16          THE COURT:  It's admitted.

17          (Government's Exhibit 212 received in evidence)

18  Q.  I asked just a moment ago, Special Agent Roa, if you were

19  able to determine the total Medicaid value of the bottles

20  reflected in the ledgers.  Government Exhibit 212 seems to

21  reflect the number of 2.4 million.  Does that refresh your

22  recollection on that point?

23  A.  Yes.  That's correct.  2.4 million.

24  Q.  Just to be clear.  I want to make sure we're all on the

25  same page about how this was created.

1                I asked you a few moments ago about how many pages

2     made up Government Exhibit 202 and you said approximately 12?

3     A.  Yes.

4     Q.  Are those the page numbers reflected across the top of the

5     chart?

6     A.  Yes, they are.

7     Q.  And let's then go over to the far left-hand column.  What

8     is that?

9     A.  That's the name of the drugs.

10    Q.  So those are the names of the various drugs involved?

11    A.  Yes.

12    Q.  Are you familiar with these drugs?

13    A.  I am.

14    Q.  What sorts of drugs are those?

15    A.  They are HIV medication.

16    Q.  And how did you become familiar with these drugs?

17    A.  Through my investigation.  And I've also handled many of

18    these drugs.

19    Q.  The next column over appears to indicate the number of

20    pills per bottle?

21    A.  Correct.

22    Q.  How did you gather that information?

23    A.  Again, I've handled many of the bottles themselves.

24    Q.  And so then as we go across there seem to be various

25    numbers for various pages.  What do those correspond to?

EA79RIG2                            Rao - direct

1   A.   Those correspond to the number of -- the number on the

2   journal.

3   Q.   So, for example, we were talking just a moment ago about

4   the Atripla 12 on page 3?

5   A.   Correct.

6   Q.   There's a 12 on page 3 next to Atripla here as well?

7   A.   Yes.

8   Q.   And then going all the way over to the far side of the

9   column there appears to be a column indicating the Medicaid

10  reimbursement price per pill?

11  A.   Yes.

12  Q.   That's information which came from the chart in front of

13  you?

14  A.   Yes.

15  Q.   And what's the final column?

16  A.   The final column is the total Medicaid cost for all the

17  pages.

18  Q.   So number of pills times price per pill?

19  A.   Correct.

20  Q.   And the total again is approximately 2.4 million?

21  A.   Correct.

22  Q.   Were there any words or medicines in the ledgers before you

23  that you didn't recognize?

24  A.   Yes, there was.

25  Q.   Does this chart account for them in any way?

EA79RIG2                          Rao - direct

1   A.  It does.  They are towards the bottom of the page.

2          MR. DISKANT:  So, for example, if we could go back,

3   Ms. Craig, to page three of Government Exhibit 202 for just a

4   moment.

5   Q.  The very top line has a word beginning with an E?

6   A.  Yes.

7   Q.  Appears to be Especials.  Is that a familiar medicine to

8   you?

9   A.  It is not.

10  Q.  Does that line of the ledger appear on your summary chart

11  anywhere?

12  A.  Yes, it does.

13  Q.  Where is it?

14  A.  It is towards the bottom -- if you look at the top and see

15  page 3, and follow it towards the bottom, you'll see Especials

16  and 39 bottles.

17  Q.  Did you ascribe any value to the 39 Especials?

18  A.  I did.  I used the 3900 which was on the list.

19  Q.  So that's the price reflected on the ledger?

20  A.  Correct.

21  Q.  Based on your participation in the investigation as well as

22  your review of the chart in front of you do you have an

23  understanding of the street price as opposed to the Medicaid

24  price of the medicines involved in the scheme?

25  A.  The Medicaid price is substantially higher.

EA79RIG2                         Rao - direct

1   Q.   Than the street price?

2   A.   Than the street price.

3   Q.   So, again, we've been talking about this Atripla 2400.

4        Is $2,400 higher or lower than the Medicaid value of

5   12 bottles of Atripla?

6   A.   Lower.

7   Q.   Special Agent Roa, are you familiar with someone named

8   Hermenegildo Fernandez?

9   A.   Yes, I am.

10  Q.   Does he go by any other names?

11  A.   Yes.  Poncho.

12  Q.   Are you familiar with the search conducted of Poncho's

13  warehouse in approximately June of 2012?

14  A.   Yes.

15  Q.   How are you familiar with it?

16  A.   I was present during the search.

17  Q.   So you're familiar with the thousands of prescription

18  bottles that were recovered during that search?

19  A.   Yes.

20  Q.   Have you taken any further investigative steps with respect

21  to those bottles?

22  A.   Yes, I did.

23  Q.   What have you done?

24  A.   Similar to the other charts I calculated the total amount

25  of drugs and multiplied that by the Medicaid reimbursement

EA79RIG2                              Rao - direct

1    value to come to a total.

2    Q.  And we've been talking a bit about the 2012 Medicaid

3    reimbursement table.  Was that available to you at the time?

4    A.  It was not.

5    Q.  What did you use?

6    A.  I used the 2011.

7    Q.  Handing you what's been marked for identification purposes

8    as Government Exhibit 217.  Do you recognize that?

9    A.  Yes.  This is the 2011 Medicaid reimbursement chart.

10   Q.  Where was that obtained from?

11   A.  New York State Department of Health.

12   Q.  And is the document in front of you a fair copy of the

13   information that was obtained from the New York State

14   Department of Health?

15   A.  Yes.

16           MR. DISKANT:  Government offers 217.

17           THE COURT:  It's admitted.

18           (Government's Exhibit 217 received in evidence)

19   BY MR. DISKANT:

20   Q.  Using Government Exhibit 217 as well as the inventory of

21   bottles recovered from Poncho's warehouse were you able to come

22   up with an approximate Medicaid reimbursement value of the

23   pills or drugs in Poncho's warehouse?

24   A.  Yes.

25   Q.  Did you create any sort of chart or document with respect

EA79RIG2                          Rao - direct

1    to those?

2    A.  I did.

3    Q.  What did you create?

4    A.  I created a similar spreadsheet that lists all the drugs

5    and the Medicaid reimbursement values along with the totals.

6    Q.  What was the approximate total Medicaid reimbursement value

7    of the drugs recovered from Poncho's warehouse?

8    A.  Approximately 6.2 million.

9            MR. DISKANT:  Ms. Craig, if we could bring up

10   Government Exhibit 215.

11   Q.  Special Agent Roa, do you recognize this document?

12   A.  Yes.

13           MS. HENDON:  Your Honor, I'm going to object to the

14   testimony about the drugs in Poncho's warehouse until there's

15   any foundation layed by a government witness connecting

16   Mr. Rigo to any of the drugs in that warehouse.  I think this

17   is all irrelevant.  I know this is a bench trial.  I'm happy to

18   listen to it.  But there has been no testimony by a government

19   witness connecting my client to that warehouse or any of that

20   medicine.

21           THE COURT:  Overruled.

22   Q.  Do you recognize this document?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  It is a summary of the Medicaid reimbursement values for

EA79RIG2                          Rao - direct

1   the drugs that were seized at Poncho's warehouse.

