UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA

                        Case  No.: 13 Cr. 897 (RWS)

               v.

BLADIMIR RIGO,

                      Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

## DEFENDANT BLADIMIR RIGO'S POST-HEARING MEMORANDUM OF LAW

SPEARS & IMES LLP
Joanna C. Hendon
Sharanya Sai Mohan
Alicia K. Amdur
51 Madison Avenue
New York, New York  10010
Tel:    (212) 213-6996
Fax:    (212) 213-0849
Email: jhendon@spearsimes.com

*Attorneys for Defendant Bladimir Rigo*

Dated:  November 14, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

I.      Mr. Rigo's Background ................................................................................... 3

II.     The 2012 "Takedown" & Follow On Investigation.......................................... 4

III.    Mr. Rigo To The Fore ..................................................................................... 5

IV.     Mr. Rigo's Arrest ............................................................................................ 7

V.      Mr. Rigo's Guilty Plea .................................................................................... 8

VI.     The Fatico Hearing ........................................................................................ 9

        A.      The Testimony of Detective Romero ................................................. 10

        B.      The Testimony of Arcadio Reyes-Arias, a/k/a/ "Chino" ...................... 11

                1.      Mr. Reyes-Arias' Testimony Concerning
                        Drug Quantity Was Not Reliable. ........................................... 11

                2.      Mr. Reyes-Arias' Main Customer Was
                        Hermenegildo Fernandez, a/k/a "Pancho" –
                        He Sold to Mr. Rigo Infrequently. .......................................... 13

                3.      Mr. Reyes-Arias Was Unable To Reliably Identify
                        Mr. Rigo's Handwriting on Any Drug Record. ....................... 14

                4.      Mr. Reyes-Arias Repeatedly Violated His Oath
                        in an Effort To Avoid Giving Testimony That
                        Would Not Help the Government ............................................ 15

        C.      The Testimony of Agent Rao .............................................................. 15

ARGUMENT ......................................................................................................... 18

I.      Legal Standard ............................................................................................. 18

II.     The Government Has Not Carried Its Burden of Proof. ................................. 19

A. At the Time of His Arrest, Mr. Rigo Was No Longer Active in the Conspiracy. ..........................................................................20

B. The Government Put Forth No Credible Evidence To Support Its Estimate of Loss Attributable to Mr. Rigo. ..................................22

  1. The Government Presented No Evidence Connecting Mr. Rigo to the Drugs Found in Mr. Fernandez's Warehouse. ....................................................22

  2. Mr. Reyes-Arias' Testimony Consists of Unreliable Assertions and Speculation. ..........................................................24

C. The Government's Loss Table Is Based on Unsubstantiated Assumptions. ........................................................................................29

  1. The Government Did Not Prove That the "Ledgers" Recovered From Mr. Rigo Reflect Drug Transactions. ...........................29

  2. The Government's Medicaid Reimbursement Value Calculation Is Not Based On Evidence. .....................................33

D. The Only Transaction Connected to Mr. Rigo And Supported By Evidence Amounts to $25,000. ..........................................................35

CONCLUSION ...............................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*United States v. Capanelli*,
270 F. Supp. 2d 467 (S.D.N.Y. 2003)..........................................................................18, 35, 36

*United States v. Coppola*,
671 F.3d 220 (2d Cir. 2012)..........................................................................................18, 29

*United States v. Cruz*,
2014 WL 4942037 (2d Cir. Oct. 3, 2014)...................................................................... 18-19

*United States v. Deutsch*,
987 F.2d 878 (2d Cir. 1993)...............................................................................................18

*United States v. Fatico*,
603 F.2d 1053 (2d Cir. 1979)...............................................................................................9

*United States v. Getto*,
729 F.3d 221 (2d Cir. 2013)...............................................................................................19

*United States v. Kaid*,
241 F. App'x 747 (2d Cir. 2007) ........................................................................................33

*United States v. McLean*,
287 F.3d 127 (2d Cir. 2002)...............................................................................................29

*United States v. Morrison*,
207 F.3d 962 (7th Cir. 2000) .............................................................................................29

*United States v. Perrone*,
936 F.2d 1403 (2d Cir. 1991)..............................................................................................19

*United States v. Pimentel*,
932 F.2d 1029 (2d Cir. 1991)...............................................................................................8

*United States v. Rizzo*,
349 F.3d 94 (2d Cir. 2003)...........................................................................................18, 35

*United States v. Studley*,
47 F.3d 569 (2d Cir. 1995).........................................................................................19, 23

*United States v. Wahl*,
563 F. App'x 45 (2d Cir. 2014) ..........................................................................................19

**U.S. Sentencing Guidelines**

U.S.S.G. § 2B1.1(b)(1) ..................................................................................................9

U.S.S.G. § 2B3.1(b)(7) ...............................................................................................35

U.S.S.G. § 6A1.3 .........................................................................................................19

**Other Authorities**

Transcript of Hearing dated January 16, 2014,
*United States v. Correa*, No. 13-CR-289-AKH (S.D.N.Y.), ECF No. 21 ....................................29

Defendant Bladimir Rigo respectfully submits this Post-Hearing Memorandum of Law, together with the Declaration of Sharanya Sai Mohan, dated November 14, 2014 ("Mohan Declaration" or "Mohan Decl.") in support of a determination by the Court that the loss estimates of between seven and twenty million dollars proffered by the Government in this case are overstated and the Government has sustained its burden of proving losses attributable to Mr. Rigo of no more than $25,000.

## PRELIMINARY STATEMENT

In July 2012, following a two-year investigation, the Government arrested and charged more than 48 people with crimes related to their trafficking in black market prescription medicine.  Only at the tail-end of that investigation did the agents discover Mr. Rigo.  In September 2012, they set up a meeting between with Mr. Rigo and Hermenegildo Fernandez (known as "Pancho"), who was cooperating with the authorities at the time.  The two men met in a restaurant for lunch.  They discussed the old days (the business as it had been), the recent arrests, and the possibility of working together one day, but nothing came of that talk.  Other than debriefing witnesses already charged with federal crimes and hoping for leniency at sentencing, the agents took virtually no steps to further investigate Mr. Rigo or his alleged role in the conspiracy.  The agents did obtain the Court's permission to use a pen register device for a period of 60 days to monitor calls made and received by Mr. Rigo on two cell phones believed to be used by him.  But that yielded nothing useful, and the agents did not seek to extend the order.

A full year later, on September 17, 2013, the agents arrested Mr. Rigo at his home on the basis of the statements made by him to Mr. Fernandez at lunch a year earlier and information provided more recently by Arcadio Reyes-Arias (known as "Chino"), who the

agents had arrested in December 2012.  There, in Mr. Rigo's home, the agents found on top of a

bureau various papers and records, including twelve pages of what appear to be handwritten

lists of drug names.   From the time of Mr. Rigo's arrest to the date of the *Fatico* hearing,

another full year passed.  Again, the agents took no steps to develop evidence of Mr. Rigo's

activities (or the losses allegedly attributable to them) or to corroborate the statements of their

key cooperating witness, Mr. Reyes-Arias.

Yet the Government seeks to hold Mr. Rigo responsible for losses of between 7 and 20

million dollars.  To meet that extraordinary burden, the Government relies upon the testimony of

Mr. Reyes-Arias, about the number of times, and over what period of time,  he sold medicine to

Mr. Rigo.  But Mr. Reyes-Arias is not credible.  He provided wildly disparate accounts of those

facts, uncorroborated by phone records, drug records, or a piece of documentary evidence (not

so much as an IOU or a scrap of paper bearing Mr. Rigo's name or telephone number); his

memory is addled by two decades of untreated alcohol addiction; and when confronted on cross-

examination with his own sworn testimony before Judge Gardephe to facts that were not part of

the Government's presentation (namely, the extent of his alcohol addiction and the fact that he

was doing business with one customer only – in all likelihood Mr. Fernandez) he repeatedly

lied, denying the underlying facts or that he testified to them before Judge Gardephe.

Mr. Rigo does not dispute his participation in the conduct with which he was charged.

He pleaded guilty to, and accepted responsibility for, that conduct.  But the Government's loss

calculations must be reasonable and supported by a preponderance of the evidence, which they

are not in this case.  The Government had the time, the expertise, and the resources to develop

evidence of the extent of Mr. Rigo's involvement in the conspiracy, including a credible case for

the losses attributable to him.  That they chose not to do so does not suggest the agents are lazy;

we know from their work preparing to charge and prosecute 48 individuals in the summer of 2012 that they are just the opposite.   That in the two years since they recorded him having lunch with Mr. Fernandez they took *no* steps to learn more about Mr. Rigo's involvement in the scheme or any losses generated by him suggests that – as the defense contends – Mr. Rigo was not a "high-level aggregator" or a significant participant in the activity.

## STATEMENT OF FACTS

We set forth below the facts relevant to the Court's determination of loss for purposes of sentencing.

## I.     Mr. Rigo's Background

Mr. Rigo is 74 years old.  He was born in 1940 in Santa Clara, Cuba.  (Mohan Decl. Ex. A (Pre-Sentencing Report, dated July 22, 2014 ("PSR")), ¶ 75.)[1]  In 1962, he fled Cuba due to the presence of the Communist regime, immigrating to the United States under refugee status. (*Id.* ¶ 76.)  Soon after arriving in the United States, he enrolled in the U.S. Army Reserves, in which he served until 1968, when he was honorably discharged.  (*Id.* ¶ 77.)  In or about 1967 or 1968, Mr. Rigo obtained permanent residency.  (*Id.*)  In 1995, he became a naturalized U.S. citizen.  (*Id.*)

For a number of years prior and continuing to the time of his arrest (and presently), Mr. Rigo owned and operated bodegas in New Jersey.  (*Id.* ¶ 90.)  As of July 2014, at the time of the PSR, Mr. Rigo maintained a personal checking account, in which he had approximately $844. (*Id.* ¶ 92.)

