# EXHIBIT Q

D7VMREYP

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              13 Cr. 51 (PGG)

5    ARCADIO REYES-ARIAS,

6              Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              July 31, 2013
9                                             10:15 a.m.

10
     Before:
11
                    HON. PAUL G. GARDEPHE,
12
                                              District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17        Assistant United States Attorney

18   MARGARET M. SHALLEY
          Attorney for Defendant
19

20

21

22

23

24

25

```
 1                 (Case called)
 2                 MR. DISKANT:  Good morning, your Honor, Edward Diskant
 3     for the government.
 4                 MS. SHALLEY:  Good morning, your Honor, Margaret
 5     Shalley for Arcadio Reyes-Arias.
 6                 THE COURT:  I am told that defendant wishes to plead
 7     guilty to a superseding information, is that correct, Ms.
 8     Shalley.
 9                 MS. SHALLEY:  That's correct, your Honor.
10                 THE COURT:  Mr. Ruocco, would you please swear in the
11     defendant.
12                 (Defendant sworn)
13                 THE COURT:  Mr. Reyes, you should understand that you
14     are now under oath and if you answer any of my questions
15     falsely, your answers can later be used against you in another
16     prosecution for perjury or for making a false statement.
17                 Do you understand that?
18                 THE DEFENDANT:  Yes.
19                 THE COURT:  You are here with Ms. Shalley this morning
20     as your attorney, is that correct?
21                 THE DEFENDANT:  Yes.
22                 THE COURT:  Have you received a copy of the
23     superseding information which reflects the charges against you?
24                 THE DEFENDANT:  Yes.
25                 THE COURT:  And has the information been read to you
```

D7VMREYP

1    in Spanish?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Have you had an opportunity to discuss it

4    with Ms. Shalley?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  You should understand that there are four

7    charges against you in the information.  The first is

8    conspiracy to commit wire fraud and health care fraud.  The

9    second is conspiracy to commit unlawful adulteration,

10   misbranding, and wholesale distribution of prescription drugs,

11   the third charge is bank fraud, and the fourth is sponsoring or

12   exhibiting an animal in a fighting venture.

13             Do you wish me to read the superseding information to

14   you now here in open court?

15             THE DEFENDANT:  No.

16             THE COURT:  I have before me a waiver of indictment

17   form that appears to bear your signature, the signature of the

18   interpreter, and the signature of your attorney, Ms. Shalley.

19   The document is in Spanish.

20             Mr. Reyes, is this your signature on the waiver of

21   indictment form?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  And did you discuss it with Ms. Shalley

24   before you signed it?

25             THE DEFENDANT:  Yes.

D7VMREYP

1          THE COURT:  Do you understand that you have no

2     obligation to waive indictment?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Have any threats been made against you or

5     any promises been made to you to induce you to waive

6     indictment?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  Do you understand that if you did not

9     waive indictment, the government would be required to present

10    your case to a grand jury, which would be asked to determine

11    whether there was probable cause to believe that you committed

12    the crimes as charged in the information?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Do you further understand that the grand

15    jury might or might not indict you?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And do you realize that by signing this

18    waiver of indictment you have given up your right to have your

19    case presented to a grand jury and that, instead, the case will

20    proceed against you on the basis of the information signed by

21    the United States Attorney?

22         THE DEFENDANT:  Yes.

23         THE COURT:  I find that you have knowingly and

24    voluntarily waived your right to have your case presented to a

25    grand jury, and the case will proceed against you by way of

Case 1:13-cr-00051-DLC Document 25-17 Filed 01/14/14 Page 6 of 40
Case 1:13-cr-00051-DLC Document 13 Filed 03/28/13 Page 5 of 39          5
D7VMREYP

1    information.

2          I also have a waiver of rights form.  Once again, it

3    appears to have been signed by you and by the interpreter and

4    by Ms. Shalley.  Is this your signature on the waiver of rights

5    form?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  I will mark it as Exhibit 1 to these

8    proceedings.

9          Finally, I have a plea agreement that appears to have

10   been signed by you and by Ms. Shalley and by representatives of

11   the U.S. Attorney's Office.  Is this your signature on the plea

12   agreement?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  I will mark it as Exhibit 2 to these

15   proceedings.

16         Before deciding whether to accept your guilty plea I

17   am required to ask you certain questions.  It's important you

18   answer these questions honestly and completely.  The purpose of

19   the proceedings is to make sure that you understand your rights

20   and for me to make certain that you are pleading guilty of your

21   own freewill and to make sure that you're pleading guilty

22   because you are, in fact, guilty and not for some other reason.

23         Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  If you don't understand any of my

Case 1:13-cr-00051-DLC Document 25-7 Filed 01/14/14 Page 7 of 40
Case 1:13-cr-00051-DLC Document 13-7 Filed 03/28/13 Page 6 of 39          6
D7VMREYP

1    questions or you want to consult with Ms. Shalley at any time,

2    please say so because it's important that you understand every

3    question before you answer.

4              Could you state your full name for the record.

5              THE DEFENDANT:  Arcadio Reyes-Arias.

6              THE COURT:  How old are you, sir?

7              THE DEFENDANT:  Forty-two.

8              THE COURT:  How far did you go in school?

9              THE DEFENDANT:  Seventh.

10             THE COURT:  Seventh grade?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Have you ever been addicted to any drugs

13   or alcohol or been treated for any type of addiction?

14             THE DEFENDANT:  Alcohol.

15             THE COURT:  When were you addicted to alcohol?

16             THE DEFENDANT:  I used to drink.  Since I was very

17   young I was drunk, since I was 18 or 19 years old.

18             THE COURT:  Have you ever been treated for that

19   condition?

