UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                           :

       - v. -                                      :                13 Cr. 897 (RWS)

BLADIMIR RIGO,                                     :
      a/k/a "Bladi,"
                                                   :
                Defendant.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**POST-HEARING BRIEFING OF THE UNITED STATES OF AMERICA**


                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York
                            Attorney for the United States of America

Edward B. Diskant
Jason A. Masimore
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

        - v. -                                    :                    13 Cr. 897 (RWS)

BLADIMIR RIGO,                                    :
    a/k/a "Bladi,"                                  :

             Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## POST-HEARING BRIEFING OF THE UNITED STATES OF AMERICA

On October 7, 2014, this Court held an evidentiary hearing pursuant to *United States* v. *Fatico*, 603 F.2d 1053 (2d. Cir. 1979) (the "Hearing"), focused on the issue of the loss amount properly attributable to defendant Bladimir Rigo, a/k/a "Bladi" (the "defendant").   At the Hearing, the Government offered witness testimony, the transcript of a consensually recorded meeting involving the defendant and made as part of the investigation, and pages from "drug ledgers" recovered from the defendant's bedroom at the time of his arrest.  That evidence overwhelmingly established the defendant's long-standing and substantial involvement – over a period of more than a decade – in a massive health care fraud scheme whereby the defendant and his co-conspirators fraudulently obtained tens of thousands of bottles of prescription medications used to treat illnesses such as HIV and AIDS before causing the same bottles to be fraudulently redistributed a second time as "new" to unsuspecting patients.   For the reasons that follow, and consistent with the evidence adduced at the Hearing, the Government respectfully submits that this Court can comfortably find that the defendant's conduct caused a loss to Medicaid and other

health care benefit plans of at least $7 million – and arguably far higher – over the course of a multi-year period.

## I.  BACKGROUND

### A.  Offense Conduct

By way of background, defendant was charged by criminal complaint in September 2013 with conspiring to commit health care fraud, among other offenses.   In November 2013, a grand jury returned indictment 13 Cr. 897 (RWS) similarly charging the defendant with one count of conspiracy to commit healthcare fraud and one count of conspiring to commit adulteration and unlawful wholesale distribution of prescription medications.   The conduct giving rise to these charges involves the defendant's agreement to participate in a scheme to obtain various prescription medications—typically those prescribed to treat HIV and AIDS—which had previously been dispensed to individuals in Newark, New Jersey and elsewhere, and then to attempt to cause these bottles to be re-dispensed as "new" to unsuspecting patients.   The drugs involved in this scheme were not drugs of abuse—*i.e.*, controlled substances —but rather were brand name pharmaceuticals used exclusively by patients with valid prescriptions and for which the price tags, almost always paid by insurance programs such as Medicaid, ran into the thousands of dollars per bottle.

As testimony adduced at the Hearing established, the scheme worked, in general terms, as follows:  *first*, the lowest level participants in the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs at pharmacies throughout the country, including in the Southern District of New York and the Newark, New Jersey area.  These Insurance Beneficiaries were typically HIV or AIDS patients who paid little or no money of their own for the drugs in question because their insurance plans, typically Medicaid, footed the bill.  The

Insurance Beneficiaries then sold their bottles of medications—rather than taking them as prescribed—to other participants in the scheme, people like Arcadio-Reyes Arias, a/k/a "Chino" and Rogelio Leyba, referred to in the investigation as "Collectors," for cash at locations like street corners and bodegas.   Collectors, in turn, sold the second-hand bottles they collected to the defendant and other "Aggregators" – *i.e.,* scheme participants who typically bought large quantities of second-hand drugs from multiple Collectors.  Eventually, the second-hand drugs made their way to corrupt distributors and pharmacies willing to re-dispense these "second-hand" drugs to unsuspecting consumers.

Health care benefit programs, such as Medicaid, were generally defrauded twice with respect to each bottle dispensed in the scheme:  on the front end, a health care benefit program was fraudulently induced into paying for these drugs under the false representation that these drugs are for the sole intended use of the program beneficiary—i.e., the Insurance Beneficiary. Indeed, the requirement that that all treatment/medication paid for by the plan be for the sole use of the insured is so integral that it is against New York state law to sell them to others.  See N.Y. Social Services Law § 146.   Similarly, the standard Medicaid beneficiary card, for example, prominently states that "fraudulent use of this card is a punishable offense."  Simply put, Medicaid and other health care benefit programs would not have paid for the drugs in question if they knew that the recipients—the Insurance Beneficiaries—had no intention of taking the drugs themselves but instead had been induced by other scheme participants to sell these drugs on street corners.  As such, every single bottle resold as part of this scheme – including all of the bottles ultimately purchased by the defendant – represented a total loss to Medicaid of its reimbursement value.

