UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :

    - v. -                                        :          13 Cr. 897 (RWS)

BLADIMIR RIGO,                              :
    a/k/a "Bladi,"
                                                        :
                  Defendant.
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**POST-HEARING REPLY BRIEF OF THE UNITED STATES OF AMERICA**


                                                         PREET BHARARA
                                                         United States Attorney for the
                                                         Southern District of New York
                                                          Attorney for the United States of America


Edward B. Diskant
Jason A. Masimore
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| - v. - : | 13 Cr. 897 (RWS) |
| BLADIMIR RIGO,   : a/k/a "Bladi," | |
| : | |
| Defendant. | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## POST-HEARING REPLY BRIEF OF THE UNITED STATES OF AMERICA

Notwithstanding overwhelming evidence of the defendant's substantial participation in the charged conspiracy – evidence including the defendant's own statements describing himself as one of the "two big people" involved in the scheme, and a classic drug ledger documenting millions of dollars in scheme activities recovered from the defendant's bedroom – the defendant, in his post-hearing briefing, takes the remarkable position that he should be held responsible for "at most" a single transaction, one which was recorded as part of the investigation, involving $25,000 in street-value worth of second-hand medications. (*E.g.*, Def. Br. at 19.)[1] This position is contrary to the evidence, the law, and most remarkably, the defendant's own guilty plea allocution in which the defendant – far from limiting his involvement to just one single planned transaction in late 2012 – admitted to participating in the scheme for *years* prior to his arrest, telling a judge, under oath, that he participated in the years "mainly 2010 to 2012, but also in previous years." (Plea Tr. at 15:19-20.)

---

[1] As noted below, even if the Court were to focus on just this transaction, the true loss to Medicaid caused by this $25,000 transaction would be closer to $250,000 given the ratio between the street value of these medicines and their Medicaid reimbursement value.

The defendant's position at sentencing is also in considerable tension with his repeated professions of "acceptance of responsibility" for his conduct, (*e.g.*, Def. Br. at 2, 35), for while the Government "bears the burden of proving" loss for purposes of sentencing, (*id.* at 35.), it is the defendant who bears the burden of establishing his acceptance of responsibility, and a defendant who "falsely denies, or frivolously contests" conduct relevant to sentencing, does not generally meet that burden, because a defendant who does so "has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 n. 1; *see also United States* v. *Carmona*, 361 Fed. Appx. 166, 169 (2d Cir. 2010) (affirming denial of acceptance points where defendant pled guilty but in connection with sentencing "repeated refusal to fully and truthfully admit" the relevant drug quantities); *United States* v. *Brennan*, 395 F.3d 59, 75 (2d Cir. 2005) affirming denial of credit for acceptance of responsibility where, inter alia, defendant "sought to minimize or conceal the extent of his guilt by grossly misstating the facts"); *United States* v. *McLean*, 287 F.3d 127, 134 (2d Cir. 2002) (affirming denial of credit for acceptance of responsibility where defendant pleaded guilty but falsely denied quantities of drugs that the district court determined were attributable to him).

For the reasons that follow, the Government continues to believe that it has met its burden – *i.e.*, that it has established that it is "more likely than not" that a "reasonable estimate of the loss" caused in this case stretches well into the millions of dollars, and certainly in excess of $7 million. Moreover, it would urge the Court, in evaluating this issue, to consider that the defendant's position on loss is not only belied by the evidence and common sense, but is also fundamentally inconsistent with the defendant's own guilty plea.

## II.     DISCUSSION

### A.  Standard

As the Court is well aware, the Government carries the burden of establishing "disputed factual allegations . . .by a preponderance of the evidence," *United States* v. *Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003), an intentionally flexible standard which requires only that the Government show that the factual issue in question is "more likely than not true." *United States* v. *Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003); *see also United States* v. *Lee*, 818 F.2d 1052, 1057 (2d Cir. 1987) (rejecting a higher burden with respect to disputed factual issues at sentencing given, among other factors, "the strong interest in judicial economy").

