UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x
                                        :
UNITED STATES OF AMERICA              :
                                        : Case No.: 13 Cr. 897 (RWS)
        v.                          :
                                        :
BLADIMIR RIGO,                        :
                                        :
                  Defendant.   :
                                        :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

# **DEFENDANT BLADIMIR RIGO'S POST-HEARING REPLY MEMORANDUM OF LAW**

                                     SPEARS & IMES LLP
                                     Joanna C. Hendon
                                     Sharanya Sai Mohan
                                     Alicia K. Amdur
                                     51 Madison Avenue
                                     New York, New York  10010
                                     Tel:    (212) 213-6996
                                     Fax:   (212) 213-0849
                                     Email: jhendon@spearsimes.com

                                   *Attorneys for Defendant Bladimir Rigo*

Dated:  November 24, 2014

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .............................................................................................................................3

I.  A "Reasonable Estimate" of Loss Cannot Be Speculative ................................................4

II. The Government's Loss Estimate Is Speculative and Should Be
    Rejected by the Court.........................................................................................................5

    A.  Mr. Reyes-Arias' Testimony as to Volume and Frequency
        Is Not Credible.........................................................................................................5

    B.  Mr. Reyes-Arias' Testimony as to Volume and Frequency Is Not
        Corroborated by Other Evidence in the Record......................................................7

        1.  Mr. Reyes-Arias Kept No Records of His Business..................................7

        2.  The Papers Marked as Government's Exhibit 202 Do Not Corroborate
            Mr. Reyes-Arias' Testimony as to Volume and Frequency. ......................8

        3.  Mr. Rigo's Statements Do Not Corroborate
            Mr. Reyes-Arias' Testimony. ...................................................................10

    C.  The Government's Analysis of Mr. Reyes-Arias' Testimony
        Is Based on Assumptions Not Grounded in the Evidence. ...................................11

    D.  The Government's Newly Minted $30 Million Loss Figure
        Is Based on Speculation. .......................................................................................12

III. Adopting the Government's Loss Estimates Will Create
     Unwarranted Sentencing Disparities................................................................................13

CONCLUSION........................................................................................................................15

## TABLE OF AUTHORITIES

### Cases

*United States v. Capanelli*,
    270 F. Supp. 2d 467 (S.D.N.Y. 2003)............................................................................. 4-5

*United States v. Clarke*,
    No. 09 Cr. 705 (LAP), 2010 WL 4449443 (S.D.N.Y. Oct. 29, 2010) ......................................7

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012)..........................................................................................4, 14

*United States v. Cuti*,
    No. 08 Cr. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ................................4, 10

*United States v. Deutsch*,
    987 F.2d 878 (2d Cir. 1993)................................................................................................4

*United States v. Guzman*,
    332 F. App'x 665 (2d Cir. 2009) ................................................................................11, 13

*United States v. Myerson*,
    18 F.3d 153 (2d Cir. 1994)................................................................................................11

*United States v. Nachamie*,
    121 F. Supp. 2d 285 (S.D.N.Y. 2000)..................................................................................8

*United States v. Persico*,
    305 F.2d 534 (2d Cir. 1962)................................................................................................6

*United States v. Rigas*,
    583 F.3d 108 (2d Cir. 2009)................................................................................................4

*United States v. Rios*,
    856 F.2d 493 (2d Cir. 1988)................................................................................................7

*United States v. Rutkoske*,
    506 F.3d 179 (2d Cir. 2007).......................................................................................... 4, 8-9

*United States v. Say*,
    923 F. Supp. 611 (D. Vt. 1995)......................................................................................4, 8

*United States v. Tzoloy*,
    435 F. App'x 15 (2d Cir. 2011) ........................................................................................11

*Wood v. Ercole*,
    644 F.3d 83 (2d Cir. 2011)..................................................................................................6

## U.S. Sentencing Guidelines

U.S.S.G. § 2B1.1 cmt. 3(B) .......................................................................................................11

Defendant Bladimir Rigo respectfully submits this Post-Hearing Reply Memorandum of Law in further support of a determination by the Court that the loss estimates proffered by the Government in this case are overstated and the Government has sustained its burden of proving losses attributable to Mr. Rigo of no more than $25,000.

