EC2PRIGC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              13 CR 897 (RWS)

5   BLADIMIR RIGO,

6                Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            December 2, 2014
9                                           11:13 a.m.

10

    Before:
11
                        HON. ROBERT W. SWEET,
12
                                            District Judge
13

14                          APPEARANCES

15

    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  EDWARD DISKANT
         Assistant United States Attorney
18
    JOANNA HENDON
19  ALICIA K. ANDUR
    SHARANYA SAI MOHAN
20       Attorneys for Defendant

21

22  ALSO PRESENT:  SELVA NEBBIA, Spanish Interpreter
                   ERICA DE LOS RIOS, Spanish Interpreter
23

24

25

EC2PRIGC

1          (In open court)

2          THE COURT:  Please be seated.

3          (Case called)

4          MR. DISKANT:  Good morning, your Honor.  Edward

5     Diskant for the government.

6          MS. HENDON:  Yes, good morning, your Honor.  Joanna

7     Hendon, and with me are Alicia Andur and Sharanya Sai Mohan for

8     Mr. Rigo, who is also here.

9          THE COURT:  Yes.  I guess the government has the

10    burden.

11         MR. DISKANT:  Yes, your Honor.

12         THE COURT:  I'll hear you.

13         MR. DISKANT:  Thank you, your Honor.  And I want to

14    start with that burden because I think it is important, and I

15    know the Court is familiar with it, but to guide our discussion

16    today, which is that the government's burden in this respect is

17    a preponderance standard, which is a more-likely-than-not

18    standard, and the factual finding the Court is required to make

19    is a reasonable estimate of loss here.

20              And that's a very important thing to keep in mind

21    because both the Second Circuit case law and the guidelines

22    themselves expressly invite the Court to engage in any number

23    of methods that amount to approximations or estimates.  Indeed,

24    every time the Second Circuit has been asked by a defendant to

25    impose a higher burden on the government, to force the

EC2PRIGC

1   government to prove with exactitude something like the loss

2   amount, the Second Circuit has rejected that, both because it

3   finds due process doesn't require it and it talks of a need to

4   preserve judicial economy, which is certainly something to keep

5   in mind here.

6        So with that sort of by way of overview, let me talk

7   briefly through what the government believes establishes its

8   more-likely-than-not burden with respect to the loss amount it

9   would encourage the Court to find here, which is that of more

10  than $7 million.

11       Now, going to the evidence, and I want to talk through

12  the recording that the government offered and the drug ledgers

13  that the government offered and, finally, the testimony of

14  Mr. Reyes-Arias.  I think it bears mention that a lot is not in

15  dispute here.  There's, obviously, no dispute that the

16  defendant was a participant in this scheme.  He has pled guilty

17  to that.  The Court has heard a recording in which the

18  defendant discusses that.

19       I think there's also no dispute that the defendant was

20  involved in this scheme for quite a number of years.  Again,

21  the defendant's own guilty plea allocution establishes his

22  involvement in this for quite a number of years.  There's

23  discussion on the recording about that.

24       THE COURT:  Well, really, we're talking about two

25  years -- I'm talking now about the plea.  Two years and, what

EC2PRIGC

1   was it, many years before?

2          MR. DISKANT:  I believe what he said was that he was

3   principally involved between 2012 -- 2010 and 2012 with some

4   involvement before that, yes.  It's during the years mainly

5   2010 to 2012 but also in previous years.  That's what he said

6   in his guilty plea.

7          And the Court has also heard testimony from

8   Mr. Reyes-Arias.  The government pointed the Court to proffer

9   notes with another defendant, Rogelio Leyba, who substantially

10   corroborates that the involvement actually spanned back to the

11   late 1990s or early 2000s.  But even if the Court were to focus

12   just mainly on those 2010 to 2012, it is quite apparent from

13   the defendant's own words that his involvement in this scheme

14   spanned considerably beyond the single conversation that the

15   defendant would have the Court to focus on.  Again, that really

16   doesn't appear to be in dispute here.

17          And the third broad issue that the government would

18   submit that should not be in dispute here is that the defendant

19   was a big-time player in this scheme because, again, the

20   defendant tells you that himself.  There's a recorded meeting

21   between the defendant and Hermendigildo Fernandez, who's known

22   as "Pancho," in which they talk about themselves as the two big

23   players in New Jersey.  Those were the defendant's own words.

24          He draws that comparison himself, which is highly

25   relevant in this context for two reasons.  The first is that

EC2PRIGC

1    the guidelines expressly invite the Court to use that sort of a

2    comparison in reaching a loss amount.  So to the extent the

3    Court is concerned with the dearth of evidence -- we don't

4    believe there is one, but with a lack of evidence with respect

5    to this defendant's specific participation, the guidelines

6    expressly invite the Court to calculate loss by drawing a

7    comparison to a similar operation.

8           And as the Court knows, Mr. Fernandez had more than

9    $6 million worth of these medications in a storage locker at

10   the time he was arrested.  The defendant, himself, tells you

11   that is a similar operation.  They are the two big-time players

12   in New Jersey.  They are buying from the same suppliers.  They

13   are selling to the same customers.  That, alone, provides the

14   Court with a basis in the guidelines themselves for finding a

15   loss amount of between two-and-a-half and $7 million.

16          Let's talk a little bit more about that recording

17   because on that recording there are actually at least two

18   specific transactions discussed.  The first is the

19   $25,000 transaction that the defendant concedes he is

20   responsible for, and the details of that transaction are

21   critical in this context for a number of reasons.

22          First, the defendant plans to purchase those drugs

23   from Arcadio Reyes-Arias and Rogelio Leyba.  That is the

24   government cooperator, who took the stand and testified to

25   selling to the defendant and another man that the Court has

EC2PRIGC

1    heard also sold to the defendant.  The defendant tells you

2    himself he was buying from those two people.

3          The defendant also tells you himself the types of

4    quantities he was buying.  He's going to buy $25,000 in street

5    value worth of these medicines at a time.  That is entirely

6    consistent with the testimony the Court heard about the

7    quantities and volumes that were being sold to this defendant.

