UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
              v.                            :
                                            :          Case No. 13 Cr. 897 (RWS)
BLADIMIR RIGO,                              :
                                            :
                      Defendant.            :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### SENTENCING MEMORANDUM ON BEHALF OF BLADIMIR RIGO

Joanna C. Hendon
Sharanya Sai Mohan
Alicia K. Amdur
SPEARS & IMES LLP
51 Madison Avenue
New York, NY  10010
(212) 213-0849

*Attorneys for Defendant Bladimir Rigo*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

I.      INTRODUCTION ...................................................................................1

II.     OFFENSE CONDUCT AND PLEA AGREEMENT ................................1

III.    THE GOVERNMENT'S INVESTIGATION ..........................................2

IV.     DISPOSITIONS OF OTHERS WHO DEALT WITH MR. RIGO
        IN THE SCHEME ..................................................................................5

        A.      Hermenegildo Fernandez (a/k/a "Pancho") ..............................6

        B.      Arcadio Reyes-Arias (a/k/a "Chino") ......................................7

        C.      Rogelio Leyba ........................................................................8

V.      BACKGROUND AND PERSONAL CHARACTERISTICS ....................9

        A.      Early Years in Cuba and Move to the United States ..................9

        B.      Mr. Rigo Has a Lengthy Employment History and Strong Work Ethic ..........10

        C.      Mr. Rigo's Wife and Children .................................................13

        D.      ████████████████████ ..........................................14

        E.      Mr. Rigo's Family Depends Upon Him and Considers Him An Example ......15

        F.      Mr. Rigo's Health Problems Counsel Against An Incarceration Sentence .....18

VI.     THE PRESENTENCE REPORT REVISED MAY 4, 2015 ......................18

VII.    CONSIDERATION OF THE FACTORS IN TITLE 18, UNITED STATES CODE
        SECTION 3553(a) SUPPORTS A NON-GUIDELINES SENTENCE ....................19

        A.      The Need to Avoid Unwarranted Sentencing Disparities Supports a Non-
                Guidelines Sentence .......................................................................20

        B.      The Nature and Circumstances of the Offense Weigh in Favor of a Sentence of
                Time Served or Probation ...............................................................21

        C.      Mr. Rigo's History and Characteristics Weigh in Favor of a Sentence of Time
                Served or Probation.........................................................................22

i

D.  Considerations of General and Specific Deterrence Support a Non-Guidelines Sentence ............................................................................................................25

CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Coleman v. Schwarzenegger*,
  922 F. Supp. 2d 882 (E.D. Cal. 2009)...................................................................26

*Gall v. United States*,
  552 U.S. 38 (2007).............................................................................................19, 20

*Kimbrough v. United States*,
  552 U.S. 85 (2007).....................................................................................................19

*Rita v. United States*,
  551 U.S. 338 (2007)...................................................................................................20

*United States v. Alba*,
  933 F.2d 1117 (2d Cir. 1991)....................................................................................25

*United States v. Barbato*,
  No. 00-cr-1028 (SWK), 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002)...............22

*United States v. Bello*,
  No. 00-cr-1288 (AKH), 2001 WL 1661919 (S.D.N.Y. Dec. 28, 2001),
  *rev'd on other grounds*, 310 F.3d 56 (2d Cir. 2002)..........................................24, 25

*United States v. Booker,*
  543 U.S. 220 (2005)...................................................................................................19

*United States v. Bullington*,
  No. 10-cr-20057-002, 2011 WL 2912799 (W.D. Ark. July 20, 2011) ....................24

*United States v. Eberhard*,
  No. 03-cr-562-01 (RWS), 2005 WL 1384038 (S.D.N.Y. June 9, 2005) .................23

*United States v. Fatico*,
  603 F.2d 1053 2d Cir. (1979).......................................................................................2

*United States v. Ferranti*,
  928 F. Supp. 206 (E.D.N.Y. 1996) ...........................................................................23

*United States v. Frias*,
  521 F.3d 229 (2d Cir. 2008).......................................................................................20

*United States v. Gamez*,
  1 F. Supp. 2d 176 (E.D.N.Y. 1998) ..........................................................................25

*United States v. Gigante*,
989 F. Supp. 436 (E.D.N.Y. 1998) ...................................................................22

*United States v. Hamilton*,
323 F. App'x 27 (2d Cir. 2009) .......................................................................23

*United States v. Hodges*,
No. 07-cr-706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) .......................................23

*United States v. Johnson*,
567 F.3d 40 (2d Cir. 2009)...........................................................................20

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008)...........................................................................19

*United States v. McClean*,
822 F. Supp. 961 (E.D.N.Y. 1993) ...................................................................24

*United States v. Ortega*,
No. 00-cr-432 (DLC), 2008 WL 2755786 (S.D.N.Y. July 14, 2008)...................................20

*United States v. Viera*,
11-cr-1072 (DLC) (S.D.N.Y.)...........................................................................21

## Statutes & Rules

18 U.S.C. § 371 ....................................................................................................2

18 U.S.C. § 1349 ....................................................................................................1

18 U.S.C. § 3553(a) ........................................................................................ *passim*

## United States Sentencing Guidelines

U.S.S.G § 5H1.1 ....................................................................................................22

U.S.S.G. § 5H1.4 ....................................................................................................22

## Miscellaneous Authorities

Elizabeth Arias, Nat'l Ctr. For Health Statistics, Ctrs. for Disease Control and Prevention, *United States Life Tables, 2010*, NAT'L VITAL STATISTICS REPORTS, Vol. 63 No. 7, Nov. 6, 2014, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_07.pdf ........................................................... 22, 23

Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 CRIME & JUST. 143 (2003). ......................................................................25, 26

Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199 (2013)...........26

U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (2004) ....................................................................23

We respectfully submit this sentencing memorandum on behalf of Bladimir Rigo, who is scheduled to be sentenced on May 19, 2015. In its Presentence Investigation Report, revised May 4, 2015 (the "PSR"), the Probation Department recommends a sentence of 48 months of imprisonment followed by a term of supervised release of three years. The defense agrees with the Probation Department's calculation of the applicable Guidelines, but disagrees that a sentence of incarceration should be imposed. There is no plea agreement in this case. As a result, there are no stipulated sentencing facts.

