UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

        - v. -                                        :                13 Cr. 897 (RWS)

BLADIMIR RIGO,                                    :

                Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Edward B. Diskant
Assistant United States Attorney
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

        - v. -                                        :                    13 Cr. 897 (RWS)

BLADIMIR RIGO,                              :

             Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

      As this Court has already found in its Opinion and Order dated January 28, 2015 ("Op. &

Order"), for more than a decade prior to his arrest, Bladimir Rigo, a/k/a "Bladi," was an

aggregator of black market drugs used to treat illness such as HIV/AIDS, trafficking in

thousands of bottles of previously-dispensed medications with the goal of ultimately passing

these bottles off as new and re-dispensing them to unsuspecting patients.   To facilitate this

criminal activity, the defendant employed workers – including Rogelio Leyba and Arcadio

Reyes-Arias a/k/a "Chino" – to buy dozens of bottles at a time off the streets of Newark.  The

defendant planned and completed transactions involving hundreds-of-thousands of dollars in

black-market medicines.  And the defendant reaped the financial benefits of his participation in

this illegal black market.  The defendant's conduct was on-going and substantial – during a

consensually recorded meeting in September 2012, the defendant described himself as one of the

"two big people" involved in the conspiracy at the time.

      The defendant's conduct was also incredibly dangerous – every bottle purchased at the

defendant's direction was being taken away from an HIV/AIDS patient who needed that

medicine.  Those bottles were then "cleaned" with dangerous chemicals as part of the co-

conspirators' efforts to make these bottles appear new before being re-dispensed to unsuspecting patients suffering from the same life-threatening ailments.  Based on the bottles included in this Court's loss finding alone, this defendant's conduct directly affected the health of thousands of people.

Based on its own independent review of the evidence, as well as this Court's findings in the Opinion and Order, the U.S. Probation Department has determined that the applicable Guidelines range in this case is 57 to 71 months' imprisonment and has recommended a sentence of 48 months.   On May 11, 2015, this Court issued its Sentencing Opinion indicating its intention to sentence the defendant to a term of 48 months' imprisonment.   For the reasons that follow, and consistent with recommendation of Probation and this Court's Sentencing Opinion, the Government respectfully submits that a substantial sentence of imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

## I. BACKGROUND

### A.    <u>Offense Conduct</u>

The following facts are taken primarily from this Court's Opinion & Order as well as the Presentence Report (the "PSR"):

The defendant was charged by Indictment 13 Cr. 897 (RWS) with one count of conspiracy to commit healthcare fraud and one count of conspiring to commit adulteration and unlawful wholesale distribution of prescription medications.   The charges stem from the defendant's participation in a large-scale scheme to obtain various prescription medications—typically those prescribed to treat HIV and AIDS—which had previously been dispensed to individuals in Newark, New Jersey and elsewhere, and then to attempt to cause these bottles to

be re-dispensed as "new" to unsuspecting patients.   The drugs involved in this scheme were not

drugs of abuse—*i.e.*, controlled substances —but rather were brand name pharmaceuticals used

exclusively by patients with valid prescriptions and for which the price tags, almost always paid

by insurance programs such as Medicaid, ran into the thousands of dollars per bottle.  (Op. &

Order at 3-4.)

The scheme worked, in general terms, as follows:  *first*, the lowest level participants in

the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs

at pharmacies throughout the country, including in the Southern District of New York and the

Newark, New Jersey area.  These Insurance Beneficiaries were typically HIV or AIDS patients

who paid little or no money of their own for the drugs in question because their insurance plans,

typically Medicaid, footed the bill.  (*Id.* at 4.)   The Insurance Beneficiaries then sold their

bottles of medication—rather than taking them as prescribed—to other participants in the

scheme, people like Reyes-Arias and Leyba, referred to in the investigation as "Collectors," for

cash at locations like street corners and bodegas.   Collectors, in turn, sold the second-hand

bottles they collected to the defendant and other "Aggregators" – *i.e.,* scheme participants who

typically bought large quantities of second-hand drugs from multiple Collectors.  Eventually, the

second-hand drugs made their way to corrupt distributors and pharmacies willing to re-dispense

these "second-hand" drugs to unsuspecting consumers.   (*Id.*)