2   Q.  What is it based on?

3   A.  It's based on the 2011 Medicaid reimbursement chart and the

4   amount of drugs.

5   Q.  Fair and accurate summary of information obtained from

6   those items?

7   A.  Yes.

8           MR. DISKANT:  Government offers 215.

9           THE COURT:  It's admitted.

10          (Government's Exhibit 215 received in evidence)

11  Q.  We've been talking a lot about the drug Atripla.  Was any

12  drug Atripla -- was any Atripla recovered from Poncho's

13  warehouse?

14  A.  Yes.

15          MR. DISKANT:  Ms. Craig, if we could zoom in on the

16  first part of this page.  We're talking about Atripla.

17  Q.  So it looks like there were approximately 2600 Atripla

18  tablets recovered?

19  A.  Correct.

20          MR. DISKANT:  Zoom out just a little bit more.

21  Q.  Looks like the Medicaid reimbursement price at that point

22  was approximately $54.50?

23  A.  Correct.

24  Q.  For a total -- keep going -- of approximately $142,000?

25  A.  Correct.

EA79RIG2                          Rao – direct

```
1              MR. DISKANT:  If we could go to the final page of
2      Government Exhibit 215.
3      Q.  As we do this, is it fair to say there were several
4      thousand bottles recovered?
5      A.  Yes.
6      Q.  Were loose pills also recovered?
7      A.  Yes.
8      Q.  Are they included in this count?
9      A.  They are.
10     Q.  So it looks like the total number of pills was just short
11     of a million?
12     A.  Yes.
13     Q.  And the total Medicaid reimbursement value was a little
14     over $6 million?
15     A.  Yes.
16     Q.  Special Agent Roa, are you familiar with individual's named
17     Arcadio Reyes Arias and Rogelio Leyba?
18     A.  Yes, I am.
19     Q.  How are you familiar with them?
20     A.  I arrested them both.
21     Q.  Prior to arresting them both did you participate in any
22     sort of investigation into them?
23     A.  Yes.
24     Q.  When did you arrest them?
25     A.  December 20, 2012.
```

EA79RIG2                          Rao – direct

1    Q.   And the investigation occurred prior to that?

2    A.   Yes.

3    Q.   What sort of investigative steps did you take with respect

4    to those individuals?

5    A.   I made recordings and I did controlled buys.

6    Q.   What's a controlled buy?

7    A.   It's a buy with a source that is controlled by the FBI.

8    Q.   And what were you buying from the defendants Arcadio

9    Reyes Arias and Rogelio Leyba?

10   A.   Prescription medication.

11   Q.   HIV medication?

12   A.   Yes.

13   Q.   Who was the source you were using to conduct these buys?

14   A.   Poncho.

15   Q.   Let's start with Mr. Reyes Arias first.  How many

16   controlled buys did you conduct with Mr. Reyes Arias?

17   A.   Two.

18   Q.   And on each occasion approximately how much medication were

19   you purchasing?

20   A.   We purchased $5,000 worth each time.

21   Q.   Just to be clear.  When you say you purchased $5,000 are

22   you referring to the street price of the drugs or the Medicaid

23   price of the drugs?

24   A.   The street price.

25   Q.   And the street price being substantially lower than the

EA79RIG2                         Rao - direct

1    Medicaid price?

2    A.   Correct.

3    Q.   After conducting those buys did you conduct an inventory of

4    the medicines you purchased?

5    A.   Yes, I did.

6    Q.   Were you able to determine the Medicaid reimbursement value

7    of those bottles?

8    A.   Yes.

9    Q.   How did you do that?

10   A.   The same way I did the other spreadsheets.  I calculated

11   the amount of drugs and multiplied by the Medicaid

12   reimbursement value.

13   Q.   How did the Medicaid reimbursement value of those drugs

14   compare to the $5,000 street price?

15   A.   It was significantly higher.

16        MR. DISKANT:  So if I could bring up Government

17   Exhibit 213.

18   Q.   Do you recognize that?

19   A.   Yes.

20   Q.   What is it?

21   A.   That is a summary of the Medicaid reimbursement values for

22   the October buy from Chino.

23   Q.   Was this the first or the second buy?

24   A.   This was the first.

25   Q.   What is this based on?

EA79RIG2                          Rao - direct

1   A.  This is based on the 2011 Medicaid reimbursement values.

2   Q.  And?

3   A.  And the amount of drugs.

4   Q.  Is this a fair characterization of those items and that

5   information?

6   A.  Yes.

7             MR. DISKANT:  Government offers 213.

8             THE COURT:  It's admitted.

9             (Government's Exhibit 213 received in evidence)

10  Q.  What was the total Medicaid reimbursement value of the

11  bottles that you paid $5,000 to Mr. Reyes Arias for?

12  A.  45,000.

13  Q.  By the way, does Mr. Reyes Arias go by any other names?

14  A.  He does.

15  Q.  What names does he go by?

16  A.  Chino.

17  Q.  So you paid $5,000 to Chino and received bottles with a

18  Medicaid reimbursement value of approximately $45,000?

19  A.  Correct.

20  Q.  How about during the second buy?

21            MR. DISKANT:  If we could bring up Government Exhibit

22  214.

23  Q.  Do you recognize this?

24  A.  Yes.  I created it.

25  Q.  What is it?

EA79RIG2                          Rao - direct

1    A.   It is a summary of the December buy from Chino.

2    Q.   And you -- to create this you followed the same process

3    we've been talking about?

4    A.   Yes.

5              MR. DISKANT:   Government offers 214.

6              THE COURT:   It's admitted.

7              (Government's Exhibit 214 received in evidence)

8    Q.   Approximately how much did you pay Chino as part of this

9    controlled buy?

10   A.   5,000.

11   Q.   That's the street price again?

12   A.   Yes.

13   Q.   What was the Medicaid reimbursement value of the bottles

14   you obtained in return?

15   A.   60,000.

16   Q.   So between the two sales you obtained approximately a

17   hundred thousand dollars worth of Medicaid-value medicine?

18   A.   Correct.

19   Q.   In return for approximately $10,000 in cash?

20   A.   Yes.

21   Q.   And you mentioned in addition to doing these controlled

22   buys from Chino you also did similar controlled buys with

23   another target, Rogelio Leyba?

24   A.   That's correct.

25   Q.   How many controlled buys did you do for Mr. Leyba?

EA79RIG2                          Rao - direct

1    A.  Two buys.

2    Q.  What source or sources did you use to conduct those buys?

3    A.  Poncho.

4    Q.  And were you able to similarly determine the Medicaid

5    reimbursement value of the bottles you bought from Mr. Leyba?

6    A.  Yes.

7              MR. DISKANT:  So if we could bring up Government

8    Exhibit 209.

9    Q.  Do you recognize this?

10   A.  Yes.

11   Q.  What is it?

12   A.  This is a summary of the Medicaid reimbursement values from

13   the August buy from Rogelio.

14   Q.  Who created Government Exhibit 209?

15   A.  I did.

16   Q.  What did you create it from?

17   A.  I used the 2011 Medicaid reimbursement values and the

18   amount of drugs that we purchased.