---

[1] On August 6, 2014, Mr. Rigo submitted objections to the PSR.  Any references to the PSR herein are to portions of the PSR to which Mr. Rigo did not object.

**II.      The 2012 "Takedown" & Follow-On Investigation**

Between 2010 and 2012, the Government conducted a nationwide investigation into the unlawful diversion and trafficking of prescription drugs that were previously dispensed to Medicaid recipients, in a national, underground, second-hand market.  (*See id.* ¶ 8.)  In July 2012, agents working with the Department of Justice arrested 48 individuals in 6 states and charged them with crimes related to the conspiracy.  Just prior to those arrests, agents in New York – including the Government's agent witnesses – engaged in an undercover operation designed to ferret out additional targets.  In a month and a half, undercover agents twice purchased prescription medicines from Hermenegildo Fernandez, whom the agents knew as "Pancho."  The agents arrested Mr. Fernandez, who became a cooperating witness for the Government.  Mr. Fernandez offered to set up additional targets, and in August and November 2012, while wearing a wire, he purchased drugs from Rogelio Leyba.  Mr. Leyba, in turn, offered to set up additional targets in an effort to become a cooperating witness for the Government.  Meanwhile, Mr. Leyba struggled to provide substantial assistance to the Government (he was unsuccessful and as a result not "signed up"), and Mr. Fernandez set up another target:  the hearing witness Arcadio Reyes-Arias (or "Chino").  In October 2012 and again in December 2012, Mr. Fernandez, again wearing a wire, bought drugs from Mr. Reyes-Arias, who the agents arrested and charged following the second sale.

In connection with all three arrests, the Government executed search warrants at stash-house locations used by the defendants.  On June 5, 2012, agents searched Mr. Fernandez's warehouse in North Bergen, New Jersey.  (Hr'g Tr. 29:12-13, 141:11-15.)[2]  As a result of that search, they recovered over 10,000 bottles of prescription drugs, as well as bottles, bags, and

---

[2] "Hr'g Tr." refers to the transcript of the *Fatico* hearing before the Court on October 7, 2014.  A true and correct copy of the transcript is attached to the Mohan Declaration as Exhibit B.

other supplies for the drug business.  (*Id.* at 29:14-20.)  On December 20, concurrent with their arrests, agents searched the apartments of Mr. Reyes-Arias and Mr. Leyba.  (*Id.* at 114:24-25, 121:6-11; Mohan Decl. Ex. C (Rao 3502-1) at 14:7-13, 20:10-15.)  From Mr. Reyes-Arias's apartment at 286 Sussex Avenue, they seized 481 prescription-drug containers, which included bottles of medication, syringes and patches, as well as cleaning supplies.  (Mohan Decl. Ex. C (Rao 3502-1) at 20:19-26; Mohan Decl. Ex. D (GX-218); Hr'g Tr. 121:23-122:21.) [3]  From Mr. Leyba's apartment at 23 Crane Street, the agents seized 482 prescription-drug containers. (Mohan Decl. Ex. E (GX-219); Mohan Decl. Ex. C (Rao 3502-1) at 14:22-15:4.)  The agents recovered no evidence from any of the stash houses identifying or connecting Mr. Rigo to those locations or the defendants' business.  (Hr'g Tr. 29:21-30:2.)  Nor is there any evidence connecting Mr. Rigo to the drugs seized during the six hand-to-hand transactions supporting the arrests of Mr. Fernandez, Mr. Leyba, and Mr. Reyes-Arias.  (*Id.* at 135:3-12.)  But there is more – prior to executing the three search warrants, the agents conducted surveillance at each location. (*Id.* at 151:4-152:9.)  At no time did they see or develop any other evidence or leads concerning Mr. Rigo.  (*See id.*)

## III.    Mr. Rigo To The Fore

Instead, in July or August 2012, Mr. Fernandez – already cooperating with the Government and presumably hoping to procure targets – contacted Mr. Rigo, hoping to set up an undercover drug transaction.  (*Id.* at 27:23-28:1.)  Mr. Rigo agreed to meet and the two old-timers sat in a restaurant swapping tales of ill-health and talking about the black market prescription drugs business.  (Mohan Decl. Ex. F (GX-211-T).)  They spoke about the recent arrests, and that the authorities were looking for two "big guys" in New Jersey.  (*Id.* at 21.)  Mr.

---

[3] The Government's exhibits at the *Fatico* hearing are denoted herein with the prefix "GX."

Rigo joked that that must mean them.  (*Id.*)  They spoke about sharing the profits of a potential

(or hypothetical) business transaction amounting to $25,000.  (*Id.* at 13.)  "If I go to Chino and

Chino has 20,000 dollars in medicine . . . and if Rogelio has 5," Mr. Rigo said to Mr. Fernandez,

"If this purchase of 25 dollars netted 25,000, then it's 12,500 for you and 12,500 for me."  (*Id.*)

Mr. Rigo reassured Mr. Fernandez that they would be able to defend themselves if they were

caught with drug-related money.  (*Id.* at 21.)  They had lunch.  (*Id.* at 18.)

At or about the time of that meeting, the agents had a telephone number for Mr. Rigo,

knew where he lived, knew (from Mr. Fernandez) the location of the bodegas he owned, and

knew the license plate for the vehicle he drove.  (Mohan Decl. Ex. G (Fernandez 3504-27);

Mohan Decl. Ex. H (Fernandez 3504-37) at 1 of 2.)  Yet the agents took no steps to discover Mr.

Rigo's supposed sources of drugs, his customers, where he did his banking, or whether he had

credit cards (the records of which might show purchases consistent with a prescription drug

operation).  Nor did they seek to obtain a search warrant for Mr. Rigo's residence or any of the

bodegas he owns.  Indeed, the agents did not so much as ask Mr. Fernandez to attempt a second

tape-recorded meeting in order to develop more concrete details about Mr. Rigo's supposed drug

activities.  The only thing the agents did to investigate Mr. Rigo was to obtain permission to put

a pen register on his phone – which yielded no evidence of wrongdoing of any kind – and to

continue to debrief cooperating witnesses such as Mr. Reyes-Arias.

The point is not that the law requires more of the Government in order to bring a case.  It

does not, as the Court's standing jury instructions make plain.  We highlight the absence of

activity, or even much curiosity, on the agents' part because it corroborates the defense's

contention that – until Mr. Rigo indicated he was serious about putting the Government to its

burden in a *Fatico* hearing – the Government simply did not consider Mr. Rigo an important

target, a fact consistent with the lack of investigation over time and at odds with the hyperbolic loss calculations now before the Court.

## IV.    Mr. Rigo's Arrest

On September 17, 2013, agents arrested Mr. Rigo at his home in Elizabeth, New Jersey. Mr. Rigo shares a two-family house with his wife, Angela, and their three children: Vincent, age 33; Angel, age 28; and Bladimir, also age 28.  (Mohan Decl. Ex. A (PSR), ¶ 78; Mohan Decl. Ex. I (Defendant's Objections to the PSR, dated August 6, 2014 ("PSR Obj.")) at 3.)  The Rigos occupy a two-bedroom, one-bathroom living area on the first floor of the house.  (Mohan Decl. Ex. A (PSR) ¶ 78.)  Mr. Rigo's son Bladimir is severely autistic and has difficulty speaking and performing other routine activities; it is for that reason that he lives with Mr. and Mrs. Rigo. (Mohan Decl. Ex. I (PSR Obj.) at 3.)  Mr. Rigo rents the first-floor living space from his son, Vincent, who resides on the second floor of the house.  (Mohan Decl. Ex. A (PSR) ¶ 78.)  Mr. Rigo's youngest son, Angel, occupies the basement.  (*Id.*)

In Mr. Rigo's bedroom, on a dresser, agents recovered four notebooks, which the Government introduced in evidence as Government's Exhibits 204-207 at the hearing.  (Hr'g Tr. 100:2-14.)[4]  Written in these notebooks were notes from Mr. Rigo's bodega business (Mohan Decl. Ex. J (GX-204) at Ledger 1_0003), cartoons apparently drawn by children (*id.* at Ledger 1_000128), and grocery lists (*id.* at Ledger 1_000151).  The notebooks contained old papers folded up and stuffed between their pages, including papers which have no connection to this case: a Sam's Club Supermarket receipt (*id.* at Ledger 1_000155); a Cuban club membership card (*id.* at Ledger 1_000158); a gas bill from 2011 (Mohan Decl. Ex. K (GX-207) at Ledger 4_00044); a Mega Sales Detergent Supplier flyer (*id.* at Ledger 4_00037); and a

---

[4] Excerpts of two of these notebooks, GX-204 and GX-207, are attached to the Mohan Declaration as Exhibits J and K, respectively.

receipt for a sandwich press from 2012 (*id.* at Ledger 4_00065).  (*See* Hr'g Tr. 144:17-145:10.)