20             THE DEFENDANT:  Yes.  I went to several programs

21   because I did have problems because I was drinking and so on.

22             THE COURT:  And did that help you with the alcohol

23   problem or not?

24             THE DEFENDANT:  No, it didn't help me much because in

25   any case I continued drinking.

D7VMREYP

1          THE COURT:  I take it you haven't had any alcohol

2     since you've been incarcerated?

3          THE DEFENDANT:  Uh-huh, yes.

4          THE COURT:  Are you presently suffering any symptoms

5     associated with your alcoholism?

6          THE DEFENDANT:  No.

7          THE COURT:  Are you now or have you recently been

8     under the care of any kind of doctor?

9          THE DEFENDANT:  No, sir.

10         THE COURT:  In the past 24 hours, have you taken any

11    drugs, medicine, or pills?

12         THE DEFENDANT:  No.

13         THE COURT:  Is your mind clear today and do you

14    understand what is happening?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Ms. Shalley, any doubts as to Mr. Reyes'

17    competence to plead guilty?

18         MS. SHALLEY:  No, your Honor.

19         THE COURT:  On the basis of Mr. Reyes' responses to my

20    questions and my observations of his demeanor, I do find that

21    he's fully competent to enter an informed plea.

22         Mr. Reyes, have you had enough time to discuss your

23    case with Ms. Shalley?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And have you discussed with her the

1    charges against you, including your intention to plead guilty?

2                THE DEFENDANT:  Yes.

3                THE COURT:  And have you discussed with her any

4    possible defenses that you might have to these charges as well

5    as all the facts about your involvement in these matters?

6                THE DEFENDANT:  Yes, sir.

7                THE COURT:  And has she told you about the

8    consequences of pleading guilty?

9                THE DEFENDANT:  Yes.

10               THE COURT:  And are you satisfied with Ms. Shalley's

11   representation of you?

12               THE DEFENDANT:  Yes.

13               THE COURT:  I must explain certain constitutional

14   rights that you have.  These are rights you'll be giving up if

15   you enter a guilty plea.

16               THE DEFENDANT:  Yes, I do understand.

17               THE COURT:  Listen carefully to what I'm about to say.

18   And if you don't understand something, stop me and either

19   myself or Ms. Shalley will explain the matter to you more

20   fully.

21               Under the Constitution and laws of the United States,

22   you have a right to a speedy and public trial by a jury on the

23   charges against you in the information.

24               Do you understand that?

25               THE DEFENDANT:  Yes.

Case 1:13-cr-00897-DLC Document 25-17 Filed 11/14/14 Page 10 of 40
Case 1:13-cr-00805-PGG Document 113 Filed 03/26/15 Page 10 of 39          9
D7VMREYP

1          THE COURT:  If there were a trial, you would be

2     presumed innocent and the government would be required to prove

3     your guilt by competent evidence and beyond a reasonable doubt.

4     You would not have to prove you were innocent at a trial.

5          Do you understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  If there were a trial, a jury composed of

8     12 people selected from this district would have to agree

9     unanimously before you could be found guilty.

10          Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  If you decided to go to trial, at that

13     trial and at every stage of your case you would have the right

14     to be represented by an attorney.  And if you could not afford

15     one, an attorney would be appointed to represent you at

16     government expense and at no cost to you.  If you retained a

17     lawyer and you ran out of money, an attorney would be appointed

18     to continue to represent you and to handle your case all the

19     way through trial and not just for purposes of a guilty plea.

20     So your decision to plead guilty should not depend on whether

21     you can afford a lawyer.

22          Do you understand that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  If there were a trial, you would have the

25     right to see and hear all of the witnesses against you and your

Case 1:13-cr-00807-DLC Document 25-17 Filed 11/14/14 Page 11 of 40
Case 1:13-cr-00051-PGG Document 137 Filed 03/28/13 Page 11 of 39          10
D7VMREYP

1    attorney could cross-examine them.  You would have a right to

2    have your attorney object to the government's evidence and to

3    offer evidence on your own behalf, if you so desired.  You

4    would have the right to have subpoenas issued to compel

5    witnesses to testify in your defense.

6             Do you understand that?

7             THE DEFENDANT:  Yes.

8             THE COURT:  If there were a trial, you would have the

9    right to testify if you wanted to, but no one could force you

10   to testify if you did not want to.  Furthermore, no inference

11   or suggestion of guilt could be drawn if you chose not to

12   testify at a trial.

13            Do you understand that?

14            THE DEFENDANT:  Yes.

15            THE COURT:  If you were convicted at a trial, you

16   would have the right to appeal that verdict to a higher court.

17            Do you understand that?

18            THE DEFENDANT:  Yes, sir.

19            THE COURT:  If you plead guilty and I accept your

20   plea, you will give up your right to a trial and the other

21   rights I just discussed other than the right to a lawyer, which

22   you have, regardless of whether or not you plead guilty.

23            If you plead guilty I will enter a judgment of guilty

24   and sentence you on the basis of your plea after I have

25   considered a presentence report and whatever submissions I

Case 1:13-cr-00007-DLC Document 25-17 Filed 11/14/14 Page 12 of 40
Case 1:13-cr-00051-PGG Document 137 Filed 03/28/13 Page 12 of 89    11
D7VMREYP

1    receive from your lawyer and the prosecutor.

2              Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  If you plead guilty you will have to give

5    up your right not to incriminate yourself because I will ask

6    you questions about what you did in order to satisfy myself

7    that you are guilty as charged, and you will have to admit and

8    acknowledge your guilt.

9              Do you understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  I must now tell you the elements of the

12   four offenses that you are charged with in the information.

13   This is what the government would have to prove beyond a

14   reasonable doubt if the case were to proceed to trial.