The scheme participants then sought to defraud health care benefit programs again on the back end of the scheme:  by taking great pains to fraudulently conceal (1) the true and illegitimate source of the bottles, and (2) the fact that the bottles have been previously dispensed, the scheme participants attempt to have the bottles re-dispensed as new, legitimately obtained drugs by pharmacies thereby fraudulently inducing health care benefit programs like Medicaid to pay for the exact same bottles a second time.  Once again, Medicaid and other health care benefit programs would not have paid pharmacy owners for the drugs in question had they knew the truth—that the bottles had previously been dispensed to others, treated with lighter fluid and other dangerous chemicals, and/or stored in hazardous and uncontrolled conditions.

As the Court heard from each of the witnesses at the Hearing, this defendant was a large-scale aggregator based in the Newark, New Jersey Area, who operated as a part of the scheme between at least 2000 and his arrest in 2013.   During that time period, the defendant aggregated bottles of these second-hand medications by employing workers in his bodega to purchase these medicines from Insurance Beneficiaries on the streets of Newark and by buying bottles from independent collectors – that is, scheme participants who worked on their own to buy these bottles from Medicaid patients before selling them to Aggregators like the defendant.

On April 23, 2014, the defendant pled guilty to his participation in this scheme without an agreement with the Government.   The Government did prepare a Pimentel letter which reflected the Government's view at that time that the loss amount attributable to the defendant was more than $7 million but less than $20 million.  During the course of his allocution, the defendant admitted to his participation in the charged scheme as follows:

> During the years mainly 2010 to 2012, but also in previous years, I agreed with others to buy and to sell medicines that had been prescribed to patients with insurance, Medicaid, without having a

> license to sell them or to buy them.  On occasion the medications
> had the labels removed or cleaned up in order for them to be sold.

(Tr. 15:19-24.)  After entering his plea, the defendant provided timely notice to the Government

of his disagreement with "the Government's characterization of Mr. Rigo's role and the scope of

his activities" including the "Government's loss calculations . . . . The Defense is prepared to put

the Government to its burden on this points at a hearing prior to sentencing, pursuant to United

States v. Fatico, 603 F.2d 1053 (2d. Cir. 1979)."   (Letter from Richard M. Benjamin, Esq.,

Counsel for Defendant, to Tandis Bruno, U.S. Probation Officer, dated Aug. 6, 2014, at 2-3.)

      **B.**      **The Fatico Hearing**

On October 7, 2014, the Court held a *Fatico* hearing focused principally on the issue of

the loss amount properly attributable to the defendant's conduct.  At the Hearing, the

Government called three witnesses: Detective Anthony Romero, Special Agent Tony Rao, and

Arcadio Reyes-Arias, a/k/a "Chino."  As detailed further below, Reyes-Arias established the

defendant's involvement in buying and selling second-hand medications on a continuous basis

from at least the late 1990s through the defendant's arrest in 2013, while Detective Romero and

Special Agent Rao offered additional evidence gathered during the investigation – including a

consensually recorded meeting involving the defendant made in September 2012 and a drug

ledger recovered from the defendant's residence at the time of his arrest – which corroborated

the testimony of Reyes-Arias and provided further detail on the scope and extent of the

defendant's involvement in the charged conspiracy.

      *1.*    *Arcadio Reyes-Arias, a/k/a "Chino"*

Reyes-Arias, who was testifying pursuant to a cooperation agreement with the

Government, testified that the first became involved in buying and selling second-hand

medications in approximately 1998 when Reyes-Arias was working for the defendant.

Specifically, as Reyes-Arias testified, between approximately 1998 and 2005, Reyes-Arias worked in one of the defendant's bodegas in Newark, New Jersey, buying these medicines from Medicaid beneficiaries in Newark so that the defendant could then resell the bottles to other scheme participants.  As Reyes-Arias testified, as part of the scheme, the defendant was then selling these bottles directly to at least one corrupt pharmacy owner based in Elizabeth, New Jersey, who presumably then caused these second-hand bottles purchased from the defendant to be distributed to his unknowing patients.  (Tr. at 38:6-11.)