While "mere speculation" has never been sufficient to meet that burden (Def. Br. at 18, 29), neither the Second Circuit nor the Guidelines themselves require exactitude.  To the contrary, the Guidelines expressly invite courts to adopt varying approaches in reaching this "reasonable estimate of loss," including through: (1) approximation – *i.e.*, "the approximate number of victims multiplied by the average loss to each victim," U.S.S.G. § 3E1.1 n. 3(C)(iv); (2) estimates – *i.e.*, based on "the scope and duration of the offense" U.S.S.G. § 3E1.1 n. 3(C)(vi); and (3) comparisons – *i.e.*, "revenues generated by similar operations." *Id.*  The Circuit has similarly emphasized the "broad discretion" sentencing courts have deciding how to resolve disputed facts at sentencing.  *United States* v. *Duverge Perez*, 295 F.3d 249, 254 (2d Cir. 2002); *cf. United States* v. *Phillips*, 431 F.3d 86, 93 (2d Cir.2005) ("The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court

afford the defendant some opportunity to rebut the Government's allegations.") (internal quotations omitted).[2]

### A.  The September 2012 Recording

At the *Fatico* Hearing, the Government offered a recording of the defendant and Hermendigildo Fernandez, a/k/a "Pancho" made in September 2012 (the "September 2012 Recording.")  The defendant does not dispute he was on that recording, or that during that recorded conversation, he and Fernandez – two "old-timers" in the game – discussed "the black market prescription drug business."  (Def. Br. at 5-6.)   As detailed, that conversation alone provides the Court with a substantial basis for finding a loss considerably in excess of $2 million.

To begin with, the "potential . . . business transaction amounting to $25,000" (Def. Br. at 5-6) the defendant proposes during the September 2012 Recording – one in which he will buy second-hand medicines from Reyes-Arias and Rogelio Leyba ("Leyba") – involved $25,000 in *street value* worth of these medicines.  The loss to Medicaid, however, had this deal gone through, would have been considerably higher, because unlike the defendant, Medicaid does not purchase medicines dispensed to its beneficiaries on the black market.  Instead, Medicaid pays full price legitimate bottles of these medicines which are dispensed to persons expected to take that medication – rather than sell it to people like the defendant and his associates.  As such, while the bottles discussed during the September 2012 may have a street value of $25,000 by the

---

[2] The defendant repeatedly cites a lone district court opinion ostensibly for the proposition that where the Government fails to prove a specific loss amount, the defendant "is entitled to be sentenced in accordance with the least amount on the grid." *United States* v. *Capanelli*, 270 F. Supp. 2d 467, 476 (S.D.N.Y. 2003) (Def. Br. at 18, 35, 36.)  *Capanelli*, which of course is not binding on this Court, is also distinguishable on a number of grounds, among them being that *Capanelli* involved a robbery – not a fraud – and thus applied a different provision of the Guidelines, Section 2B3.1, which unlike the provision at issue in the instant case, does *not* permit a Court to take make a reasonable estimate of intended losses but instead requires a specific finding of the actual loss caused by the robbery.  *See* U.S.S.G. § 2B3.1(b)(7) & n.3 (directing court to increase the offense level based on "loss" and defining loss as "the value of the property taken, damaged, and destroyed")

-5-

time the defendant purchased them from Reyes-Arias and Leyba, Medicaid had already suffered a full loss of approximately ten times that amount, or roughly $250,000.[3]

Moreover, during the same conversation, the defendant discusses his dealings with other co-conspirators, including "Conrado" – *i.e.*, Conrado Vasquez – who was charged and has already pled guilty to his role in this conspiracy which consisted principally of purchasing these medicines from aggregators like Pancho and the defendant.   During the September 2012 Recording, the defendant tells Pancho that Conrado "stole from me almost 200,000 dollars" – that is, $200,000 worth of the second-hand medications that Conrado took but never paid for. (GX 211-T at 29.)   Applying the same principles, the loss to Medicaid from $200,000 worth of medication would be far higher – roughly ten times higher – as the price Medicaid paid for these medications before they were fraudulently obtained by the defendant would have been closer to $2 million.[4]

More generally, the same recording established that this defendant was an experienced trafficker of second-hand pills.  The recording makes clear, for example, that the defendant had, at the time of the recording, at least two established suppliers – Reyes-Arias, a/k/a "Chino," and Leyba – both of whom the Court heard substantial testimony regarding at the Hearing.   The same recording establishes that the defendant had recently lost a long-time customer of these second-hand medications – a pharmacy owner – because, as the defendant tells Fernandez, "[t]he

---

[3] As detailed more extensively in the Government's opening brief, based on the investigation, including a series of controlled buys and analysis of the bottles purchased, the Government understands there to be an approximate ration of 10 to 1 between Medicaid reimbursement value and street value of these medicines.