## PRELIMINARY STATEMENT

The Government seeks to hold Mr. Rigo responsible for between $7 and $30 million dollars in drug sales over a twelve-year period, notwithstanding that the agents seized from him no drugs, no drug proceeds, nor any paraphernalia of the Medicaid fraud to which he pleaded guilty. Mr. Rigo appeared on no surveillance and was never set up by any cooperating witness to buy or sell drugs. The Government's loss estimates depend entirely upon a single tape-recorded meeting between Mr. Rigo and a competitor (Hermenegildo Fernandez) in September 2012; twelve pages of records seized from Mr. Rigo's residence; and the testimony of a single cooperating witness, Arcadio Reyes-Arias. But that humble evidentiary foundation cannot support the flights of fancy proffered by the Government here.

The Government concedes its loss estimates depend upon the testimony of Mr. Reyes-Arias, who lied to the Court about matters material to the proceeding (whether he told Judge Gardephe that he had only one customer, and whether he was addicted to alcohol throughout the period he claims to have done business with Mr. Rigo). The Government seeks to overcome this, arguing the testimony of Mr. Reyes-Arias is corroborated by other evidence. But it is not – and that is why the Court must reject the problematic testimony and the loss estimates built upon it. According to the Government (and to Mr. Reyes-Arias), Mr. Reyes-Arias was in the Medicaid fraud business from the late 1990s until his arrest in 2012, but kept no records of any kind. Whether or not true, a consequence of that testimony is that there is no

physical evidence of a single drug transaction between Mr. Rigo and Mr. Reyes-Arias. Nor do the records recovered from Mr. Rigo's home corroborate Mr. Reyes-Arias' testimony. To be sure, those records tend to prove Mr. Rigo was involved in the fraud, something he does not contest. But nothing in those records attests to how frequently or extensively Mr. Rigo allegedly bought medicine from anyone, let alone Mr. Reyes-Arias. The Government did not seek to prove (or even discover) who created those records; they contain a variety of different styles of handwriting. Nor did the Government seek to establish what the records mean – simply put, of what the twelve sheets of paper are records.

      Finally, the Government points to the consensually recorded meeting between Mr. Rigo and Mr. Fernandez. That conversation does not come close to corroborating how frequently, to what extent, in what years, or if in fact Mr. Rigo ever purchased medicine from Mr. Reyes-Arias. The conversation concerns a meeting between Mr. Rigo and an alleged competitor (Mr. Fernandez), not Mr. Reyes-Arias. And while there is no dispute that Mr. Fernandez was Mr. Reyes-Arias' main customer (if not his only customer), such that, if called as a witness, Mr. Fernandez might have testified about his own dealings with Mr. Reyes-Arias – or his knowledge of the purported relationship between Mr. Rigo and Mr. Reyes-Arias – the Government declined to call him for that or any other purpose. The law in this Circuit is clear that where a party has it peculiarly within its power to produce a witness (here, the cooperator Mr. Fernandez) and fails to do so, the trier of fact may infer that the testimony of the missing witness would be unfavorable to that party.

      Unsurprisingly (and over the defense's objection), the Government was at pains to present evidence of drugs, records, and paraphernalia seized from defendants other than Mr. Rigo, without ever (then or now, in its briefing) seeking to connect Mr. Rigo to any of that

evidence. It did not do so, because it cannot. The Government learned of Mr. Rigo late in its investigation and prosecuted him based on a thin, but legally adequate, record: the September 2012 tape-recorded meeting, the records seized at his home, and information provided by Mr. Reyes-Arias. But its efforts to convert that proof into evidence sustaining loss amounts of somewhere between $7 million and $30 million are rooted in impermissible speculation. The Court should reject the Government's unauthorized estimates and determine the losses for which Mr. Rigo is responsible to be no greater than $25,000.

## ARGUMENT

The Government asserts – but has not proven – that Mr. Rigo was a "massive participant" in the fraud. (Gov. Br. at 21).[1] Had the agents believed Mr. Rigo to be a major figure, as the prosecutors now urge, they presumably would have taken steps to prove it. Instead, they did virtually nothing. They subpoenaed no financial records of Mr. Rigo, despite locating bank records at his home; they sought no search warrants, despite knowing where Mr. Rigo lived and the addresses of the bodegas with which Mr. Rigo was associated; they made only half-hearted efforts to engage him in drug trafficking activity of any kind (a single lunch meeting with an alleged competitor); and they made no effort to surveil him. We know, because Agent Rao testified, that, while surveiling other targets in this case (including Rogelio Leyba, Mr. Fernandez, and Mr. Reyes-Arias), Mr. Rigo never once appeared coming to, or leaving from, any targeted premises. Nor did the Government step up its efforts to prove the scope of Mr. Rigo's involvement for the *Fatico* hearing. Were the Government's view of Mr. Rigo (as a "massive participant") correct, there should be numerous witnesses – whether law enforcement agents or