8          Now, with respect to loss amount, $25,000 isn't the

9    end of the story because that's the street value.  The actual

10   loss to Medicaid, the government would submit, is approximately

11   ten times that.  And we offered during the hearing itself, and

12   it's highlighted in our brief, how it is we get from the street

13   value to the Medicaid-reimbursement value.  And the clearest

14   and most direct way that we get there is through just taking a

15   look at a number of controlled purchases of drugs that were

16   made during this case.

17         So, for example, the Court heard about four different

18   times in which the government purchased street medicine from

19   either Arcadio Reyes-Arias, who testified here, or Rogelio

20   Leyba.  And in each time the government purchased approximately

21   $5,000 in the street value worth of medicine and in each case

22   the government got approximately $50,000 or ten times that in

23   Medicaid reimbursement value.  That is the amount of value

24   these drugs had when Medicaid paid for them in the first

25   instance.  That is the loss value in this case.

EC2PRIGC

1          So when the defendant buys $25,000 worth of medicine

2     at street price from Reyes-Arias, he is contributing to a loss

3     of approximately $250,000 to Medicaid because that's what

4     Medicaid paid for those drugs.  So that's the first loss that

5     is discussed expressly on the recording.

6          But the second loss that is discussed expressly on the

7     recording is where the defendant talks about how another scheme

8     participant, someone named Conrado Vasquez, stole $200,000

9     worth of medicine from him.  Again, he's talking about street

10     value; so $200,000 worth of medicine is approximately

11     $2 million in Medicaid reimbursement value.  That's the deal

12     that the defendant did with Conrado Vasquez that went bad.

13          So there alone you have approximately $2.25 million in

14     loss.  That is the $250,000 on the $25,000 deal, and the $2

15     million on the $200,000 with Conrado Vasquez.  Going no

16     further, you have $2 million worth of losses that the defendant

17     tells you about himself.

18          By the way, you know that Medicaid is a victim here

19     because the defendant admitted to that.  That was part of his

20     allocution.  He concedes that he knew that Medicaid was paying

21     for these bottles.

22          There's been the drug ledgers, and the drug ledgers,

23     the government would submit, establish an additional loss of

24     approximately $2.4 million, and we've excerpted these as

25     Government Exhibit 202.  Government Exhibit 202 is

EC2PRIGC

approximately 12 to 13 pages.  They were recovered from a

series of notebooks that the defendant concedes were his.

These are notebooks that were recovered from the

defendant's bedroom.  They had the defendant's other personal

items in them, including doodles by his children and

grandchildren, receipts and bills.  And by the way, those

receipts and bills make very clear that these notebooks were

recent.  That is, the bills were for the months leading up to

his arrest.  These are not historical items.  These are his

current business dealings.

The government would submit that the only logical

inference to be drawn from these documents is that these are

drug ledgers accounting for his involvement in the scheme.

That is where he lists 35 Atripla, a hundred Truvada, 70

Reyataz.  He's referring to bottles of the medicine that he's

either buying from someone or selling to someone.

And the defendant makes a great deal about the fact

that the government doesn't have a handwriting expert.  We

would submit that we don't need one because given the fact that

the defendant is charged with participating in a conspiracy, it

really doesn't matter where the defendant created these lists

or these lists were given to the defendant by someone who was

supplying drugs to him.  The important point is they establish

his involvement in the scheme, and they give the Court some

context, critically for these purposes, about the volume of his

EC2PRIGC

involvement.

So for example, Page 3 of Government Exhibit 202 is a list that the Court heard about from Arcadio Reyes-Arias. You'll recall that Reyes-Arias testified to selling these bottles of medicine to the defendant, and he told you, this is my handwriting.  I created this list as a list of the bottles that I had for sale, and the defendant wrote in the prices he was willing to pay for them.

So is all of the handwriting in these documents the defendant's?  No.  The government has never suggested as much. The point is that these documents establish the volume with which the defendant was participating.

So the government took these documents, and they applied the New York State Medicaid reimbursement value to them, and with those values, we calculated a total Medicaid loss for the bottles listed in these drug ledgers of approximately $2.4 million.  We would submit that that's another $2.4 million in loss amount added to the $2.25 million discussed on the recording, that brings us to a total of at least $4 million in loss to Medicaid by the defendant.

And by the way, it bears mention that the government's inference, the inference we are urging the Court to draw from the drug ledgers, is not only consistent with common sense, it's consistent with the other evidence that the Court heard in the hearing.  It's consistent with the defendant describing

EC2PRIGC

himself as a big-time player in this scheme.  It's consistent

with the testimony from Arcadio Reyes-Arias who told you that

he was selling these drugs to the defendant in volumes that are

very, very comparable to the ones listed in this drug ledger.

So, for example, Page 3 of this drug ledger, which

Mr. Reyes-Arias told you was his handwriting, lists a total

sale of approximately $11,605 in street value of drugs.  That's

entirely consistent, in fact it's a little higher than

Mr. Reyes-Arias' estimate of his average sales to the

defendant.  That's four-and-a-half, approximately, million

dollars in loss alone, even if the Court were to essentially

ignore the cooperator testimony and focus solely on the records

in this case and solely on the recording of the defendant's own

voice.

But the Court did hear if Mr. Reyes-Arias, and we

would submit to you that Mr. Reyes-Arias was truthful with you

to the best of his ability; that he has told the government

essentially the same narrative from the outset, which is that

he began working for this defendant in the late 1990's or

approximately 2000, that he worked for him in a bodega in

Newark, New Jersey, buying approximately 100 bottles of these

medicines a week and he did so until 2005.

And in 2005 he went out on his own.  He started his

own bodega, and he continued to buy these medicines and to sell

them both to the defendant and Hermendigildo Fernandez, that is

EC2PRIGC

Pancho.  He has always been consistent about the fact that
starting at that point, Pancho was his primary customer, but
that he also sold to this defendant.  He said that on direct.
He said that on cross-examination.  He said that in his
proffers with the government.