## I.   INTRODUCTION

A non-Guidelines sentence of time served or probation is appropriate in this case due to Mr. Rigo's age, health, family situation, the nature of the offense he committed, the principles of general and specific deterrence, the need to avoid unwarranted sentencing disparities, and the balance of the factors set forth in Title 18, United States Code Section 3553(a).

## II.   OFFENSE CONDUCT AND PLEA AGREEMENT

On September 17, 2013, Mr. Rigo was arrested at his home in Elizabeth, New Jersey, pursuant a criminal complaint charging him with violation of Title 18, Section 1349 of the U.S. Code, arising from his participation in a second-hand prescription-drug resale conspiracy (the "Scheme"). Under the Scheme, insurance beneficiaries – mainly Medicaid beneficiaries – sold bottles of medication that they had been prescribed to other participants in the Scheme. These individuals, in turn, sold the medications purchased from beneficiaries to other participants such as Mr. Rigo. Typically, the medications changed hands again, eventually finding their way to pharmacies, which then dispensed them customers. (*See* PSR ¶¶ 9-13.)

On April 23, 2014, Mr. Rigo pleaded guilty to a two-count indictment, which charged him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and

conspiracy to commit adulteration offenses and unlawful distribution of prescription drugs, in violation of 18 U.S.C. § 371.  In his allocution, he admitted to the crimes and involvement in the Scheme, telling Magistrate Judge Fox:

> During the years mainly 2010 to 2012, but also in previous years, I agreed with others to buy and to sell medicines that had been prescribed to patients with insurance, Medicaid, without having a license to sell them or to buy them. . . . When I did this, I was in Newark, New Jersey, but I knew that some of the medicines were bought in Manhattan.  I knew that what I was doing was wrong.

(Tr. of Rigo Plea Allocution, dated April 23, 2014 ("Plea Tr."), 15:19-16:2 (Dkt. No. 14).)

There is no plea agreement in this case because Mr. Rigo contested the amount of loss attributable to him, which the Government claimed exceeded $7 million, and was as high as $30 million.  (*See* Post-Hearing Briefing of the United States at 23, dated November 14, 2014 (Dkt. No. 26).)  As a result, he pleaded guilty without a plea agreement.

On October 7, 2014, the Court held a hearing, pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) ("*Fatico* hearing"), to resolve the parties' dispute concerning the loss amount.  Following a day-long hearing and a morning of oral argument, the Court ruled the loss attributable to Mr. Rigo, for Guidelines purposes, to be $2.9 million.  (Opinion at 23, dated January 29, 2015 ("*Fatico* Opinion") (Dkt. No. 33).)  Mr. Rigo has no criminal history points and therefore is in criminal history category I.  (PSR ¶ 60.)

## III.    THE GOVERNMENT'S INVESTIGATION

Between 2010 and 2012, the Government conducted a nationwide investigation into the Scheme.  (*See id.* ¶¶ 8, 12.)  In July 2012, agents working with the Department of Justice arrested 48 individuals in 6 states and charged them with crimes related to the Scheme.  (*Fatico* Opinion at 5.)  Just prior to those arrests, agents in New York – including the Government's agent

witnesses – engaged in an undercover operation designed to ferret out additional targets. (*Id.* at 5-6.) In a month and a half, undercover agents twice purchased prescription medicines from Hermenegildo Fernandez (a/k/a "Pancho"). (*Id.* at 6.) The agents arrested Mr. Fernandez, who then became a cooperating witness for the Government. (*Id.*) Mr. Fernandez offered to set up additional targets, and in August and November 2012, he purchased drugs from Rogelio Leyba while wearing a wire. (*Id.*) Mr. Leyba, in turn, offered to set up targets in an effort to become a cooperating witness for the Government. However, Mr. Leyba struggled to provide substantial assistance to the Government; he was unsuccessful and as a result not "signed up." (*Id.*) Meanwhile, Mr. Fernandez set up another target: the hearing witness Arcadio Reyes-Arias (a/k/a "Chino"). (*Id.*) In October 2012 and again in December 2012, Mr. Fernandez, again wearing a wire, bought drugs from Mr. Reyes-Arias, whom the agents arrested and charged following the second sale to Mr. Fernandez. (*Id.*; *see* Defendant Bladimir Rigo's Post-Hearing Memorandum of Law at 4-5, dated November 14, 2014 (Dkt. No. 24).)

In connection with all three arrests, the Government executed search warrants at stash-house locations used by the defendants. On June 5, 2012, agents searched Mr. Fernandez's warehouse in North Bergen, New Jersey. (*Fatico* Opinion at 6.) As a result of that search, they recovered over 10,000 bottles of prescription drugs, and bottles, bags, and other supplies for the drug business. (*Id.*) On December 20, concurrent with their arrests, agents searched the apartments of Mr. Reyes-Arias and Mr. Leyba. (*Id.*) From Mr. Reyes-Arias's apartment, agents seized 481 prescription-drug containers, including bottles of medication, syringes and patches, as well as cleaning supplies. (*Id.* at 7.) From Mr. Leyba's apartment, the agents seized 482 prescription-drug containers. (*Id.*) The agents recovered no evidence from any of the stash

houses identifying or connecting Mr. Rigo to those locations or the defendants' business.  (Hr'g Tr. 29:21-30:2.)[1]  Nor was there any evidence connecting Mr. Rigo to the drugs seized during the six hand-to-hand transactions supporting the arrests of Mr. Fernandez, Mr. Leyba, and Mr. Reyes-Arias.  (*Id.* at 135:3-12; *Fatico* Opinion at 7.)  Prior to executing the three search warrants, the agents conducted surveillance at each location.  (Hr'g Tr. 151:4-152:9.)  At no time during the surveillance did they see or develop any other evidence or leads concerning Mr. Rigo.  (*See id.*)