Health care benefit programs, such as Medicaid, were generally defrauded twice with

respect to each bottle dispensed in the scheme:  on the front end, a health care benefit program

was fraudulently induced into paying for these drugs under the false representation that these

drugs are for the sole intended use of the program beneficiary—i.e., the Insurance Beneficiary.

The scheme participants then sought to defraud health care benefit programs again on the back

end of the scheme:  by taking great pains to fraudulently conceal (1) the true and illegitimate
source of the bottles, and (2) the fact that the bottles have been previously dispensed, the scheme
participants attempt to have the bottles re-dispensed as new, legitimately obtained drugs by
pharmacies thereby fraudulently inducing health care benefit programs like Medicaid to pay for
the exact same bottles a second time.  (*Id.* at 4-5.)

> This defendant participated in this scheme as a significant Aggregator based in Newark,
New Jersey who, from at least 2000 up until his arrest in 2013, purchasing large numbers of
bottles of these second-hand medications before selling them to even higher-level scheme
participants in return for cash.  (*Id.* at 5.)  To facilitate his activities, the defendant needed to
employ workers – *i.e.*, people who would operate as "collectors" and purchase bottles of second-
hand medications from the Insurance Beneficiaries for the defendant to resell.   Among others,
the defendant employed Reyes-Arias and Leyba who, for a period of approximately five years
from at least 2000 through approximately 2005, bought significant numbers of bottles of these
medicines for the defendant to resell.  (*Id.* at 8.)  After that time period, both Reyes-Arias and
Leyba went out on their own, opening their bodegas, from which they continued to work as
collectors, buying bottles of second-hand medications to sell to the defendant, among others.

> To make the scheme work, the bottles purchased by the defendant needed to be
"cleaned," (*e.g.*, Plea Tr. at 15:19-24), that is, the patient labels affixed when the bottles were
initially dispensed to the Insurance Beneficiaries needed to be removed so that the bottles would
appear to be "new."  To "clean" the bottles, the defendant and his co-conspirators doused the
medications with lighter fluid or a similar chemical to melt off the initial patient label.  As
inspection of bottles recovered during the investigation confirmed, this process of "cleaning" the
bottles was inherently dangerous – as the testing on some of these bottles confirmed, the

chemicals used to "clean" the bottles frequently seeped into them, thereby contaminating the pills themselves with chemicals known to be dangerous or even fatal if swallowed.   A copy of one of the lab reports documenting these findings is attached as Exhibit A.

In October 2014, this Court held a hearing pursuant to *United States* v. *Fatico*, 603 F.2d 1053 (2d. Cir. 1979).  Based on evidence presented at that hearing, this Court was able to conclude that the defendant's involvement in this conspiracy spanned many years, a time period during which the defendant was repeatedly involved in planning and consummating transactions involving hundreds of thousands of dollars in second-hand medications.  (*E.g.*, Op. & Order at 16, 18-19).   Indeed, the Court found that during this time period, the defendant was a "principal player in the New Jersey branch" of this nationwide conspiracy.  (*Id.* at 16.)

Moreover, and focusing principally on the period leading immediately up to the defendant's arrest – a time period for which evidence of precise transactions was more readily available – this Court has determined that the defendant's conduct involved at least $2.9 million worth of second-hand medications.  In reaching that figure, the Court determined that the defendant purchased approximately $30,000 worth of second-hand medications from Reyes-Arias – drugs with a Medicaid value of closer to $300,000 – in December 2012, and that the defendant contemplated a purchase of approximately $250,000 worth of medications from Reyes-Arias and Leyba in September 2012.   (*Id.*at 18-19).