19             MR. DISKANT:  Government offers 209.

20             THE COURT:  It's admitted.

21             (Government's Exhibit 209 received in evidence)

22   Q.  What was the total Medicaid reimbursement value of the

23   bottles you bought from Rogelio on August 14, 2012?

24   A.  Approximately 36,000.

25   Q.  How much did you pay in street value for these medicines?

EA79RIG2                          Rao – direct

1   A.  4,000.

2   Q.  You mentioned you did two buys with Mr. Leyba?

3   A.  Yes.

4            MR. DISKANT:  If we could bring up Government Exhibit

5   210.

6   Q.  Do you recognize this?

7   A.  Yes.  I created it.

8   Q.  What is it?

9   A.  It's a summary of the October buy –– I'm sorry, November

10  buy from Rogelio.

11  Q.  So this was the second buy?

12  A.  Yes.

13  Q.  And you mentioned you created this?

14  A.  I did.

15  Q.  How did you create it?

16  A.  I looked up this drug in question, calculated the amount of

17  drugs, and multiplied it, and got the total.

18           MR. DISKANT:  Government offers 210.

19           THE COURT:  It's admitted.

20           (Government's Exhibit 210 received in evidence)

21  Q.  What was the total Medicaid reimbursement value of the

22  bottles you bought from Leyba on November 30, 2012?

23  A.  Approximately 62,000.

24  Q.  How much cash in street value did you pay Mr. Leyba for

25  these medicines?

EA79RIG2                        Rao - direct

1    A.  5,000.

2    Q.  So, again, the two sales for Mr. Leyba you paid

3    approximately $9,000 and got approximately $100,000 in Medicaid

4    value?

5    A.  Correct.

6    Q.  In addition to the controlled buys, did you and other

7    agents conduct any searches as part of the investigation of

8    Mr. Leyba and Mr. Reyes Arias?

9    A.  Yes, we did.

10   Q.  Where did you search?

11   A.  At their residences.

12   Q.  Let's start with Chino, Mr. Reyes Arias.  Did you find

13   anything?

14   A.  Yes.  We found HIV medication.

15   Q.  Did you create any sort of a chart or summary of what you

16   found?

17   A.  I did.

18          MR. DISKANT:  If we could bring up Government Exhibit

19   218.

20   Q.  Do you recognize that?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is a summary of the search at Chino's residence.

24          MR. DISKANT:  Government offers 218.

25          THE COURT:  It's admitted.

EA79RIG2                          Rao - direct

1            (Government's Exhibit 218 received in evidence)

2   Q.   Special Agent Roa, I want to direct your attention to the

3   very bottom where the number 481 appears.   Do you see that?

4   A.   Yes, I do.

5   Q.   What does that reflect?

6   A.   That's the amount of items that were seized.

7   Q.   The amount of bottles that were recovered?

8   A.   No, it's not.

9   Q.   Were there non-bottled items included in that tally?

10  A.   Yes, there was.

11  Q.   What non-bottled items were included?

12  A.   There were syringes and Lidoderm patches.

13  Q.   So starting with the syringes.   It looks like there were

14  approximately 172 syringes recovered?

15  A.   Correct.

16  Q.   And those were part of the 481 items tallied?

17  A.   Yes.

18  Q.   And there were approximately 147 patches?

19  A.   Correct.

20  Q.   Those are also part of the 481 total items tallied?

21  A.   Correct.

22  Q.   So if I were to ask you how many total bottles of medicine

23  were recovered it sounds like that number would be

24  substantially lower than 481?

25  A.   That's correct.

EA79RIG2                         Rao - direct

1    Q.  Did you also conduct a search of Mr. Leyba's residence?

2    A.  I did.

3    Q.  What did you find?

4    A.  I found HIV medication.

5    Q.  And before moving on.  I should just stop here.  What was

6    the total Medicaid reimbursement value of the bottles that you

7    did find in Chino's residence?

8    A.  73,000.

9    Q.  Turning back again to Mr. Leyba.

10           Have you prepared a similar chart documenting your

11   findings with respect to Mr. Leyba?

12   A.  I have.

13           MR. DISKANT:  If we could bring up Government Exhibit

14   219.

15   Q.  Do you recognize this?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  This is a summary of the items that were seized from

19   Rogelio's residence.

20   Q.  Who prepared it?

21   A.  I did.

22   Q.  And how did you prepare it?

23   A.  I listed the drugs that were found and multiplied it by the

24   Medicaid reimbursement value.

25   Q.  Which you obtained from the charts we've been talking

EA79RIG2                          Rao - direct

1   about?

2   A.   Yes.

3           MR. DISKANT:  Government offers 219.

4           THE COURT:  I'm sorry.

5           MR. DISKANT:  Government offers 219.

6           THE COURT:  It's admitted.

7           (Government's Exhibit 219 received in evidence)

8           MR. DISKANT:  Go to the second page of 219.

9   Q.   What was the total Medicaid reimbursement value of the

10  bottles you recovered from Mr. Leyba's residence?

11  A.   86,000.

12          MR. DISKANT:  Your Honor, if I could just have a

13  moment.

14          (Pause)

15          Nothing further.

16          MS. HENDON:  Your Honor, would it -- with your

17  permission we would like to divide the cross-examination of

18  Agent Roa between Ms. Amdur and Ms. Mohan, spare us calling the

19  agent on a defense case, if that's all right.

20          THE COURT:  Any objection from the government?

21          MR. DISKANT:  No, your Honor.

22          THE COURT:  Okay.

23          MS. AMDUR:  Thank you, your Honor.

24          Your Honor, may I proceed?

25          THE COURT:  Yes.

EA79RIG2                        Rao – direct

1    CROSS-EXAMINATION

2    BY MS. AMDUR:

3    Q.  Good afternoon, Agent Roa.

4    A.  Good afternoon.

5    Q.  Agent Roa, to arrive at your $2.4 million loss figure on

6    Government's Exhibit 212 you tallied up the drugs on the lists

7    recovered from Mr. Rigo's home, correct?

8    A.  Correct.

9    Q.  And these lists were loose sheets of paper, correct?

10   A.  Correct.

11   Q.  Found stuffed into notebooks in Mr. Rigo's home?

12   A.  They were open on his dresser.

13   Q.  Agent Roa, do you have Government's Exhibit 202 in front of

14   you?

15   A.  I do not.

16          MS. AMDUR:  May I approach, your Honor?

17          THE COURT:  Yes.

18   Q.  So I've just handed you a copy of Government's Exhibit 202

19   which are the lists recovered from Mr. Rigo's home.  Surely

20   you'll notice that these lists are handwritten, correct?

21   A.  Yes.

22   Q.  And you notice that the handwriting is not the same on all

23   of the pages, correct?

24   A.  Correct.

25   Q.  And sometimes it appears that there's more than one

EA79RIG2                         Roa – cross

1   person's handwriting on a single page, correct?

2   A.  I'm not sure.

3   Q.  And at no time did you or your colleagues subpoena Mr. Rigo

4   for handwriting exemplars, correct?