Also found folded up in two of the notebooks were twelve loose sheets of paper containing

what appear to be handwritten lists of prescription medications, and, as to some of the pages,

dollar amounts or quantities.  (Hr'g Tr. 101:11-13; Mohan Decl. Ex. L (GX-202).)[5]  Together

with the testimony of Mr. Reyes-Arias, these records were the crux of the Government's

evidence at the hearing, yet at no time did the Government subpoena Mr. Rigo for handwriting

exemplars in order to determine whether he wrote any of the lists.  (Hr'g Tr.126:3-5, 126:20-

127:1.)  Nor – until three weeks before the hearing – did the agents show the records to any

cooperating witness in order to develop proof of whether the lists, rather than simply showing

inventory, in fact signify any actual drug transaction.  (*Id.* 131:5-132:6.)

   Agents also recovered financial records from Mr. Rigo's home: a bank receipt for a

Santander bank account (Mohan Decl. Ex. J (GX-204) at Ledger 1_000156); a payment notice

for a safe-deposit box in Mr. Rigo's name (Mohan Decl. Ex. K (GX-207) at Ledger 4_00042);

and a check signed by Mr. Rigo, drawn on an account for JJ Supermarket at Sovereign Bank

(Hr'g Tr. 149:21-150:4).

## V.      Mr. Rigo's Guilty Plea

   On February 14, 2014, the Government provided Mr. Rigo with a letter pursuant to

*United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991) ("Pimentel Letter"), setting forth

the Government's position as to the application of the United States Sentencing Guidelines

("U.S.S.G." or "Guidelines") to the charges against Mr. Rigo.  For Count One of the Indictment,

the Government calculated a 20-level increase to Mr. Rigo's base offense level pursuant to

---

[5] Some of these pages contain drug names, apparent quantities, and apparent dollar amounts (*see, e.g.*, Mohan Decl. Ex. L (GX-202) at 000058-61, 000064, 000066, 000067); other pages list drug names and nothing further (*id.* at 000062); others contain the names of drugs followed by apparent quantities, but no dollar amounts (*id.* at 00056-57, 63).

U.S.S.G. § 2B1.1(b)(1), based on a loss calculation of $7 million to $20 million.  (Mohan Decl.

Ex. M (Pimentel Letter) at 2.)

On March 5, 2014, the Government provided Mr. Rigo with a plea agreement for Count

One of the Indictment.  In its plea agreement, the Government calculated an 18-level increase to

Mr. Rigo's base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J), based on a loss calculation

of $2.5 million to $7 million.  (Mohan Decl. Ex. N (Plea Agreement) at 2.)  Because Mr. Rigo

disputed the Government's calculation of the loss attributable to him as a result of the offense

conduct, he did not sign the Government's plea agreement.

On April 23, 2014, Mr. Rigo pled guilty to both Counts of the Indictment before the

Honorable Kevin N. Fox, Magistrate Judge.  (Mohan Decl. Ex. O (Transcript of Plea Allocution

of Bladimir Rigo, dated April 23, 2014) at 6.)  In his allocution before Judge Fox, Mr. Rigo

stated, among other things, that his participation in the Medicaid re-sale business occurred

"[d]uring the years mainly 2010 to 2012, but also in previous years."  (*Id.* at 15.)

On September 5, 2014, counsel for Mr. Rigo requested a hearing pursuant to *United*

*States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) ("Fatico Hearing") on behalf of both Mr. Rigo and

the Government in order to resolve the parties' dispute concerning the loss amount.  On

September 11, 2014, the Court granted the parties' request and set the Fatico Hearing to take

place on October 6, 2014.  (Endorsed Letter from J. Hendon (ECF No. 16).)  On September 30,

2014, the Court rescheduled the Fatico Hearing for the following Tuesday, October 7.

## VI.    The Fatico Hearing

On October 7, 2014, between 10 a.m. and 4 p.m., the Court heard the Government's

evidence of loss in this case.  The Government called three witnesses:  Detective Anthony

Romero of the New York City Police Department; Mr. Arcadio Reyes-Arias; and FBI Special Agent Antonio Rao.

### A.     The Testimony of Detective Romero

Detective Romero testified about the recorded meeting between Mr. Fernandez and Mr. Rigo on September 28, 2012; the search of the storage facility maintained by Mr. Fernandez in New Jersey; and the arrest of Mr. Rigo and the search of his residence.  On cross examination, Detective Romero conceded that it was Mr. Fernandez who had reached out to Mr. Rigo to set up an undercover drug transaction as part of his cooperation with the Government (Hr'g Tr. 27:23-28:1) – and not the other way around, as the Complaint states (Sealed Complaint (ECF No. 1) ("Compl.") ¶ 11); and that, although the two men discussed possibly doing business together in the future, neither Mr. Rigo nor Mr. Fernandez did anything to follow up on those discussions, and no transaction ever took place.  (Hr'g Tr. 28:11-23.)

Detective Romero also testified about the search by agents of Mr. Fernandez's storage facility on June 5, 2012.  (*Id.* at 29:12-13.)  At that time, agents recovered over 10,000 bottles of prescription drugs, together with medicine bottles, bags, lighter fluid, glue, and labels.  (Hr'g Tr. 29:14-20.)  The agents recovered no evidence, either at the time or later, "connecting Mr. Rigo to that storage facility."  (*Id.* at 29:21-30:2.)  In fact, during his cooperation, Mr. Fernandez told the Government that "Mr. Rigo had never seen his storage facility" and that Mr. Rigo "didn't know where [the storage facility] was."  (*Id.* at 30:15-17.)  Mr. Fernandez told the Government that he and Mr. Rigo had not spoken recently, and that he and Mr. Rigo "only had one transaction between the two of them."  (*Id.* at 30:9-14; 30:20-24.)  Mr. Fernandez and Mr. Rigo "were competitors," Detective Romero explained, and so "they didn't sell to each other."  (*Id.* at 30:11,

31:6-7.)  Detective Romero also confirmed Mr. Reyes-Arias' recollection that the last time Mr.

Rigo did business with Mr. Fernandez was 2010 or 2011.  (*Id.* at 30:25-31:6.)

### B.    The Testimony of Arcadio Reyes-Arias, a/k/a "Chino"

For reasons not disclosed at the hearing, Mr. Reyes-Arias – unlike the Government's

other cooperating witnesses in this case – was detained at the time of his arrest and has never

been released, or sought release, on bail.  He has family in the United States (*id.* at 78:11), little

criminal history (*id.* at 85:25-85:2), is a legal resident (*id.* at 85:22-24), and has lived in the Tri-

State area for at least 15 years (*see id.* at 33:1-15).

### 1.    Mr. Reyes-Arias' Testimony Concerning Drug Quantity Was Not Reliable.

Mr. Reyes-Arias gave varying accounts of the quantity of prescription drugs he sold to

Mr. Rigo during two time frames: the late 1990s until 2005, when he worked at Mr. Rigo's

bodega; and from approximately 2005 to 2012, when, in business for himself, he allegedly sold

prescription drugs to Mr. Rigo and others.  Although his testimony drifted on these points, he

appeared to state that, during the earlier period, he provided Mr. Rigo with "around a hundred

[bottles] a week."  (*Id.* at 34:1-6.)  Although he lowered that estimate to between 60 and 80

bottles a week in the period before he stopped working at the bodega with Mr. Rigo (*id.* at 36:10-

24 (explaining that "before I left [Mr. Rigo's bodega in 2004 or 2005] I was selling less" to Mr.

Rigo – approximately 60, 70, or 80 bottles per week)), on re-direct examination, he raised his

estimate again, stating that he purchased for Mr. Rigo "[a] hundred and more . . . [u]p to two

hundred" bottles per week (*id.* at 95:13-16).  During the later period (2005-12), when Mr. Reyes-

Arias was in business for himself, he testified to selling Mr. Rigo approximately $3,000 to

$8,000 or $9,000 worth of prescription medication, approximately once a month.  (*Id.* at 39:14-

23.)

The sworn testimony of FBI Special Agent Rao in the Complaint in support of the warrant for Mr. Rigo's arrest directly contradicts that testimony. On September 9, 2013, Agent Rao testified that Mr. Reyes-Arias said that, from 2005 through 2012, he was selling Mr. Rigo 70 to 80 bottles "once every other month" (Compl. ¶ 7f.) When confronted with that evidence, Mr. Reyes-Arias denied making those statements to Agent Rao. (Hr'g Tr. 61:7-14.) He then went further. Under pressure, on cross examination, he denied having *ever* told Government agents or prosecutors "the amount of bottles I was selling him [Mr. Rigo]." (*Id.* at 90:22-91:1.)

Mr. Reyes-Arias insisted that he sold $30,000 of prescription drugs to Mr. Rigo in December 2012, a few weeks prior to his (Reyes-Arias') arrest. (*Id.* at 40:5-11, 91:10). That testimony is contradicted by a tape recording made by the Government of a meeting between Mr. Reyes-Arias and Mr. Fernandez on December 3, 2012. On that date Mr. Hernandez, already working for the Government, purchased medicines from Mr. Reyes-Arias in the transaction that led to the arrest of Mr. Reyes-Arias. Referring to Mr. Rigo, Mr. Fernandez asked, "This guy doesn't get anymore from you?" to which Mr. Reyes-Arias responded, "Bladimir? Bladimir hasn't been around here anymore." (*Id.* at 92:7-11.) Confronted with that evidence at the hearing, Mr. Reyes-Arias claimed that he was lying on the tape recording. (*See id.* at 92:12-13.)