15             Count One charges you with a conspiracy to commit wire

16   fraud and health care fraud.  The government would have to

17   prove that the conspiracy charged in the information in Count

18   One existed; in other words, that at some point between 2000

19   and December 2012, there was, in fact, an agreement or

20   understanding between two or more people to commit wire fraud

21   and health care fraud.

22             Second, the government would have to prove that you

23   knowingly became a member of the conspiracy, that is, that you

24   knowingly associated yourself with the conspiracy and

25   participated in the conspiracy to commit wire fraud and health

D7VMREYP

1    care fraud.

2              A person commits wire fraud by knowingly and willfully

3    executing a scheme to defraud or to obtain money and property

4    by means of materially false and fraudulent representations or

5    promises and by using interstate wires in execution of the

6    scheme.  A person commits health care fraud in connection with

7    the delivery of or payment for health care benefits, items, or

8    services.  That person executes a scheme or artifice to defraud

9    a health care benefit program or obtains by means of false or

10   fraudulent representations or promises money or property owned

11   by or under the custody or control of a health care benefit

12   program.

13             Count Two charges you with conspiracy to commit

14   unlawful adulteration, misbranding, and wholesale distribution

15   of prescription drugs?

16             MR. DISKANT:  Your Honor, I apologize for

17   interjecting.  I don't believe there is a misbranding objective

18   in Count Two.

19             THE COURT:  Okay.

20             In connection with Count Two, the government would

21   have to prove the existence of the conspiracy charged, in other

22   words, that at some point between 2000 and December 2012 there

23   was, in fact, an agreement or understanding between two or more

24   people to unlawfully adulterate and distribute in a wholesale

25   manner prescription drugs.  An adulterated drug is defined by

D7VMREYP

statute to mean, among other things, a drug that has been

prepared, packed or held under unsanitary conditions whereby it

has been rendered injurious to health.  Wholesale distribution

is defined by statute to mean the distribution of drugs to

persons other than the consumer or patient.

The government would also have to prove that you

knowingly became a member of that conspiracy, that is, that you

knowingly associated yourself with the conspiracy charged in

Count Two and participated in that conspiracy.

Third, the government would have to prove that a

member of the conspiracy committed an overt act in furtherance

of the unlawful agreement.  Here the information charges the

following overt act:  On or about December 3, 2012, you sold 52

bottles of prescription medications to a cooperating witness

which had been held under unsanitary conditions and that you

did so without a license from any state to engage in such a

sale.

Count Three of the superseding information charges you

with bank fraud.  The elements of bank fraud are as follows:

First, that there was a scheme to defraud a bank; second, that

you executed or attempted to execute a scheme with the intent

to defraud the bank; third, that you intended to expose the

bank to losses, and that at the time the scheme was executed

against the bank, its deposits were insured by the Federal

Deposit Insurance Corporation.

D7VMREYP

```
 1            Count Four charges you with sponsoring or exhibiting
 2   an animal in a fighting venture.  The government would have to
 3   prove that you knowingly and willfully sponsored an animal in a
 4   fighting venture which is defined by statute to mean an event
 5   which is in or affects interstate or foreign commerce and that
 6   involves a fight conducted or to be conducted between at least
 7   two animals for purposes of sport, wagering, or entertainment.
 8            Do you understand that these are the elements of the
 9   offenses you are charged with in the superseding information?
10            THE DEFENDANT:  Yes, sir.
11            THE COURT:  I must tell you the maximum and any
12   minimum possible penalties for these crimes.  The maximum means
13   the most punishment that could possibly be imposed.  It does
14   not necessarily mean that is what you will receive.  But you
15   have to understand that by pleading guilty you are exposing
16   yourself to the possibility of receiving any combination of
17   punishments up to the maximum I'm about to describe.
18            Do you understand that?
19            THE DEFENDANT:  Yes.
20            THE COURT:  Count One carries a maximum sentence of 20
21   years' imprisonment, which could be followed by as much as
22   three years of supervised release.  Supervised release means
23   that if you are sentenced to prison, after you are released
24   from prison you will be subject to supervision by the U.S.
25   Probation Office.  There will be rules of supervised release
```

1    that you will have to follow.  And if you violate those rules

2    you can be returned to prison without a jury trial to serve

3    additional time even beyond your original sentence.  In

4    addition, Count One carries a maximum fine of the greatest of

5    $250,000, twice the gross pecuniary gain derived from the

6    offense or twice the gross pecuniary loss resulting from the

7    offense.

8            Count Two carries a maximum sentence of five years'

9    imprisonment and a maximum term of three years of supervised

10   release.  Count Two carries a maximum fine of the greatest of

11   $250,000, twice the gross pecuniary gain derived from the

12   offense or twice the gross pecuniary loss resulting from the

13   offense.

14           Count Three carries a maximum sentence of 30 years'

15   imprisonment and a maximum term of five years of supervised

16   release.  A maximum fine on Count Three is the greatest of $1

17   million, twice the gross pecuniary gain derived from the

18   offense, or twice the gross pecuniary loss resulting from the

19   offense.

20           Count Four carries a maximum sentence of five years'

21   imprisonment, a maximum term of three years of supervised

22   release, and a maximum fine of the greatest of $250,000, twice

23   the gross pecuniary gain derived from the offense or twice the

24   pecuniary gross resulting from the offense.

25           The sentences on these four charges could be imposed

1    concurrently, that is, to be served at the same time, or

2    consecutively, that is, one after the other.  Accordingly, the

3    total maximum sentence of imprisonment on all counts is 60

4    years.

5            Parole has been abolished in the federal system.  If

6    you are sentenced to prison, you will not be released early on

7    parole.  There is a limited opportunity to earn credit for good

8    behavior, but you will have to serve at least 85 percent of the

9    time you are sentenced to.