According to Reyes-Arias, during that time period – i.e., roughly 1998 to 2005 – he bought approximately 100 bottles of second-hand medications at the defendant's direction and based off of hand-written lists the defendant provided.  (*Id.* at 33:14-34: 9.)  Reyes-Arias paid in cash for these bottles using money provided by the defendant and then turned these bottles over to the defendant at the end of each day for resale.  As Reyes-Arias testified, during this time period, his purchases of second-hand medications for the defendant were regular and continuous. (*Id.* at 35:19-36: 9.)

In approximately 2005, Reyes-Arias stopped working directly for the defendant, going out on his own – to work as an independent "Collector."  In that capacity, as Reyes-Arias testified, he continued to buy second-hand medications directly from Medicaid beneficiaries but now sold them to both the defendant and "Pancho" – subsequently identified by the investigation as Hermendigildo Fernandez.  According to Reyes-Arias, between 2005 and his arrest in December 2012, he sold to the defendant approximately once a month, selling approximately $3,000 to $8,000 in street value worth of medications to the defendant at a time.  (*Id.* at 39:14-20.)  Reyes-Arias also described his largest single sale to the defendant – of approximately

$30,000 in street value worth of second-hand medicines – which occurred in the weeks leading up to his arrest in December 2012.  (*Id.* at 40:5-10.)[1]

Reyes-Arias also testified about his knowledge of others working for the defendant as part of the charged conspiracy, including Rogelio Leyba.  According to Reyes-Arias's testimony, between approximately 2000 and 2005, Leyba worked in one of the defendant's bodegas, buying second-hand medications at the defendant's direction much as Reyes-Arias had during that time period.  (*Id.* at 37:4-25.)   According to Reyes-Arias, Leyba similarly ventured out on his own in approximately 2005, opening his own bodega in that time period from which Leyba continued to buy second-hand medications from Medicaid beneficiaries before reselling the same to the defendant and Fernandez.  Indeed, Reyes-Arias testified that he and Leyba continued to talk on a regular basis about their sales to the defendant and others, including "Pancho," up until the time of Reyes-Arias' arrest in December 2012.  (*Id.* at 42:13-20.)[2]

Finally, Reyes-Arias was shown certain pages from the drug ledgers recovered from the defendant's bedroom at the time of his arrest, and recognized at least one page as bearing Reyes-Arias' own handwriting.  As Reyes-Arias explained, the page in question contained a list of medications that Reyes-Arias had for sale and which Reyes-Arias had provided to the defendant who, in turn, filled in the prices per bottle the defendant was willing to pay for each.  (*Id*. at 47:8-49:5.)

### 2.   *Detective Anthony Romero*

Detective Romero testified to his participation in the broader investigation of the second-hand medication scheme, including the arrests of Hermendigildo Fernandez, a/k/a "Pancho"

---

[1] During the same time period, Reyes-Arias also sold considerable quantities of these medications to Pancho, selling $5,000 to $8,000 worth of medicines to Pancho on approximately a weekly basis.  (*Id.* at 41:25-42:8.)

[2] Rogelio Leyba was arrested the same date and has since pled guilty to his participation in the conspiracy.  *See United States* v. *Rogelio Leyba*, 13 Cr. 055 (GBD).

(hereinafter "Pancho") and Reyes-Arias.  With respect to Pancho, in particular, Detective Romero testified to the recovery of thousands of bottles of second-hand medications from two storage facilities under Pancho's control, as well as to Pancho's decision to cooperate after his arrest.   Detective Romero further testified to a consensually recorded meeting Pancho conducted, as part of his cooperation, with the defendant in September 2012, and through Detective Romero, a transcript of that recording was offered.  (GX  211-T)  Portions of that transcript were then reviewed in Court, including a portion in which the defendant confirmed substantial portions of Reyes-Arias' testimony.  For example, during that meeting, the defendant volunteered that he purchased these medications from both Reyes-Arias – known commonly as "Chino" – and Rogelio Leyba, even suggesting that he and Pancho continue to purchase from Reyes-Arias and Leyba in significant quantities:

| | | |
|---|---|---|
| BLADIMIRO LNU:[3] | Listen to me, listen to me. If I go to Chino and Chino has 20,000 dollars in medicine... | Escucha, escucha. Si yo voy donde el Chino y el Chino tiene veinte mil pesos en medicina... |
| CONFIDENTIAL HUMAN SOURCE: | Yes. | Ujú. |
| BLADIMIRO LNU: | ...and if Rogelio has 5, that makes 25. O.K.? | ...y Rogelio tiene cinco, son veinticinco. ¿O.K? |
| CONFIDENTIAL HUMAN SOURCE: | Right. | Ajá. |
| BLADIMIRO LNU: | So then you will set the prices that you're going to sell it for. And the price...you know what they sell it for. | Entonces tú pones los precios que tú vendes. Y el precio... tú sabes cómo venden ellos. |