[4] As discussed further below, in opposing the Government's methodology in calculating loss, the defendant argues that "the Government has presented no evidence that he prescription drugs listed [in the drug ledgers, for example] were ever billed to any state agency." (Def. Br. at 32-33.)   This position – like much of the defendant's brief -- is simply inconsistent with the defendant's own plea allocution in which he told Judge Fox: "I agreed with others to buy and to sell medicines *that had been prescribed to patients with insurance, Medicaid*, without having a license to sell them or to buy them."   (Plea Tr. at 15:19-23.)

Italian guy sold the pharmacy. So now I'm fucked." (*Id.* at 28). Most important of all, the recording demonstrates the defendant's own view that the defendant and Fernandez were the "two big people here in New Jersey" (*Id.* at 21.)

That last piece is especially crucial in this context for at least two reasons. First, and as discussed further below, it entirely corroborates the other evidence in the case – the drug ledger found in the defendant's bedroom detailing more than $2.4 million in second-hand prescriptions, and the testimony of Reyes-Arias as to the scope and duration of the defendant's conduct. But second, and arguably more important, the comparison the defendant draws between himself and Fernandez is critical because Guidelines expressly invite the Court, in reaching a "reasonable estimate of loss," to look to "revenues generated by *similar operations*." *Id.* at 3(C)(vi) (emphasis added).

Here the defendant himself makes clear that he and Fernandez ran similar operations – that they bought from the same suppliers, did business with the same buyers – and were the "two big people" in the state of New Jersey involved in the scheme. And as the Court is well aware, the losses caused by Fernandez's conduct were massive – at the time of Pancho's arrest, agents recovered more than $6.1 million worth of second-hand medications from a storage facility under his control, a figure that would, of course, not include any of the dealings by Fernandez in the months and years prior to his arrest.[5] This, too, thus, provides the Court another strong basis in law and rooted in the September 2012 Recording for making a "reasonable estimate of loss" vastly in excess of $25,000.

The Government, thus, submits that September 2012 Recording alone makes it "more likely than not" that a "reasonable estimate of the loss" caused by the defendant was

---

[5] The defendant contends that the Government "presented no evidence connecting [the defendant] in any way to these drugs." (Def. Br. at 24.)

substantially in excess of $2,250,000 – that is, the Medicaid reimbursement value of the "$25,000 transaction" and the $200,000 prior deal with "Conrado" – and likely quite higher. Indeed, were the Court to accept the defendant's invitation to draw the comparison between the defendant and Fernandez, the Court could, consistent with the guidance in U.S.S.G. § 3E1.1 n. 3(C)(vi), make a reasonable estimate of loss of more than $6.1 million.

And those loss figures, if adopted, would still likely be incredibly conservative. Because as the September 2012 Recording makes clear, these two "old-timers" (Def. Br. at 5) were no strangers to this scheme, and had been involved in deals just like these many times before.

### B. The Drug Ledgers

In addition to the September 2012 recording, the Government offered a series of pages from notebooks found in the defendant's bedroom at the time of his arrest. These ledgers unquestionably belonged to the defendant – as the defendant himself argues, the notebooks in question also contained "notes from Mr. Rigo's bodega business," various bills, even "cartoons apparently drawn by his children." (Def. Br. at 32.) These were the defendant's notebooks.