---

[1] "Gov. Br." refers to the Post-Hearing Briefing of the United States, dated November 14, 2014. "Def. Br." refers to Bladimir Rigo's Post-Hearing Memorandum of Law, dated November 14, 2014. "Mohan Decl." refers to the Declaration of Sharanya Sai Mohan, dated November 14, 2014. "Hr'g Tr." refers to the transcript of the *Fatico* hearing before the Court on October 7, 2014, attached as Exhibit B to the Mohan Declaration.

cooperators among the dozens of arrestees in this case – to offer proof against him.  Yet, the Government chose to call only one witness, the flawed Mr. Reyes-Arias, to testify to the facts that drive its loss calculation.  Having pursued a "less is more" strategy with respect to its burden of proof throughout this case – presumably because Mr. Rigo was not a substantial enough target to justify the investment of investigative resources at the time – the Government may not pursue a "more is not enough" strategy at sentencing on the basis of unproven – and therefore speculative – assertions.

### I. A "Reasonable Estimate" of Loss Cannot Be Speculative.

"It is the Government's burden to prove loss."  *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011).  The Government urges the Court to accept its loss figure because the Court is only required to make a "reasonable estimate of the loss." (Gov. Br. at 16 (quoting *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009).)  But while a reasonable estimate of the loss amount is permitted, "speculation is not."  *United States v. Say*, 923 F. Supp. 611, 614-15 (D. Vt. 1995) (refusing to attribute intended loss amount when there was a "dearth of information" as to the defendant's "knowledge of or role in" the larger scheme); *see United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (remanding for resentencing when loss amount was based on "pure speculation" because "[s]uch speculation is not permissible under the Guidelines").  Instead, a loss finding must be "grounded in the evidence," *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012), and the fixing of loss amounts not supported by the evidence is reversible error, *United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007).  That the Government may be unable meet that burden is no excuse for it positing an exceptionally high value and asking the sentencing Court to "pick a number, any number" within an unproven range of losses, simply because it believes the defendant is

responsible for greater losses than it is able to prove.  *See United States v. Capanelli*, 270 F. Supp. 2d 467, 476 (S.D.N.Y. 2003).

## II.     The Government's Loss Estimate Is Speculative and Should Be Rejected by the Court.

The Government seeks to hold Mr. Rigo responsible for losses ranging from $7 to $30 million by extrapolating from weekly and monthly estimates of transactions its cooperating witness, Mr. Reyes-Arias, says took place with Mr. Rigo.  The Government relies upon the number of bottles Mr. Reyes-Arias claims to have purchased per week on behalf of Mr. Rigo between 1998 and 2005 (100 bottles per week) and the dollar value of monthly sales Mr. Reyes-Arias claims to have made to Mr. Rigo between 2005 and 2012 ($3,000 to 8,000).  For the earlier period (1998-2005), the Government multiplies the number of bottles purchased per week by an approximate Medicaid reimbursement value of $1,000.[2]  (Gov. Br. at 19.)  For the later period (2005-2012), the Government uses Mr. Reyes-Arias' estimate that he sold approximately $3,000 to $8,000 in second-hand drugs to Mr. Rigo each month.  It then applies an average value in that range ($5,000) to each month within an eight-year period, and multiples that value by a factor of 10 to arrive at a loss amount per month of $50,000.  (*Id.* at 20.)