          The core issue for the Court to focus on is the amount
he was selling to the defendant, obviously, and the estimate
that he provided to the Court was approximately 3,000 to
$8,000 once a month.  So we took that amount, we took an
average value of approximately $5,000, somewhere between three
and $8,000.  And knowing that the street value is about a tenth
of the Medicaid reimbursement value, we just did the math and
we laid that out in a chart for the Court in our brief.  It's
Page 20 of our brief, which lays out that the defendant was
receiving approximately $600,000 in Medicaid reimbursement
value medicines from Mr. Reyes-Arias each year, and that
doesn't take account of medicines he was buying from other
sources, just the bottles he was buying from this defendant.

          That comes out to a total rough loss of about
$4.8 million just for the period 2005 to 2012.  So taking that
$4.8 million and adding it to the approximately $4.5 million
covered in the drug ledgers, covered in the recording, the
Court is already very, very comfortably in that 7 to
$20 million range, which is the range the government is urging
the Court to find.

EC2PRIGC

1          And that doesn't even touch the hundred or more

2     bottles per week that the witness was buying for the defendant

3     between 2000 and 2004.  It doesn't include any of the bottles

4     that Rogelio Leyba was purchasing and selling to the defendant.

5     It doesn't include any of the bottles the defendant was

6     obtaining from other people, other people who worked at his

7     bodegas.  It is a conservative estimate, it is an estimate

8     based on the evidence, and it is a reasonable estimate of loss

9     in this case.

10         And let me just finally note, with respect to

11    Mr. Reyes-Arias' testimony, again, the ways in which it is

12    corroborated by the other evidence in the case because I'm sure

13    there's going to be quite a bit of attack on him and his

14    testimony, as we have seen in the defense brief.  And we would

15    simply ask the Court to evaluate the testimony on its own.

16         It is corroborated by the drug ledgers, which as noted

17    seem to show sales of exactly the amounts or precisely exactly

18    the amounts that the witness described selling to the

19    defendant.  It is consistent with the defendant's description

20    of himself as a big-time player.  It is consistent with the

21    recording in which the defendant himself talked about buying

22    medicine from the witness.  He was going to buy $20,000 in

23    street value worth of medicines from the witness at a time.

24         It's clearly entirely consistent with what

25    Mr. Reyes-Arias told you about himself, his conduct and his

EC2PRIGC

involvement with the defendant.  And one final note in that

regard, it bears particular mention that Mr. Reyes-Arias has

very, very little incentive to inflate the numbers because

Mr. Reyes-Arias is going to be held responsible for all of

those losses himself.  So to the extent that he is

exaggerating, to the extent that he's telling you about sales

that didn't occur, the joke, I would submit, is ultimately on

him because he will be held responsible for all of those losses

as part of his sentencing as well.

         Unless the Court has other questions, I'm happy to

rest on my submission.

         MS. HENDON:  May I, your Honor?

         THE COURT:  Yes.

         MS. HENDON:  Thank you.  Thank you, your Honor.  I'd

just like to address a couple of the comments made by the

government this morning, and it's interesting to me that the

government's theory of loss just keeps shifting in this case.

We came to the Fatico hearing and I actually subpoenaed Pancho,

Mr. Hernandez, to be here outside the courtroom because the

government's theory initially had been that the warehouse of

drugs was somehow going to be connected to my client or the

government would seek to associate that warehouse of drugs with

my client.  And that was the big $6 million megillah that was

driving the loss calculation that found its way into the draft

PSR.

EC2PRIGC

1          So Mr. Fernandez was in court all day.  Of course, I

2     had no desire to call the government's cooperator on my case,

3     but he was there in case I had to resort to some sort of

4     rebuttal testimony on that because, of course, his

5     3500 material was full of disclaimers about my client's

6     involvement with the warehouse.

7          For the first time, we're hearing in the briefing and

8     in oral argument today that the Court should ascribe a

9     two-and-a-half million dollar loss to some discussion on the

10    tape recording of a man named Conrado.  Now, the government

11    didn't advance any proof or argument on that point, as best I

12    can recall, at the hearing.

13         And I invite your Honor to look at Pages 28 and 29 of

14    Government's Exhibit 211-T, which is the transcript in

15    evidence.  Were this or any Court to premise a loss calculation

16    on the $200,000 event discussed on that tape, based on the

17    prosecutor's argument, I think that would be reversible error.

18         There is nothing in the transcript that affords the

19    Court, by a preponderance of the evidence, a basis for

20    concluding that this has anything to do with medicines other

21    than that he's talking to a competitor about the drug business

22    generally.  The statement in the transcript at Page 29 by my

23    client is -- Mr. Fernandez says on Page 29:  "Oh, this guy

24    spoke to me one day..."  I think they're speaking over each

25    other.  And Mr. Rigo says: "Between Conrado and my

EC2PRIGC

brother-in-law, they stole from me.  They stole from me almost

$200,000."  Mr. Fernandez says:  "They did?"  And Mr. Rigo

says:  "Yes.  Right there, with those two, I was done."

There's no discussion of what the theft of the money

was about.  Mr. Rigo has bodegas.  He has legitimate

businesses.  Even when he was in the drug business, he had

legitimate businesses.  The government did nothing at the

hearing, there's nothing in the record, to establish who this

person Conrado is.

The government introduced evidence at the hearing

about a defendant in the drug business named Conrado, but they

did nothing with this transcript at the hearing.  They knew

Mr. Fernandez, who is the party to this conversation with my

client, was here all day.  If they wanted to establish a basis

for the Court making loss determinations based on anything said

in the transcript, they had a live witness whom they could have

called and asked questions to, and that witness could have laid

a foundation for the Court making such a finding, but they

didn't do that.  And we have these stray words in a transcript.

Mr. Diskant repeatedly said your Honor heard a tape

recording.  The government didn't play a tape recording for the

Court.  We have the government's transcript.  That's fine.