Instead, in July or August 2012, Mr. Fernandez – already cooperating with the Government and presumably hoping to procure targets – contacted Mr. Rigo, hoping to set up an undercover drug transaction.  (*Id.* at 27:23-28:1.)  Mr. Rigo agreed to meet and, in September 2012, the two old-timers sat in a restaurant, swapping tales of ill-health and talking about the black market prescription drugs business.  (Mohan Decl. Ex. F (GX-211-T).)  They spoke about the recent arrests, and that the authorities were looking for two "big people" in New Jersey.  (*Id.* at 21.)  Mr. Rigo joked that that must mean them.  (*Id.*)  They spoke about sharing the profits of a potential business transaction amounting to $25,000.  (*Id.* at 13.)  "If I go to Chino and Chino has 20,000 dollars in medicine . . . and if Rogelio has 5," Mr. Rigo said to Mr. Fernandez, "If this purchase of 25 dollars netted 25,000, then it's 12,500 for you and 12,500 for me."  (*Id.*)  Mr. Rigo reassured Mr. Fernandez that they would be able to defend themselves if they were caught with drug-related money.  (*Id.* at 21.)  They had lunch.  (*Id.* at 18.)

---

[1] "Hr'g Tr." refers to the transcript of the *Fatico* hearing before the Court on October 7, 2014.  A true and correct copy of that transcript is attached as Exhibit B to the Declaration of Sharanya Sai Mohan, dated November 14, 2014 ("Mohan Declaration" or "Mohan Decl.") (Dkt. No. 25), submitted in connection with Mr. Rigo's Post-Hearing Memorandum of Law.

A full year after that meeting, agents arrested Mr. Rigo on the basis of his statements to Mr. Fernandez during that lunch meeting and information provided by Mr. Reyes-Arias, whom agents had arrested in December 2012, as part of his cooperation.  At the time of Mr. Rigo's arrest, the agents found on a bureau various papers and records, including twelve pages of what appear to be handwritten lists of drug names.  (*Fatico* Opinion at 7-8.)

At or about the time of the September 2012 meeting, the agents had a telephone number for Mr. Rigo, knew where he lived, knew (from Mr. Fernandez) the location of the bodegas he owned, and knew the license plate for the vehicle he drove.  (Mohan Decl. Ex. G (Fernandez 3504-27); Mohan Decl. Ex. H (Fernandez 3504-37) at 1 of 2.)  The agents took no steps to discover Mr. Rigo's supposed sources of drugs, his customers, where he did his banking, or whether he had credit cards (the records of which might show purchases consistent with a prescription drug operation).  Nor did they seek to obtain a search warrant for Mr. Rigo's residence or any of the bodegas he owns.  The only thing the agents did to investigate Mr. Rigo was to obtain permission to put a pen register on his phone – which yielded no evidence of wrongdoing of any kind – and to continue to debrief cooperating witnesses such as Mr. Reyes-Arias.

## IV.   DISPOSITIONS OF OTHERS WHO DEALT WITH MR. RIGO IN THE SCHEME

The Rule 16 and Jencks Act material provided by the Government at the hearing disclose that Mr. Rigo interacted with two individuals, Mr. Reyes-Arias and Mr. Leyba.  Mr. Rigo did engage in a consensually recorded discussion with Mr. Fernandez about the possibility of them working together in 2012, but the evidence proved the two men to have been competitors who did not work together.  The Government charged all three individuals (and Mr. Rigo) with

5

participation in the Scheme, subsequently enlisting two (Fernandez and Reyes-Arias) as cooperators.  Each received a sentence of probation or time served.

A.      **Hermenegildo Fernandez (a/k/a "Pancho")**

Mr. Fernandez was a key player in the Scheme and the "main customer" purchasing second-hand drugs from Mr. Reyes-Arias.  (*See Fatico* Opinion at 8.)  At sentencing, the Government "safely estimate[d]" that Mr. Fernandez was responsible for between $20 million and $50 million worth of second-hand prescription drugs.  (*See* Sentencing Submission by USA as to Hermenegildo Fernandez at 3, *United States v. Fernandez*, No. 12-cr-731 (PAE) (S.D.N.Y. Dec. 31, 2014) ("Fernandez Sentencing Submission") (Dkt. No. 27).)

Agents arrested Mr. Fernandez in June 2012, after twice selling second-hand prescription medications to undercover agents.  (*Fatico* Opinion at 6.)  From his storage facility, agents recovered more than 10,000 bottles of second-hand prescription drugs, having a Medicaid reimbursement value of approximately $6.2 million – as well as bottles, bags, and other supplies for the second-hand drug business, including cleaning supplies.  (*Id.* at 6 (citing Hr'g Tr. 29:12-20, 141:11-15); Hr'g Tr. 112:6-8; *id.* at 20:22-22:12, 23:6-8.)  In addition to purchasing and aggregating bottles from street-level collectors and supplying them to higher-level participants, Mr. Fernandez also "cleaned" those bottles – that is, removed the previous patient labels to make the bottles appear to be in factory condition – and generated and obtained counterfeit manufacturer labels (some altering expiration dates) so they could be resold as new to unsuspecting customers.  (*See* Fernandez Sentencing Submission at 3.)

On January 8, 2015, the Honorable Paul A. Englemeyer sentenced Mr. Fernandez to three years of probation and 200 hours of community service.  (Judgment as to Hermenegildo

Fernandez, *Fernandez*, 12-cr-731 (S.D.N.Y. Jan. 9, 2015) (Dkt. No. 28).)  Mr. Fernandez has

since completed his community service and received permission to relocate to Tampa, Florida, to

be closer with his children and live in a warmer climate.  (Endorsed Ltr., *Fernandez*, 12-cr-731

(S.D.N.Y. Mar. 18, 2015) (Dkt. No. 35).)