The Court's loss figure also includes nearly $2.4 million worth of sales of second-hand HIV/AIDS medications documented in a series of classic "drug ledgers" recovered from the defendant's bedroom.   In particular, as this Court found, these ledgers, which show sales of nearly 2,700 bottles of black market drugs "corroborated Reyes-Arias' testimony regarding the magnitude of [the defendant's] involvement in this conspiracy from 2005-2012, as well as [the

defendant's] self-characterization as a principal player in the New Jersey branch of the market." (*Id.* at 16.)

On April 23, 2014, the defendant pled guilty to his participation in this scheme without an agreement with the Government.   As noted, in October 2014, this Court held a *Fatico* hearing focused on the issue of loss, and, by Opinion & Order dated January 28, 2015, concluded that the loss amount directly attributable to this defendant's conduct was approximately $2.9 million.   (*Id.* at 16, 23.)

**C.     The Guidelines Range**

As independently determined by the U.S. Probation Department and not disputed by either party, the November 1, 2014 Guidelines Manual applies to Counts One and Two of the Indictment in the following manner:

1.      Pursuant to U.S.S.G. § 3D1.2 (d), Counts One and Two are grouped together as one (the "Group").

2.      The applicable sentencing guideline to the Group is U.S.S.G. § 2B1.1. Pursuant to U.S.S.G. § 2B1.1(a), the base offense level is six.

3.      Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), a 18-level increase is warranted because the loss exceeded $2,500,000, but was not more than $7,000,000.

4.      Pursuant to U.S.S.G. § 2B1.1(b)(7)(i), a two-level increase is warranted because the offense caused a loss to a Government health care program of more than $1,000,000.

5.      Pursuant to U.S.S.G. § 2B1.1(b)(15), a two-level increase is warranted because the offense involved the conscious or reckless risk of death or serious bodily injury.

6.      Because the defendant clearly demonstrated acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, because the defendant has accepted responsibility as described in the previous paragraph, an additional one-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his

intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Consistent with the above, the defendant's total, adjusted offense level is 25.  (PSR ¶¶ 45-56).

The defendant, who has seven prior arrests, has no criminal history points and, as such, is in Criminal History Category I.  (*Id.* ¶¶ 63-69.)

With a total offense level of 25, and a Criminal History Category of I, the advisory, applicable Guidelines range is 57 to 71 months' imprisonment.  The Probation Department has recommended a sentence of 48 months' imprisonment.

## II.    DISCUSSION

In light of the nature of the instant offense as well as the history and characteristics of this defendant, and consistent with the recommendation of the Probation Department, the Government believes that a substantial sentence of incarceration is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.   Indeed, consideration of the factors set forth in Title 18, United States Code, Section 3553(a), factors which militate forcefully in favor of a substantial sentence:

*First*, a substantial sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A). Over the period of more than a decade, the defendant was a significant participant and "principle player" in a nationwide scheme to defraud insurance plans.  The defendant's role in the scheme was long-standing and important – at various times, the defendant even employed workers to help him collect and aggregate these bottles – and the transactions he arranged and participated in involved hundreds of thousands of dollars of black-market medicines at a time.  Indeed, the

drug ledgers recovered from the defendant's bedroom alone document transactions involving 168,000 pills with a combined Medicaid reimbursement value in excess of $2.4 million.