5   A.  Correct.

6   Q.  You're not a handwriting expert, are you, Agent Roa?

7   A.  I am not.

8   Q.  And, in fact, in your direct testimony you offered no

9   opinion on whose handwriting is on any of these page, correct?

10  A.  Correct.

11  Q.  Now, Mr. Rigo's name first became known to you and your

12  colleagues no later than August or September 2012, correct?

13  A.  Correct.

14  Q.  That was around when you set up the meeting between

15  Mr. Rigo and Mr. Fernandez, also known as Poncho?

16  A.  Let me backtrack.

17          After Poncho was arrested in June of 2012 he received

18  a phonecall from Bladimir.  He then told us about that

19  phonecall.  And that was around June or July of 2012.

20  Q.  So then to be clear between June or July of 2012 and now,

21  over two years later, at no time did anyone in the FBI or

22  Department of Justice obtain handwriting exemplars from

23  Mr. Rigo?

24  A.  Correct.

25  Q.  Or engage a handwriting expert to look at these?

EA79RIG2                          Roa - cross

1   A.  Correct.

2   Q.  Agent Roa, you're not in a position to say whether these

3   lists reflect medications changing hands, are you?

4           MR. DISKANT:  Objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  No.

7   Q.  You understand the way that these lists generally were used

8   was the person with the inventory perhaps made a list of

9   available medications, correct?

10  A.  Can you repeat the question.

11  Q.  You understand that the way these lists may have been used

12  was the person with the inventory, medication to sell, made a

13  list of what they had, correct?

14  A.  Correct.

15  Q.  And then the person with the inventory could give the list

16  to buyers or to intermediaries who might have buyers, correct?

17  A.  Correct.

18  Q.  And the people with the inventory could provide the list of

19  available medications to multiple buyers or multiple

20  intermediaries?

21  A.  Correct.

22  Q.  And then the buyers might fill in the prices that they'd be

23  willing to pay, correct?

24  A.  Correct.

25  Q.  And a deal might or might not result, correct?

EA79RIG2                          Roa - cross

1    A.  Correct.

2    Q.  And sometimes the buyers might write down the drugs that

3    they were interested in and the prices they'd pay and give that

4    to the sellers, correct?

5    A.  Could happen.

6    Q.  And sometimes again to multiple sellers?

7    A.  Correct.

8    Q.  And, again, a deal might or might not result, correct?

9    A.  Correct.

10   Q.  So, Agent Roa, if you look at Government Exhibit 202 and

11   turn to the page marked 56.  I think it should be that first

12   sheet.

13   A.  Yep.

14   Q.  Looking at this list, you can't tell that a transaction

15   took place, can you?

16   A.  I cannot.

17   Q.  But you included the numbers from this page in your

18   computation of loss, didn't you?

19   A.  I did.

20   Q.  And so the only basis for including the numbers from this

21   page in your loss calculation was an assumption that you made,

22   correct?

23   A.  Correct.

24   Q.  And now if you flip to page 57.  It's the next page.  And

25   looking at this list you can't tell that a transaction took

EA79RIG2                    Roa - cross

1    place, can you?

2    A.   No.

3    Q.   But, again, you included the numbers on this list in your

4    loss calculation, correct?

5    A.   Correct.

6    Q.   And, again, the only basis for including anything from this

7    page in your loss calculation was an assumption that you made,

8    correct?

9    A.   Correct.

10   Q.   And now if you flip to page 63.  And, again, looking at

11   this list you can't tell that a transaction took place, can

12   you?

13   A.   No.

14   Q.   And, again, you included the numbers from this page in your

15   loss calculation in Government Exhibit 212, correct?

16   A.   Yes.

17   Q.   And, again, the only basis for including this in your loss

18   calculation was an assumption you made, correct?

19   A.   Correct.

20   Q.   Now, Agent Roa, if you can flip back to page 59.

21           This list looks a little different from the previous

22   three that we've looked at, correct?

23   A.   Correct.

24   Q.   You see a drug name followed by a number, times another

25   number, equals another number, correct?

EA79RIG2                        Roa - cross

1    A.  Correct.

2    Q.  I take it you included the information on this page in your

3    loss calculation because you believe it's reflective of a

4    prescription drug sale for which Mr. Rigo should be held

5    accountable, correct?

6    A.  Correct.

7    Q.  But, again, isn't it true that you made an assumption in

8    this regard?

9    A.  No.  That's not true.  From my experience, individuals like

10   Mr. Rigo tend to retain receipts for their drugs.  And this, in

11   my opinion, is a receipt.

12   Q.  Well, I'm asking:  Is there anything on the face -- there's

13   nothing on the face of this record that indicates that drugs or

14   money changed hands, correct?

15   A.  No.

16   Q.  And is it also possible that what we see on this list is a

17   list from a potential buyer indicating the prices that he or

18   she would pay for these drugs?

19   A.  Correct.  Or did pay.

20   Q.  It could be something like a bid, correct?

21   A.  Correct.

22   Q.  And, again, is it fair to say you made an assumption about

23   what this record reflects?

24   A.  Okay.

25   Q.  So, Agent Roa, in using these lists for your loss

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EA79RIG2                        Roa - cross

1    calculation, every time you saw the name of a drug with a
2    number next to it you considered it to be a sale or
3    contemplated sale; is that fair?
4    A.  Yes.
5    Q.  Now, Mr. Fernandez, also known as Poncho, has been
6    cooperating with the government since June 2012 and he's still
7    cooperating with the government, right?
8    A.  Correct.
9    Q.  And at no time did you ever show these lists to Poncho and
10   ask him if they were a record of a transaction between he and
11   Mr. Rigo, correct?
12   A.  Correct.
13   Q.  And Mr. Rogelio Leyba has also been providing information
14   to the government, correct?
15   A.  Yes.
16   Q.  And at no time did you show these lists to Mr. Leyba and
17   ask him if they were a record of a transaction he did with
18   Mr. Rigo, correct?
19   A.  Correct.
20   Q.  And now with respect to Mr. Reyes Arias who has been
21   cooperating with the government and providing information to
22   the government since I think, I believe he testified about two
23   months after his arrest, the first time anyone ever showed
24   Mr. Reyes Arias any of these lists was September 2014, correct?
25   A.  I would have to check my notes.  I'm not sure.

EA79RIG2                         Roa - cross

1   Q.  Was it around that time, September 2014?

2   A.  Probably.  Could have been.

3   Q.  And even Mr. Reyes Arias couldn't say whether he recognized

4   any of these records to reflect an actual transaction with

5   Mr. Rigo, correct?

6   A.  Correct.

7   Q.  So, Agent Roa, the calculations that are reflected on

8   Government Exhibit 212, do you have a copy of that?

9   A.  No.

10          MS. AMDUR:  Thank you very much.

11  Q.  So you performed these calculations for the first time in

12  August 2014, correct?

13  A.  (No response).

14  Q.  With respect to the medications on the lists recovered from

15  Mr. Rigo?

16  A.  Okay.

17  Q.  Is that a yes?

18  A.  I think -- no.  That's not correct.  It was calculated

19  before that.