Mr. Reyes-Arias was crystal-clear on one point: Despite his claim to have done business with Mr. Rigo on a continuous basis for over a decade, he has "no records of any business with" Mr. Rigo and that he was not aware of a "single piece of paper in this case that was taken from [his] home or [his] person" connecting his business to Mr. Rigo.[6] (*Id.* at 63:14-64:12.) Mr. Reyes-Arias admitted that his testimony was entirely "based on [his] memory." (*Id.* at 64:13-

---

[6] Mr. Reyes-Arias did not keep *any* "records and ledgers of [his] business." (Hr'g Tr. 82:17-20.)

23.)  He "never knew the amount of bottles that [he] sold to him [Mr. Rigo].  [He didn't] have that written down.  [He didn't] keep that register."  (*Id.* at 82:1-2.)

Memory is fallible.  This is an inexorable fact of litigation and of life.  But there is reason the Court should exercise special care when deciding how much to credit Mr. Reyes-Arias' testimony in support of any loss calculation.  There is good reason to believe Mr. Reyes-Arias' memory is impaired as a result of two decades of untreated alcohol addiction.  (*Id.* at 65:20-66:16.)  Mr. Reyes-Arias conceded that he had been addicted to alcohol for approximately 20 years; that he has repeatedly – unsuccessfully – sought treatment; that his drinking has taken a great toll on his life; and that sustained alcohol abuse of this sort can impair one's brain function, including memory.  (*Id.* at 65:20-71:4.)  He denied blacking out for days at a time, but admitted he might have missed work due to his drinking.  (*Id.* at 68:22-25 ("Not [passed out] for days.  I just wouldn't show up for work that day.").)  (Inexplicably the Government failed to elicit this *Giglio* material on its direct examination of this witness.)

## 2.     Mr. Reyes-Arias' Main Customer Was Hermenegildo Fernandez, a/k/a "Pancho" – He Sold to Mr. Rigo Infrequently.

The Government elicited almost no testimony from Mr. Reyes-Arias on direct concerning his relationship with Mr. Fernandez.  Yet Mr. Fernandez, the record is clear, was Mr. Reyes-Arias' main customer at all times relevant to this case.  Indeed, Mr. Reyes-Arias was required to concede on cross-examination that his "main customer" was Mr. Fernandez, and that whatever else he had to say about bottles sold to Mr. Rigo per week or per month, or biweekly, the truth was that he sold to Mr. Rigo "not too frequently."  (*Id.* at 72:14-16, 72:20-73:4.)  When asked if Mr. Fernandez usually purchased his entire inventory during the 2005 to 2012 time period, Mr. Reyes-Arias resisted but eventually conceded that Mr. Fernandez usually bought "all of it." (*Id.* at 73:9-20.)  Indeed, during his plea allocution, Mr. Reyes-Arias testified that after he bought

-13-

prescription drugs, he sold them to "one person, all of it." (*Id.* at 74:12-16; Mohan Decl. Ex. Q

(Transcript of Reyes-Arias Plea Allocution, dated July 31, 2013 ("Reyes-Arias Plea Tr.")) at

20:24-21:3). When asked during the allocution what he thought was going to happen to the

drugs "after [he] sold them to the person that [he] reference[d]," Mr. Reyes-Arias again

responded, "Well, I sold it to him. I think he just sold it on." (Hr'g Tr. 74:17-21; Mohan Decl.

Ex. Q (Reyes-Arias Plea Tr.) at 21:4-8.) When confronted with his previous testimony during

cross-examination, Mr. Reyes-Arias denied that it was true, saying he "did not sell everything to

one person." (Hr'g Tr. 77:4.)

### 3. Mr. Reyes-Arias Was Unable To Reliably Identify Mr. Rigo's Handwriting on Any Drug Record.

On direct examination, Mr. Reyes-Arias testified that Mr. Rigo gave him handwritten

lists of medicines to buy and, at times, Mr. Reyes-Arias gave Mr. Rigo lists of medications he

had available to sell. (*Id.* at 34:7-15; 46:22-47:7.) The Government showed Mr. Reyes-Arias a

page of Government's Exhibit 202, which Mr. Reyes-Arias testified contained Mr. Rigo's

handwriting. (*Id.* at 48:12-14.) He claimed he could identify Mr. Rigo's handwriting because "I

know his handwriting because he would always make lists for me too." (*Id.* at 48:15-17.) On

cross-examination, Mr. Reyes-Arias admitted that the Government asked him to review

Government's Exhibit 202 with a view to helping them Mr. Rigo's handwriting for the first time

only three weeks ago. (*Id.* at 55:19-25.) He admitted he was "not a handwriting expert," but

testified that he knew Mr. Rigo's handwriting from knowing him for such a long time, and might

be able to recognize the way Mr. Rigo made certain letters. (*Id.* at 55:23-56:6.) Defense counsel

showed Mr. Reyes-Arias three of the lists that he claimed contained Mr. Rigo's handwriting.

(*Id.* at 54:1-55:9; Mohan Decl. Ex. L (GX-202) at 5 (000060), 11 (000066), 12 (000067); *see*

Mohan Decl. Ex. P (Reyes-Arias 3503-35).) But in response to counsel's pointing out some of

the more obvious inconsistencies in the handwriting on those pages (in particular the letters "E" and "R") (Hr'g Tr. 57:4-58:8)), Mr. Reyes-Arias conceded he was wrong (*id.* at 58:9-11).

### 4. Mr. Reyes-Arias Repeatedly Violated His Oath in an Effort To Avoid Giving Testimony That Would Not Help the Government.

In an apparent effort to avoid giving testimony that would not help the Government, Mr. Reyes-Arias repeatedly disavowed or contradicted his previous testimony at his plea allocution before Judge Gardephe. At the Fatico hearing, he steadfastly denied his longstanding alcohol addiction (Hr'g Tr. 65:4-71:4), conceding only that he "used to drink but was not an addict" and that he "would drink like once a week," ( *id.* at 66:7-9; 66:16-17), "[a]nd sometimes a month would go by and [he] wouldn't drink" (*id.* at 66:7-9). He likewise denied having testified before Judge Gardephe that during the conspiracy he sold drugs "to one person, all of it" (*id.* at 74:12-16; Mohan Decl. Ex. Q (Reyes-Arias Plea Tr.) at 20:24-21:3), an obvious reference to Mr. Fernandez. (Hr'g Tr. 77:7-8 ("I didn't tell the judge that I had sold everything to just one person.").)

### C. The Testimony of Agent Rao

Finally, the Government called Agent Antonio Rao to the stand. Agent Rao testified about the arrest of Mr. Rigo in September 2013 and the simultaneous search of his residence in New Jersey. Specifically, Agent Rao testified about four journals seized from Mr. Rigo, from which the Government obtained the handwritten drug lists (GX-202) shown to Detective Romero and Mr. Reyes-Arias. Agent Rao then testified how, using those lists, he calculated a loss amount of $2.4 million, based on Medicaid reimbursement values in New York State.

On cross examination, Agent Rao reviewed the lists in GX-202. He admitted that "at no time" did he or his colleagues "subpoena Mr. Rigo for handwriting exemplars" or "engage a handwriting expert" to look at the lists. (Hr'g Tr. 126:2-5; 126:20-127:1.) He acknowledged

that he is "not a handwriting expert" and offered "no opinion on whose handwriting is on any of"
the pages of GX-202.  (*Id.* at 126:6-10.)  Agent Rao testified that he never showed these lists to
Mr. Fernandez or Mr. Leyba to ask if they reflected records of their transactions with Mr. Rigo.
(*Id.* at 131:9-19.)  He agreed that even Mr. Reyes-Arias, who was shown these lists in September
of 2014, "couldn't say whether he recognized any of these records to reflect an actual transaction
with Mr. Rigo."  (*Id.* at 131:20-132:6.)

      Agent Rao testified that "every time [he] saw the name of a drug with a number next to it,
[he] considered it to be a sale or contemplated sale" for the purposes of his loss calculation.  (*Id.*
at 130:25-131:4.)  Upon reviewing the lists again, however, he agreed that a "deal might or
might not result" from the information reflected on the lists, and indeed from the face of the lists,
he "[could not] tell that a transaction took place."  (*Id.* at 8-16.)  Therefore, he testified, the only
basis for including the numbers from these lists in his loss calculation was an "assumption" he
made about what these lists represent.  (*Id.* at 129:3-9.)  When asked if it was possible that
certain of the lists indicate the price that a potential buyer "*would*" pay for these drugs," that is,
"something like a bid," Agent Rao agreed and again acknowledged that he had "made an
assumption about what [the] record reflects."  (*Id.* at 130:16-24.)

      When questioned about Government's Exhibit 212, which is a table reflecting
calculations performed by Agent Rao, Agent Rao admitted that he did not "know for a fact
where any of the prescriptions reflected on [GX-212] were filled."  (*Id.* at 134:1-3.)  This is
because, as Agent Rao acknowledged, (1) "no medications were seized from Mr. Rigo at any
time"; (2) the Government "did not find any bottles of second-hand prescription drugs" in Mr.
Rigo's home or his bodegas; and (3) "there is no evidence connecting Mr. Rigo" to any of the

bottles seized from the residences of Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba.  (*Id.* at 134:7-135:12.)