10           Do you understand that?

11           THE DEFENDANT:  Yes.

12           THE COURT:  There is also a mandatory minimum fine or

13   special assessment of $100 on each count.

14           As part of your sentence I'm authorized to order you

15   to make restitution to any person injured as a result of your

16   criminal conduct, and I can also order you to forfeit certain

17   property to the government, I should say.

18           Do you understand that?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Being convicted of a felony may have other

21   consequences, such as the loss of licenses or the right to

22   possess a firearm.  If you are a citizen of the United States,

23   you could lose your right to vote.  If you are not a citizen of

24   the United States, you will likely lose your right to remain in

25   the United States and you may be deported.  This is not a full

D7VMREYP

 1    list of the consequences of a felony conviction, but these are

 2    examples of consequences that may result from a felony

 3    conviction.

 4              Do you understand that?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  There are sentencing guidelines that I

 7    must consult.  In order to determine the appropriate sentence

 8    in your case, have you talked with Ms. Shalley about the

 9    sentencing guidelines?

10              THE DEFENDANT:  Yes.

11              THE COURT:  You should understand that I will not be

12    able to determine what the recommended sentence is under the

13    guidelines until after a presentence report has been prepared

14    by the U.S. Probation Office.

15              Do you understand that?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  After I have determined what the

18    recommended sentence is under the guidelines and determined

19    whether a departure either upward or downward from that range

20    is called for, I will then determine what an appropriate

21    sentence is in your case, having in mind, among other things,

22    all of the factors set forth in the sentencing statute,

23    including the need for the sentence imposed to reflect the

24    seriousness of the offenses, the need to promote respect for

25    the law, the need to provide just punishment, and the need to

D7VMREYP

1    afford adequate deterrence to criminal conduct.

2              Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  You should understand that if your

5    attorney or anyone else has attempted to estimate or predict

6    what your sentence will be that that estimate or prediction

7    could be wrong.

8              Do you understand that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  No one, not even your attorney or the

11   prosecutor, can give you any assurance of what your sentence

12   will be.  Your sentence cannot be determined until after a

13   presentence report is prepared and I have determined whether

14   there are any valid challenges to the report and whether there

15   is any ground to depart either upwards or downwards from the

16   recommended sentencing range and otherwise determine what an

17   appropriate sentence is in your case.

18             Do you understand that?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  You should fully understand that even if

21   your sentence is different from what your attorney or anyone

22   else told you it might be, or if it is different from what you

23   expect, you will still be bound by your guilty plea and you

24   will not be allowed to withdraw your plea of guilty.

25             Do you understand that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE DEFENDANT:  Yes.

2          THE COURT:  I have before me a plea agreement which

3     I've marked as Exhibit 2 to these proceedings.  Was this

4     document read to you in Spanish before you signed it?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Did you fully understand all the terms of

7     the agreement before you signed it?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Does this agreement constitute your

10    complete and total understanding of the entire agreement

11    between you and the government as to these matters?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Has anyone offered you any inducements or

14    threatened you or forced you to plead guilty or to enter into

15    this plea agreement?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Ms. Shalley, do you know of any valid

18    defense that would prevail at trial or any other reason why

19    Mr. Reyes should not be permitted to plead guilty?

20         MS. SHALLEY:  No, your Honor.

21         THE COURT:  And do you believe there is an adequate

22    factual basis to support a guilty plea?

23         MS. SHALLEY:  Yes.

24         THE COURT:  Mr. Diskant, does the government represent

25    it has an adequate factual base basis to support a guilty plea

D7VMREYP

1  as to each count in the information?

2         MR. DISKANT:  Yes, your Honor.

3         THE COURT:  Mr. Reyes, we have reached the point in

4  the proceedings where I need you to tell me what you did in

5  connection with the crimes charged in the information that

6  makes you believe that you are guilty of these offenses.

7         And we will begin with the first two counts in the

8  information, which charge you with conspiracy to commit wire

9  fraud and health care fraud, Count One, and in Count Two with

10  conspiring to adulterate drugs.

11         What makes you believe that you are guilty of these

12  offenses?

13         THE DEFENDANT:  Well, I agreed with another person to

14  buy medications.

15         THE COURT:  Were these medications prescription drugs?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  And who were you buying these prescription

18  drugs from?

19         THE DEFENDANT:  I bought it from a person who bought

20  it from a pharmacy.

21         THE COURT:  And why were you buying these prescription

22  drugs from people who had obtained the drugs at pharmacies?

23         THE DEFENDANT:  They bought them to sell them.

24         THE COURT:  And what did you do with these

25  prescription drugs after you bought them from the people who

D7VMREYP

1    would obtain them from the pharmacies?

2            THE DEFENDANT:  Well, I collected it or put it

3    together.  Then I sold it to one person, all of it.

4            THE COURT:  And what was your understanding of what

5    was going to happen to these prescription drugs after you sold

6    them to the person that you've made reference to?

7            THE DEFENDANT:  Well, I sold it to him.  I think he

8    just told it on, sold it somewhere else.

9            THE COURT:  Did you have an understanding that

10   ultimately these prescription drugs were going to be sold

11   through pharmacies to --

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  To other people?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Now, Mr. Diskant, what's the government's

16   theory with respect to use of the wires and interstate

17   commerce?

18           MR. DISKANT:  Your Honor, I believe the defendant will

19   be able to allocute that he used, among other things, a cell

20   phone in furtherance of the fraudulent scheme he has just

21   described.

22           THE COURT:  Mr. Reyes, did you, in your dealings with

23   the people that you bought these prescription drugs from or the

24   people to whom you sold these prescription drugs, did you make

25   the arrangements to do this through using your cell phone?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And where were you when you made these

3     purchases of prescription drugs and these sales of prescription

4     drugs?  Were you in New York or were you someplace else?