---

[3] As identified in the transcript, Bladimiru LNU refers to the defendant, Bladimir Rigo, while "Condifential Human Source" refers to Hermendegildo Fernandez, a/k/a "Pancho."

| CONFIDENTIAL HUMAN SOURCE: | Yes. | Ajá. |
|---|---|---|
| BLADIMIRO LNU: | If this purchase of 25 dollars netted 25,000, then it's 12,500 for you and 12,500 for me. | Si esta compra de veinticinco pesos nos dio veinticinco mil, doce mil quinientos para ti y doce mil quinientos para mí. |
| CONFIDENTIAL HUMAN SOURCE: | Right. | Ajá. |
| BLADIMIRO LNU: | You don't have to put up anything, I'll put up the money. You just give me the customer. | Tú no tienes que poner nada, yo pongo el dinero. Tú nada más pones el cliente. |

(GX 211-T at 13.)   During other portions of same recorded meeting, the defendant discussed his dealings with another known co-conspirator, Conrado Vasquez or "Conrado," a Miami-based high-level aggregator who was charged as part of a large, forty-eight defendant case and has since pled guilty to his participation in the charged conspiracy.  *See United States* v. *Viera*, *et al.*, 11 Cr. 1072 (DLC).[4]   Specifically, during the recorded meeting, the defendant indicated that he had done a high volume of business with Vasquez who, at that time, owed the defendant more than $200,000:

| BLADIMIRO LNU: | Conrado got arrested. And the people from New York all of them got picked up. | A Conrado se lo llevaron preso. Y a la gente de *New York* lo recogieron a todos. |
|---|---|---|
| CONFIDENTIAL HUMAN SOURCE: | Really? Yes, I heard something to that effect. | ¿Sí? Sí, yo oí como algo. |

---

[4] Copies of the Indictment charge Vasquez as well as Vasquez's plea allocution were also offered as Government Exhibits 203 and 208.

| BLADIMIRO LNU: | They brought 44 people arrested from Florida and they're going to trial here. | Cuarenta y cuatro presos trajeron de la Florida le están celebrando juicio aquí. |
|---|---|---|

*          *          *

| BLADIMIRO LNU: | ...between Conrado and my...and my brother-in-law, they stole from me...they stole from me almost 200,000 dollars. | ...entre Conrado y el... y el... y el cuñado mío, que se llevaron... me llevaron casi doscientos mil pesos. |
|---|---|---|
| CONFIDENTIAL HUMAN SOURCE: | They did? | ¿Sí? |
| BLADIMIRO LNU: | Yeah. Right then and there, with those two I was done. | Yeah. Ahí mismo ya, con esos dos ya yo acabé. |
| CONFIDENTIAL HUMAN SOURCE: | And it was your brother-in-law? | ¿Y un cuñado tuyo? |
| BLADIMIRO LNU: | Yes, the guy who used to hang out with Conrado, was my brother-in-law. | Sí, el que andaba con Conrado, era cuñado mío. |

(*Id.* at 20, 29.)

Finally, and critically in this context, during the recorded meeting, the defendant confirmed the scope and magnitude of his own conduct, comparing himself to Pancho, and referring to himself and Pancho as the "two big people in New Jersey" law enforcement was then pursuing:

| BLADIMIRO LNU: | So then...uh... | Entonces... eh... |
|---|---|---|
| CONFIDENTIAL HUMAN SOURCE: | And since... | Y como a... |
| BLADIMIRO LNU: | ...uh...they're looking for two big people here in New Jersey. | ...eh... andan buscando dos gentes grandes de aquí de *New Jersey*. |

| CONFIDENTIAL HUMAN SOURCE: | They are? | ¿Sí? |
|---|---|---|
| BLADIMIRO LNU: | And I think that's you and me. | Yo creo que es a ti y a mí. |

(*Id.* at 21.)

### 3.  Special Agent Antonio Rao

Finally, the Government called Special Agent Antonio Rao who testified to his participation in the investigations of Reyes-Arias and Leyba, as well as the investigation and arrest of the defendant.  Through Special Agent Rao, the Government offered a series of notebooks reflecting lists of medications – *i.e.*, "drug ledgers" – recovered from the defendant's bedroom at the time of his arrest.   (GX 202-207.)