Moreover, these ledgers clearly document the defendant's role in the scheme to which he has pled guilty – that is, to his role in agreeing with others "to buy and to sell medicines" over a period of several years (Plea Tr. at 15:20-21). These documents contain handwritten lists of hundreds of bottles of HIV/AIDS medications, the very medications the defendant was involved in buying and selling. Many list prices, sums, totals – all clear indicia of transactions being discussed and likely consumed. There simply is no other logical inference to be drawn – the defendant, in argument, certainly does not choose to advance one – nor any innocent explanation for the presence of these classic ledgers in his notebooks in his bedroom.

Instead, the defendant argues that the Government cannot prove whether all of the handwriting on the lists belongs to the defendant, or whether the transactions documented in the lists were ever consummated.  Those arguments are correct – the Government has suggested the contrary.  (*E.g.*, Tr. at 126:2-127:1.)   But these arguments miss the point, because the Court need not resolve any of those issues to impose sentence.  Instead, because the defendant is charged with – and has pled guilty to – participating in a conspiracy, he is equally liable for the acts of his co-conspirators, including others who may have written those lists, and the plans and intentions of the conspiracy, whether consummated or not.  *See generally United States* v. *Jackson*, 335 F.3d 170, 181 (2d Cir. 2003) ("Under well-established law, [the defendant] was responsible not only for the cocaine he himself conspired to import but also for the cocaine his co-conspirators conspired to import, provided he knew of his co-conspirators illicit activities or the activities were reasonably foreseeable by him."); *United States* v. *Martinez*, 987 F.2d 920, 923-26 (2d Cir. 1993) (same).  In other words, the existence of these documents alone, in the context of the conspiracy to which the defendant has pled guilty, makes it "more likely than not" that the bottles detailed on these lists are losses properly attributable to the defendant.

The defendant next attacks the Government's method of calculating the Medicaid reimbursement value of the bottles listed on the ledgers, calling application of the New York state rates "entirely arbitrary,"  (Def. Br. at 34.) and further asserting that  there is "no evidence that the prescription drugs listed were ever billed to any state agency."  (Def. Br. at 32-33.)  With respect to the former, this "entirely arbitrary" process has been deemed an appropriate benchmark for making a "reasonable" estimate of loss by at least three different judges in this District, itself strong evidence that this process provides a sound basis for making the estimate required.  *See, e.g.*, *United States* v. *Viera*, *et al.*, 11 Cr. 1072 (DLC); *United States* v. *Correa*, 13

Cr. 289 (AKH); *United States* v. *Leyba*, 13 Cr. 051 (GBD).   Indeed, while the defendant suggests through argument that the Government has somehow intentionally chosen to apply New York rates to unfairly inflate the loss, as noted in the Government opening brief, the Medicaid reimbursement rates in New Jersey, where this defendant resides, are actually *higher*, and application of New Jersey rates would thus result in higher loss figures.

With respect to the latter, the defendant seems to once again recant – or at least run afoul of – his own guilty plea allocution during which he told Judge Fox: "I agreed with others to buy and to sell medicines *that had been prescribed to patients with insurance, Medicaid*, without having a license to sell them or to buy them."   (Plea Tr. at 15:19-23.)   It is thus, somewhat surprising, that the defendant would now contest that very fact.[6]

\*       \*       \*

Applying the New York rates, the Government determined the Medicaid reimbursement value of the bottles listed to be approximately $2.4 million.  That is to say, the drug ledgers recovered from the defendant's notebooks in the defendant's bedroom at the time of the defendant's arrest make it "more likely than not" that a "reasonable estimate" of the loss caused by that component of the defendant's conduct, as documented in those ledgers, is at least $2.4 million.

As such, and when added to the losses stemming from the two specific transactions described in the September 2012 Recording and which totaled approximately $2.25 million, this Court could make a loss finding – without regard to any further testimony – of more than $4.6 million.

---

[6] The Court also heard testimony from Reyes-Arias as to this issue.  In particular, Reyes-Arias testified to purchasing the bottles he then sold to the defendant from Medicaid beneficiaries on the streets of Newark. (Tr. at 34:18-25.)