### A.     Mr. Reyes-Arias' Testimony as to Volume and Frequency Is Not Credible.

The Government concedes that its calculations rest on Mr. Reyes-Arias' testimony. (Gov. Br. at 18.)  But the Court should reject Mr. Reyes-Arias' testimony and the arithmetic flowing from it, because Mr. Reyes-Arias is not a credible witness, and – despite the Government's arguments to the contrary – his testimony about the volume and frequency of his dealings with Mr. Rigo is not corroborated.  Mr. Reyes-Arias lied to this Court, including about

---

[2] Although the evidence at the hearing concerned the period between 1998 and 2012, the Government excludes alleged losses incurred in 1998 and 1999 from its estimates.  That is because Mr. Rigo was indicted for conduct beginning in 2000.

matters material to the *Fatico* hearing. (Def. Br. at 13-14, 15; Hr'g Tr. 74:9-25, 77:1-8 (disavowing testimony in plea allocution that he had sold the drugs he purchased "to one person, all of it," claiming he "didn't tell the judge that"); *id.* at 65:4-66:25 (denying alcohol addiction, despite previous testimony in plea allocution to being addicted to alcohol).) Mr. Reyes-Arias' testimony about his dealings with Mr. Rigo is entitled to no more weight. Mr. Reyes-Arias' testimony that he sold Mr. Rigo 100 bottles of medicine a week or a dollar volume of drugs each month is contradicted by his testimony and statements to the Government that he "never told [the Government] the amount of bottles" he was selling to Mr. Rigo (Hr'g Tr. 90:22-91:4); that he sold his drugs to "one person, all of it," referring to Mr. Fernandez (Mohan Decl. Ex. Q (Tr. of Reyes-Arias Plea Allocution, dated July 31, 2013) at 20:24-21:3); that, between 1998 and 2005, he purchased "60 to 70 to 80 bottles per week" to "[u]p to two hundred" bottles per week on behalf of Mr. Rigo (Hr'g Tr. 36:19-24; 95:13-16); and that, between 2005 and 2012, he sold drugs to Mr. Rigo, not every month, but "once every *other* month" (Compl. ¶ 7f (emphasis added)).

      Under these circumstances, the Court should discredit the testimony of Mr. Reyes-Arias. *See Wood v. Ercole*, 644 F.3d 83, 94-95 (2d Cir. 2011) (fact-finder unlikely to credit testimony of a key cooperating witness "absent strong corroboration" where witness, among other things, was a "frequent drinker," offered "contradictory statements," previously lied under oath, and testified pursuant to a plea agreement, which "illustrat[ed] vividly . . . his powerful incentive . . . to seek leniency by implicating others"); *United States v. Persico*, 305 F.2d 534, 536 (2d Cir. 1962) (reviewing with "extreme care" conviction resting "entirely upon the uncorroborated testimony, inconsistent with his earlier testimony in some respects, of an accomplice and coconspirator who had the strongest possible reasons to become a Government witness"); *see*

*also United States v. Rios*, 856 F.2d 493, 495 (2d Cir. 1988) (noting that a witness's testimony "may be so inconsistent or implausible on its face that a reasonable factfinder would not credit it," and that a finding based on such testimony could constitute clear error); *cf. United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *3 (S.D.N.Y. Oct. 29, 2010) (finding co-defendant testimony credible where it was "clear, straightforward, and non-evasive" and its "account of the facts . . . remained consistent").

### B. Mr. Reyes-Arias' Testimony as to Volume and Frequency Is Not Corroborated by Other Evidence in the Record.

The Government contends that Mr. Reyes-Arias' testimony is corroborated by other evidence, including the tape-recorded discussion between Mr. Rigo and Mr. Fernandez in September 2012 and the records recovered from Mr. Rigo's home at the time of his arrest in September 2013. (Gov. Br. at 21-24.) But none of that evidence (nor any evidence in the case) corroborates Mr. Reyes-Arias on the facts for which his testimony was offered in this case: how frequently, to what extent, and over what period of time he engaged in transactions with Mr. Rigo. At most, that evidence tends to show a fact not disputed: namely, that Mr. Rigo was a member of the conspiracy and engaged in unlawful transactions involving prescription drugs.

#### 1. Mr. Reyes-Arias Kept No Records of His Business.

As an initial matter, Mr. Reyes-Arias appears to have kept no records of his own illicit activities – not a single record of a career lasting more than twelve years. According to Mr. Reyes-Arias, he kept no "records and ledgers of [his] business," including of any transactions involving Mr. Rigo. (Hr'g Tr. 82:17-20.) He was unaware of a "single piece of paper in this case that was taken from [his] home or [his] person" connecting his business to Mr. Rigo. (*Id*. at 63:14-64:12.) Mr. Reyes-Arias testified that "[t]here must be lists because we made lists" (*id*. at 63:17-18), but the Government offered only one such list in evidence (part of Government's

Exhibit 202 (Mohan Decl. Ex. L), recovered from Mr. Rigo's residence) (*see* Hr'g Tr. 47:11-14; 64:9-12). And as to that document, Agent Rao testified that Mr. Reyes-Arias *could not say that it contained any record of a transaction involving Mr. Rigo*. (*Id*. at 132:3-6.)