It's in evidence, but the stray reference to my client having

been stolen from, robbed by his brother-in-law, as to whom

there's no evidence in the record of any kind and someone named

EC2PRIGC

Conrado, is an inadequate basis for leaping to a $2.5 million
loss figure.  That's just inviting speculation, and I think the
Court can be comfortable that that is exactly what it is by the
lateness of the government's proffer on this point.

Now, before I address the question of reasonable
estimates of loss, I'd like to make a broader point about this
litigation.  Mr. Rigo, early on, announced that he'd like to
plead guilty to the indictment and put the government to its
proof regarding loss.  What happened next?  The probation
department was given a loss estimate of between 7 and
$20 million.  Fine.

We came to the hearing prepared to establish the lack
of credibility in that estimate, to unpack the government's
case, to put the government to its burden, and I think we did
that.  And what happened next?  We got the government's
post-hearing brief in which the number is now $30 million, not
$20 million.  So we put in a -- we, ourselves, responded to the
proof the government adduced at the hearing which, as I said,
makes for a thin but legally adequate basis for conviction, but
does not support the loss estimates proposed here.

We put in our main brief, and I think we did a pretty
good job, Mr. Rigo did a pretty good job in his main brief,
focusing the Court on the government's defect in the case and
on the controlling legal principle.

What happened next?  We got a reply brief suggesting

EC2PRIGC

1    that Mr. Rigo should have his acceptance points taken away from

2    him.  Now, I raise this because I think the Court should

3    consider, in assessing the credibility of the government's

4    presentation from start to finish, this desire to intimidate,

5    frankly, and the will to punish, in this case, a defendant who

6    has asked only for the opportunity to have a hearing and

7    cross-examine live witnesses and cross-examine the government's

8    proof.

9             Now, with that, I'd like to turn to the concept of

10   reasonable estimate.  What is a reasonable estimate?  Of

11   course, that is what the Court must determine.  I do agree with

12   the government on that point.

13            And I want to turn now -- I want to turn, before I get

14   to the government's loss figures which are really the main

15   event here.  I want to start with the $25,000 figure that we

16   referenced in our brief, and I want to make sure that the Court

17   did not misconstrue that as an effort by the defense to be cute

18   here.  We do acknowledge, and our client, in pleading guilty,

19   acknowledged that he was involved in this business for a period

20   of time, for between 2010 and 2012 and at other times.

21            So I'm not standing here, your Honor, and saying that

22   if I were to proffer to the Court -- if I were to proffer to

23   the Court a reasonable estimate of loss, and I were to sit and

24   huddle with my client and have him tell me everything he did,

25   that I would come up with $25,000 or even $250,000.  But it's

EC2PRIGC

```
 1    not my burden to present a reasonable estimate of loss.  And
 2    what I meant to establish by putting that figure in, your
 3    Honor, is that that's what the government has established.
 4    That is all they've established.
 5          Now, they certainly disagree with that.  They think
 6    they've proven much more, and I think I -- I hope I've
 7    dispensed with these arguments that we're hearing today, that
 8    those 2.5 million lurking on Page 29 of the transcript is not
 9    there, and it would be speculation for the Court to find it
10    there.  There's discussion of a theft of $200,000.
11          Putting aside the transcript -- well, one other point
12    about the transcript.  The government today argues that because
13    Mr. Rigo refers to Pancho and himself, we're the two big guys
14    in New Jersey, the government argues that the Court should
15    ascribe $6 million in loss value to Mr. Rigo because that's
16    what they found in Mr. Fernandez's warehouse.  That, too, I
17    think, is asking the Court to engage in impermissible
18    speculation, particularly when Mr. Fernandez was here all day.
19    And if he and Mr. Rigo are the two big guys in New Jersey and
20    they've been running parallel operations, as the government
21    asserts but as to which there's no evidence at all other than
22    this stray remark about we're the two big guys, which we didn't
23    even hear in Spanish the tone of voice, the tenor in which it
24    was said, but other than that stray remark, there's nothing to
25    suggest that these two men have parallel operations.
```

EC2PRIGC

 1              And if the government had evidence that it did, it

 2     would have been in the mouth of Mr. Fernandez, whom they could

 3     have called and didn't.  So constructing multimillion dollar

 4     loss figures on the basis of the words in an English

 5     transcription of a tape recording, I don't think it was put in

 6     evidence, the Court certainly didn't hear it, when we had the

 7     cooperating party to the conversation available to the

 8     government, who wasn't called, would be improper and

 9     speculative.

10              So I think the transcript does nothing more than what

11     we've said all along it does, which is establish why this man

12     pled guilty.  He couldn't go to trial with evidence like that,

13     and he needed to take responsibility for his involvement in

14     this crime, and he has.

15              Now, back to where the government focused its energies

16     at the hearing, anyway.  They had two bases for a so-called

17     reasonable loss estimate.  The first came from Chino -- I'm

18     going to call him Chino because I flip his name around all the

19     time and get it wrong.  First came from Mr. Reyes-Arias, and

20     that's where we get the $30 million figure.

21              The second basis for a purported reasonable estimate

22     are these drug ledgers, and from that second basis, the

23     government asks the Court to find $2.4 million in losses.  And

24     I'm going to focus my remarks on those two estimates because

25     that was the focus of the Fatico hearing and of the briefing.

EC2PRIGC

1          Neither figure represents a reasonable estimate of

2     loss.  I'm going to start with the Chino testimony, and I won't

3     dwell on it because I think our brief verged on the repetitive

4     on this point, your Honor.  Our briefs laid out in detail all

5     the reasons the Court should reject the testimony and the math

6     that flows from the testimony of, and the math that flows from

7     Mr. Reyes-Arias.

8          First, he lied to the Court.  He was reckless and

9     dishonest enough to lie about testimony given under oath at his

10    guilty plea.  Secondly, his testimony about what he did with

11    Mr. Rigo drifted all over the place.  For the 2000 to 2004

12    period, the government is sticking with this 100 bottles a week

13    number, and that's what they base all their math on.  And I'm

14    going to come back to that.