### B.    Arcadio Reyes-Arias (a/k/a "Chino")

On December 2, 2014, hours after this Court held oral argument on the loss amount

attributable to Mr. Rigo, the Honorable Paul Gardephe sentenced Mr. Reyes-Arias to time served

and three years of supervised release for his involvement in the Scheme and his participation in

mortgage fraud.  (*See* Judgment as to Arcadio Reyes-Arias, *United States v. Reyes-Arias*, 13-cr-

51 (PGG) (S.D.N.Y. Dec. 4, 2014) ("Reyes-Arias Judgment") (Dkt. No. 20) (judgment imposed

December 2, 2014).)  Agents arrested Mr. Reyes-Arias in December 2012, after he sold Mr.

Fernandez second-hand prescription drugs in two controlled buys, occurring in December and

October 2012.  (*Fatico* Opinion at 6.)  At that time, agents executed a search warrant of Mr.

Reyes-Arias's apartment, seizing 481 prescription-drug containers, which included bottles of

medication, syringes and patches, as well as cleaning supplies.  (*Id.* at 7.)

Notwithstanding an advisory Guidelines range of 97 to 121 months' imprisonment, Judge

Gardephe imposed a sentence of time served, in recognition of Mr. Reyes-Arias's cooperation, as

detailed for him by the prosecutors in this case.  (Ex. E at 15:4-17:22; Reyes-Arias Judgment at

3.)  From the transcript of those proceedings, it appears Mr. Reyes-Arias's cooperation consisted

entirely of assistance in the prosecution of Mr. Rigo, including his testimony at the *Fatico*

hearing in this Court.  (*See* Ex. E at 9:3-8, 11:2-9 (adverting to assistance provided in the

prosecution of Mr. Rigo).)

7

The Government's submission in aid of Mr. Reyes-Arias's sentencing is not publicly available, presumably because he was sentenced as a cooperator.  Because it is the longstanding practice of the Office to bring to the attention of sentencing judges all relevant facts, both favorable and unfavorable, concerning its cooperating witnesses, we assume, for purposes of this submission, that Judge Gardephe imposed the sentence he did (time served) with full knowledge of Mr. Reyes-Arias' failings as a cooperator.  For example, the Court will recall that, on cross examination, Mr. Reyes-Arias denied previously admitting under oath to Judge Gardephe (during his plea allocution) that he had been addicted to alcohol at all times relevant to the offense (*see Fatico* Opinion at 20), and that, in connection with the offense, he only "sold to one person, all of it," the implication being Mr. Fernandez, not Mr. Rigo (*id.* at 21).  For these and other reasons, this Court, however, rejected Mr. Reyes-Arias' testimony, finding it "lack[ed] credibility" and was "unreliable."  (*Id.* at 21-22.)

### C.    Rogelio Leyba

Agents arrested Mr. Leyba in December 2012, after selling second-hand prescription drugs in two controlled buys to Mr. Fernandez in August and November 2012.  (*Fatico* Opinion at 6.)  From a search of Mr. Leyba's apartment, authorities seized an additional 482 prescription-drug containers.  (*Id.* at 7.)  Following his arrest, Mr. Leyba claimed to have offered to cooperate with the Government and set up additional targets (potentially Mr. Rigo), but his efforts were unsuccessful.  (*Id.* at 6.)  At sentencing, the Government asked Judge Daniels to impose a sentence of between 18 and 24 months' imprisonment.  (*See* Tr. of Rogelio Leyba Sentencing Hr'g 3:3-6, 13:13-14, dated September 3, 2014, *United States v. Leyba*, 13-cr-55 (GBD) (S.D.N.Y.) (Dkt. No. 34).)  After considering the Section 3553(a) factors, Judge Daniels imposed

a non-Guidelines sentence of three years' probation, six months' home confinement, and 200 hours of community service.  (*Id.* at 22:21-23:16; Judgment as to Rogelio Leyba at 2-4, *Lebya*, 13-cr-55 (S.D.N.Y. Sept. 4, 2014) (Dkt. No. 31).)

## V.    BACKGROUND AND PERSONAL CHARACTERISTICS

Bladimir Rigo is 75 years old.  Born and raised in Cuba, he fled the Communist regime and immigrated to the United States when he was 22, in pursuit of the American dream.  He is a dedicated husband to his wife, Angela, and father to their three children, who, through his life, has struggled to provide for his family.

### A.    Early Years in Cuba and Move to the United States

Mr. Rigo was born in Cuba on March 22, 1940.  (PSR ¶ 71.)  He was one of three siblings and was very close to his brother, Jose Ramon, who passed away in approximately 1996, and his sister, Concepcion, who currently lives in Hialeah, Florida.  (*See id.*)  Mr. Rigo's father was a merchant who owned a country store in Cuba.  (*See id.* ¶ 72.)

Fidel Castro's Communist regime came to power in Cuba when Mr. Rigo was 18 years old, in January 1959.  The Communist government expropriated Mr. Rigo's family's property on several occasions.  (*See id.*)  Mr. Rigo, who was always interested in politics, believed that the Communist regime placed no value on human rights and, along with his brother, participated in political activism against the regime.  As a result, Mr. Rigo and his brother were arrested and detained by government officials.  He was deemed a "rebel" and placed into an asylum without any tendering of process.  In 1962, at the age of twenty-two, Mr. Rigo escaped his persecution and came to the United States with his brother, under refugee status.  They travelled by boat with a group of seventeen people.

Mr. Rigo and his fellow refugees landed in the United States and, after meeting with immigration officials, went to an office for refugees that he remembers as the "Tower of Freedom." At this location, he was met by army recruiters and informed that he needed to have a draft card. So, shortly after arriving in the United States, Mr. Rigo joined the army. (*See id.* ¶ 73.)