That the defendant's conduct potentially endangered the lives of thousands of people is yet another reason why a substantial term of imprisonment is appropriate.   As noted above, to make the scheme work, on the front end, the defendant and his co-conspirators preyed on indigent HIV/AIDS patients so desperate for money they were willing to sell, rather than take, the life-saving medications they received for free through programs like Medicaid.   In so doing, the defendant and his co-conspirators directly affected the health of the thousands of Insurance Beneficiaries from whom these bottles were purchased.   Then the defendant and his co-conspirators subjected these second-hand medications to a "cleaning" process that entailed dousing the bottles in lighter fluid so as to remove the previously-affixed patient labels and thereby make the bottles seem "new."   As a result of this "cleaning" process, the chemicals used by the co-conspirators frequently seeped into the bottles thereby contaminating the pills themselves with substances that are considered fatal if swallowed.   As such, the defendant and his co-conspirators also directly affected the lives of the thousands of unknowing patients to whom these second-hand bottles were re-dispensed.   Indeed, for just these reasons, Probation has found – and the defendant does not dispute – that a two-level enhancement pursuant to Section § 2B1.1(b)(15) is appropriate because the defendant's conduct involved the conscious or reckless risk of causing death or serious bodily injury to others.

This was, in sum, a very serious and long-running crime for which a substantial sentence is both necessary and appropriate.

*Second*, a substantial sentence is necessary to afford adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).   With respect to general deterrence, as the Court is at this point aware, the

defendant was a significant participant in a massive, nationwide scheme: the Government's investigation to date has led to the arrest of more than 60 participants in this scheme, who were collectively responsible for diverting and re-dispensing more than $500,000,000 worth of these second-hand medications.   Given the clear allure of this scheme to so many, sending a strong message to others that trafficking in second-hand medicines is a crime which will result in a substantial term of incarceration is thus both necessary and appropriate under the circumstances.

Specific deterrence is also a factor that should weigh on the Court in imposing sentence. Notwithstanding the very substantial evidence of this defendant's role in the charged conspiracy – including his own statements, on the September 2012 consensually-made recording, that he was one of the "two big people" involved in the conspiracy at the time – the defendant has steadfastly and repeatedly sought to deny and downplay the scope of his conduct.[1]   Particularly alarming were the defendant's attempts to disclaim any responsibility for the more than $2.4 million worth of drug sales documented in drug ledgers recovered from his bedroom and which plainly demonstrates his very substantial role in the charged conspiracy.   That position was not consistent with any sort of genuine acknowledgement of responsibility by the defendant for his conduct, *cf.* U.S.S.G. § 3E1.1 n. 1 (noting that a defendant who "falsely denies, or frivolously contests" conduct relevant to sentencing "has acted in a manner inconsistent with acceptance of responsibility"), and it bespeaks the strong need for a substantial term of incarceration to make clear to the defendant the magnitude and seriousness of his wrongdoing.

In seeking a substantial downward variance, the defendant seeks to compare himself principally to two cooperators, Reyes-Arias and Fernandez, both of whom – unlike this defendant – not only fully accepted responsibility for their conduct but provided substantial

---

[1]   As the Court may recall, the defendant's position at the *Fatico* hearing was that he should be responsible for "at most" the $25,000 transaction detailed in the September 2012 recording.

-10-

assistance to the Government.[2]   Fernandez, in particular, who played a role to similar to that of this defendant in the scheme, attended a dozen or more proffer sessions with the Government, made numerous consensual recordings, conducted four controlled buys at the Government's direction, and helped the Government arrest and prosecute three additional targets, including this defendant.   As such, the Government moved for a downward departure pursuant to Section 5K1.1 of the Sentencing Guidelines at the time of his sentence, and Fernandez was sentenced accordingly.   None of the above, of course, is true with respect to this defendant.

### III.    CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of imprisonment is appropriate here and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        May 12, 2015

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York


                              By:       ___/s/_____
                                        Edward B. Diskant
                                        Assistant United States Attorney
                                        (212) 637-2294

---

[2] The comparison to Reyes-Arias is particularly inapt because, as this Court has already found, Reyes-Arias worked under this defendant as part of his participation in the scheme and was thus a lower-level participant.  Moreover, the loss figure for which Reyes-Arias was held responsible – *i.e.*, $7 million to $20 million – reflected all of the conduct Reyes-Arias about which he testified at the *Fatico* hearing.   Finally, it bears mention that by the time Reyes-Arias was sentenced to "time served," he had already served approximately 24 months.