20  Q.  Do you recall about when it was calculated?

21  A.  I do not.

22          MS. AMDUR:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          MR. DISKANT:  Your Honor, what's the relevance of

25  this?  The chart was generated.  We are here.

EA79RIG2                         Roa - cross

1              THE COURT:  Overruled.

2   Q.  So, Agent Roa, I've just handed you a document that was

3   part of the government's 3500 material.  It was part of the set

4   marked Roa 3502-2?

5   A.  Okay.

6   Q.  And it's an e-mail from you to Mr. Diskant dated August 11,

7   2014.

8   A.  Yes.

9   Q.  And does this refresh your recollection about the first

10  time you computed these loss amounts based on these ledgers?

11  A.  This may have been the first time that I sent it to Ted

12  electronically.

13  Q.  Agent Roa, let me ask you the reason you were asked to

14  perform these loss calculations in the summer of 2014 was

15  because Mr. Rigo was asking for a Fatico hearing on loss

16  amount, correct?

17  A.  No, I calculated it because -- to determine a value.

18  Regardless of the Fatico hearing.

19  Q.  Can you tell us around when you first calculated a loss

20  amount based on these ledgers?

21  A.  I cannot.  I do not know.

22  Q.  So moving on.  Agent Roa, you used the New York Medicaid

23  reimbursement values for 2012 for every drug that's listed on

24  Government Exhibit 212, correct?

25  A.  Correct.

EA79RIG2                        Roa - cross

1    Q.  But you don't know for a fact where any of the

2    prescriptions reflected on the list were filled, correct?

3    A.  I do not.  Correct.

4    Q.  And that's because no medications were seized from Mr. Rigo

5    at any time, right?

6    A.  That's correct.

7    Q.  You and your colleagues did not find any bottles of

8    secondhand prescription drugs in Mr. Rigo's home, correct?

9    A.  We didn't have a search warrant.  We did not search his

10   residence.

11   Q.  Can you please answer the question.  You and your

12   colleagues did not find any bottles of secondhand prescription

13   drugs in Mr. Rigo's home?

14   A.  We did not.

15   Q.  And your colleagues did not find any bottles of secondhand

16   prescription drugs in Mr. Rigo's bodegas, correct?

17   A.  We did not search his bodegas.

18   Q.  Is that a no?  You did not find any bottles in Mr. Rigo's

19   bodegas?

20   A.  That's a no.

21   Q.  You and your colleagues did not recover from Mr. Rigo

22   original pharmacy labels removed for cleaning, correct?

23   A.  We did not.

24   Q.  And there is no evidence connecting Mr. Rigo to any of the

25   bottles seized from Mr. Reyes Arias, correct?

EA79RIG2                          Roa - cross

1    A.  Mr. Reyes told us that he purchased –– that he sold

2    medication to Bladimir.

3    Q.  I'm talking about the 481 bottles recovered from

4    Mr. Reyes Arias, whether there's any evidence connecting

5    Mr. Rigo to them?

6    A.  No.

7    Q.  And there is no evidence connecting Mr. Rigo to any of the

8    bottles seized from Poncho, correct?

9    A.  Correct.

10   Q.  And there is no evidence connecting Mr. Rigo to any of the

11   bottles seized from Mr. Leyba, correct?

12   A.  Correct.

13   Q.  And so let's just backup for a second and talk generally

14   about how state Medicaid agencies reimburse for prescription

15   drugs.

16   A.  Okay.

17   Q.  So a pharmacy dispenses drugs to a Medicaid beneficiary.

18   And then the pharmacy goes back and submits a Medicaid

19   reimbursement claim to the state Medicaid agency, correct?

20   A.  Correct.

21   Q.  And the reimbursement claim is to a state Medicaid agency

22   not to the federal government, correct?

23   A.  I'm not a Medicaid expert.  I cannot answer that question.

24   Q.  Is it your testimony that you're not a Medicaid expert but

25   you applied the Medicaid reimbursement values for loss in this

EA79RIG2                    Roa - cross

1  case?

2  A.  That's correct.

3  Q.  So, Agent Roa, for any one drug, there's not one uniform

4  Medicaid reimbursement value that's applicable in every state,

5  correct?

6  A.  Correct.

7  Q.  So the federal government or Medicaid doesn't say to all

8  the states for Truvada you're going to reimburse $50 a pill,

9  right?

10  A.  I spoke to HRA and they said that the values are very

11  similar to the ones in New York.

12  Q.  But each state sets its own Medicaid prescription drug

13  reimbursement values, correct?

14  A.  Correct.  But they have to fall within a parameter.

15  Q.  Are you aware of what the parameter is, Agent Roa?

16  A.  I am not.

17  Q.  I believe the -- are you aware that the parameter is

18  estimated acquisition price plus a reasonable dispensing fee,

19  that that is the parameter?

20  A.  That I don't know.

21  Q.  And let me ask you, Agent Roa, that -- we said each state

22  sets its own Medicaid reimbursement drug values.  Those values

23  can vary between states for the same drug, correct?

24  A.  Correct.

25  Q.  Some states may reimburse more for the same exact drug than

EA79RIG2                              Roa - cross

1    other states, correct?

2    A.  Correct.

3    Q.  And some states may reimburse less for the same exact drug?

4    A.  Correct.

5    Q.  And isn't it also true that states have different formulas

6    for calculating reimbursement values?

7    A.  Again, I'm not a Medicaid expert.  I don't know.

8    Q.  For example, New Jersey may have one way of figuring out

9    Medicaid reimbursement values, correct?

10            MR. DISKANT:  Your Honor, we've established that the

11   witness is not an expert on this.  I'm not quite sure where

12   we're going.

13            THE COURT:  Overruled.

14   Q.  So, for example, New Jersey may have one way of figuring

15   out Medicaid reimbursement values, correct?

16   A.  They may.

17   Q.  And New York may have another way, correct?

18   A.  They may.

19   Q.  And the actual amount that New Jersey and New York

20   reimburse for the same drug may be different, correct?

21   A.  It may be.

22   Q.  Let me ask.  The Medicaid value that applies all depends on

23   in which state's Medicaid program the beneficiary is enrolled

24   or in which state the prescription is filled, correct?

25   A.  Correct.

EA79RIG2                          Roa - cross

1    Q.  So let's say a New Jersey Medicaid patient has a

2    prescription filled for Zyprexa in New Jersey and a New York

3    Medicaid patient has an identical Zyprexa prescription filled

4    in New York.  Isn't it true that New Jersey Medicaid is going

5    to reimburse for the New Jersey patient and New York Medicaid

6    reimburses for the New York patient?

7    A.  Again, I'm not an expert.  I don't know how it works.

8    Q.  And New Jersey Medicaid is going to reimburse based on its

9    own rates for Zyprexa; is that right?

10   A.  Correct.

11   Q.  And New York is going to reimburse based on its own rates?

12   A.  Correct.

13   Q.  Do you know which one is higher?

14   A.  I do not.

15   Q.  And you understand that it's not just New York and

16   New Jersey; that each state has its own formula for calculating

17   Medicaid reimbursement values?

18   A.  Okay.

19   Q.  And that all of these different formulas result in states

20   having different reimbursement rates for the same drug?