When asked about the methodology he used to select the appropriate Medicaid reimbursement values for the drugs in his calculation, Agent Rao repeatedly testified that he "[was] not a Medicaid expert" and therefore could not answer those questions.  (*See, e.g.*, *id.* at 135:23.)  He did, however, agree that Medicaid reimbursement values "can vary between states for the same drug" (*id.* at 136:21-24) and "[t]he Medicaid value that applies all depends on in which state's Medicaid program the beneficiary is enrolled or in which state the prescription is filled" (*id.* at 137:22-25).  Agent Rao also admitted that he "just applied the New York Medicaid reimbursement values" without taking "any steps to account for the variation in Medicaid reimbursement values between states."  (*Id.* at 140:11-17.)  Finally, he admitted that of the thousands and thousands of bottles seized from Mr. Fernandez, he reviewed a sample, and learned that only two were prescribed by pharmacies in the State of New York. (*Id.* at 141:23-142:4.)  "After [he] found those two, [he] stopped."  (*Id.* at 142:3-4.)  Yet, Agent Rao "applied the New York Medicaid reimbursement rate" even though he and his colleagues "were [not] able to tell whether any of the drugs reflected on Mr. Rigo's lists [in GX-202] were prescribed to New York Medicaid beneficiaries or were from New York pharmacies."  (*Id.* at 142:5-12.)

Agent Rao then testified that, in 2012, he or his colleagues obtained and executed search warrants for the premises of Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba.  (*Id.* at 147:22-148:16.)  "[T]he reason [he] obtained these search warrants is because [he] had reason to believe [he] would find evidence at these locations."  (*Id.* at 148:17-20.)  And in fact, each of these searches yielded hundreds, if not thousands, of bottles of prescription drugs.  (*Id.* at 147:22-148:16.)  Yet, even though the Government knew Mr. Rigo's home address, and the address of

the bodegas he operated, and even though Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba had

all spoken to the Government about Mr. Rigo before his arrest, he did not obtain a single

application for a search warrant related to any of Mr. Rigo's premises.  (*Id.* at 1498:21-149:10.)

Agent Rao also testified he did not make "[any] efforts to investigate Mr. Rigo's financial

condition," even though the FBI recovered financial records from Mr. Rigo's residence.  (*Id.* at

149:21-150:25.)

Finally, Agent Rao testified that although the FBI had conducted surveillance of the

residences of Mr. Reyes-Arias and Mr. Leyba, and of Mr. Fernandez's storage facilities in 2012,

they never once observed Mr. Rigo entering or exiting those premises.  (*Id.* at 151:4-152:9.)

**ARGUMENT**

## I.      Legal Standard

For sentencing, the Government bears the burden of proving any "disputed factual

allegations" by a "preponderance of evidence."  *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir.

2003) (internal citation omitted).  "In determining a loss amount for purposes of Guidelines

calculation, a district court's findings must be grounded in the evidence and not derive from

mere speculation."  *United States v. Coppola*, 671 F. 3d 220, 249 (2d Cir. 2012) (citing *United

States v. Deutsch*, 987 F.2d 878, 886 (2d Cir.1993)).  If the Government is unable to prove that a

sentence should be increased on the basis of any particular loss amount, the defendant "is entitled

to be sentenced in accordance with the least amount on the grid."  *United States v. Capanelli*,

270 F. Supp. 2d 467, 476 (S.D.N.Y. 2003) (rejecting Government's "invitation for the Court to

'pick a number, any number'" when it failed to sustain its burden of proof for loss-based

sentencing increases provided by the Sentencing Guidelines for the crime of robbery).  Finally, it

is well settled that, in the sentencing context, a district court may rely on "hearsay evidence and

out-of-court declarations, so long as it has 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Cruz*, 2014 WL 4942037, at \*1 (2d Cir. Oct. 3, 2014) (summary order) (quoting U.S.S.G. § 6A1.3 & cmt.).

A defendant can only be held accountable for losses caused by others upon a finding that "the acts were committed in furtherance of the jointly undertaken activity and could reasonably have been foreseen by the defendant." *United States v. Wahl*, 563 F. App'x 45, 51 (2d Cir. 2014) (quoting *United States v. Studley*, 47 F.3d 569, 573 (2d Cir. 1995)).  This requires two particularized two findings by the Court: 1) that the scope of activity to which the defendant agreed was broad enough to include the co-conspirator acts at issue; and 2) that the acts on the part of the co-conspirator were foreseeable to the defendant.  *Id.*; *United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013).[7]

## II.   The Government Has Not Carried Its Burden of Proof.

The evidence proffered by the Government does not support a loss determination of $7 to $20 million – or even $1 million – in this case.  It would, at most, support a determination that Mr. Rigo should be held accountable for the $25,000 transaction that he and Mr. Fernandez discussed on September 28, 2012.

### A.   At the Time of His Arrest, Mr. Rigo Was No Longer Active in the Conspiracy.

The Government's approach to the Fatico Hearing and its related loss calculation appear to be premised on the assumption that Mr. Rigo was a "high-level aggregator" in the Medicaid fraud conspiracy.  But this assumption is belied by the testimony of the Government's own witnesses, which depicted a sparse, half-hearted investigation of Mr. Rigo, and the lack of

---

[7] Furthermore, "'the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy.'" *Getto*, 729 F.3d at 234 n.11 (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)).

evidence demonstrating that Mr. Rigo occupied anything approaching a senior role in the conspiracy.

The Government first learned of Mr. Rigo in June or July of 2012. (Hr'g Tr. 126:17-19.) At that time, the Government had already arrested Mr. Fernandez, after he made two undercover sales of prescription drugs. (*Id.* at 25:21-26:3.) It had searched Mr. Fernandez's warehouse and seized over 10,000 bottles of prescription drugs and other paraphernalia. (Compl. ¶¶ 8-9; Hr'g Tr. 21:21-25; 147:22-148:3.) In hopes of obtaining leniency, Mr. Fernandez began providing information to the law enforcement. (Compl. ¶ 10.) Shortly after his arrest, Mr. Fernandez set up two separate drug transactions with Mr. Reyes-Arias, in which Mr. Reyes-Arias sold Mr. Fernandez dozens of bottles of prescription drugs. (*Id.* at 26:24-27:13.) Mr. Reyes-Arias was then arrested in December of 2012. (Compl. ¶ 7; Hr'g Tr. 114:16-25.) His apartment, which was under surveillance, was searched, and hundreds of bottles of prescription drugs were seized. (Hr'g Tr. 148:9-14, 151:4-9; Mohan Decl. Ex. D (GX-218).) Around that same time, Mr. Fernandez set up two drug transactions with Mr. Leyba, also involving dozens of bottles of drugs. (Hr'g Tr. 26:13-23.) The Government searched Mr. Leyba's residence, which was also under surveillance at the time, and recovered, again, hundreds of bottles of prescription drugs. (*Id.* at 148:4-8, 151:17-25; Mohan Decl. Ex. E (GX-219).)

And during this same period, Mr. Fernandez set up a meeting with Mr. Rigo. During that meeting, Mr. Fernandez and Mr. Rigo discussed business, had lunch, and planned to do business in the future. (Hr'g Tr. 28:4-14.) But no drug transaction happened that day, or any time after that. (*Id.*) And the Government also apparently ceased any investigation that day of Mr. Rigo: it did not obtain or execute a search warrant for either his home or his businesses (*id.* at 148:21-149:10); it did not subpoena his financial records (*id.* at 150:12-19); it made "no efforts to

investigate Mr. Rigo's financial condition" (*id.* at 150:23-25); and it presented no evidence of any further undercover meetings between Mr. Fernandez and Mr. Rigo (*see id.* at 28:20-23).  In fact, the Government apparently did not take any steps to further investigate Mr. Rigo's role in the conspiracy until his arrest a full year later, in September of 2013.

At the time of his arrest, the Government seized four composition notebooks from Mr. Rigo's residence.  (*Id.* at 23:16-20.)  Interspersed between the pages of these notebooks were a handful of sheets containing the names of drugs and numbers.  (*Id.* at 125:9-12, 143:19-25; *see* Mohan Decl. Exs. J & K (GX-204 & GX-207).)  After arresting Mr. Rigo and seizing these notebooks, the Government apparently again halted any efforts to investigate Mr. Rigo until the time came for the Fatico Hearing, a full year after his arrest.  During that year, the Government took no steps to obtain handwriting samples from Mr. Rigo and the other conspirators; to verify whether the loose drug lists reflected any actual transactions; to look for any other similar drug lists; or to look for any physical evidence at all connecting Mr. Rigo to the conspiracy.  (Hr'g Tr. 126:6-10, 126:20-127:1, 131:9-132:6; 134:7-20.)

Had the Government truly believed that Mr. Rigo was a "high-level aggregator," it would have at the very least taken the investigative steps it took with Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba.  It would have set up multiple undercover meetings.  It would have, at minimum, obtained a search warrant to look for prescription drugs.  None of these steps were taken.  This is because, as the Government has known all along, Mr. Rigo was *not* a high-level participant in the conspiracy.  Instead, he is a 74-year-old man who lives with his wife and three sons and earns his income primarily from his bodega businesses and Social Security, and who has nearly no assets to speak of.  Mr. Rigo pled guilty, and therefore does not deny that he was a participant in the drug resale scheme.  But the fact is that he was not a lynchpin of the operation, as the

Government seeks to portray.  Instead, he was merely a loose end for the Government to tie up

nearly a year after it arrested the major players in the conspiracy, and another name for those

major players to add to the Government's list so that they could earn their status as cooperators.

  This reality is reflected starkly in the paucity of any evidence put forth by the

Government to justify its asserted loss amount.  In contrast to the surfeit of prescription drugs

seized from Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba, authorities did not recover any

second-hand medication or drug-related supplies from Mr. Rigo, his home, or his bodega.  (Hr'g

Tr. 134:4-23.)  In fact, the Government has no physical evidence whatsoever that is in any way

connected to Mr. Rigo other the loose sheets of paper found in his composition notebooks and

the September 2012 meeting recording.