5          THE DEFENDANT:  In New Jersey.

6          THE COURT:  And, Mr. Diskant, what's the theory on

7     venue?

8          MR. DISKANT:  Your Honor, as a preliminary matter, the

9     defendant is waiving venue as a condition of his plea

10     agreement.  That said, the government would proffer that a

11     number of the bottles that the defendant was purchasing were

12     initially dispensed here in Manhattan or elsewhere in the

13     Southern District of New York.

14          THE COURT:  Ms. Shalley, you agree with what Mr.

15     Diskant just said?

16          MS. SHALLEY:  I honestly didn't hear it.

17          THE COURT:  Can you repeat that, Mr. Diskant.

18          MR. DISKANT:  Certainly, your Honor.  As a preliminary

19     matter I was noting that the defendant is agreeing to waive

20     venue as a condition of the plea agreement, but additionally

21     with respect to Counts One and Two, the government can proffer

22     that a number of the bottles the defendant was purchasing and

23     indeed a number of the bottles that the government seized from

24     the defendant were initially dispensed here in the Southern

25     District of New York.

1          THE COURT:  Do you agree with that, Ms. Shalley?

2          MS. SHALLEY:  That is correct.  And they were

3   originally purchased by people who were on Medicaid in New York

4   and they were brought to New Jersey, which I think is an

5   element that was missing.

6          THE COURT:  With respect to Count Three, Mr. Reyes,

7   you are charged with bank fraud, and I've explained what the

8   elements of bank fraud are to you.

9          MR. DISKANT:  Your Honor, I apologize.  Before we move

10  on, unless the Court wants to circle back to Count Two, I

11  believe both the adulteration and wholesale distribution have

12  some additional elements that the defendant is prepared to

13  allocute to.

14         With respect to the adulteration, the unsanitary

15  conditions under which the drugs were held; and with respect to

16  the wholesale distribution, the fact that the defendant at no

17  time had a license from any state.

18         THE COURT:  Mr. Reyes, first of all, is it correct

19  that you had no license at any point in time to be selling

20  prescription drugs?

21         THE DEFENDANT:  Correct, yes.

22         THE COURT:  Tell me what the conditions were in which

23  these drugs that you purchased and then ultimately resold, what

24  condition were these drugs held in?

25         THE DEFENDANT:  I used to keep them in boxes and bags.

1             THE COURT:  And what else can you tell me about that?

2             THE DEFENDANT:  Well, I sold them in good condition.

3     I also always looked at the date and that the date would be

4     good.

5             THE COURT:  Mr. Diskant, what's the government's

6     proffer as to the conditions in which the drugs were held while

7     they were in Mr. Reyes' possession?

8             MR. DISKANT:  Your Honor, most, if not all, of these

9     drugs are required by the FDA to be kept at very specific

10    temperatures.  The government can proffer they were not being

11    held under those conditions.  Additionally, I believe the

12    defendant can allocute that he and other coconspirators treated

13    the bottles with chemicals, including lighter fluid, as part of

14    the scheme.

15            THE COURT:  Mr. Reyes, during the period of time that

16    the drugs were in your possession, did you make any effort to

17    maintain them at the temperatures that are recommended by the

18    manufacturers of these products?

19            THE DEFENDANT:  No, sir.

20            THE COURT:  And the assistant just mentioned that as

21    part of the scheme lighter fluid was used on the bottles, I

22    assume, to remove labels and perhaps for other reasons.  Can

23    you tell me about the use of lighter fluid with respect to

24    these prescription drugs?

25            THE DEFENDANT:  Yes.  It was to remove the label that

Case 1:13-cr-00051-PGG Document 137 Filed 03/28/14 Page 26 of 40

D7VMREYP

1   the pharmacy applies on the bottles.

2          THE COURT:  And did you do that with respect to every

3   prescription bottle that you obtained from the people who would

4   obtain the drugs from the pharmacies?

5          THE DEFENDANT:  No, I didn't do it on all of them

6   because I wasn't really good at it.  The person that bought the

7   medications is the one who did it sometimes.

8          THE COURT:  Is that someone you were working with?

9          THE DEFENDANT:  Yes.  The one I sold to.

10         THE COURT:  And what was the purpose of removing the

11  labels?

12         THE DEFENDANT:  Well, because supposedly he sold the

13  medication to the pharmacies.

14         THE COURT:  Why was it necessary to remove the labels

15  to do that?

16         THE DEFENDANT:  Because the labels had the name of the

17  patients that the medications were for.

18         THE COURT:  Now, did your involvement in this scheme

19  take place at some point between 2000 and December 2012?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Now, anything else in Counts One and Two,

22  Mr. Diskant?

23         MR. DISKANT:  Your Honor, with respect to the

24  adulteration, the statutes requires that the defendant do so

25  with the intent to defraud.  I believe the defendant can state

Case 1:13-cr-00003-PGG Document 25-17 Filed 11/14/14 Page 27 of 40    26
Case 1:13-cr-00051-PGG Document 137 Filed 08/28/13 Page 26 of 39
D7VMREYP

1    in adulterating he was acting in furtherance of the fraud

2    charge in Count One.  That's the only remaining item.

3         THE COURT:  I want to make sure I understand the fraud

4    aspect of this.  It seems to me that the people who originally

5    obtained the medication with the intent to sell it to Mr. Reyes

6    and his colleagues, his coconspirators, were committing fraud,

7    that they were obtaining these medications through Medicaid

8    without any intention of actually using the medication.  So

9    that's one aspect of fraud.  There are other aspects of fraud

10   here that the government is contending.