Special Agent Rao also testified to the method by which the loss amounts have been calculated in this and related investigations, a method which has focused on the Medicaid reimbursement value of the prescription medications involved in the scheme.    Specifically, through Special Agent Rao, the Government offered the 2011 and 2011 New York State Medicaid Reimbursement Formulary Tables (GX 201, 217), which Special Agent Rao further explained he was able to use to calculate the Medicaid reimbursement value of the medication involved in the scheme.   Specifically, as Special Agent Rao testified, to determine the Medicaid reimbursement value of a given prescription pill – and thus the loss suffered by Medicaid for each bottle it was fraudulently induced into dispensing as part of this scheme – the FBI has used the formulary tables to determine the price-per-pill Medicaid will pay and then multiply that value by the number of pills associated with any particular defendant or scheme participant. (*E.g.*, Tr. at 103:9-104:11.)

For example, with respect to the drug ledgers recovered from the defendant's bedroom at the time of his arrest, Special Agent Rao presented a summary chart, which reflected the very calculations described above as applied to pages of those ledgers.  In each instance, as Special Agent Rao testified, Special Agent Rao accounted for each bottle listed in the ledger, determined the number of pills in that bottle, and then multiplied the total number of pills by the per-pill Medicaid reimbursement value for that particular medication.  (*Id.* at 105:12-106:7.)  Applying that basic method to the drug ledgers recovered from the defendant's bedroom, Special Agent Rao was able to determine that the total Medicaid reimbursement value for the pills documented in that ledger was approximately $2.4 million.   The summary chart fully documenting Special Agent Rao's findings in this regard was also offered into evidence  (GX 212.)

Special Agent Rao similarly testified to applying the same method to determine the Medicaid reimbursement values – and thus losses caused – by other scheme participants, including Pancho, Reyes-Arias, and Leyba.   With respect to each, for example, Special Agent Rao offered summary charts indicating the Medicaid reimbursement value of the various bottles recovered from them during searches executed incident to their arrests.   While those summary charts are in evidence, as Government Exhibits 215, 218, and 219, the findings are summarized below, along with those for the drug ledgers recovered from the defendant's  bedroom at the time of his arrest:

| Defendant | Number of Pills | Medicaid Reimbursement Value | GX |
|---|---|---|---|
| Hermendigilgo Fernandez, a/k/a "Pancho" | 953,218 | $6,139,649 | 215 |
| **Bladimir Rigo, a/k/a "Bladi"** | **168,731** | **$2,397,400** | **212** |
| Arcadio Reyes-Arias, a/k/a "Chino" | 9185 | $73,570 | 218 |
| Rogelio Leyba | 11140 | $86,390 | 219 |

Finally, Special Agent Rao testified to the relation between the street value of these drugs – that is, the prices people like Reyes-Arias and the defendant would pay for them – and the Medicaid reimbursement values of the same.   In particular, Special Agent Rao testified about a series of controlled purchases of these second-hand medications made from Reyes-Arias and Leyba during the course of the investigation of those two targets prior to their arrests.  In each instance, law enforcement paid street values in cash for bottles of medicine whose Medicaid reimbursement values they were subsequently able to determine.  In so doing, agents were able to develop a sense of the relationship between the street value of these drugs and their Medicaid reimbursement value.  While summary charts relevant to each of those individual events were separately offered, the key data points are summarized below:

| Date | Seller | Street Value/Price Paid | Bottles Sold | Medicaid Reimbursement Value | GX |
|---|---|---|---|---|---|
| 8/14/12 | Rogelio Leyba | $4,000 | 61 | $35,939 | 209 |
| 11/30/12 | Rogelio Leyba | $5,000 | 60 | $61,794 | 210 |
| 10/12/12 | Arcadio Reyes-Arias, a/k/a "Chino" | $5,000 | 42 | $45,319 | 213 |
| 12/3/12 | Arcadio Reyes-Arias, a/k/a "Chino" | $5,000 | 52 | $60,538 | 214 |
| **TOTAL** | | **$19,000** | **215** | **$203,538** | |

Based on the above, as well as the rest of the multi-year investigation, there would appear to be, as a general matter, a ratio of approximately 10:1 between a bottle's street-price and its Medicaid reimbursement value.  In other words, a purchase by the defendant of $5,000 in medications from a Collector like Reyes-Arias would net bottles with a Medicaid reimbursement value of roughly ten times that, or approximately $50,000.