### C. The Testimony of Arcadio Reyes-Arias

Finally, the Government offered the testimony of a cooperating witness, Arcadio Reyes-Arias, a/k/a "Chino," and the defendant devotes much of his opening brief to attacking Reyes-Arias' character, testimony, and credibility.  The defendant describes Reyes-Arias as "not credible," asserting that he "repeatedly lied," and "violated his oath in an effort to avoid giving testimony that would not help the Government."  (Def. Br. at 2, 15)   The defendant goes further, claiming Reyes-Arias is "addled by two decades of untreated alcohol addiction," before ultimately labeling him not just an alcoholic and a liar but a "dishonest witness."  (*Id.* at 2, 27.)

The Court heard the testimony of Reyes-Arias and can and will evaluate that testimony on its own.  The Government would submit that Reyes-Arias was truthful, answering every question put to him on both direct and cross-examination to best of his ability.    Indeed, notwithstanding the strong accusations that Reyes-Arias "repeatedly lied" and was "dishonest," his testimony was almost entirely corroborated by the other evidence in the case.

As an initial matter, and arguably most importantly, Reyes-Arias core testimony – that he was a co-conspirator of the defendant's, working for the defendant and selling second-hand medications to the defendant –  is corroborated by the defendant himself, who during the September 2012 Recording, identifying Reyes-Arias, a/k/a "Chino," by name as one of his main suppliers.  (GX 211-T at 13.)   Indeed, during that same meeting, the defendant and Ferndandez discuss having worked with Chino in the past as part of this scheme.

Reyes-Arias similarly testified to the fact that he sold to "Pancho" – calling Fernandez, a/k/a "Pancho," on both direct and cross-examination, his primary customer.  (Tr. at 42:9-11, 72:13-16.)  That testimony is, of course, corroborated through the same recording, one in which Pancho also discusses his dealings with Reyes-Arias and agrees – in his role as a Government

cooperator, of course – to the new deal the defendant proposes in which they will purchase significant quantities of additional second-hand medications from Reyes-Arias.

Reyes-Arias then testified as to other aspects of the defendant's participation in the conspiracy, including some of the defendant's customers – a pharmacy owner in New Jersey to whom the defendant delivered these second-hand medications (*Id.* at 38:8-11) – as well as to others who worked for and sold to the defendant, including Rogelio Leyba.  (Tr. at 36:25-37:22.) And this testimony is also entirely corroborated by the defendant himself, as captured on the September 2012 Recording.  (*E.g.*, GX 211-T at 13.)

Finally, Reyes-Arias provided rough estimates of the volume of second hand medications he sold to the defendant, dividing that testimony into two time periods – (1) the time period of roughly 1998 to 2005, when he worked for the defendant and purchased approximately 100 bottles of second-hand medication a week for the defendant; and (2) the time period 2005 to his arrest in 2012, in which he sold approximately $3,000 to $8,000 in street value worth of these medications to the defendant each month.   Reyes-Arias provided this information on direct examination and again on re-direct examination, qualifying them in each instance as "approximate."  (*E.g.*, *id.* 95:20. 96:9.)

As an initial matter, that testimony with respect to quantities, is, in general terms, entirely consistent with the evidence before the Court – the drug ledgers, for example, found in the defendant's bedroom and depicting millions of dollars' worth of medications; the September 2012 Recording, in which the defendant proposes to buy $25,000 worth of medications at a time from Reyes-Arias and Leyba.  Indeed, with respect to the ledgers in particular, Reyes-Arias identified at least page as containing his own handwriting – page 3 of Government Exhibit 202 –

which shows a sale of "11,605" which is actually somewhat *higher* than Reyes-Arias' estimate of the approximate amount he sold to the defendant each month.

The testimony also comports with Reyes-Arias' statements in the past. While none of the 3500 material was offered into evidence as part of the Hearing, the defendant relies on it in his opening brief, and the Government has no objection to the Court's consideration of the material should the Court deem it appropriate. But review of that 3500 material as a whole makes clear that Reyes-Arias has told the Government the same essential narrative from his very proffer up through the Hearing – that he began working for the defendant in the late 1990s, buying approximately 100 bottles of medicine a week, before going out on his own in approximately 2005, at which point he continued selling to the defendant in significant volumes while selling even more to his main customer, "Pancho," on regular intervals. (*E.g.*, 3503-22, 3503-25, 3503-26.) Indeed, in the criminal complaint against this defendant, the information provided by Reyes-Arias, who is identified as CW-1, is synthesized in a manner virtually identical to the testimony provided at the Hearing, namely:

      b.      CW-1 first became involved in the scheme while employed by BLADIMIR RIGO, a/k/a "Bladi," the defendant in a bodega owned by RIGO on Orange Street in Newark, New Jersey. CW-1 was initially hired by RIGO in or around 1998 and, according to CW-1, became involved in purchasing second-hand medications at RIGO's direction in or around 2000 from Insurance Beneficiaries who would come to RIGO's bodega to sell their medications.

      c.      According to CW-1, he and another bodega worker ("CC-1") would purchase these medications on a daily basis at prices set by RIGO and according to lists created by RIGO. CW-1 and CC-1 would purchase up to 100 bottles of these second-hand medications each week, and RIGO would then collect the bottles purchased by CW-1 and CC-1 for resale to higher level aggregators and other co-conspirators.

      d.      On several occasions, CW-1 traveled with RIGO to meet with one of RIGO's customers, who worked at a Pharmacy in Elizabeth, New Jersey. Specifically, on at least two occasions, RIGO took CW-1 with him to the pharmacy, which was on East Jersey Street, in Elizabeth, New Jersey, to collect money RIGO was owed for second-hand medications. On each

of these occasions, CW-1 stayed in the car while RIGO entered the pharmacy to collect the money owed.

  e. In or around 2005, CW-1 stopped working for RIGO and instead opened his own bodega in Newark.  CW-1 continued to purchase second-hand medications from Insurance Beneficiaries, however, and would sell those medications to RIGO as well as to another high-level aggregator operating in the Newark area, who had been introduced to CW-1 by RIGO and who, as detailed further below, is now also cooperating with law enforcement ("CW-2").

  f. Specifically, between in or around 2005 and CW-1's arrest in December 2012, CW-1 sold second-hand medications to RIGO on a regular basis – approximately once every other month.  These sales would occur in CW-1's bodega in Newark and would generally consist of 70-80 bottles of second-hand medications which CW-1 would sell to RIGO for approximately $7,000 to $8,000.

(3502-4.)  That account – provided by Reyes-Arias over the course of a series of meetings with the Government after his own arrest – is almost substantively identical to his testimony before the Court.

  Indeed, if the Court is inclined to consider 3500 material, it should note that the testimony of Reyes-Arias also comports with the prior statements of others, including Rogelio Leyba, who was not a Government witness at the Hearing, but who did meet with the Government, and whose statements were produced to the defendant.   In those meetings, Leyba similarly told the Government about how he first became involved in the late 1990s "with Bladimir Rigo at the bodega" because "everybody that worked at Bladimir's bodega was involved [and] directed by Bladimir."  (3505-22 at 1.)  It's similarly consistent with the statements of Fernandez, who told the Government, in initial meetings, that "Bladimir" has been in the business "for years" and that "two people" – identified by Pancho as Reyes-Arias and Leyba – "who used to work with Bladimir" in his stores are now suppliers.  (3504-23.)

           *   *   *

  The Government detailed far more thoroughly, in its opening brief, how and why it believes Reyes-Arias' testimony supports a loss amount considerably in excess of $7 million – in

fact, in excess of *four times* that amount – and thus continues to believe that even after discounting that value appropriately to reflect the fact that "[m]emories are fallible," (Def. Br. at 13,) the testimony of Reyes-Arias – in connection with, and as corroborated by, the other evidence offered at the Hearing – supports a finding that the defendant was a major and long-time participant in the scheme, for whom a "reasonable estimate" of loss is vastly in excess of $25,000.

### III.   CONCLUSION

For the foregoing reasons, the Government respectfully submits that it has established a substantial factual basis for a finding of a loss of more than $7 million properly attributable to the defendant.

Dated:  New York, New York
        November 24, 2014

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York


                                By:      /s/                          _____
                                        Edward B. Diskant
                                        Jason A. Masimore
                                        Assistant United States Attorneys
                                        (212) 637-2294/2580