> 2. The Papers Marked as Government's Exhibit 202 Do Not Corroborate Mr. Reyes-Arias' Testimony as to Volume and Frequency.

The Government argues that the pages marked as Government's Exhibit 202 ("GX-202") "document" $2.4 million in drug transactions and thus are "independent evidence of the defendant's role in the charge[d] scheme and, in particular, his involvement in very large transactions involving these second-hand medications." (Gov. Br. at 21.) Those records do not corroborate Mr. Reyes-Arias' testimony about the volume or frequency of his dealings with Mr. Rigo. Indeed, the Government failed to establish even the most basic facts concerning those records: who wrote them, when they were created, why they were created, and of what they purport to be a record. Agent Romero testified only to the fact that these pages were recovered from Mr. Rigo's residence. (Hr'g Tr. 23:16-24.) Mr. Reyes-Arias testified that of the twelve pages in GX-202, four contained handwriting he recognized to be Mr. Rigo's (*id.* at 47:8-48:17; 54:4-55:9), but on cross-examination he was forced to admit that he was wrong (*id.* at 58:9-11). And while Agent Rao constructed his $2.4 million damages chart (Mohan Decl. Ex. R (GX-212)) on the theory that each entry on the pages (by whomever made) represented a "sale or contemplated sale" (Hr'g Tr. 130:25-131:4), he was forced to admit that he "made an assumption" in that regard (*id.* at 128:17-23, 129:3-9, 129:14-19, 130:22-24).[3] It is black-letter law that the Government may not meet its burden with unsupported assumptions. *See Rutkoske*,

---

[3] The Government claims it need not prove any entry on GX-202 reflects an actual drug transaction, because "planned or intended losses are counted equally with actual losses." (Gov. Br. at 22.) For an intended loss calculation, however, the Government bears of the burden of showing that the defendant intended or attempted to inflict the loss, which it has failed to do with respect to any of the entries on GX-202. *See United States v. Nachamie*, 121 F. Supp. 2d 285, 291 (S.D.N.Y. 2000); *Say*, 923 F. Supp. at 613-14.

506 F.3d at 180 (district court's acceptance of Government expert's methodology to calculate loss, when not supported by the evidence put forth by the Government, contributed to reversible error); *Say*, 923 F. Supp. at 614-615 (refusing to attribute intended loss to defendant, who was convicted of unlawfully transporting counterfeit credit cards, because it would be "based upon speculation," due to a "dearth of information" as to the "origin or intended fate of the credit cards . . . or as to [defendant's] knowledge of or role in" the counterfeiting scheme).[4]

The Government's $2.4 million calculation is flawed for an independent reason. In order to generate losses of $2.4 million from the records marked as GX-202, the Government multiplied the number of entries on each list by the New York State Medicaid reimbursement values associated with the medicines listed. It did so, the Government asserts, because that is the method it used to calculate the losses attributable to Messrs. Reyes-Arias, Leyba, and Fernandez. (Gov. Br. at 13.) That argument ignores the fact that in each of those cases, unlike the instant case, the Government recovered numerous bottles of medication from the defendant or his stash house, at least some of which were found to have been dispensed by pharmacies in New York. (*Id.* at 13-14; *see* Mohan Decl. Exs. D, E, S, T, U, & V; Hr'g Tr. 141:23:142:4.) In no other instance of which we are aware has the Government advocated for loss estimates by performing math calculations against entries contained in records, the significance of which the Government has not proven by even a preponderance of evidence. Even assuming for the sake of argument that GX-202 does reflect a drug transaction for which Mr. Rigo could be held responsible, the Government presented no principled basis for applying New York State's (consistently high) Medicaid values, given its inability to determine to which state's Medicaid agency the drugs (if

---

[4] In fact, the manner in which the documents were maintained – haphazardly stuffed into notebooks with other miscellaneous papers, such as detergent flyers and two-year-old gas bills (*see* Hr'g Tr. 144:17-145:10) – permits an inference that Mr. Rigo occasionally received copies of inventory lists from sellers or "drugs wanted" lists from buyers (of the numerous identical copies the buyers and sellers disseminated), and, not seeking to participate, simply shoved these lists into notebooks with other inconsequential papers from the past, to be forgotten or discarded.