15         But Mr. Reyes-Arias also testified at the hearing that

16    the number could be 60 to 80 bottles a week, 60 bottles a week,

17    70 bottles a week, 80 bottles a week.  He also testified at the

18    hearing that he sold to Mr. Rigo not too frequently.  He also

19    testified at the hearing that he never told the agents how many

20    bottles a week he sold to Mr. Rigo.  He also testified at the

21    hearing he never knew how many bottles he sold to Mr. Rigo

22    between 2000 and 2004.

23         So this is a man whose testimony is all over the

24    place.  This is a man who lied to the Court about important

25    matters, and he lied to the Court about matters he recognized

EC2PRIGC

on the stand were going to be harmful to the government's case.
And from that, we can infer that he was prepared to lie or at
least exaggerate about matters that might be helpful to the
government's case.

Now, what is wrong with Mr. Rigo -- pardon me, with
Mr. Reyes-Arias beyond the fact that he lied, beyond the fact
that his testimony about Mr. Rigo is all over the place?  Well,
there's no evidence to corroborate what he said about the
number of bottles and how frequently he sold.  He didn't keep
any records of that.  That's what he told the government.

I find it very hard to believe that in a career
spanning, I don't know if it's 11 or 12 years, the man didn't
have a shred of paper showing who his customers were or amounts
owed or due, but that's his testimony.  So he doesn't have
anything connecting his business to Mr. Rigo other than the
line he testified about in the ledgers that came from
Mr. Rigo's house.  But that single line falls far short of
corroborating testimony spanning 12 years of weekly and monthly
transactions.

Now, for the 2000-2004 period, as I mentioned, he --
testimony was all over the place, but the government has seized
on and used in its calculations the 100-bottles-a-week figure.
For the eight years between 2005 and 2012 he testified that he
sold between 3,000 and $8,000 worth of drugs on a monthly basis
to Mr. Rigo.

EC2PRIGC

1          That's what he said from the witness stand here, but

2     two years earlier he told Agent Rao, when Agent Rao was getting

3     the arrest warrant for Mr. Rigo, that he sold to Mr. Rigo every

4     other month, half as often.  So with respect to the earlier

5     period and the later period, his testimony is unreliable.

6          There's another problem with the government's

7     $30 million loss estimate, beyond Mr. Reyes-Arias' lack of

8     credibility, beyond the fact that there are no documents

9     corroborating that volume or nature of business.  The problem

10    is it's not, in fact, a reasonable estimate, your Honor.

11         And if you look at the government's brief, where they

12    have these charts, I think the prosecutor directed the Court to

13    them earlier, you see that for the 2000 to 2004 time period,

14    the government generated its loss figure by taking 52 weeks a

15    year of business by Mr. Reyes-Arias, over the full five-year

16    period, sometimes the 100 bottles a week figure, using the

17    government's average Medicaid reimbursement value of $1,000 per

18    bottle, pardon me -- per bottle.

19         Now, how is taking 100 bottles a week as the value

20    you're going to use and applying it to every week for five

21    years an estimate, let alone a reasonable estimate?  It's not a

22    reasonable estimate.  It's an effort to ring from the evidence

23    the maximum loss.  Now, you've got a witness who has said on

24    some occasions it's between 60 and 80 bottles a week.  On some

25    occasions he has testified it's 100 bottles a week.

EC2PRIGC

         He's also testified it was not too frequently that he
dealt with Mr. Rigo, and he's also testified that he doesn't
even know how many bottles a week he sold to Mr. Rigo.  So when
you take all that testimony, wouldn't a reasonable estimate
say, well, okay, I'm going to take this 2000 to 2004 period and
I'm going to say for some period of time I'll use a hundred,
for some period of time I'll use 60.

         I remember he testified, the prosecutor might have
said, I remember my cooperator testified he traveled sometimes,
he was home drunk sometimes.  So maybe I won't apply my figures
to all 52 weeks.  I mean, that's how you get to a reasonable
estimate.  I mean, you take -- if I'm the prosecutor, you take
everything your witness has said, like it or not like it,
there's stuff that's good for you, there's stuff that's not so
helpful to you, you put it all together and say, look, I can be
really aggressive and take route one, I could be really wimpy,
make the defendant's day and take route three, or I could take
the middle ground and take the more aggressive testimony of my
witness and discount it by various factors because I'm trying
to arrive at a reasonable estimate.  Not, I'm trying to ring
from this very thin case the last drop of jail time, the last
dollar humanly possible.

         Now, the same problem obtains for the later period of
this $30 million loss estimate, which isn't a loss estimate.
It's basically applying math in the most aggressive way

EC2PRIGC

possible.  Now, here, between 2005 and 2012, we're not using a

bottles-per-week estimate.  We have the cooperator saying,

well, I sold somewhere between 3,000 and $8,000 worth of drugs

to Mr. Rigo, and the government says, okay, I think I'll pick

5,000 because that's in the middle.  That seems fair.

It's kind of low middle, but this is a witness who, in

connection with getting the complaint sworn out, says he did

that every other month, and in the Fatico hearing says he did

it every month.  So does the government come to the Court and

say, look, I've taken the $5,000 number because I'm a

reasonable guy, and I'm applying an every-month figure for a

certain period of time for every month within this eight-year

period and I'm applying every-other-month math calculation for

other times?  No.

I mean, on what business did they chose to pick the

most favorable, aggressive favorable components of the

cooperator's testimony and wrap it into a calculation and dress

it up and call it a reasonable estimate.  Just because they

call it -- it's not even an estimate.  An estimate would apply

discounts based on the vicissitudes of the witness' memory and

testimony.  They didn't do that here.  It's not an estimate,

and it's not reasonable.