In the Army, Mr. Rigo was placed among a special brigade of Cuban exile soldiers. (Ex. B.) The unit to which Mr. Rigo belonged was a special assault brigade, training for a possible land invasion of Cuba. Mr. Rigo, along with the brigade, underwent training at Fort Knox in Kentucky and Fort Jackson in South Carolina. Luckily, he never had to go to Cuba for that purpose, as the unit was disbanded during the Kennedy administration. Mr. Rigo spent six months in the army and then continued in the army reserves until 1968, when he was honorably discharged. (PSR ¶ 73.) During that time, Mr. Rigo was on standby to serve the United States in the conflict in Vietnam. (*Id.*)

Having been given the opportunity to escape the oppressive regime in Cuba and start fresh in the United States, Mr. Rigo "develop[ed] a love affair for the country that he [now] calls home and raised his family in." (Ex. B.) As their letters reflect, Mr. Rigo's children consider him a "patriot" (Ex. C) who, through his hard work and perseverance, was able to achieve the "American Dream" for himself and his family (Ex. B).

### B.  Mr. Rigo Has a Lengthy Employment History and Strong Work Ethic

Following his discharge from the army, Mr. Rigo began working at a cigar company in Miami. He relocated to Perth Amboy, New Jersey, approximately one year later in order to be closer to his brother, who had already moved there. In New Jersey, Mr. Rigo remained in the

10

cigar business, working at the General Cigar Company for over a year.  He then moved to a job at a precious metals factory in Carteret, New Jersey, where he worked for five or six years.  He held various positions while at the metal company, working as a laborer, on a train, in the ovens, and on a crane.

In 1967, Mr. Rigo helped bring his father and mother from Cuba to the United States (*see* Ex. B), and sponsored them in the Freedom Flights program.  After his arrival, Mr. Rigo's father accompanied Mr. Rigo to the doctor.  The doctor informed Mr. Rigo that the acid and smoke he was exposed to at his job gave him black lungs and advised him to "get out of there."  As a result, in 1969 or 1970, he left the precious metals factory and began working as a street vendor, selling miscellaneous items and produce.

Mr. Rigo helped support his parents and assisted them in getting on their feet.  Mr. Rigo's father, Jose, helped operate a small grocery in Perth Amboy, New Jersey.  Mr. Rigo helped his father in the bodega whenever he finished work at the factory or as a vendor.  Mr. Rigo then began helping his father full time.  In 1974, after he started getting established in the bodega business, Mr. Rigo, his father, and his brother were finally able to purchase a bodega of their own.  In 1976, Mr. Rigo bought his own bodega, El Cochinito, in Elizabeth, New Jersey, which he owned off and on through the subsequent years.

For the next fifteen years, Mr. Rigo shuttled between Miami and New Jersey, as work opportunities presented themselves.  From approximately 1976 until 1980, he and his now-wife, Angela, lived in Miami, where he worked in construction.  In 1981, Mr. Rigo returned to New Jersey after his brother requested his help with his markets.  Mr. Rigo also sold items on the street during this time.  Angela and their young son, Vincent, who was born in 1981, remained in

11

Miami until Mr. Rigo found stable work in New Jersey.  Finally, in 1984, he was able to bring his family to New Jersey to join him.  The young family settled in Elizabeth, New Jersey, but it was not for long.  In 1988, Mr. Rigo, Angela, their two-year old twins, Bladimir and Angel – who were born in 1986 – and Vincent returned to Miami as Mr. Rigo pursued work to support his family.  Once back in Miami, Mr. Rigo worked intermittently as a vendor at a flea market, where Angela also worked.  The flea market operation was a family endeavor, with even little Vincent helping.

Unable to find consistent work to support his family, Mr. Rigo returned to New Jersey and the bodega business in 1991, when a friend sought help with his bodega in Passaic.  Given the family's finances, Angela and the children were not able to join him, and remained in Miami, where Angela continued to work at the flea market.  Mr. Rigo sent nearly everything he made back to Miami to support them, and it was an extremely trying time for the entire family. Finally, after two years of separation, Mr. Rigo was able to bring his wife and children to join him in New Jersey.  From that time forward, Mr. Rigo and his family lived in New Jersey.

Throughout his life, Mr. Rigo worked "very hard."  (Ex. C.)  After establishing his bodega businesses, he "would work from six in the morning until nine or ten at night, and often on the weekends."  (*Id.*)  Through his efforts, he was able to go from being an immigrant and a refugee who arrived in this country by boat to a small-business owner running multiple successful grocery stores.  And as described below, Mr. Rigo was able to pass along the lessons he learned and his work ethic to his sons, who were able to establish their own businesses as well.  (Ex. B.)  Not one to be able to sit idle for very long, Mr. Rigo continues to actively help his son Angel with his grocery store business.  (Ex. C.)

Mr. Rigo worked so hard throughout his life with the goal "to provide a living" for his family.  (*Id.*)  When he was not working, he was spending time with them (*id.*), which is reflected in the deep impact he has had on the lives of his wife, children, and grandchildren.

### C.      Mr. Rigo's Wife and Children

Mr. Rigo has been married to Angela Rigo for nearly thirty years.  (*See* PSR ¶ 75.)  They have been together for nearly forty years.  Mr. Rigo and Angela met at a party in 1974 in New York City at a restaurant called Casa Espana.  He and Angela had quite a bit in common:  she too had immigrated to the United States from Cuba in the 1960s.  Her father and mother came with her as well.  Mr. Rigo and Angela got to know each other over the next few years and began a serious relationship in 1976, which eventually led to their marriage in 1988 and their three children.

Angela has worked throughout her life in the United States.  She spent many years as a factory worker in New Jersey and has held other jobs, including as a beautician.  In Miami in the late 1980s and early 1990s, she worked as flea-market vendor, while at the same time raising three young children.  Eventually, after the entire family returned to New Jersey in 1993, she came to help her husband with his businesses and worked at his bodegas.  At the bodegas, Angela did everything she could to help, including doing the shopping, placing the merchandise, making sandwiches, cleaning, and working as a cashier.