21   A.  Correct.

22   Q.  And as a result the Medicaid reimbursement value for say a

23   bottle of Truvada will vary from state to state?

24   A.  Correct.

25   Q.  Isn't it wrong to assume that the reimbursement value for a

EA79RIG2                          Roa - cross

1   bottle of Truvada for one state will be the same as the value

2   for New York?

3   A.   It's not wrong to assume.  Again, it's within the

4   parameter.  So the numbers are going to be extremely close.

5   Q.   Please explain how the numbers are going to be extremely

6   close within the parameter.

7   A.   If you have ten, we'll say, pills of Atripla at $62, it's

8   going to be $620.  In New Jersey it may be slightly less or

9   slightly more.  So in New Jersey it may be $60.  So, therefore,

10  it would be $600 as opposed to $620.

11  Q.   So with all states having different ways of figuring out

12  Medicaid reimbursement values there can be a pretty broad range

13  of reimbursement values for the same drug across a region?

14  A.   Again, I'm not an expert and I don't know the prices in

15  other states.

16  Q.   Well, in fact, would you be surprised to hear that in 2004

17  the Office of the Inspector General for HHS conducted an

18  analysis of Medicaid reimbursement data for 28 sample drugs and

19  found that for each of the sample drugs the highest paying

20  state reimbursed between 12 percent and 4,073 percent more than

21  the lowest paying state?

22  A.   Okay.

23  Q.   And would you be surprised to hear that the same study also

24  concluded that on average the highest paying state paid

25  477 percent more per drug than the lowest paying state for each

EA79RIG2                        Roa - cross

1    of the drugs in the sample?

2    A.   Okay.

3    Q.   And would you be surprised to hear that that same study --

4          MR. DISKANT:  Your Honor the witness has said many

5    times he's not an expert.  If the defendant would want to call

6    a witness on this, they should.

7          THE COURT:  Sustained.

8    Q.   You are aware though that New York is one of the highest

9    reimbursing states, correct?

10   A.   I don't know that.

11   Q.   So moving on to your calculations.  In this case in

12   computing the loss amount for Mr. Rigo you just applied the

13   New York Medicaid reimbursement values, correct?

14   A.   Correct.

15   Q.   And you didn't take any steps to account for the variation

16   in Medicaid reimbursement values between states, correct?

17   A.   Correct.

18   Q.   And you didn't take steps to determine how New York's

19   formula might compare to New Jersey?

20   A.   Again, I'm not an expert.

21   Q.   And you didn't take any steps to determine whether

22   New York's values might be higher than New Jersey's?

23         MR. DISKANT:  Asked and answered.

24         THE COURT:  Sustained.

25   Q.   You also know from your investigation that some of the

EA79RIG2                          Roa - cross

1   medications that you did recover from Mr. Fernandez, Mr. Leyba,

2   and Mr. Reyes Arias were from states other than New York,

3   correct?

4   A.  Correct.

5   Q.  So you're not testifying under oath that all of the

6   medications seized from those three gentlemen were prescribed

7   to New York beneficiaries or were from New York pharmacies, are

8   you?

9   A.  The ones that had -- there were some that had labels that

10  were from New Jersey and other states.

11  Q.  For example, isn't it true that on June 5, 2012 your

12  colleagues executed a search warrant for Mr. Fernandez's

13  storage facility in North Bergen, New Jersey and recovered

14  10,369 bottles of medications, correct?

15  A.  Correct.

16  Q.  But three months after the search, as of September 2012,

17  you were only able to identify 2 bottles of those 10,369 that

18  came from New York pharmacies?

19  A.  I would have to review my notes and I'd have to look at the

20  drugs.

21          MS. AMDUR:  May I approach, your Honor?

22          THE COURT:  Yes.

23  Q.  So this is part of the 3500 material that's numbered 3502

24  from the government.  Does this refresh your recollection as to

25  how many bottles from New York state that you had found three

EA79RIG2                          Roa - cross

1   months after the search of Poncho's warehouse?

2   A.  I took a sample size, a box or two.  I sorted through the

3   box.  And I found two from New York.  After I found those two,

4   I stopped.

5   Q.  So you applied the New York Medicaid reimbursement rate but

6   you and your colleagues weren't able to tell whether any of the

7   drugs reflected on Mr. Rigo's list here were prescribed to

8   New York Medicaid beneficiaries or were from New York

9   pharmacies, correct?

10  A.  From Mr. Rigo's list?

11  Q.  Yes.

12  A.  Correct.

13          MS. AMDUR:  Thank you, your Honor.

14          Agent Roa, I have no more questions and I'm now going

15  to turn it over to my colleague, Sai Mohan who will be asking

16  some additional questions.

17          MS. MOHAN:  May I proceed, your Honor?

18          THE COURT:  Yes.

19  CROSS-EXAMINATION

20  BY MS. MOHAN:

21  Q.  Good afternoon, Agent Roa.

22  A.  Good afternoon.

23  Q.  Agent, do you still have Government Exhibit 204 to 207 in

24  front of you?

25  A.  I do.

EA79RIG2                      Roa - cross

1   Q.  And those are the notebooks recovered from Mr. Rigo's

2   residence, correct?

3   A.  Correct.

4   Q.  Agent Roa, could I ask you to remove the four notebooks

5   from their folders, please.

6           Could I ask you to hold those four notebooks up so

7   that the Court can see exactly what they look like.

8           Thank you very much.

9           Do you have Government Exhibit 202 in front of you,

10   which are those loose sheets of paper, Mr. Rigo's lists.

11   A.  This one?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Now these pieces of paper that form Government Exhibit 202

15   were recovered from Mr. Rigo's residence, correct?

16   A.  Correct.

17   Q.  And his residence was in Elizabeth, New Jersey, correct?

18   A.  I don't recall what city.  I know it was in New Jersey.

19   Q.  When those pieces of paper were recovered from Mr. Rigo's

20   residence, they weren't collected together and stapled in the

21   format of Government Exhibit 202, correct?

22   A.  Correct.

23   Q.  In fact, they were interspersed within the pages of the

24   composition notebooks you just held up, correct?

25   A.  Correct.

EA79RIG2                      Roa - cross

1   Q.  And it's not your testimony today that the four composition

2   notebooks recovered are drug ledgers, correct?

3   A.  They contain drug lists.

4   Q.  When you say "they contain drug lists," you're referring to

5   the loose sheets of paper that were interspersed within the

6   composition notebooks, correct?

7   A.  Correct.  I'm not sure if they were all loose.  There may

8   have been some that were bound.

9   Q.  There may have been some of those lists that were bound to

10  the composition notebooks?

11  A.  Correct.

12  Q.  So did you tear them out of the composition notebooks?

13  A.  I did not.

14  Q.  Do any of those loose sheets of paper appear to have been

15  torn out of the composition notebooks?

16  A.  That I don't know.  I would have to review them.

17  Q.  Now, in addition to these lists that you found wedged in

18  the composition notebook, there were other pieces of paper

19  wedged in there, correct?