  Indeed, the Government seems to have approached its analysis with the logic that, if Mr.

Rigo was in fact a high-level aggregator, it can attribute loss amounts to Mr. Rigo without

proving those losses actually occurred, without proving any credible connection between Mr.

Rigo and those losses, and without proving the underlying premise of Mr. Rigo's role.  The

result is that the Government is not able to meet its burden of proof.

  **B.**  **The Government Put Forth No Credible Evidence To Support Its Estimate of Loss Attributable to Mr. Rigo.**

    **1.**  **The Government Presented No Evidence Connecting Mr. Rigo to the Drugs Found in Mr. Fernandez's Warehouse.**

  The Government's extraordinary suggestion in its Pimentel Letter that Mr. Rigo's loss

calculation could be as high as $20 million indicates that it seeks to attribute the contents of Mr.

Fernandez's New Jersey storage facility to Mr. Rigo.  Indeed, the Government spent a

considerable amount of time at the Fatico Hearing discussing and presenting evidence about Mr.

Fernandez's storage facility, which was searched in June of 2012 and from which agents recovered over 10,000 bottles of prescription drugs.

But though the Government was able to present multiple pictures of the results of that search, and a detailed analysis of the value of drugs seized, they presented no evidence that Mr. Rigo had any connection to the storage facility or that it related to any jointly undertaken activity between Mr. Rigo and Mr. Fernandez.  Under the law of this Circuit, "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts." *Studley*, 47 F.3d at 575; *id.* ("[T]he fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. The relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.")  When a defendant has "no interest in the success of the operation as a whole, and took no steps to further the operation beyond" executing his own transactions, his sentence cannot take into account the consequences of fraudulent activity by others.  *Id.*

Here, the Government's own witnesses testified that Mr. Fernandez stated that "Mr. Rigo had never seen his storage facility" and that Mr. Rigo "didn't know where [the storage facility] was."  (Hr'g Tr. 30:15-17.)  In fact, Mr. Fernandez and Mr. Rigo "only had one transaction between the two of them," (*id.* at 30:9-14; 30:20-24), and the last time Mr. Rigo did business with Mr. Fernandez was 2010 or 2011 (*id.* at 30:25-31:6).  At most, Mr. Fernandez and Mr. Rigo "were competitors," Detective Romero explained, and so "they didn't sell to each other."  (*Id.* at 30:11, 31:6-7.)  Therefore, the Government has no basis to attribute the contents of Mr. Fernandez's storage facility to Mr. Rigo, when Mr. Rigo's participation in the conspiracy had no

connection whatsoever to the facility, and there is no evidence that Mr. Rigo had any idea that the facility or the drugs inside existed.[8]

Similarly, although the Government spent considerable time at the Fatico Hearing analyzing the value of the drugs found at the residences of, or recovered from, Mr. Reyes-Arias (575 containers),[9] and Mr. Leyba (603 containers),[10] it presented no evidence connecting Mr. Rigo in any way to those drugs.  (*Id.* at 134:24-135:12.)  In fact, Agent Rao testified that Mr. Rigo was never observed entering or exiting these premises while they were under surveillance. (*Id.* at 151:4-152:9.)  There is no evidence that Mr. Rigo knew about these drugs or ever transacted drugs that were stored in Mr. Reyes-Arias' or Mr. Leyba's residences.  Without such evidence, the Government cannot establish that Mr. Rigo is in some way responsible for the loss amounts resulting from those drugs.

### 2. Mr. Reyes-Arias' Testimony Consists of Unreliable Assertions and Speculation.

The next prong of the Government's loss analysis is testimony by Mr. Reyes-Arias regarding his sales to Mr. Rigo over the 1997 to 2012 period.  Mr. Reyes-Arias' testimony on this point, however, both during the Fatico Hearing and when compared to his previous statements, is so inconsistent as to be unbelievable.  During the hearing, Mr. Reyes-Arias initially stated that, during the time period of approximately 1997 to 2005, he purchased

---

[8] Indeed, the Government cannot plausibly argue that the drugs seized from Mr. Fernandez constitute jointly undertaken activity between Mr. Rigo and Mr. Fernandez, as in the Government's view they were "competitors" who did not sell to each other.  (Hr'g Tr. 30:11, 31:6-7.)

[9] The figure includes the 481 items recovered from Mr. Reyes-Arias' apartment pursuant to search warrant, (Mohan Decl. Ex. D (GX-218)), which include syringes and patches, as well as bottles, (Hr'g Tr. 122:9-25), and the 94 bottles he transacted in two controlled buys with Mr. Fernandez, (Mohan Decl. Exs. S & T (GX-213; GX-214)).

[10] The figure includes 482 containers recovered from Mr. Leyba's apartment at 23 Crane Street pursuant to search warrant executed at the time of his arrest, (GX-219), and the 121 bottles he transacted in two controlled buys with Mr. Fernandez, (Mohan Decl. Ex. U (GX-209); Mohan Decl. Ex. V (GX-210)).

"between a hundred and two hundred [bottles] a week" for Mr. Rigo, immediately clarifying that it was "around a hundred a week." (*Id.* at 34:1-6.) Later in his testimony, he admitted that the estimate was lower at certain points, explaining that "before I left [Mr. Rigo's bodega in 2004 or 2005] I was selling less" to Mr. Rigo – approximately 60, 70, or 80 bottles per week. (*Id.* at 36:10-24.) On re-direct, Mr. Reyes-Arias returned to his original position that the volume he purchased for Mr. Rigo during the earlier timeframe was "[a] hundred and more. Up to two hundred" bottles per week. (*Id.* at 95:13-16.) For the latter time-period, 2005-2012, Mr. Reyes-Arias testified that he sold Mr. Rigo approximately $3,000 to $8,000 or $9,000 worth of prescription medication, approximately once a month. (*Id.* at 39:14-23.)

None of these numbers presented by Mr. Reyes-Arias at the Fatico Hearing align with his previous statements as to his business dealings with Mr. Rigo. In fact, Agent Rao's sworn testimony in support of the complaint against Mr. Rigo states that Mr. Reyes-Arias sold drugs to Mr. Rigo "approximately once every *other* month during the period 2005 to 2012." (Compl. ¶ 7f (emphasis added).) These sales "generally consist[ed] of 70-80 bottles" for about "$7,000 to $8,000." (*Id.*) Prior to that period, Agent Rao stated in the complaint, Mr. Reyes-Arias and another conspirator were purchasing "*up to* 100 bottles" per week at Mr. Rigo's direction. (*Id.* ¶ 7c (emphasis added).) During a June 17, 2013 meeting with the FBI, Mr. Reyes-Arias stated that his average sale to Mr. Rigo was 70 to 80 bottles, "but that didn't happen freq[uently]" and that Mr. Rigo bought "once a month or once every two months."[11] (Mohan Decl. Ex. W (Reyes-Arias 3503-26).) And finally, for the first time during a September 2014 meeting with the Government, Mr. Reyes-Arias recalled that starting in mid-2012, Mr. Rigo started buying drugs

---

[11] During that meeting, Mr. Reyes-Arias did not connect this frequency with a particular time period, but the questioning related to the entire period that he claimed to have conducted business with Mr. Rigo.

from him more frequently, up to twice a month, and started buying more drugs each time. (Mohan Decl. Ex. X (Reyes-Arias 3503-34).)

All of these recollections directly contradict Mr. Reyes-Arias' own sworn testimony at his plea allocution, when he testified that he collected the drugs he purchased and "sold [the collection] to one person, all of it." (Mohan Decl. Ex. Q (Reyes-Arias Plea Tr.) at 20:24-21:3.)

When pressed on cross-examination about his inconsistencies, Mr. Reyes-Arias backtracked from his previous assertions. Instead, he stated, he "never knew the amount of bottles that [he] sold to him." He testified, "I don't have that written down. I don't keep that register." (Hr'g Tr. 82:1-2.) He also conceded that it was "false" that Mr. Rigo was purchasing drugs from him twice a month in 2012. (*Id.* at 89:25-90:21.) When asked if it was the case that "every time [he sits] down with agents or prosecutors," Mr. Reyes-Arias tells "a different story" about the frequency of his dealings with Mr. Rigo and the number of bottles Mr. Reyes-Arias sold to Mr. Rigo during those dealings, Mr. Reyes-Arias repeated, "I never told them the amount of bottles I was selling [to] him." (*Id.* at 90:22-91:4.)

Perhaps one source of Mr. Reyes-Arias' confusion is that he kept no records over the course of his 15 years of doing business with Mr. Rigo. In fact, Mr. Reyes-Arias was not aware of a "single piece of paper in this case that was taken from [his] home or [his] person" connecting his business to Mr. Rigo.[12] (*Id.* at 63:14-64:12.) Aside from the lists he reviewed upon the Government's instruction three weeks prior to the Fatico Hearing, his entire testimony regarding his "business dealings with Mr. Rigo" were "based on [his] memory." (*Id.* at 64:13-23.)

---

[12] Mr. Reyes-Arias later testified that he did not keep *any* "records and ledgers of [his] business." (Hr'g Tr. 82:17-20.)