11        MR. DISKANT:  Yes, your Honor.  As the defendant just

12   said a moment ago, the individuals that he sold to were

13   purchasing these prescriptions in bulk with the intention of

14   reselling them to pharmacies so they could be redistributed.

15   In fact, the purpose of using lighter fluid to remove the

16   patient labels was to present the bottles as new so they could

17   be redistributed.  That also constitutes a fraud on what we

18   call the back end of the scheme because, once again, those

19   drugs were being paid for almost exclusively by health care

20   benefit programs which would not pay for the drugs if they knew

21   they were not new and legitimate bottles.

22        THE COURT:  Now, Mr. Reyes, you, first of all, were

23   aware that the drugs that you were buying and reselling, they

24   had been obtained through Medicaid, in other words, the

25   government was paying for these drugs.  You knew that at the

Case 1:13-cr-00003-DLC Document 25-7 Filed 01/14/14 Page 28 of 40
Case 1:13-cr-00051-PKC Document 137 Filed 03/28/13 Page 27 of 90        27
D7VMREYP

1       time?

2                 THE DEFENDANT:  At the beginning I didn't know it was

3       like that.  Then later on I came to know that that was the way

4       it was.

5                 THE COURT:  When you say later on, at some point

6       during your involvement in the conspiracy you came to learn

7       this?

8                 THE DEFENDANT:  Yes.

9                 THE COURT:  And I take it it was obvious to you that

10      the people who would obtain the medication from the pharmacies

11      and then sold it to you never had any intention of actually

12      using the drugs themselves but rather were obtaining the drugs

13      for purposes of selling the drugs to you and your colleagues?

14                THE DEFENDANT:  Yes.

15                THE COURT:  And you also knew that the drugs would be

16      resold after you sold them to the individual you've mentioned

17      and would be distributed to consumers as if they had been

18      originally obtained by these individuals?

19                THE DEFENDANT:  Yes.  That's what they told me, that

20      they sold them again.

21                THE COURT:  Anything else, Mr. Diskant, on Counts One

22      and Two?

23                MR. DISKANT:  No, your Honor.  Thank you.

24                THE COURT:  That brings me to Count Three, which

25      charges bank fraud that took place at some point in 2006.

Case 1:13-cr-00005-DLC Document 237 Filed 11/14/14 Page 29 of 40
Case 1:13-cr-00051-PGG Document 137 Filed 03/28/13 Page 29 of 39          28
D7VMREYP

1          What did you do, Mr. Reyes, that makes you think that

2     you are guilty of bank fraud as charged in Count Three?

3          THE DEFENDANT:  I was buying some property.  I was

4     buying the house where I used to live.  The owner of the house

5     proposed to me to sell the house to me, and I didn't even have

6     money to buy it.  And he told me he was going to help me with

7     the closing costs, the closing costs to buy the house.  I said

8     it was fine because I didn't know too much about houses and

9     mortgages and all that.  And he was going to deposit some money

10    in my bank account.  And when the closing of the house would

11    take place, I had to return him the money, the money he

12    deposited.

13         THE COURT:  Now, you, I gather, obtained a loan or

14    mortgage for the property that you were buying, correct?

15         THE DEFENDANT:  A loan.

16         THE COURT:  And were you required to complete

17    documents in order to obtain the loan?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  And was the loan from a bank?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  And do you recall the name of the bank?

22         THE DEFENDANT:  Wachovia.

23         THE COURT:  So you were asked to provide certain

24    information to Wachovia in order to obtain the loan so that you

25    could purchase the house?

D7VMREYP

1              THE DEFENDANT:  Yes.

2              THE COURT:  Now, was some of the information that you

3      provided to Wachovia in order to obtain the loan, was some of

4      that information false?

5              THE DEFENDANT:  Well, mainly what was false was the

6      money that this man lent to me.

7              THE COURT:  Did you disclose to Wachovia that the

8      seller had agreed to loan you some money in order so that you

9      could pay the closing costs that you've made reference to?  Did

10     you disclose that to the bank?

11             THE DEFENDANT:  No, sir.

12             THE COURT:  And did you disclose to the bank that you

13     had agreed after the sale had gone through to return to the

14     seller the money he had given you to help you pay for the

15     closing costs?

16             THE DEFENDANT:  No.

17             THE COURT:  Now, at the time that you submitted this

18     false information to Wachovia, was it your intention to expose

19     Wachovia to the risk of loss?

20             THE DEFENDANT:  No.  To be frank, I couldn't really

21     know too much about mortgages.  My intention was not a bad one.

22             MS. SHALLEY:  Just one moment, please.

23             THE COURT:  Yes.

24             MR. DISKANT:  I should add, your Honor, I am not sure

25     the government used that as an element of the offense.  I think

1   from the government's perspective it is sufficient if he makes

2   a statement he knows to be false in the hopes of gaining a

3   loan.

4           MS. SHALLEY:  Your Honor, I think we are ready.

5           THE COURT:  Ms. Shalley, does Mr. Reyes want to say

6   anything else about whether he was aware that the bank might

7   suffer a loss as a result of him providing false information

8   concerning his finances?

9           MS. SHALLEY:  He could speak as to defrauding the bank

10  as to the amount of money that he had, which was the fraud in

11  this particular case.  That he can explain.

12          THE COURT:  Let me hear what he has to say about that.

13          THE DEFENDANT:  Well I had a little money in the bank,

14  and that money was supposed to have enough money to be able to

15  buy.  33,000.  Yes.  So that is what was shown to the bank.

16          THE COURT:  But I thought you said that you had not

17  disclosed to the bank that the seller was providing you with

18  the funds necessary to pay for the closing costs.