Similarly, and based on the same, the investigation determined that, as a general matter, each bottle sold as part of this scheme, had an approximate Medicaid reimbursement value of $1,000, meaning that a sale of 100 bottles by a Collector like Reyes-Arias to an Aggregator like the defendant would result in a loss to Medicaid of approximately $100,000.

*          *          *

At the conclusion of Special Agent Rao's testimony, the Government rested.  The defendant called no witnesses and offered no evidence at the hearing.

## II.    DISCUSSION

As noted, the primary issue in dispute at the *Fatico* hearing was the loss amount properly attributable to the defendant for purposes of sentencing.   The Government submits, consistent with the description above, that the evidence overwhelmingly establishes that the defendant was a massive participant in the charged scheme, one responsible for moving tens of thousands of bottles of these second-hand medications during the period of his involvement in the conspiracy, with a combined Medicaid reimbursement value substantially in excess of $7 million.

### A.  Applicable Law

Pursuant to Section 2B1.1 of the United States Sentencing Guidelines ("U.S.S.G."), the sentencing Court is directed to make a "reasonable estimate of the loss" caused by the

defendant's conduct.   U.S.S.G. § 2B1.1 n.3(C).  "Actual loss" is defined to include "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 n.3(i), which in turn is defined to include "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."   U.S.S.G. § 2B1.1 n.3(iv).  In making that "reasonable estimate of loss," the court is entitled to consider all "available information" including "the fair market value of" the goods or property at issue as well as "more general factors, such as the scope and duration of the offense and revenues generated by similar operations."  *Id.*

Consistent with the above, the Second Circuit has repeatedly instructed that "[i]n calculating the amount of loss under the Guidelines, a sentencing court need only make a reasonable estimate of the loss."  *United States* v. *Rigas*, 583 F.3d 108, 120 (2d Cir. 2009); *see also United States* v. *Certified Envtl. Servs.*, 753 F.3d 72, 103 (2d Cir. 2014) (same).  Indeed, the circuit has observed that "the Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision."  *United States* v. *Bryant*, 128 F.3d 74, 75 (2d Cir. 1997). All that is required is a "method of calculating the amount of loss [that is] legally acceptable."  *United States* v. *Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (internal quotation marks omitted).

### B.  Discussion

As an initial matter, it bears that certain issues relevant to the loss calculation either are not or cannot be seriously disputed.   For example, there can be no serious dispute that the defendant was a significant participant in the charged scheme.  After all, during the recorded meeting between the defendant and Pancho in September 2012, the defendant refers to *himself* as such, describing himself and Pancho as "big people" in the scheme:

| BLADIMIRO LNU: | So then...uh... | Entonces... eh... |
|---|---|---|
| CONFIDENTIAL HUMAN SOURCE: | And since... | Y como a... |
| BLADIMIRO LNU: | ...uh...they're looking for two big people here in New Jersey. | ...eh... andan buscando dos gentes grandes de aquí de *New Jersey*. |
| CONFIDENTIAL HUMAN SOURCE: | They are? | ¿Sí? |
| BLADIMIRO LNU: | And I think that's you and me. | Yo creo que es a ti y a mí. |

(GX 211-T at 21.)   That the defendant groups himself with Pancho – they are the "two big people here in New Jersey" – is particularly telling in this context given the testimony and photographs offered at the Hearing documenting Pancho's role in the scheme.   After all,  at the time of his arrest just several months prior to this meeting, Pancho had nearly 1 million pills in his storage facility, pills with a combined Medicaid reimbursement value of more than $6 million.

Second, there can be no serious dispute that, as part of the scheme, the defendant purchased these pills from Arcadio Reyes-Arias, a/k/a "Chino," and that he did so in large quantities.  Once again, the defendant says as much himself during the recorded meeting in September 2012, proposing to Pancho that they buy $20,000 worth of medicine from "Chino" – i.e., Reyes-Arias – and another $5,000 worth of medicine from Leyba to do another deal.   (GX 211-T at 13.)   Indeed, in this critical respect, the defendant's own statements are *entirely consistent* with the testimony of Reyes-Arias that he sold regularly to the defendant, typically in

quantities of $3,000 to $8,000 worth of medication at a time, but ranging up to $30,000 worth of medication at a time.

Third, there can be no serious dispute that Medicaid suffered a loss as a result of the defendant's conduct.   Once again, the defendant's own words make clear his knowledge that these second-hand bottles were coming to him from Medicaid beneficiaries – that is, they "had been prescribed to patients with insurance, Medicaid." (Plea Tr. at 15:12-13.)  Reyes-Arias similarly testified to his knowledge that substantially all of the bottles he purchased at the defendant's behest or sold to the defendant had initially been dispensed to Medicaid beneficiaries.  (Tr. at 34:18-25.)