at all) were billed.  (Def. Br. at 33-34; Hr'g Tr. 136:21-137:4, 140:11-17, 142:5-12.)  Although the Government claims "there is no evidence in the record to support the defense argument that the New York State rates are somehow unrepresentative" (Gov. Br. at 23), it is the Government's burden (and not the defense's) to establish the loss amount, *see Cuti*, 2011 WL 3585988, at *5-6 (finding government failed to sustain its burden of establishing loss where, among other things, loss methodology was "inherent[ly] flaw[ed]" by expert's failure to "consider other data or other methodologies" for loss calculation).  Furthermore, Exhibit A to the Government's opening brief only demonstrates the wide disparity in reimbursement values across states and that they do not fall within a "parameter," as Agent Rao claimed.  (*See* Hr'g Tr. 138:22-139:4.)  According to that exhibit, New York reimburses $0.84 for each pill of Singulair, while New Jersey reimburses $5.19 – an amount over six times greater for the same medication.  (*See* Gov. Br. at 23 and Ex. A.)

        3.      Mr. Rigo's Statements Do Not Corroborate Mr. Reyes-Arias' Testimony.

The Government contends that the statements made by Mr. Rigo during the September 2012 meeting with Mr. Fernandez corroborate its view of Mr. Rigo as a "massive participant" in the scheme.  (The Government cites discussion on the tape allegedly showing that Mr. Rigo sought to coordinate a transaction with Mr. Reyes-Arias and Mr. Leyba for $25,000, that Mr. Rigo was owed $200,000 by Mr. Conrado Vasquez, and that Mr. Rigo referred to himself and Mr. Fernandez as "big people" (Gov. Br. at 9-11).)  Again, the Government asks the Court to engage in improper speculation.  Mr. Fernandez became a cooperating witness in 2012.  (Hr'g Tr. 25:24-26:6.)  There is no dispute that he was available to testify at the *Fatico* hearing as to the meaning of his statements on the tape recording and his understanding of what Mr. Rigo meant by his statements.  That the Government declined to call Mr. Fernandez to offer such evidence permits an inference that he would have testified in a manner that would have been

unhelpful to the Government.  *See United States v. Guzman*, 332 F. App'x 665, 667 (2d Cir. 2009) ("[W]hen a party has it peculiarly within its power to produce witnesses and fails to do so, the jury may infer that the testimony [of the missing witness], if produced, would be unfavorable to that party.'") (alterations in original) (quoting *United States v. Myerson*, 18 F.3d 153, 158 (2d Cir. 1994)).  In any event, the transcript of the tape recording, which the Government did introduce in evidence, depicts two old hands discussing the possibility of future dealings.  It sheds no light on – and therefore provides no corroboration of – the volume, frequency, and time period in which that Mr. Rigo dealt with a third party, Mr. Reyes-Arias.[5]

###      C.     The Government's Analysis of Mr. Reyes-Arias' Testimony Is Based on Assumptions Not Grounded in the Evidence.

In order to arrive at its loss figure, the Government takes Mr. Reyes-Arias at his word on the frequency and volume of his dealings with Mr. Rigo between 1998 and 2012 and applies two different calculations, depending on the time period.  For the earlier portion of that period, the Government multiplies 100 bottles per week by a Medicaid reimbursement value of $1,000 per bottle to arrive at a weekly loss estimate of $100,000, or a yearly loss estimate of $5,200,000.  For the latter portion, the Government uses an average sale amount of $5,000 per month (based on Mr. Reyes-Arias' testimony that he sold between $3,000 and $8,000 worth of drugs to Mr. Rigo per month).  It then applies a ratio of Medicaid reimbursement value to street value of 10:1.  (Gov. Br. at 19-20.)