Now, this ten-to-one value is particularly vicious,

and of it the Court should be particularly skeptical.  And what

I'm referring to here is the notion that where one sees or

EC2PRIGC

hears reference to, you know, a thousand dollars changing

hands, the Court should assume a Medicaid reimbursement of

10,000 changing hands.

It is true that, as the prosecutors told the Court,

that with respect to four of the undercover buys, I think two

by Mr. Fernandez and two by Mr. Reyes-Arias, you can look at

the government's -- you know, the FBI records or notes and see

a ten-to-one ratio.  But we're not talking about four

transactions that were done in the summer of 2012.  That's what

Mr. Diskant is referring to, four transactions done in the

summer of 2012.

That ten-to-one ratio is being applied over a 12- or

13-year period without any testimony from Mr. -- from Agent Rao

about the basis for doing that.  So I assume, I have no reason

to doubt, that if you look at the drugs and the money that

changed hands in the summer of 2012 in those four deals, that

we see a ten-to-one ratio.

So presumably, someone in the Department of Justice or

in Medicaid could say, you know, the way the street was working

or the way the business was working in the summer of 2012,

that's what we saw, a ten-to-one ratio.

Well, is that what we saw in the prior year, 2011, or

2010 or 2009 or '8 or '7 or '6 or '5 or anything back to 2000?

Because if it's not, maybe when we do our math for the Court,

we should use the ratio that applied in those earlier years.

EC2PRIGC

1    And if we, in fact, don't know what those ratios were because

2    we didn't think it was important to look them up, we should

3    surely discount the values we're giving the Court so the Court

4    understands we haven't put in the record a basis for the

5    ten-to-one ratio applying over the full period in this case.

6         I concede it applies in the summer of 2012, but the

7    government didn't elicit from its witness, why apply it in

8    other years?  Wouldn't it vary?  Isn't it a market?  Don't the

9    value for drugs go up and down?  Don't Medicaid reimbursement

10   values go up and down?

11        I don't know the answer to any of those questions.

12   And if you don't know the answer to those questions, there's no

13   answers in the record, then oughten your loss figures be

14   discounted?  Because what if ten-to-one didn't apply in those

15   other years?  Because if it didn't, what you're doing with

16   these numbers is ruthless, and premised on speculation, which

17   is sort of the legal problem.

18        Now, the government's treatment of the ledgers suffers

19   from similar problems, and I guess what I'd like to do, your

20   Honor, may I hand to the Court a copy of Exhibit 2002, which is

21   a copy of the ledgers and a copy of exhibit -- pardon me, 202,

22   not 2002, 202, and a copy to Exhibit 212 which is the chart by

23   which the government purports to come up with this $2.4 million

24   value.  May I provide those to the Court?

25        I think the Court recognizes these records.  202 are

EC2PRIGC

1    the lists that were taken from my client's residence when he

2    was arrested, and 212 is the chart that Agent Rao and the

3    government put together showing how they assigned dollar values

4    to the items on Exhibit 202.  Now, I've made a little

5    PowerPoint, but I don't have a computer.  If I could just hand

6    the Court a copy and Mr. Diskant a copy and ask you to follow

7    along.

8              THE COURT:  Sure.

9              MS. HENDON:  I think this will allow me to go a little

10   more efficiently and quickly than if left to my own devices.

11   Thank you.  This is marked as defense one.

12             So just pretend there's a screen, and I have a clicker

13   and it's colorful.  So I think I sort of lay things out

14   pretty -- in a straightforward way, at least this is our

15   position, your Honor.  If you look at the first page,

16   Government's Exhibit 202 consists of 13 pages, 12 of which are

17   unique.  What that means is that one of the pages is simply a

18   photocopy of the other.

19             So the parties, when we sit and calculate values

20   associated with these pages, really focused on 12 pages, not

21   13.  And the government elected to rely on ten of these 12

22   unique pages to generate the 2.4 million loss figure in

23   Government's Exhibit 212.

24             If you turn to the next page, Page 3, in order to

25   generate the $2.4 million in losses using the ledgers from

EC2PRIGC

1    Mr. Rigo's home, the government assigned losses as follows, and

2    you can just find these values on Exhibit 212.  We just broke

3    them out here.  And what you're looking at on the left-hand

4    column are just the Bates numbers, the Bates page numbers for

5    the ledgers.  So the government, using its methodology, reaches

6    a total of $2.4 million across those ten pages.

7            If you turn to the next page, Page 4, I want to show

8    you what the government did here, and this comes right from

9    Agent Rao's testimony.  He said he made the chart.  So we've

10   blown up a copy of one of the lists.  It's Bates page 67.  And

11   we've circled just randomly two of the entries here, and

12   Mr. Reyes-Arias testified when he looked at one of these lists,

13   that he provided the list he was shown to Mr. Rigo, a list of

14   medications that he had available for sale, and he said

15   Mr. Rigo, in turn, would fill in the prices he'd pay for them.

16   And that's at transcript 4810 through 4905.

17           So here, you see the first item blown up in a box,

18   Truvada, the drug name; 46 would be the quantity; 180 per

19   bottle, we all assume would be -- or at least Agent Rao assumed

20   would be how you calculate the street value of that

21   particular -- I think Agent Rao said transaction or

22   contemplated transaction.  And then you see the street pricing

23   there.  And then we just did the same thing twice; so you could

24   sort of see the methodology that the government contends is

25   reflected on the exhibit on Page 67.

EC2PRIGC

And I think we've -- on Page 5, we're now showing how the government did its math, 46 bottles, and these figures on Page 5 of Defense Exhibit 1, all come from the Government's Exhibit 212.  So you can see these are the values that Agent Rao used to sort of come up with his ultimately $2.4 million, 46 bottles, 30 pills per bottle.  And instead of using the street value, the government has used the Medicaid reimbursement value.

And, again, we just repeat that again so you can see it.  And if you turn to Page 6, we say that the government erroneously includes three pages of lists bearing no indicia of a transaction or intended transaction.  So let's look at those.