Following an accident in or about 2011 in which she broke both her legs and hips, Angela has difficulty walking (Ex. C), and has since retired from working at the family bodegas.  Despite significant surgery, she has not fully recovered and still has difficulty walking.  (*Id.*)

She requires assistance with other everyday activities, such as getting out of bed and going up and down stairs, which Mr. Rigo provides.  (*See id*.)

The couple's three children are Vincent (age 33), Angel (age 29), and Bladimir (age 29). Angel and Bladimir are twins ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██    ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



**E.    Mr. Rigo's Family Depends Upon Him and Considers Him An Example**

Mr. Rigo's attentiveness towards Bladimir is consistent with his approach to taking care of the rest of his family.  Throughout his life, Mr. Rigo has maintained very close ties with his immediate family, providing them support when they needed it and relying upon them in turn. Today, Mr. Rigo lives in the same house as his wife and their three sons.  Mr. Rigo and Angela live on the first floor of his house with Bladimir; Vincent lives upstairs with his wife and his own three children; and Angel lives in the basement.  (PSR ¶ 74.)

Mr. Rigo's history as a refugee and immigrant influenced the values he chose to instill in his children.  As Angel writes, "My father felt that it was really important that I complete college because he wanted to make sure that I did not go through what he went through during his younger years."  (Ex. C.)  When Angel faced a difficult job market after graduation, Mr. Rigo taught him the skills he needed to run his own grocery business – he "showed [Angel] the ropes" and taught him "what to look for in a location, the size, how to deal with the landlords, how to purchase merchandise, how many aisles to have, where to put the meat and the vegetables."  (*Id.*)  Similarly, Mr. Rigo taught his son Vince "how to age tobacco, blend and roll premium cigars," so that Vince could pursue his own career in cigars.  (Ex. B.)  Mr. Rigo taught Vincent about "perseverance," "hard work, heritage and a means which [he] love[s]" through which Vincent provides for his own young family.  (*Id.*)  Indeed, Mr. Rigo has shown his children that by "working hard and applying yourself[,] the American Dream is possible."  (*Id.*)

The Rigo family is close-knit, all working to help one another, not out of obligation, but out of love.  Nearly every day, Mr. Rigo assists his son, Angel, with his own bodega business, going to the bank for him and shopping for his bodega.  (Ex. C.)  Mr. Rigo also aids his other son, Vincent, with his cigar business, rolling cigars for him and staffing events.  Mr. Rigo does not get paid, nor does he ask for money, in return; he helps his children because they are family, and he wants them to succeed.  And his children, in turn, help Mr. Rigo and Angela when they need something, buying groceries for them, taking Angela to the doctor, or providing money, if needed.  A family helps each other out, Mr. Rigo says, because that is what family does.

It is extremely important to the Rigo family to remain close to one another.  Every day Mr. Rigo visits with his three grandchildren, ████████████████████████████

16

▮ who live upstairs with Vincent Sr. and his wife, Mirna.  He takes them to McDonald's and Burger King, and to the movies, and plays games with them.  Every Sunday, they join Mr. Rigo early in the morning to take a trip to the bakery, where they "share fresh Cuban bread together." (Ex. B.)  They would be devastated at losing their grandfather.  And Mr. Rigo, in turn, would be devastated if he were to miss out on these important years with his grandchildren, on being able to see them every day, on being able to watch them grow.  As his wife, Angela, writes:

> We have grown old together seeing our children grow up.  Hopefully, together we will see our grandchildren grow up.

(Ex. A.)  Mr. Rigo's son Angel echoes this sentiment, writing that if he has children, he "would like them to know their grandfather."  (Ex. C.)

        In addition to caring for Bladimir, Mr. Rigo also cares for his wife, who suffered from an accident a few years ago in which she broke both her legs and her hips.  (Ex. C.)  She underwent serious surgery and took two years to recover (*id.*), one of which was spent bed-ridden (Ex. B).  She continues to have "limited" mobility (*id.*) and "still has a lot of trouble walking, climbing stairs, and even getting up" (Ex. C).  Mr. Rigo is there for her, helping her "get around" and "tak[ing] care of her."  (Ex. B.)  Because Angela can no longer safely drive, Mr. Rigo has taken over tasks that require driving, such as picking up groceries.  (Ex. C.)

        But Mr. Rigo's caring and generosity goes beyond his immediate family members.  Indeed, he shared his home with his mother-in-law for thirty-three years, after she separated from her own husband.  Angela's mother passed away two or three years ago after a painful and difficult bout of ovarian cancer.  Throughout this time, Mr. Rigo was there for his mother-in-law and his wife.  As Angela notes:  "When my mother passed away he gave me a lot of support.  He always loved and respected her."  (Ex. A.)

17

**F.      Mr. Rigo's Health Problems Counsel Against An Incarceration Sentence**

As a result of Mr. Rigo's age as well as his years working long hours and difficult jobs to

support his family, ██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████

      ███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

**VI.      THE PRESENTENCE REPORT REVISED MAY 4, 2015**

The PSR determines Mr. Rigo's advisory Guidelines range as 57 months to 71 months of

imprisonment.  (PSR ¶ 94.)  The Probation Department recommends that Mr. Rigo be sentenced

to 48 months' incarceration followed by three years of supervised release.  (PSR at 26-28.)