20  A.  Correct.

21  Q.  These included a Sam's Club grocery receipt, correct?

22  A.  That I don't know.  I would have to review them.

23  Q.  They included a flier advertising detergent, correct?

24  A.  I don't know.

25  Q.  They included a gas bill from August 2011, correct?

1   A.  Correct.

2   Q.  They included a Cuban club membership card, correct?

3   A.  I don't recall.

4   Q.  They included a receipt for a sandwich press, correct?

5   A.  I don't recall.

6           THE COURT:  I'm sorry?

7   Q.  A receipt for a sandwich press, correct?

8   A.  I don't recall.

9   Q.  For making Cuban sandwiches?

10  A.  I don't recall.

11  Q.  So you would agree, Agent Roa, that these nine pieces of

12  paper you testified about or I'm sorry these loose pieces of

13  paper that you testified about were not maintained in any

14  organized fashion, correct?

15  A.  I don't recall.

16  Q.  They were not maintained in a manner consistent with a

17  sophisticated drug business, correct?

18  A.  I don't know what a sophisticated drug business ledger

19  would look like.

20  Q.  And how long have you been involved in drug investigations?

21  A.  Two-and-a-half years.

22  Q.  And so in those two-and-a-half years based on your

23  two-and-a-half year experience you don't know what a

24  sophisticated drug ledger would look like?

25          MR. DISKANT:  Objection.

EA79RIG2                          Roa - cross

1          MS. MOHAN:  I'll move on to another question.

2    Q.  You seized records from Mr. Hernandez's storage facility,

3    correct?  Drug ledgers?

4    A.  I do not recall.

5          MS. MOHAN:  Your Honor, may I approach?

6          THE COURT:  Yes.

7    Q.  Agent Roa, I just put in front of you a copy of the

8    government's second binder of 3500 materials.

9    A.  Okay.

10   Q.  And I've put in front of you specifically the page marked

11   Fernandez 001245.  Do you see that?

12   A.  Yes.

13   Q.  This is one of the notebooks that were part of the drug

14   records seized from Mr. Fernandez, correct?

15   A.  Correct.

16   Q.  Could you please now page through that notebook, which are

17   pages 1246 to 1282.

18   A.  Okay.

19   Q.  Now these pages show records of a drug business, correct?

20         MR. DISKANT:  Your Honor, I'm not sure what we're

21   doing here.  Are we refreshing a recollection?  Are we offering

22   evidence?

23         MS. MOHAN:  Refreshing.

24         THE WITNESS:  They appear to be a drug list.

25   Q.  And you would agree with me that these records reflect a

EA79RIG2                          Roa - cross

1   sophisticated record?

2   A.  I do not agree with that.

3   Q.  Agent Roa, I'm going to ask you some questions about the

4   investigation of my client, Mr. Rigo.

5   A.  Okay.

6   Q.  In your experience, isn't it your practice to obtain search

7   warrants of drug trade participants because they keep items

8   used to connect their drug activity?

9   A.  Every investigation is different.

10  Q.  Well, in your experience individuals who illegally traffic

11  in prescription drugs maintain things like, for example, a

12  stock of prescription drugs, correct?

13  A.  Some do and some do not.

14  Q.  What about drug bottles?

15  A.  Again, some do and some do not.  Every case is different.

16  Q.  Drug labels?

17  A.  Again, some do and some do not.

18  Q.  Agent Roa, isn't it standard boilerplate in every search

19  warrant affidavit in this case that drug dealers maintain the

20  types of items I just listed?

21  A.  In the search warrants that I conducted?  Yes.

22  Q.  Now, in June of 2012, upon Mr. Fernandez's arrest, you

23  obtained and executed a search warrant for his storage facility

24  in North Bergen, correct?

25  A.  Correct.

EA79RIG2                          Roa - cross

1   Q.  And that search yielded over 10,000 bottles of prescription

2   drugs, correct?

3   A.  Correct.

4   Q.  And in 2012 you secured and executed a search warrant for

5   Mr. Leyba's apartment at 23 Crane Street, correct?

6   A.  Correct.

7   Q.  And that search yielded 482 bottles of drugs, correct?

8   A.  481 items.

9   Q.  In 2012 you secured and executed a search warrant for

10  Mr. Reyes Arias apartment at 286 Sussex Avenue, correct?

11  A.  Correct.

12  Q.  And that search yielded 172 empty bottles and 300 bottles

13  of prescription drugs, correct?

14  A.  I would have to review the exact numbers.

15  Q.  And that search also yielded cleaning supplies, correct?

16  A.  I don't recall.

17  Q.  And the reason you obtained these search warrants is

18  because you had reason to believe you would find evidence at

19  these locations, correct?

20  A.  Correct.

21  Q.  And by the time you arrested Mr. Rigo, you knew his home

22  address, correct?

23  A.  I did.

24  Q.  And you knew the addresses of the bodegas he operated,

25  correct?

EA79RIG2                          Roa - cross

1    A.  I knew some of the addresses.

2    Q.  And you debriefed Mr. Fernandez about Mr. Rigo, correct?

3    A.  Correct.

4    Q.  And you debriefed Mr. Reyes Arias about Mr. Rigo, correct?

5    A.  Correct.

6    Q.  And you debriefed Mr. Leyba about Mr. Rigo, correct?

7    A.  Correct.

8    Q.  And yet you didn't obtain search warrants to search any of

9    Mr. Rigo's premises, correct?

10   A.  That is correct.

11   Q.  In fact, you didn't make a single application for a search

12   warrant related to Mr. Rigo's premises, correct?

13   A.  Again, every case is different.

14   Q.  And that's because you knew that Mr. Rigo was not an active

15   member of the conspiracy during that part of your

16   investigation, right?

17   A.  That's not correct.

18   Q.  Now, Agent Roa, you sometimes subpoena financial records in

19   drug cases, correct?

20   A.  Sometimes, yes.

21   Q.  And one of the things the FBI recovered from my client's

22   home was a check, correct?

23   A.  I believe so.

24   Q.  Signed by Mr. Rigo, correct?

25   A.  I would have to review it.

EA79RIG2                        Roa - cross

1   Q.   Drawn from an account for JJ Supermarket?

2   A.   Again, I would have to review it to refresh my memory.

3   Q.   At a bank account at Sovereign Bank?

4   A.   Okay.

5   Q.   The FBI also recovered a bank receipt for a Santander Bank

6   account, correct?

7   A.   Again I would have to review the items.

8   Q.   And the FBI also recovered a payment notice for a safe

9   deposit box in my client's name at Garden State Community Bank,

10  correct?

11  A.   I don't recall.

12  Q.   Agent Roa, did you or did you not subpoena records for my

13  client's bank account at Sovereign Bank?

14  A.   I did not.

15  Q.   What about for his bank account at Santander Bank?

16  A.   I did not.

17  Q.   Did you or did you not subpoena records for my client's

18  safe deposit box as Garden State Community Bank?

19  A.   I did not.

20  Q.   Did you or did you not attempt to search the safe deposit

21  box?