Mr. Reyes-Arias' memory is faulty, to say the least.  For example, he could not remember the number of bottles or types of drugs recovered from his home during the Government's search, even though his home was his primary base of operations.  (*Id.* at 51:8-52:20.)  He also could not remember his previous testimony about his customer base, stating, "I didn't tell the judge that I had sold everything to just one person."  (*Id.* at 77:7-8.)  When asked if Mr. Fernandez usually purchased his entire inventory during the 2005 to 2012 time period, Mr. Reyes-Arias gave inconsistent answers, first denying that Mr. Fernandez bought "all of it" and then agreeing that Mr. Fernandez usually purchased the entire inventory.  (*Id.* at 73:9-15.)

He also proved himself a dishonest witness.  Mr. Reyes-Arias repeatedly contradicted or disavowed his previous sworn testimony during his plea allocution before Judge Gardephe.  Confronted by the contradiction between his testimony in his plea allocution that he sold the prescription medications to just "one person, all of it," and his current position that Mr. Rigo was a regular customer, Mr. Reyes-Arias not only denied that the former statement was true (*id.* at 77:4), but denied having even made it at his plea allocution (*id.* at 77:7-8).  Mr. Reyes-Arias insisted, "I didn't tell the judge that I had sold everything to just one person," (*id.* at 77:7-8), despite the fact that the plea transcript – at multiple points – shows the exact opposite (Mohan Decl. Ex. Q (Reyes-Arias Plea Tr.) at 20:24-21:3 ("I sold it to one person, all of it."); *id.* at 21:4-8 ("I sold it to him."); *id.* at 25:6-7 ("The person that bought the medications is the one who did it [removed the pharmacy labels] sometimes.")).  And, perhaps to appear a more reliable witness, he repeatedly attempted to walk-back or minimize the alcohol addiction about which he had testified so extensively before Judge Gardephe.  Despite previously telling Judge Gardephe that he had been addicted to alcohol, saying that "since I was very young I was drunk," that "I went to several programs because I did have problems because I was drinking," but that "I continued

drinking," (*id.* at 6:12-25), Mr. Reyes-Arias now claimed he "used to drink, but [he] was not an addict," (Hr'g Tr. 66:16-17), drinking just "once a week" or sometimes not even for a month, (*id.* at 66:7-9), that it was just twice that he went to rehab (*id.* at 69:19-23), and it was because "the Court made me go" (*id.* at 67:9-10).  Regardless of whether he was untruthful during his plea allocution (when he had little apparent motive to shade the truth) or during the Fatico Hearing (when his testimony against Mr. Rigo may, pursuant to his cooperation agreement with the Government, yield a lighter sentence (*see id.* at 45:12-24)), it is plainly apparent that Mr. Reyes-Arias's sworn testimony cannot be trusted.

Further, it became evident at the hearing that Mr. Reyes-Arias was willing to testify to whatever was necessary to produce the best evidence for the Government, whether he had a basis to do so or not.  For example, rather than calling a handwriting expert or simply procuring a sample of Mr. Rigo's handwriting, the Government decided to have Mr. Reyes-Arias, as part of his cooperation, review the loose drug lists recovered from Mr. Rigo's residence to identify the handwriting on those lists in preparation for the Fatico Hearing.  Mr. Reyes-Arias was apparently able to identify Mr. Rigo's handwriting based on his memory of other such lists.  (*Id.* at 48:15-17.)  But when it was pointed out to him on cross examination that two of the lists purportedly written by Mr. Rigo looked drastically different in certain aspects, Mr. Reyes-Arias readily admitted that the two lists were written by two different people.  (*Id.* at 58:9-11.)

Mr. Reyes-Arias' testimony, therefore, consisted of unsubstantiated assertions by a witness who could not even remember basic facts about his own business and was reckless and dishonest enough, under pressure, to lie about events previously testified to under oath.  He is a witness with every incentive to make the Government's job in this case easier, particularly when the Government failed to procure any physical evidence that could corroborate (or dispute) any

-28-

of his various recollections of the scope and frequency of his dealings with Mr. Rigo.  *Cf. United v. Morrison*, 207 F.3d 962, 967 (7th Cir. 2000) (statements of co-conspirators may "require further testimony as substantial indicia of reliability" when "evidence of relevant conduct significantly increased drug calculations"); *United States v. McLean*, 287 F.3d 127, 133 (2d Cir. 2002) (noting that "uncorroborated" testimony of a cooperating witness who was "eager to please the Government" bore on that witness's credibility).  Moreover, if Mr. Reyes-Arias "never knew the amount of bottles that [he] sold to" Mr. Rigo (*id.* at 82:1-2), and has no consistent recollection of how frequently he sold to Mr. Rigo, then any extrapolation from Mr. Reyes-Arias' testimony as to Mr. Rigo's loss amount is simply "mere speculation."  *Coppola*, 671 F.3d at 249; *see* Tr. of 1/16/14 Hearing at 215-216, *United States v. Correa*, No. 13-CR-289-AKH (S.D.N.Y.), ECF No. 21 (expressing "a great deal more comfort" in prescription-drug loss amounts established by defendant's records than cooperator's testimony about drug sales);

### C.   The Government's Loss Table Is Based on Unsubstantiated Assumptions.

During the Fatico Hearing, the Government presented a loss table in which it created a list of transactions from loose sheets of paper listing medications found stuffed into notebooks in Mr. Rigo's home, and then applied Medicaid reimbursement values to those transactions in order to come up with a loss valuation of $2.4 million.  (Mohan Decl. Ex. R (GX-212).)  As discussed below, that $2.4 million is based entirely upon unsubstantiated assumptions, about both the nature of the loose lists and about the Medicaid reimbursement values used to arrive at that amount.

### 1.   The Government Did Not Prove That the "Ledgers" Recovered From Mr. Rigo Reflect Drug Transactions.

The Government contends that the handful of loose pages listing prescription drugs, which were found interspersed in notebooks in Mr. Rigo's home (Hr'g Tr. 144:23-25),

"document deals involving dozens of bottles of . . . second-hand medications," (Ltr. from P. Bharara, dated Oct. 6, 2014 (ECF No. 18).)  Far from offering any support for that conclusion (aside from unsubstantiated assumptions or speculation), Government witnesses, in fact, admitted the opposite – that they cannot tell whether the drug lists represent transactions in second-hand prescription drugs.  (*See* Hr'g Tr. 127:2-6, 128:14–131:2.)

During the Fatico Hearing, the Government's witnesses testified that lists of prescription drugs could be used in different ways.  Lists could be provided by buyers, setting forth the medications they sought to acquire.  (*Id.* at 34:7-9 (Mr. Reyes-Arias); *id.* at 128:2-7 (Agent Rao).)  Such lists could also be distributed by sellers, setting forth their inventory, *i.e.*, medications they had available for sale.  (*Id.* at 46:22-47:7 (Mr. Reyes-Arias); *id.* at 127:11-24 (Agent Rao).)  In either situation, copies of the same lists might be distributed to numerous other individuals; hoping to obtain the best deal, the buyers might distribute their lists of sought-after medications to multiple known sellers, and, likewise, sellers might distribute their lists of inventory to multiple potential buyers.  (*See id.* at 127:18-21, 128:2-7.)  Even lists containing quantities and prices might merely indicate the amounts at which buyers or sellers were willing to purchase or dispose of the medications, akin to bids or solicitations.  (*See id.* at 127:22-24, 128:2-5, 130:16-21.)  As a result of a list, Agent Rao agreed, a deal might or might not result. (*Id.* at 127:25-128:9.)

Against this backdrop, Agent Rao generally agreed that he was not in a position to say whether the lists recovered from Mr. Rigo's notebooks reflected medications changing hands or actual transactions.  (*Id.* at 127:2-6.)  Moreover, on cross-examination, when reviewing specific lists that only set forth medication names and quantities, (Mohan Decl. Ex. L (GX-202) at 1 (00056), 2 (00057), 8 (00063)), Agent Rao could not tell by looking at any of the lists that any

transactions took place.  (Hr'g Tr. 128:10-129:13.)  Even when looking at a sample list that contained medication names, quantities, and pricing (Mohan Decl. Ex. L (GX-202) at 4 (00059) – which Agent Rao initially claimed was "receipt," but then admitted could represent a bid (Hr'g Tr. 130:16-21) – Agent Rao agreed that nothing on the face of the document indicated that money or medications changed hands (*id.* at 130:12-15).  Nevertheless, despite being unable to discern whether any lists represented actual or intended transactions, Agent Rao included the quantities on each of these lists in the Government's loss calculation, agreeing that his only bases for doing so were assumptions that he made.  (*Id.* at 128:17-23, 129:3-9, 129:14-19.)

In deciding what to include in the Government's loss calculations, Agent's Rao methodology essentially boils down to this:  If he saw a drug name with a number next to it on any of the lists, he considered it to be a sale or contemplated sale, and included it in his tally.  (*Id.* at 130:25-131:4.)  There was no further investigation of avenues easily available to the Government to determine whether that assumption might be correct.  Although Mr. Fernandez had been cooperating with the Government since 2012, at no time did the Government show the lists to Mr. Fernandez and ask if they were records of transactions between him and Mr. Rigo.  (*Id.* at 131:5-12.)  Nor did it show the lists to Mr. Leyba – who had been seeking to cooperate – and ask the same.  (*Id.* at 131:16-19.)  And, despite having cooperated with the Government since early 2013, Mr. Reyes-Arias was only first shown the lists around September 2014.  (*Id.* at 131:20-132:2.)[13]

Even if, as the Government contends, some lists might represent actual or intended transactions by someone, it offers no evidence that they constitute transactions for which Mr. Rigo should be held responsible.  As discussed above, the Government did not procure

---

[13] Even then, Agent Rao agreed, Mr. Reyes-Arias could not say whether he recognized the records to reflect an actual transaction with Mr. Rigo.  (Hr'g Tr. 132:3-6.)

handwriting samples from Mr. Rigo or from any other member of the conspiracy in order for anyone – expert or not – to determine which lists contain Mr. Rigo's handwriting.  The Government's "expert," Mr. Reyes-Arias, identified certain of the lists as bearing Mr. Rigo's handwriting, but quickly backtracked once it was pointed out to him that two of those lists contained very different handwriting from two different people.  (*Id.* at 58:9-11.)  His mistake is understandable, as he was relying purely on his memory of Mr. Rigo's handwriting, which he would have last seen, at the latest, in 2012, prior to his incarceration.