19          MS. SHALLEY:  It was more than the closing costs.  It

20  was $33,000 to show that he had the money in the bank that was

21  required to buy the building from the seller.  It wasn't his

22  money.  It was the seller's money.

23          THE COURT:  So I want to make sure I understand.  Are

24  you saying, Mr. Reyes, the $33,000 that was in your account,

25  all of that had actually been provided by the seller?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  And was this represented to be the down

3     payment on the house?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  And that was false, that it wasn't your

6     money?

7              THE DEFENDANT:  It was not my money.

8              THE COURT:  You understood that the bank was going to

9     give you the loan or did give you the loan based on the

10    understanding that that $33,000 was your money?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Mr. Diskant, in the case of U.S. v.

13    Nkansah, 699 F.3d 743 (2d Cir. 2012), the Court says at page

14    748:  "Convictions for bank fraud are limited to situations

15    where the defendant (1) engaged in a course of conduct designed

16    to deceive a federally-chartered or insured financial

17    institution into releasing property; and (2) possessed an

18    intent to victimize the institution by exposing it to actual or

19    potential loss."  That case is quoting United States v.

20    Barrett, 178 F.3d 643, 647-68 (2d Cir. 1999).

21             What you seem to be saying is that it's enough if the

22    defendant engaged in a course of conduct designed to convince

23    the federally-insured institution to release property, but what

24    the Court is saying is that that's prong 1 and that prong 2 is

25    that at the time the defendant engaged in that scheme to obtain

D7VMREYP

1    property from the federally-insured institution, he must

2    possess an intent to victimize the institution by exposing it

3    to actual or potential loss.

4              MR. DISKANT:  Your Honor, I confess I'm not familiar

5    with that particular case, but I think on these facts, however,

6    the element can be satisfied.  The defendant has allocuted that

7    he obtained a loan.  Certainly, any time a loan is issued the

8    bank is exposing itself to a risk of loss and the defendant

9    knew that.  The defendant also is now currently either in

10   default or substantially behind on his payments.  So Wachovia

11   has in fact suffered such a loss.

12             THE COURT:  Let me pursue it this way.

13             Mr. Reyes, you understood that the bank would not have

14   given you the loan to purchase the property if it understood

15   that the $33,000 in your account had actually been provided by

16   the seller?  You understood that, right?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And you understood that the reason why the

19   bank would not have given you the loan, if the bank understood

20   that the $33,000 was provided by the seller, was that the bank

21   would conclude that you couldn't afford the house?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And because you didn't have the down

24   payment necessary to purchase the house.  You understood that

25   if the bank loaned you the money, there was a chance that the

Case 1:13-cr-00003-DLC Document 25-17 Filed 11/14/14 Page 34 of 40    33
Case 1:13-cr-00051-PGG Document 137 Filed 03/28/13 Page 34 of 39

D7VMREYP

1    bank wasn't going to get paid back.  You understood that at the

2    time?

3              THE DEFENDANT:  No, sir, I didn't understand that that

4    way at that moment.

5              THE COURT:  So you didn't believe at the time that

6    there was any risk that the bank wasn't going to be paid back?

7              THE DEFENDANT:  No.

8              THE COURT:  I can't accept the plea, not on Count

9    Three and not under this case, because the Second Circuit has

10   said explicitly and, in fact, vacated a bank fraud conviction

11   where there wasn't a record of an intent to expose the bank to

12   an actual or potential loss.

13             And what I'm hearing from the defendant is that he had

14   no intention or belief that the bank would be exposed to any

15   potential loss as a result of the false information he provided

16   to obtain the loan from Wachovia.

17             MR. DISKANT:  Your Honor, if I may, again, I haven't

18   seen the case.

19             THE COURT:  You need to see the case, Mr. Diskant,

20   because it actually constitutes a pretty significant decision

21   in the context of bank fraud.  If you have not read the case

22   you need to be familiar with it before you can really address

23   the problem.  I've read the language to you.  It's pretty

24   clear.  You obviously believe it's enough if there was an

25   intention to obtain the property and it was obtained.  I'm

Case 1:13-cr-00007-DLC Document 25-17 Filed 11/14/14 Page 35 of 40
Case 1:13-cr-00051-PGG Document 137 Filed 03/28/13 Page 34 of 39          34
D7VMREYP

1    telling you, that's not what the case says and convictions were

2    vacated based on the absence of that element.  I can't accept

3    the plea on Count Three.

4         You're welcome to send me a letter after you've read

5    the case and tell me why you think I'm wrong.  But repeating to

6    me that it's enough to obtain the property is not going to be

7    successful.

8         MR. DISKANT:  I understand, your Honor.  I want to

9    understand the Court's position.  The Court's position, in

10   light of the Second Circuit opinion, is that the defendant had

11   to intend at the time he made the loan application not to repay

12   the loan?

13        THE COURT:  What the case says is that the defendant

14   has to possess an intent to victimize the institution by

15   exposing it to actual or potential loss.  And, as I said, what

16   I'm hearing from the defendant was, he had no intent to expose

17   the bank to an actual or potential loss when he provided the

18   false information on the loan application.

19        MR. DISKANT:  Okay.

20        THE COURT:  Ms. Shalley, anything else you want to say

21   on this subject?

22        MS. SHALLEY:  I understand the case.  I actually

23   should have thought about it a little more.  Normally, mortgage

24   fraud cases are written up as wire fraud and bank fraud and,

25   frankly, the charge probably should have been wire fraud for

Case 1:13-cr-00051-PGG Document 137 Filed 11/14/14 Page 36 of 40

D7VMREYP

1    the transfer of money for the mortgage.

2            THE COURT:  It's undoubtedly the case that there are

3    multiple charges that could be brought based on the record that

4    we have.  But in the context of bank fraud, the circuit has

5    been clear that this element of an intent to victimize the bank

6    has to be there, or the conviction can't be sustained.