*      *      *

In making its proposed loss calculation for purposes of sentencing, the Government relies initially on the testimony of Reyes-Arias, who testified that he began working for the defendant as early as 1997 or 1998, and working with the defendant continuously through until arrest in December 2012.   In testifying, Reyes-Arias spoke of two different time periods – (1) the time period from roughly 1998 to 2005 when Reyes-Arias was working directly for the defendant, purchasing approximately 100 bottles of second hand medication per week (*e.g.* Tr. at 94:22-95:17); and (2) the time period from roughly 2005 until his arrest in December 2012 when Reyes-Arias sold roughly $3,000 to $8,000 in street value worth of medications to the defendant approximately once per month (*Id.* at 95:24-96:12.)

Focusing, first, on the time period of 1998 to 2005, and incorporating the analysis provided through Special Agent Rao and his summary charts which indicate an approximate Medicaid reimbursement value of $1,000 per bottle for the types of medicines involved in this

scheme, the Government calculates the loss caused by the bottles the defendant directed Reyes-Arias to purchase as follows:

| 1998-2005: | | | | |
|---|---|---|---|---|
| Year | Bottles Per Week | Approx. Medicaid Reimbursement Value/Loss Per Bottle | Total Medicaid Loss Per Week | Total Medicaid Loss Per Year |
| 2000 | 100 | $1,000 | $100,000 | $5,200,000 |
| 2001 | 100 | $1,000 | $100,000 | $5,200,000 |
| 2002 | 100 | $1,000 | $100,000 | $5,200,000 |
| 2003 | 100 | $1,000 | $100,000 | $5,200,000 |
| 2004 | 100 | $1,000 | $100,000 | $5,200,000 |
| 2000-2004 | | | | $26,000,000 |

Similarly, with respect to the second time period covered by Reyes-Arias' testimony, that is from approximately 2005 to his arrest in December 2012, a time period during which the defendant sold approximately $3,000 to $8,000 worth of second-hand medicines to the defendant, the Government would calculate the loss caused solely by the bottles the defendant from Reyes-Arias as follows:

| 2005-2012: | | | |
|---|---|---|---|
| Year | Street Value of Monthly Sale | Approx. Medicaid Reimbursement Value/Loss Per Sale | Total Medicaid Loss Per Year |
| 2005 | $5,000 | $50,000 | $600,000 |
| 2006 | $5,000 | $50,000 | $600,000 |
| 2007 | $5,000 | $50,000 | $600,000 |
| 2008 | $5,000 | $50,000 | $600,000 |
| 2009 | $5,000 | $50,000 | $600,000 |
| 2010 | $5,000 | $50,000 | $600,000 |
| 2011 | $5,000 | $50,000 | $600,000 |
| 2012 | $5,000 | $50,000 | $600,000 |
| 2005-2012 | | | $4,800,000 |

In reaching these calculations, the Government adopted a rough average of $5,000 per month meant to reflect the range provided by Reyes-Arias – that is, from roughly $3,000 to $8,000 per month – and then multiplied that figure by the approximate 10:1 ratio for street value to Medicaid reimbursement value, as established through the various summary charts provided by Special Agent Rao.

In total, thus, the Government would estimate the loss caused by bottles purchased just from Reyes-Arias *alone* to exceed $30 million.  And while these numbers are unquestionably approximate, they represent the sort of "reasonable estimate" of loss required by law for two reasons:

*First*, they are far more likely to be under-inclusive than over-inclusive.   In particular, these numbers do not include any bottles purchased by the defendant from anyone other than Reyes-Arias.   They do not include, thus, the thousands of bottles the defendant purchased from Rogelio Leyba, the other Collector who worked for the defendant from at least 2000 to 2005, before branching out on his own while continuing to sell to the defendant until 2012.   They also don't include bottles the defendant bought and sold with others, including Conrado Vasquez, a high-level scheme participant whom the defendant indicated owed him $200,000 as of September 2012.    And as noted above, based on the approximate street-value-to-Medicaid-reimbursement-value ratio in this scheme, a $200,000 tab would likely have covered prescription medication with $2,000,000 or more in Medicaid reimbursement value.  Nor, for that matter, do these numbers include any of the bottles recovered from the defendant's co-conspirators at the times of their arrests – that is, the bottles recovered from Panco, from Reyes-Arias, or from Leyba, bottles with a combined Medicaid reimbursement value in excess of $6 million.  (GX 215, 218, and 219.)