But neither the Government in its opening brief nor any witness at the hearing provided *any* factual basis for applying the Medicaid reimbursement value of $1,000 to each of the tens of

---

[5] With respect to the $25,000 transaction contemplated by Mr. Rigo during that recorded meeting, that amount is an appropriate alternate basis for assigning loss where the loss amount cannot be reasonably determined.  *See* U.S.S.G. § 2B1.1 cmt. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."); *United States v. Tzolov*, 435 F. App'x 15, 17 (2d Cir. 2011) (summary order) (affirming use of gain realized as alternative measure under § 2B1.1 where the amount of loss could not reasonably be determined).

thousands of bottles for which the Government seeks to hold Mr. Rigo accountable at sentencing for the 1998-2005 period.[6] Nor did the Government advance evidence supporting a 10:1 ratio of street value to Medicaid value for purposes of its 2005-2012 loss calculation. The Government claims this ratio was "established" through Agent Rao's "summary charts." (Gov. Br. at 20.) Without a citation to any exhibit received in evidence or any testimony at the hearing, it is difficult to know which charts the Government is relying on for this proposition. Agent Rao testified about charts summarizing four controlled buys involving Mr. Leyba and Mr. Reyes-Arias, which were introduced as Government's Exhibits 209, 210, 213, and 214. (Hr'g Tr. 119:7 -124:11; Mohan Decl. Exs. S, T, U, & V.) But these charts contain no information about street values of the reflected transactions and simply demonstrate how the Government calculated the Medicaid reimbursement value of those transactions. The only witness on the subject of street value of these drugs was Agent Rao, and he testified regarding only the street value of those four controlled buys. (Hr'g Tr. 119:7-124:11.) But Agent Rao failed to provide any basis for extrapolating his observations of four controlled buys to the transactions between Mr. Reyes-Arias and Mr. Rigo, occurring over an eight-year period.

> D. **The Government's Newly Minted $30 Million Loss Figure Is Based on Speculation.**

In an effort to make its $7 to $20 million loss estimate appear less speculative, the Government suggests (for the first time in its opening brief) that the Court assign losses in excess of $30 million to Mr. Rigo. (Gov. Br. at 20, 23-24.) The Government suggests that this larger figure, in fact, likely understates the losses for which Mr. Rigo should be held responsible, because it does not include purported transactions between him and "anyone other than Reyes-

---

[6] Indeed, Mr. Reyes-Arias could not recall what types of medications, or even how many different kinds of medications, he had in his home at the time of his arrest (Hr'g Tr. 52:14-53:11), an event less than two years prior to the hearing, much less what types of medications he sold to Mr. Rigo over a seven-year period.

Arias." (*Id.* at 21.) In part, the Government cites testimony by Mr. Reyes-Arias to the effect that Mr. Rigo also did business with Mr. Leyba. (*Id.* at 8 (citing Hr'g Tr. 37:4-25), 21.) The Government also cites to statements made by Mr. Rigo during his September 2012 recorded meeting with Mr. Fernandez, in which he discussed Mr. Vasquez stealing money from him. (*Id.* at 21.) Here, too, the Government invites the Court to engage in improper speculation. Mr. Leyba's sentencing briefing makes clear that he made himself available to the Government as a cooperating witness. *See* Defendant's Pre-Sentence Memorandum at 5-6, *United States v. Leyba*, No. 13 Cr. 00055 (GBD) (S.D.N.Y. Aug. 15, 2014), ECF No. 29. To that end, he recorded over 20 phone calls with potential targets. *Id.* But, the Government chose not to sign up Mr. Leyba as a cooperating witness or offer his testimony at the hearing. Likewise, the Government declined to call Mr. Fernandez to testify as to his understanding of Mr. Rigo's statements at the lunch regarding, or Mr. Rigo's dealings with, Mr. Vasquez. That the Government declined to call either of these individuals again allows inferences that their testimony would have been unfavorable on the subject of Mr. Rigo's alleged dealings with other conspirators. *See Guzman*, 332 F. App'x at 667.

### III. Adopting the Government's Loss Estimates Will Create Unwarranted Sentencing Disparities.

The Government urges the Court to adopt its loss estimate in part because to reject it allegedly would create unwarranted sentencing disparities. (Gov. Br. at 22-23.) In that regard, the Government notes that the methodology it proposes the Court adopt in this case has been used "to determine loss throughout the investigation" and sentence "more than 60 defendants." (*Id.* at 22-23.) As an initial matter, the Government has not identified any instance in which a defendant in this investigation contested the losses for which the Government sought to hold him accountable. The willingness of six, 60, or even 600 defendants to accept loss calculations as

part of a settlement or plea is legally irrelevant to these proceedings and does not alter the requirement that the Court make a finding of loss amount that is "grounded in the evidence and not derived from speculation." *See Coppola*, 671 F.3d at 249.