Recall on the earlier pages of this PowerPoint you see a drug name, a quantity of bottles, presumably, and a street pricing calculation.  But if you look at Page 7 and Page 8 and Page 9, these lists, from the testimony, really just look like inventory, drugs somebody has available for sale.

I think Ms. Andur elicited from Agent Rao that that's what these lists are consistent with.  There's no indication that anyone thought about pricing, sought pricing, proposed pricing.  That list on Page 7 of Defendant's Exhibit 1 is very different looking than the others that the Court has seen, and if you turn to Page 8, you'll see again another list that if you just wanted to draw a reasonable inference about what this was, based on the testimony at the hearing, you might conclude

EC2PRIGC

1    it was a list of drugs and the amount of drug available for

2    sale.

3              Not that anyone made a bid.  Not that anyone's made an

4    offer.  Not that anyone has done any sort of chicken scratch

5    here to figure out what they might like to buy or sell, and the

6    same is true on Page 9.  And the testimony is in the record

7    that these lists are consistent with lists of inventories that

8    are available.

9              So Page 10, despite the lack of evidence connecting

10   Mr. Rigo to any transaction or proposed transaction, the

11   government assigns losses of 1.5 million based on these three

12   pages alone.  And if you turn to Page 11, we show you what the

13   government did here, and it's not -- you know, it's not

14   complicated.

15             Even though there's no evidence of pricing being

16   sought or provided with respect to these three pages, the

17   government simply took, you know, total number of drugs and the

18   Medicaid reimbursement value of those drugs and did exactly the

19   same kind of computation that it did on the balance of those

20   pages.  But just by removing those three pages from the mix,

21   your Honor, if you turn to Page 1, that $2.4 million loss

22   figure comes down to $851,394.11.

23             So what is my point here?  I'm not here proffering an

24   $851,000 loss figure to the Court, although I think if the

25   Court were going to base its decision here on these records, it

EC2PRIGC

1    could look at the records the way we've suggested here.  My

2    point is consistent with my larger point this morning, which is

3    these records, we don't really know how they were used, who

4    they were used by.

5         We don't know whether Mr. Rigo used all of them.  You

6    know, they were folded up in his notebooks.  Maybe he was given

7    some and just didn't feel like working that day; so he put them

8    in a book or, you know, folded them up and put them away.

9    Maybe he used some that have chicken scratch on them, which if

10   it's his handwriting, which we don't know, but I'm trying to

11   put myself in the shoes of a prosecutor, a prosecutor

12   proffering to the Court a reasonable estimate based on these

13   records, not let me take these records and ring from each line

14   every dollar I possibly can.

15        That's not reasonable when there's no evidence about

16   which of these lists Mr. Rigo ever used, whether any of the

17   handwriting even on the pages at the front of my exhibit, even

18   the chicken scratch, there's no evidence that that's Mr. Rigo's

19   handwriting.  We don't know how these records were used or

20   really what they're records of.

21        So if we don't know that, might we not start with 2.4

22   million and then apply some sort of, you know, discount factor

23   that would reflect all that we don't know?  And the fact that

24   we're making a lot of assumptions here, and we're not doing it,

25   you know, at a Christmas pageant, we're doing it in the context

EC2PRIGC

1    of sentencing.

2         You know, the government's proposed losses here drive

3    the guidelines 22 levels up that fraud chart.  Once you get

4    over that million dollars, there's an adjustment, and then

5    there's 20 levels up.  So this is serious business.  But if

6    we're going to put in competing loss estimates, I don't think

7    we should have to, but I'm offering to you what the government

8    should have, not my most aggressive case with a little bit of a

9    softening.

10        On the 3,000 to $8,000 a month Chino testimony, for

11   the latter period, they didn't pick the 8,000, they picked 5,

12   and they picked a Medicaid value of $1,000.  I don't know where

13   that was from, but that is what they picked.  Maybe they could

14   have picked 10,000, but there are places where they seemed to

15   have gone in the right direction.

16        But given all that is unknown and all that was not

17   explored, investigated or, most importantly, proven in this

18   case, these are very, very aggressive projections.  They are

19   not reasonable estimates of loss.  Thank you, your Honor.

20             MR. DISKANT:  May I have a brief rebuttal?

21             THE COURT:  Yes.

22             MR. DISKANT:  Thank you, your Honor.  There are two

23   sort of broad points I want to make because I think it's

24   important to keep in mind with respect to virtually everything

25   Ms. Hendon just said.  The first pertains to this notion of a

EC2PRIGC

middle ground, and I think it's very clear that the Court keep
in mind that the government did precisely what Ms. Hendon was
just speaking about.  We just did it in a manner that was
slightly different from the way she did it, which is that we
did the math and we laid it for the Court and we got an
astronomical loss figure of over $30 million.

          We're not asking the Court to make that finding
because we acknowledge that these are estimates.  We
acknowledge that witness memories are fallible.  We acknowledge
that there are a lot of assumptions built into the analysis.
We're asking the Court to make a finding that's a quarter the
of that, just 25 percent.

          $7 million, we think that that is entirely consistent
with the approach at Ms. Hendon just outlined for the Court
because the government, of course, recognizes that there are
weaknesses in every case, there are weaknesses in every
witness' testimony.  But we believe that that $7 million figure
is, in fact, the very middle ground that she posits, and is
entirely consistent with the evidence in this case.

          Now, the second point that I want to raise to the
Court, because Ms. Hendon alluded to it, is this notion of
acceptance of responsibility.  The government is not trying to
intimidate anyone, of course.  The issue, however, is that
Ms. Hendon keeps taking the position that she may know the
answer, but she's not going to tell the Court.