VII.   **CONSIDERATION OF THE FACTORS IN TITLE 18, UNITED STATES CODE SECTION 3553(a) SUPPORTS A NON-GUIDELINES SENTENCE**

For the reasons detailed below, we ask that the Court impose a non-Guidelines sentence of time served or impose a sentence of probation.  The guiding principle of Section 3553(a) is the need to arrive at a sentence that is "sufficient, but not greater than necessary, to accomplish the goals of sentencing." *Kimbrough v. United* States, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted).  Section 3553(a) provides that the goals of sentencing are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The advisory Guidelines range is but one of several factors set forth in 18 U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See United States v. Booker*, 543 U.S. 220, 260 (2005); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007) (other factors include, among other things, the nature and circumstances of the offense and history and characteristics of the defendant and the need to avoid unwarranted sentencing disparities). "[D]istrict courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).  District courts may not presume that the Guidelines range is reasonable, and may consider arguments that the Guidelines sentence fails to properly to reflect the considerations of Section 3553(a). *Gall*, 552

U.S. at 50; *see Rita v. United States*, 551 U.S. 338, 350-51 (2007).  In every case, sentencing courts "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

As explained below, a non-Guidelines sentence is appropriate here in light of the need to avoid unwarranted sentencing disparities, Mr. Rigo's age, health, family situation, the nature of his offence, the principles of general and specific deterrence, and the balance of the factors set forth in Title 18, United States Code Section 3553(a).

**A.**     **The Need to Avoid Unwarranted Sentencing Disparities Supports a Non-Guidelines Sentence**

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  In assessing this factor, the Court may consider sentencing disparities among co-conspirators.  *See United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 n.8 (2d Cir. 2008)); *United States v. Ortega*, No. 00-cr-432 (DLC), 2008 WL 2755786, at *2 (S.D.N.Y. July 14, 2008) (court may consider sentence imposed on co-conspirators).  Each of the co-conspirators with whom Mr. Rigo has been linked – Messrs. Fernandez, Reyes-Arias, and Leyba – received a non-incarceratory sentence: of probation, time served, and probation with a period of home confinement, respectively.  Therefore, a sentence of time served or probation for Mr. Rigo would not only create no such disparity, but would *avoid* sentencing disparities between Mr. Rigo and the three other co-conspirators with whom he was associated.[2]

---

[2] In so far as the Government might direct the Court to the sentences imposed by the Honorable Denise Cote, who presided over the prosecution of fifty individuals who were targeted in the first wave of arrests in the Government's

Mr. Fernandez, as to whom the evidence of his involvement in the conspiracy and the extent of losses for which he is responsible far exceeds that applicable to Mr. Rigo, received a sentence of three years' probation and 200 hours of community service.  Mr. Reyes-Arias, the failed cooperator, received a sentence of time served, followed by three years' supervised release.  Finally, Mr. Leyba, whom the Government did not use as a cooperator and thus is more similarly situated to Mr. Rigo, received a non-incarceratory, non-guidelines sentence of three years' probation, six months' home confinement, and 200 hours of community service.

Under these circumstances, to sentence Mr. Rigo for a prison term would be contrary to the Section 3553(a) consideration of avoiding unwarranted sentencing disparities.

### B.     The Nature and Circumstances of the Offense Weigh in Favor of a Sentence of Time Served or Probation

Mr. Rigo pled guilty to the crime for which he is being sentenced.  He has admitted that he "knew that what [he] was doing was wrong."  (Plea Tr. at 16:1-2.)  He knows that he has caused the Government harm, and he also knows that his conduct has placed a great strain on his family.  However, in determining an appropriate sentence, the Court should bear in mind that Mr. Rigo's crime was nonviolent, and as the evidence showed at the *Fatico* hearing, his role in the offense was relatively small compared to the cooperators identified by the government.  As the Court found in its *Fatico* Opinion, there was no evidence recovered tying Mr. Rigo "to the searched stash houses, to the drugs . . . seized during the six hand-to-hand transactions supporting the arrests of Fernandez, Leyba, and Reyes-Arias, or otherwise identifying Rigo as a co-conspirator."  (*Fatico* Opinion at 7.)  Indeed, to this day, not one bottle of drugs has been

---

investigation, a number of those defendants were charged with not just Medicaid fraud, but also money laundering, wire fraud, and conspiracy to distribute narcotics.  *See United States v. Viera, et al.*, 11-cr-1072 (DLC) (S.D.N.Y.).  In any event, neither the PSR nor material disclosed so far connects Mr. Rigo with the crimes of those individuals.

found in Mr. Rigo's possession.  Mr. Rigo was not a kingpin of this operation, as demonstrated when comparing the $2.9 million loss amount attributed to Mr. Rigo to the $20 to $50 million amount attributed to Mr. Fernandez or the $7 million in losses attributed to Mr. Reyes-Arias.

### C.  Mr. Rigo's History and Characteristics Weigh in Favor of a Sentence of Time Served or Probation

Mr. Rigo's advanced age and ill health make even a sentence of imprisonment at the bottom of the Guidelines range a particularly harsh sentence, one that will leave him with little, if any, life to live after his release.  Moreover, a sentence of imprisonment will devastate the Rigo household, and will particularly harm ███████████████ and his ailing wife Angela, both of whom depend on Mr. Rigo as a provider and a caretaker.

### 1.  Age

Mr. Rigo's advanced age supports a non-Guidelines sentence.  "'[S]entencing courts are permitted to take into account a defendant's age and frailty'" in determining an appropriate sentence.  *United States v. Barbato*, No. 00-cr-1028 (SWK), 2002 WL 31556376, at *5 (S.D.N.Y. Nov. 15, 2002) (quoting *United States v. Gigante*, 989 F. Supp. 436, 443 (E.D.N.Y. 1998)); *see Gigante*, 989 F. Supp. at 443 (granting downward departure based on defendant's medical condition and age); *see also* U.S.S.G. §§ 5H1.1, 5H1.4.  "Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  *Barbato*, 2002 WL 31556376, at *5 (quoting U.S.S.G. § 5H1.1)).