22  A.   I did not.

23  Q.   In fact, you made no efforts to investigate Mr. Rigo's

24  financial condition, correct?

25  A.   I did not.

EA79RIG2                          Roa - cross

1    Q.  And that's because you knew that Mr. Rigo was not an active

2    member of the conspiracy, correct?

3    A.  That's not correct.

4    Q.  Now at some point in 2012 you conducted surveillance of an

5    apartment above Noris Grocery in Newark, New Jersey, correct?

6    A.  Correct.

7    Q.  And that apartment was used by Mr. Reyes Arias as his base

8    of operations, correct?

9    A.  Correct.

10   Q.  And during that surveillance you observed the comings and

11   goings of individuals purchasing drugs from Mr. Reyes Arias,

12   correct?

13   A.  I noticed people coming and going, not purchasing drugs.

14   Q.  But you never once observed Mr. Rigo coming or going from

15   Mr. Reyes Arias's apartment?

16   A.  No.

17   Q.  And at some point in 2012 you conducted surveillance of an

18   apartment building located at 23 Crane Street, correct?

19   A.  Correct.

20   Q.  And Mr. Leyba used that apartment building as his base of

21   operations, correct?

22   A.  He did.

23   Q.  And during that surveillance you observed Mr. Leyba and

24   Mr. Fernandez entering and exiting those premises, correct?

25   A.  Correct.

EA79RIG2                        Roa - cross

1   Q.  But you never once observed Mr. Rigo entering or exiting

2   those premises, correct?

3   A.  That's correct.

4   Q.  And in 2012 you also conducted surveillance of

5   Mr. Fernandez's storage facility in North Bergen, correct?

6   A.  Correct.

7   Q.  And, again, you never once observed Mr. Rigo entering or

8   exiting those premises, correct?

9   A.  That's correct.

10          MS. MOHAN:  May I have a moment, your Honor?

11          (Pause)

12          MS. MOHAN:  I have nothing further.  Thank you very

13   much.

14          MR. DISKANT:  No redirect, your Honor.  Thank you.

15          THE COURT:  Thank you, agent.

16          (Witness excused)

17          MR. DISKANT:  Your Honor, the government rests.

18          MS. HENDON:  Nothing from the defense, your Honor.  We

19   rest.

20          THE COURT:  We'll take a few moments.  Karen has been

21   very patient.

22          (Recess)

23          THE COURT:  This took longer than I had anticipated.

24   And I have another matter scheduled at 4:00.

25          So I think the best thing to do is nothing.  Until

EA79RIG2                         Roa - cross

1    tomorrow.  How about 9:30?

2              MS. HENDON:  Your Honor, we had discussed with the

3    government putting in posthearing papers.

4              THE COURT:  All right.  Okay.  You want to do that?

5    That's fine.

6              With the demonstrated skill that has been exhibited

7    today, both on the prosecution and the defense, that would be

8    most welcome.

9              So, when?

10             MS. HENDON:  We were thinking about, if it's

11   acceptable to your Honor, simultaneous submissions 30 days from

12   now and then maybe like simultaneous replies ten days later.

13             THE COURT:  Never do today what can be put off until

14   tomorrow I think is probably a sound rule.  That schedule works

15   for me.

16             What are those dates?

17             MS. HENDON:  I don't have a calendar.  I'm so sorry.

18   Mr. Chan, can you tell us what 30 days from today would be.

19             Friday, November 7.

20             THE COURT:  Say it again.

21             MR. DISKANT:  Your Honor we propose, with the Court's

22   permission, simultaneous submissions on Friday November 7,

23   which is exactly 30 days from today, with reply -- simultaneous

24   reply briefs ten days later on Monday, November 17.

25             THE COURT:  And we'll have the argument on

EA79RIG2                         Roa - cross

1   Wednesday -- I don't have my calendar.  What's that Wednesday?

2          MR. DISKANT:  The 19th, your Honor.

3          THE COURT:  Wednesday the 19th.

4          MR. DISKANT:  Your Honor I'm in California on that

5   date.  Could we do it on a later date, the next day, the

6   20th?

7          THE COURT:  Why are you going to California?

8          MS. HENDON:  Because it's my boyfriend and my

9   five-year anniversary, your Honor.

10         THE COURT:  Isn't -- well I guess it might turn out to

11  be worthwhile.  You never know.

12         MS. HENDON:  I'm not getting any younger, Judge.

13         THE COURT:  Tell me about it.

14         So what's good?  Before or after?  Tuesday?  Thursday?

15         MS. HENDON:  So Monday is the 17th.  Wednesday is

16  the 19th.  Could we come in Friday morning, the 21st.

17         THE COURT:  Fridays are not good.  How about Thursday

18  afternoon at 3:00?

19         MS. HENDON:  Perfect, Judge.  Thank you.

20         THE COURT:  How is that?

21         MR. DISKANT:  That works.  Very good.  Thank you.

22         THE COURT:  Thank you all.

23         Appreciate the help.

24         (Adjourned)

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     ANTHONY ROMERO

 4    Direct By Mr. Masimore . . . . . . . . . . . 3

 5    Cross By Ms. Mohan . . . . . . . . . . . . .25

 6     ARCADIO REYES ARIAS

 7    Direct By Mr. Diskant . . . . . . . . . . .31

 8    Cross By Ms. Hendon . . . . . . . . . . . .49

 9    Redirect By Mr. Diskant . . . . . . . . . .94

10     ANTONIO RAO

11    Direct By Mr. Diskant . . . . . . . . . . .98

12    Cross By Ms. Amdur . . . . . . . . . . . . 125

13    Cross By Ms. Mohan . . . . . . . . . . . . 142

14                       GOVERNMENT EXHIBITS

15    Exhibit No.                              Received

16     204, 205, 206 and 207 . . . . . . . . . . .24

17    102   . . . . . . . . . . . . . . . . . . . 7

18    103   . . . . . . . . . . . . . . . . . . .12

19    104   . . . . . . . . . . . . . . . . . . .13

20    105   . . . . . . . . . . . . . . . . . . .19

21    201   . . . . . . . . . . . . . . . . . . 102

22    202   . . . . . . . . . . . . . . . . . . 101

23    203   . . . . . . . . . . . . . . . . . . .14

24    208   . . . . . . . . . . . . . . . . . . .17

25    209   . . . . . . . . . . . . . . . . . . 119
```

1    210  . . . . . . . . . . . . . . . . . . . 120

2    211  . . . . . . . . . . . . . . . . . . . . 8

3    211T  . . . . . . . . . . . . . . . . . . . 9

4    212  . . . . . . . . . . . . . . . . . . . 106

5    213  . . . . . . . . . . . . . . . . . . . 117

6    214  . . . . . . . . . . . . . . . . . . . 118

7    215  . . . . . . . . . . . . . . . . . . . 113

8    217  . . . . . . . . . . . . . . . . . . . 111

9    218  . . . . . . . . . . . . . . . . . . . 122

10   219  . . . . . . . . . . . . . . . . . . . 124

11   220  . . . . . . . . . . . . . . . . . . .46

12

13

14

15

16

17

18

19

20

21

22

23

24

25