Moreover, while the Government tried to paint these loose lists as drug "ledgers" (*id.* at 100:15) that were part of some organized accounting system, the fact is that these lists were loosely interspersed between four composition notebooks recovered from Mr. Rigo's residence without any particular rhyme or reason (*see id.* at 143:23-25).  These composition notebooks also contained notes from Mr. Rigo's bodega business (Mohan Decl. Ex. J (GX-204) at Ledger 1_0003), cartoons apparently drawn by children (*id.* at Ledger 1_000128), and grocery lists (*id.* at Ledger 1_000151).  In fact, the lists used by the Government were found wedged in only two of those four notebooks.  And there were other pieces of paper interspersed within the pages of those two notebooks, including a Sam's Club Supermarket receipt (*id.* at Ledger 1_000155); a Cuban club membership card (*id.* at Ledger 1_000158); a gas bill from 2011 (Mohan Decl. Ex. K (GX-207) at Ledger 4_00044); a Mega Sales Detergent Supplier flyer (*id.* at Ledger 4_00037); and 2012 receipt for a sandwich press (*id.* at Ledger 4_00065).  Even a lay observer could concede that these notebooks, or the lists contained in them, were not sophisticated drug ledgers maintained by a leader of a drug organization.

And finally, even if these lists did represent actual or intended transactions attributable to Mr. Rigo, the Government has presented no evidence that the prescription drugs listed were ever

billed to any state Medicaid agency.  Therefore, even taking into account all of the assumptions made by the Government regarding the meaning of these lists, there is no evidence that the drugs on these lists fall within the scope of the Medicaid fraud charged by the Government.

In sum, the Government was not able to prove that these loose lists (1) were drug ledgers; (2) contained Mr. Rigo's handwriting; (3) represented drug transactions; (4) described drugs paid for by Medicaid; or (5) provide any insight into Mr. Rigo's participation in the conspiracy. Instead, its analysis of these lists was founded on unsubstantiated assumptions, rather than actual evidence, and therefore that analysis cannot be the basis of the Court's sentence.  *United States v. Kaid*, 241 F. App'x 747, 752 (2d Cir. 2007) (summary order) (defendants entitled to resentencing when forensic auditor who determined how much tax loss to attribute to each defendant had been told by Government to link certain invoice codes with certain defendants where such links were not supported by testimony or other record evidence).

### 2.     The Government's Medicaid Reimbursement Value Calculation Is Not Based On Evidence.

Having assumed that the loose lists represented drug transactions and that the numbers on those loose lists represented quantities, Agent Rao then applied a very simple analysis to arrive at the Medicaid reimbursement value for each transaction:  he took his tally of bottles from the loose lists and multiplied that number by the New York State Medicaid reimbursement values for each drug.  (Hr'g Tr. 140:11-17.)  This methodology, however, is also founded upon multiple assumptions with no basis in the evidence.

During the Fatico Hearing, Agent Rao agreed that Medicaid reimbursement values "can vary between states for the same drug" (*id.* at 136:21-24) and "[t]he Medicaid value that applies all depends on in which state's Medicaid program the beneficiary is enrolled or in which state the prescription is filled" (*id.* at 137:22-25).  However, he admitted that, in coming up with the $2.4

-33-

million loss figure, he "just applied the New York Medicaid reimbursement values" without taking "any steps to account for the variation in Medicaid reimbursement values between states." (*Id.* at 140:11-17.)  His analysis is therefore flawed in a fundamental way.  In fact, Medicaid reimbursement values have been found to vary as much as 4,073% between the lowest-paying state and the highest-paying state for a particular drug.[14]  The Government presented no reasoning for its decision to apply the New York State values – which have been found to be consistently high[15] – as opposed to some other state's values, in arriving at its loss amounts.  And while it is true, as Agent Rao asserted, that state Medicaid reimbursement values "have to fall within a parameter," (*id.* at 136:12-20), he was unaware of what that parameter was and did not testify that the parameter he described had in any way factored into his analysis.[16]  Therefore, his choice to apply the New York State reimbursement values seems to be entirely arbitrary.

If the Government had conducted any analysis of the evidence to make a reasoned choice as to which state's reimbursement values to apply, it could not have arrived at a blanket application of the New York rates.  Agent Rao admitted that he and his colleagues "were [not] able to tell whether any of the drugs reflected on Mr. Rigo's lists [in GX-202] were prescribed to New York Medicaid beneficiaries or were from New York pharmacies."  (*Id.* at 142:5-12.)  He also admitted that some of the medication recovered from Mr. Fernandez, Mr. Reyes-Arias, and Mr. Leyba "were from states other than New York."  Indeed, after seizing over 10,000 bottles

---

[14] Department of Health and Human Services, Office of Inspector General, Variation in State Medicaid Drug Prices, September 2004, at 8, available at https://oig.hhs.gov/oei/reports/oei-05-02-00681.pdf.

[15] *Id.* at 12.

[16] Under federal regulations, the "parameter" (with certain exceptions) is that each state's reimbursement for a covered outpatient drug not exceed the lower of (1) estimated acquisition cost plus reasonable dispensing fees; or (2) providers' usual and customary charges to the general public.  42 C.F.R. § 447.512(b).  Medicaid only establishes specific maximums − called "Federal Upper Limits" ("FUL" or "FULs") − for certain generic or multiple-source prescription drugs.  *See* DEP'T OF HEALTH AND HUMAN SERVICES, ANALYZING CHANGES TO MEDICAID FEDERAL UPPER LIMIT AMOUNTS 1-2 (2012) (explaining FUL program).

from Mr. Fernandez's New Jersey storage facility, Agent Rao merely "sorted through" a sample

size of a "box or two" and identified only two bottles from New York.  (*Id.* at 141:23-142:4.)

And "[a]fter [he] found those two, [he] stopped."  (*Id.* at 142:3-4.)

Therefore, when the limited analysis that the Government did conduct pointed to no clear

answer, the Government chose to assume that it could apply the New York values and meet its

burden of proof without fully investigating where the drugs at issue came from.  This

assumption, along with the host of assumptions made regarding the meaning of the loose lists,

renders the Government's loss table unusable as evidence of loss attributable to Mr. Rigo.

### D.      The Only Transaction Connected to Mr. Rigo And Supported By Evidence Amounts to $25,000.

During the course of the Fatico Hearing, the Government raised only one specific

transaction that, based on the evidence put forth, is more likely than not attributable to Mr. Rigo.

This transaction was a sale proposed by Mr. Rigo during the September 2012 undercover

meeting with Mr. Fernandez.  During that meeting, Mr. Rigo proposed a transaction in which he

would sell $25,000 of prescription drugs to a customer suggested by Mr. Fernandez.  Then he

and Mr. Fernandez would divide the profits in half.  (Hr'g Tr. 11:6-25.)  Although there is no

evidence that Mr. Rigo transacted anything during that meeting or any time after that meeting, he

does not and indeed cannot dispute that he proposed this deal.

To be clear, Mr. Rigo accepts that he committed the crimes charged by the Government

and does not mean to take the position before this Court that his only participation in the

conspiracy whatsoever was his September 2012 proposal.  But it is the Government that bears

the burden of proving a specific loss amount for purposes of sentencing.  *Rizzo*, 607 F.3d at 312;

*see Capanelli*, 270 F. Supp. 2d at 476 ("The Government having failed to prove that [the

defendant's] sentence should be adjusted [under U.S.S.G. § 2B3.1(b)(7)] on the basis of any

particular amount, he was entitled to be sentenced in accordance with the least amount" available

under the Sentencing Guidelines provision at issue).  If the Government conducts a limited

investigation and then chooses to rely upon assumptions and incredible witnesses, rather than

reliable evidence, then it, not Mr. Rigo, must bear the consequence of being unable to meet its

burden of proof.  *See Capanelli*, 270 F. Supp. 2d at 476 (when the Government failed to meet its

burden to prove a loss amount justifying a sentencing increase, the Court's selection of a greater

loss amount "would have been entirely speculative and consequently unacceptable").

## CONCLUSION

For the reasons stated above, Defendant Bladimir Rigo respectfully requests that the

Court find that the Government has not met its burden of proof regarding loss amounts

attributable to Mr. Rigo in excess of $25,000.

Dated:  New York, New York
       November 14, 2014

Respectfully submitted,

SPEARS & IMES LLP

By: /s/ Joanna C. Hendon
    Joanna C. Hendon
    Sharanya Sai Mohan
    Alicia K. Amdur
    51 Madison Avenue
    New York, New York  10010
    Tel:   (212) 213-6996
    Fax:  (212) 213-0849
    jhendon@spearsimes.com

*Attorneys for Defendant Bladimir Rigo*