7            MS. SHALLEY:  I understand.

8            THE COURT:  As to Count Three I am not going to be

9    able to accept the plea.

10           We will proceed with Count Four.

11           Mr. Reyes, Count Four alleges that at some point

12   between 1996 and December 2012, you were involved in conduct

13   that included sponsoring animals to engage in fights.  What did

14   you do in connection with Count Four that makes you believe

15   that you are guilty of that offense?

16           THE DEFENDANT:  Yes.  I do accept that here.  Yes.  I

17   had participated in cock fights.

18           THE COURT:  Did that take place at some point between

19   '96 and 2012?

20           THE DEFENDANT:  Well, it was not 2006 to 2012.  It was

21   about 2004 to 2012.

22           THE COURT:  I said 1996.  At some point between 1996

23   and 2012.

24           MR. DISKANT:  Your Honor, I apologize.  We have

25   actually changed the superseding information in which he's

D7VMREYP

1    pleading from 2004 to 2012.

2            THE COURT:  When did you engage in this conduct,

3    Mr. Reyes, involving the roosters or cocks?

4            THE DEFENDANT:  Every Saturday and Sunday we used to

5    get together from 2004 to 2012, like every once or twice a

6    month we got together.

7            THE COURT:  And what was your role on these weekends

8    that you've talked about?  What did you do?

9            THE DEFENDANT:  Well, we sent them to fight.

10           THE COURT:  And were some of these animals yours?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  And these were roosters?

13           THE DEFENDANT:  Roosters, yes.

14           THE COURT:  And you engaged them in these cock fights?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  And was that for purposes of making bets?

17           THE DEFENDANT:  Yes.  We used to bet as well.

18           THE COURT:  And this happened at some place in New

19    Jersey?

20           THE DEFENDANT:  Yes.  Yes.  It happened in New Jersey.

21           THE COURT:  Ms. Shalley, your client is waiving venue

22    with respect to this count?

23           MS. SHALLEY:  Well, a number of the participants came

24    from Connecticut and New York and would bring their cocks to

25    fight in New Jersey.

D7VMREYP

1          THE COURT:  Well, the charge pleads that it took place

2     in the District of New Jersey.

3          MS. SHALLEY:  He waives venue.

4          THE COURT:  What's the government's theory on

5     interstate commerce?

6          MR. DISKANT:  As Ms. Shalley just noted, the defendant

7     could allocute that a number of the participants came from

8     other states to participate in these animal fighting ventures.

9          THE COURT:  Mr. Reyes, is it true that some of the

10    people who came to these cock fights came from Connecticut and

11    New York to attend?

12         THE DEFENDANT:  Yes.  They came from different cities,

13    yes.

14         THE COURT:  How about different states?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Anything else on Count Four, Mr. Diskant?

17         MR. DISKANT:  No, your Honor.

18         THE COURT:  Mr. Reyes, as to Counts One, Two, and

19    Four, are you pleading guilty because you are guilty and are

20    you pleading guilty voluntarily and of your own freewill?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  I will ask you now as to Count One, do you

23    plead guilty or not guilty?

24         THE DEFENDANT:  Guilty.

25         THE COURT:  As to Count Two, guilty or not guilty?

D7VMREYP

1          THE DEFENDANT:  Guilty.

2          THE COURT:  As to Count Four, guilty or not guilty?

3          THE DEFENDANT:  Guilty.

4          THE COURT:  Mr. Diskant, do you wish me to allocute

5   Mr. Reyes on the forfeiture allegation in the information?

6          MR. DISKANT:  Briefly, your Honor.  He has consented

7   to it as a condition of the agreement.

8          THE COURT:  Mr. Reyes, the information includes a

9   forfeiture allegation in which the government puts you on

10  notice that it is seeking all property constituting and derived

11  from any proceeds that you obtained directly or indirectly as a

12  result of the conspiracy charged in Count One of the

13  information and that they are seeking all property that was

14  used or intended to be used in any manner or part to commit or

15  to facilitate that offense.

16          Do you admit the forfeiture allegation as it's set

17  forth in the information?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Because you acknowledge that you're guilty

20  as charged in Counts One, Two, and Four of the superseding

21  information, because I find that you know your rights and that

22  you're waiving them knowingly and voluntarily, because I find

23  that your plea is entered knowingly and voluntarily as to those

24  counts and is supported by an independent basis in fact

25  containing each of the essential elements of the offense, I

D7VMREYP

1  accept your guilty plea on Counts One, Two, and Four and

2  adjudge you guilty of the offenses to which you have pled

3  guilty.

4          With respect to Count Three, the parties are free to

5  return, or not, as the case may be.

6          With respect to the preparation of a presentence

7  report, Mr. Diskant, what do you recommend?

8          MR. DISKANT:  Your Honor, given the status of the

9  case, I think it might be perhaps best to set a control date

10  for sentencing approximately six months out.

11          THE COURT:  Today is July 31.  I'll put it down as a

12  control date for January 31 at 10 a.m.

13          I take it you don't wish me to order a presentence

14  report at this point?

15          MR. DISKANT:  That's correct, your Honor.

16          THE COURT:  Ms. Shalley, you're fine with that?

17          MS. SHALLEY:  Yes, your Honor.

18          THE COURT:  We will put it down for January 31, 10

19  a.m. as a control date for sentencing.  The government will

20  send me a letter a week beforehand to tell me what the status

21  of the case is and whether they request a further adjournment.

22          Anything else we should do today?

23          MR. DISKANT:  Not from the government, your Honor.

24          MS. SHALLEY:  No, your Honor.  Thank you.

25                              o0o