*Second*, the approximate figures above are corroborated by substantial, independent evidence gathered during the investigation, evidence which is entirely consistent with the Government's view of this defendant as a massive participant in the charged scheme, one responsible for causing millions of dollars in losses to Medicaid.   In particular, these figures and this view of the defendant's role are corroborated by the drug ledgers recovered from the defendant's bedroom, ledgers that document approximately $2.4 million in prescription medications.   These lists provide strong, independent evidence of the defendant's role in the charge scheme and, in particular, his involvement in very large transactions involving these second-hand medications.

That the Government cannot – and has never sought – to prove that the defendant's handwriting appears on each of these pages is completely irrelevant.  Indeed, the Government elicited testimony that at least some of these lists were assuredly authored by the defendant's co-conspirators, including Reyes-Arias, who then provided these to the defendant as lists of medicine being offered for sale.  (E.g., Tr. at 47:8-49:5)).  Nor is it relevant that the Government cannot – and has never sought – to prove that each of these transactions was actually completed.  It is well-established law that not all aspects of a conspiracy need be successful, and for purposes of sentencing, in particular, that planned or intended losses are counted equally with actual losses.  The essential fact established through the ledgers is that the defendant was plainly in the business of negotiating very large sales of prescription medications, which is, of course, the core issue presently before the Court.

The Government's loss calculation is then further corroborated by the recorded meeting between the defendant and Pancho in September 2012, during which the defendant confirmed his role as a large player in this second-hand medication scheme.  In particular, the defendant himself confirmed Reyes-Arias testimony in critical respects, confirming, for example, that the defendant purchased these medications from both Reyes-Arias and from Leyba and that he did so in purchases of thousands of dollars' worth of second-hand medications at a time.  (*E.g.*, GX 211-T).

\*     \*     \*

While the defendant chose not to present evidence at the Hearing, through cross-examination, the defendant attacked the Government's use of the New York State Medicaid Formulary Table for determining loss, suggesting that the New York State rates might not be representative particularly where, as here, the defendant was domiciled in New Jersey.  As an

initial matter, and as adduced through witness testimony, the New York State table has been used to determine loss throughout this investigation, one which has led to the prosecutions of more than 60 defendants who have been sentenced based on those calculations by at least three different in judges in this District.  Those facts alone weigh strongly in favor of using the same basic approach in this case.  *Cf.*  18 U.S.C. § 3553(a)(6)(directing courts, in imposing sentence, to "avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct").

Second, and arguably more important, while there is no evidence in the record to support the defense argument that the New York State rates are somehow unrepresentative in this context, in effort to aid the Court, the Government has gathered information on the New Jersey State Medicaid reimbursement rates for the medications at issue in this case.   Based on that information, it would appear that the New Jersey state rates are actually slightly *higher* than the New York rates.   For example, Special Agent Rao compared New York rates and New Jersey rates for one page of the defendant's drug ledger – page 3 of Government Exhibit 201 – a page about which significant testimony was adduced at the Hearing.   Applying the New York State rates to the medications listed on that page, Special Agent Rao came up with a total Medicaid reimbursement value of $75,992.   Applying the New Jersey rates, by contrast, Special Agent Rao came up with a total Medicaid reimbursement value of $85,943 – *i.e.*, a figure more than 13 percent higher than the New York rate.   A summary chart documenting Special Agent Rao's findings is attached hereto as Exhibit A.

*          *          *

As such, the Government believes that its proposed loss figure of $30 million or more is grounded in a solid evidentiary record – evidence which includes witness testimony as

corroborated by physical evidence, drug ledgers and other records, and the defendant's own statements.   That body of evidence is substantial and corroborated and provides a basis using this figure as a "reasonable estimate of loss" in this case.

Recognizing, however, that the Pimentel letter reflected a loss of $7 million to $20 million and in an effort to even further compensate for any estimates included in the Government's calculations, the Government would urge this Court to simply find a loss figure of more than $7 million pursuant to U.S.S.G. §2B1.1(b)(1)(K).

### III.    CONCLUSION

For the foregoing reasons, the Government respectfully submits that it has established a substantial factual basis for a finding of a loss of more than $7 million properly attributable to the defendant.

Dated:  New York, New York
        November 14, 2014

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York


                                By:     ___/s/_____
                                        Edward B. Diskant
                                        Jason A. Masimore
                                        Assistant United States Attorneys
                                        (212) 637-2294/2580