Further, to adopt the Government's loss estimates as to Mr. Rigo in fact would increase, rather than decrease, the risk of unwarranted disparities. If the Court adopts the Government's estimate, Mr. Rigo will be exposed to a far longer sentence than would Mr. Fernandez, Mr. Reyes-Arias, or Mr. Leyba, notwithstanding the relative paucity of evidence against Mr. Rigo and the fact that each of these three defendants was more active in the Medicaid fraud than was Mr. Rigo. On two occasions in the spring of 2012, Government agents arranged undercover purchases and sales of second-hand prescription medications with Mr. Fernandez. (Hr'g Tr. 25:21-26:3.) Agents arrested Mr. Fernandez on June 5, 2012, and concurrent with his arrest, the Government executed a search warrant at his storage facility, a consequence of which it recovered 10,369 bottles of medication with a Medicaid reimbursement value of over $6 million, as well as bottles, bags, and other supplies. (*Id.* at 18:11-19:17, 29:12-20, 112:6-8.) In August 2012 and again in November 2012, Mr. Leyba made two recorded, undercover sales of a total of 121 bottles of second-hand prescription drugs to Mr. Fernandez, with a combined Medicaid reimbursement value of approximately $98,000. (*Id.* at 26:13-22, 119:22-120:23; Mohan Decl. Exs. U (GX-209), V (GX-210).) Agents arrested Mr. Leyba on December 20, 2012, and, concurrent with his arrest, the Government executed a search warrant of his apartment, recovering 482 prescription drug containers, with a Medicaid reimbursement value of over $86,000. (Mohan Decl. Ex. E (GX-219); Ex. C (Rao 3502-1) at 14:22-15:4.) Similarly, in October 2012 and again in December 2012, Mr. Reyes-Arias made two recorded, undercover sales of a total of 94 bottles of second-hand prescription drugs to Mr. Fernandez, with a

Medicaid reimbursement value of $105,000. (Hr'g Tr. 27:2-8, 117:10-118:15; Mohan Decl. Exs. S (GX-213), T (GX-214).) On December 20, 2012, agents arrested Mr. Reyes-Arias and executed a search warrant of his apartment, seizing 481 prescription drug containers – including bottles of medication, patches, syringes, and cleaning supplies – with a Medicaid reimbursement value of over $73,000. (Hr'g Tr. 121:23-122:21; Mohan Decl. Ex. C (Rao 3502-1) at 20:19-26; Mohan Decl. Ex. D (GX-218).)

Yet all three of these defendants will likely receive sentences far below the sentence that would flow from the Court's adoption of the Government's loss estimates in this case. On September 4, 2014, the Honorable George Daniels sentenced Mr. Leyba to a sentence of six months of home confinement and three years of probation. Judgment, *United States v. Leyba*, No. 13-Cr-0055 (GBD) ("*Leyba*") (S.D.N.Y. Sept. 4, 2014), ECF No. 31; *see* Order of Restitution, *Leyba* (Sept. 4, 2014), ECF No. 32 (ordering payment of restitution in the amount of $184,123). Mr. Fernandez is due to be sentenced in January 2015; Mr. Reyes-Arias was scheduled for sentencing on October 8, 2014, but of our review of the docket does not disclose whether he has been sentenced or what sentence he received. By dint of Mr. Fernandez and Mr. Reyes-Arias each having received a cooperation agreement, each will likely advocate for a sentence of time served or probation. Mr. Reyes-Arias testified that this was his intention. (Hr'g Tr. 89:9-10.)

## CONCLUSION

For the reasons stated above, Defendant Bladimir Rigo respectfully requests that the Court find that the loss estimates proffered by the Government in this case are overstated and the Government has sustained its burden of proving losses attributable to Mr. Rigo of no more than $25,000.

Dated: New York, New York
November 24, 2014

                                  Respectfully submitted,

                                  SPEARS & IMES LLP

                       By: /s/ Joanna C. Hendon
                           Joanna C. Hendon
                           Sharanya Sai Mohan
                           Alicia K. Amdur
                           51 Madison Avenue
                           New York, New York  10010
                           Tel:   (212) 213-6996
                           Fax:   (212) 213-0849
                           jhendon@spearsimes.com

                           *Attorneys for Defendant Bladimir Rigo*