EC2PRIGC

```
 1              Her client concedes that he did this for a long period
 2      of time, but he's not going to tell you exactly what he did,
 3      we're just going to put the government to the burden.  That's a
 4      trial position.  The defendant is entitled to take that
 5      position, the defendant is entitled to put the government to
 6      it's burden, but as the guidelines make clear, that's generally
 7      not consistent with acceptance of responsibility because
 8      acceptance of responsibility doesn't generally permit a
 9      defendant, at least a defendant seeking the reduction, to
10      falsely deny or frivolously contest conduct relevant to
11      sentencing.
12              So let's talk about this drug ledger, for example, and
13      Ms. Hendon has a PowerPoint.  I'm a little bit less
14      sophisticated, but I want to focus on the ledger itself,
15      Government Exhibit 202.  The question for the Court is whether
16      it is more likely than not, based on these pages, that the
17      defendant was a big-time participant in this scheme and
18      involved in selling lots of bottles of this medicine.  And the
19      answer to that question is, of course.
20              One has to wonder, in effect, what we're really doing
21      here fighting about this.  You know, Ms. Hendon says there's no
22      proof of a sale on some of these pages.  It's completely
23      irrelevant.  Even if all these reflect is inventory, those
24      inventories are properly attributable to the defendant as loss
25      amounts for any number of reasons.
```

EC2PRIGC

 1          First, they are properly attributable to the defendant

 2   because if they are the inventory of a coconspirator, that's

 3   part of the conspiracy and clearly attributable to him under

 4   governing law.

 5          But second of all, even if there was no secondary or

 6   tertiary sale, the fact that the inventory was created means

 7   that Medicaid was ripped off.  Because keep in mind how that

 8   inventory is generated.  If Mr. Reyes-Arias is generating

 9   inventory, that means he's buying these medicines off the

10   street.  That means Medicaid is being defrauded.

11          So even if all this page, for example, reflects -- and

12   I'm pointing to Page 1 of Government Exhibit 202 -- is in

13   inventory, Medicaid has already suffered the loss.  And if a

14   co-conspirator of the defendant is providing this to him in

15   contemplation of a sale, the defendant is responsible for that

16   amount.  That's the $2.4 million.

17          Now, the second reason that $2.4 million figure is

18   important is because it entirely corroborates the other

19   testimony in the case.  And Ms. Hendon pointed the Court to a

20   number of instances in which she claimed the witness lied or

21   perjured himself or mislead the Court, and I would urge the

22   court to be skeptical of those representations for a couple of

23   reasons.

24          First, I think Miss Hendon was misquoting or partially

25   quoting in a number misleading ways.  For example, the witness

EC2PRIGC

1   did tell agents that he sold to the defendant not too

2   frequently but that was in the context of a comparison.  What

3   he said was, yeah, I sold to the Pancho every week.  I sold to

4   the defendant not too frequently, maybe once a month.  That's a

5   very, very important context.

6          Similarly, this notion of a hundred bottles a week.

7   Yes, the witness very candidly said sometimes it was 60 to 80.

8   He also said sometimes it was more than a hundred, which is why

9   a hundred is a reasonable estimate.  That's what the government

10  is trying to do here.

11         With respect to the ten-to-one ratio, there actually

12  is evidence in the record to support the fact that the Medicaid

13  values don't change all that much year to year.  We offered the

14  2011 tech table, in addition to the 2012.  Those are both in

15  the record as Government Exhibits 201 and 202, I believe.

16  There's very little change year to year in the Medicaid

17  reimbursement value.

18         And then one more point I wanted to make, because I

19  think this also sort of hammers home the government's

20  fundamental disagreement with the approach that the defendant

21  is taking in this proceeding, which is that Ms. Hendon talked

22  to you a fair bit about the transcript, Government Exhibit 211,

23  in particular this loss suffered by Conrado, and she pointed

24  the Court to Page 29 of the transcript.

25         And the problem with the approach that Ms. Hendon is

EC2PRIGC

urging you to take is it just doesn't make any sense.  You
know, one could conceivably pluck a sentence out of the middle
of nowhere and say, well, if somebody is talking about a
$200,000 loss, we don't have any idea how that loss occurred
and/or who Conrado was, but that's not what we offered.

Now, as an initial matter, we did offer testimony in
evidence about who Conrado was.  Special Agent Tony Romero took
the stand and told your Honor about who Conrado was, that he
had been identified, that he had been arrested, that Conrado
was someone who purchased these medicines from the defendant
and from Pancho, which is why Pancho and the defendant are
talking about sales and losses to Conrado in this transcript.

We offered you the transcript of Conrado Vasquez's
guilty plea, which was entered shortly thereafter, as well as
the charging instrument against him.  Those are all marked as
government exhibits.  They are all in the record.  But again,
more importantly, context here is everything.

Look at the conversation that the defendant is having
with Pancho on pages 28 and 29 when he talks about Conrado and
the loss to Conrado.  It starts with the defendant at the top
of that page saying "I'm fucked.  The Italian guy sold the
pharmacy."  That's the person the defendant is selling these
medicines to.  They're not talking about some random business.
They're talking about this scheme.

They then go on.  Pancho says:  Really?  The defendant

EC2PRIGC

1    says:  Yes.  They then go on to talk about Conrado and the loss

2    they suffered to Conrado, and they then keep going on.  This is

3    in the context of a conversation about the scheme.  They are

4    talking about other people they do business with in the scheme.

5    It is entirely logical and entirely permissible.  Indeed, the

6    only permissible inference, really, for the Court to draw,

7    they're talking about a drug transaction with Conrado.

8              The same, of course, applies to the drug ledgers.

9    There's really only one permissible inference to be drawn from

10   these.  The defendant did not have these in his notebooks in

11   his bedroom because he liked doodling the names of medicines

12   when he got bored.  He didn't like collect scrap papers that

13   just so happened to have the names of these medicines listed on

14   them.

15             They support the loss amount the government is urging

16   here.  So we believe it is a reasonable estimate of loss.  We

17   believe it is precisely the middle ground that Ms. Hendon is

18   asking the Court to take, and we believe it is consistent with

19   the standard of what the Court should adopt as loss.

20             THE COURT:  Thank you all very much.  I appreciate the

21   help, and I will reserve decision.

22             MR. DISKANT:  Thank you.

23             MS. HENDON:  Thank you.

24             (Adjourned)

25