Mr. Rigo is 75 years old.  Based on the Center for Disease Control's life expectancy tables of 2010, he has a life expectancy of approximately twelve years remaining.  Elizabeth Arias, Nat'l Ctr. For Health Statistics, Ctrs. for Disease Control and Prevention, *United States*

*Life Tables, 2010*, NAT'L VITAL STATISTICS REPORTS, Vol. 63 No. 7, Nov. 6, 2014, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_07.pdf.  Given his overwhelming number of health issues, it is likely that, in reality, a Guidelines sentence will place Mr. Rigo behind bars for most, if not all, of his remaining lifetime.  A non-Guidelines sentence would avoid "a life sentence in fact" for an offense that does not justify such a harsh punishment.  *United States v. Ferranti*, 928 F. Supp. 206, 216 (E.D.N.Y. 1996).

Moreover, because the "Guidelines do not take into account the inverse relationship between age and recidivism," *United States v. Hodges*, No. 07-cr-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009), the sentence imposed on Mr. Rigo must account for the well-established principle that older defendants exhibit "markedly lower rates of recidivism," *United States v. Eberhard*, No. 03-cr-562-01 (RWS), 2005 WL 1384038, at *10 n.3 (S.D.N.Y. June 9, 2005) (Sweet, J.) (noting that two other courts "declined to impose Guidelines sentences" on older defendants because such defendants were less likely to be recidivists); U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 28 (2004) (finding that the recidivism rate for defendants over age 50 in Criminal History Category I was a mere 6.2%); *see United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (summary order) (remanding for abuse of discretion where District Court did "not tak[e] into account policy considerations with regard to age recidivism not included in the Guidelines").

### 2.      Physical Condition

Mr. Rigo's weak physical condition, tied to his age but also caused by years of grueling factory work and the lifestyle of a poor refugee, makes a Guidelines sentence unreasonably harsh

and unnecessarily long.  *See United States v. Bullington*, No. 10-cr-20057-002, 2011 WL 2912799, at *3 (W.D. Ark. July 20, 2011) (considering defendant's "relatively poor health," including diagnoses for "high blood pressure, high cholesterol, diabetes, [and] sleep apnea," in granting a non-Guidelines sentence); *United States v. Bello*, No. 00-cr-1288 (AKH), 2001 WL 1661919, at *2 (S.D.N.Y. Dec. 28, 2001) (considering defendant's "very poor health," including a "totally occluded coronary artery," in granting a non-Guidelines sentence of home detention and probation), *rev'd on other grounds*, 310 F.3d 56 (2d Cir. 2002).  █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████

Mr. Rigo's ill health and age make him even more vulnerable to prison conditions, and will cause him to "suffer more than the average inmate" if he is imprisoned.  *United States v. McClean*, 822 F. Supp. 961, 962 (E.D.N.Y. 1993).  Time served or probation, on the other hand, would allow Mr. Rigo to continue to receive the medical care he needs without further hazarding his health, while fully serving the purposes of sentencing.

3.      Family

The Court should also consider Mr. Rigo's crucial role as provider and caretaker to both his wife and █████████████████, in determining the nature of the sentence imposed.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    Mr. Rigo also cares for his wife, who no

longer works and has limited mobility due to her accident.  (*Id.*)  Theirs is a "close-knit family

whose stability depends on [Mr. Rigo's] continued presence."  *See United States v. Alba*, 933

F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure for extraordinary family

circumstances when, among other things, defendant lived with disabled father who depended on

defendant to get in and out of his wheelchair).

Any period of incarceration imposed upon Mr. Rigo will therefore not only punish him

but also punish his entire family, and may well "result in the destruction of an otherwise strong

family unit."  *Id.*  A sentence of time served or a period of probation, on the other hand, will

allow Mr. Rigo to continue taking care of his son and his wife in the home and be a continued

presence in their lives.  *Bello*, 2001 WL 1661919, at *2 ("The needs of defendant's wife – her

difficulty in caring for herself, her home, and her teenage children – argue persuasively that

defendant should not be removed from that household, if an alternative to custody would be

reasonable in the circumstances."); *United States v. Gamez*, 1 F. Supp. 2d 176, 184-85 (E.D.N.Y.

1998) (considering the "detriment that would be felt by the families of the defendants if lengthy

periods of incarceration were imposed" in granting downward departures).

### D.   Considerations of General and Specific Deterrence Support a Non-Guidelines Sentence

A sentence of time served or probation is sufficient for general deterrence in this case.

There is "no conclusive evidence that supports the hypothesis that harsher sentences reduce

crime through the mechanism of general deterrence."  Anthony N. Doob & Cheryl Marie

Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 CRIME & JUST. 143, 187 (2003).  In fact, "there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013). Indeed, when states adopt alternatives to lengthy prison terms – including "intermediate" punishments like supervised release – crime rates do not rise.  *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 997-99 (E.D. Cal. 2009).

A sentence of time served or probation is also sufficient for specific deterrence in this case.  As noted above, Mr. Rigo is 75 years old and has a litany of health problems.  He is too old and weak to participate in criminal activity.  To the extent he is not already, he will be after his sentence.

More importantly, Mr. Rigo is deeply sorry for his participation in the Scheme.  He has seen the incredible strain that his conviction and pending sentence have imposed upon his family and has no plans to put them through such suffering again.

Finally, it bears noting that the Scheme has been successfully and entirely dismantled, and Mr. Rigo's co-conspirators have all been sentenced; some have relocated, and Mr. Rigo is loathe to associate with any again.  The risk that Mr. Rigo will re-engage with them, and fall back into the illegal conduct for which he is so genuinely remorseful, is trivial.

*       *       *

**CONCLUSION**

For the reasons discussed above, we ask the Court to impose a non-Guidelines sentence of time served or probation.

Dated:  New York, New York
       May 5, 2015

Respectfully submitted,

SPEARS & IMES LLP

By:   /s/ Joanna C. Hendon
      Joanna C. Hendon (jhendon@spearsimes.com)
      Sharanya Sai Mohan (smohan@spearsimes.com)
      Alicia K. Amdur (aamdur@spearsimes.com)
      Spears & Imes LLP
      51 Madison Avenue
      New York, New York  10010
      (212) 213-6996

      *Attorneys for Defendant Bladimir Rigo*