```
F5J9RIGS
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
3  UNITED STATES OF AMERICA,
4            v.                              13 CR 897 (RWS)
5  BLADIMIR RIGO,
6                 Defendant.
7  ------------------------------x
8                                          New York, N.Y.
                                           May 19, 2015
9                                          4:42 p.m.

10
   Before:
11
                    HON. ROBERT W. SWEET
12
                                           District Judge
13
14                      APPEARANCES

15 PREET BHARARA
        United States Attorney for the
16      Southern District of New York
   EDWARD DISKANT
17      Assistant United States Attorneys

18 SPEARS & IMES
        Attorneys for Defendant
19 JOANNA C. HENDON
   ALICIA K. AMDUR
20 SHARANYA SAI MOHAN

21 ALSO PRESENT:  HUMBERTO GARCIA, Spanish Interpreter

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1           (In open court; case called)

2           MR. DISKANT:  Good afternoon, your Honor.  Edward
3   Diskant for the government.

4           MS. HENDON:  Good afternoon, your Honor.
5           Joanna Hendon for Mr. Rigo who is here with me.  And
6   my colleagues, Sharanya Sai Mohan and Alicia Amdur are at
7   counsel table as well.

8           THE COURT:  Thank you.
9           Ms. Hendon, have you had an opportunity to discuss the
10  presentence report and the Court's proposed sentencing opinion
11  with your client?

12          MS. HENDON:  Yes, your Honor.
13          THE COURT:  Is there anything you'd like to tell me?
14          MS. HENDON:  I would like to address the Court, if I
15  might.

16          THE COURT:  Sure.
17          MS. HENDON:  Thank you, Judge.
18          Your Honor, we rely primarily on our sentencing
19  memorandum and our letter of May 14 which I know the Court has
20  read carefully.  But there are a few points we would like to
21  highlight in support of our argument that a noncustodial
22  sentence in this case accomplishes the goals of Section
23  3553(a).

24          First, I'd like to introduce to the court Mr. Rigo's
25  immediate family who are all here today.  His wife, Angela

F5J9RIGS

Rigo, of 30 years.  In the second row, his oldest son, Vincent, is here.  And -- I misspoke because Mr. Rigo has two younger twin sons, Angel, who wrote a letter to the court.  Angel is working.  Is not here today.  Angel's twin brother Bladimir is here with his mother.

First, your Honor, I'd like to emphasize the crucial role that Mr. Rigo plays in his family.  You know from our submission Mr. Rigo has been married to Mrs. Rigo for more than 30 years.  The Rigoes live in the same house as their adult children and grandchildren.  Mr. Rigo's children look up to him.  He has worked hard to provide for them.  He has instilled good, decent values in his children and has helped them run their own businesses.  As Vincent here today wrote in his letter to the Court, "My father is the epitome of the principle that by working hard and applying yourself the American dream is possible."

The Rigo family is close-knit.  Mr. Rigo spends time with his sons and grandchildren daily.  In particular, he is deeply involved in caring for Bladimir who is in court today.  Bladimir Rigo suffers from debilitating disorder.  He has a fixed routine that involves regular outings with his father.  It is his father, the defendant, who coaxes him daily to complete basic tasks like eating and getting haircuts.

As Angel Rigo, Bladimir's twin who is not here, wrote in his letter to the Court, "My brother Bladimir is very close

to my father.  My brother has a fixed routine that he follows everyday.  He does not talk very much and can only write in broken sentences.  Although we were able to play normally as kids, now that we're older it's difficult for me to interact with him as much because he follows the same routines he did as a child.  Of the three of us brothers, my father was most worried about Bladimir.  Now, in addition to living with him, my father spends time with him almost everyday.  It is difficult to get Bladimir to eat.  My dad makes sure Bladimir eats and takes him out to eat.  He also takes him to do his daily chores."

Mr. Rigo also is instrumental in the care of Mrs. Rigo who in 2011 had an accident that left both of her hips and legs broken.

As Angel Rigo wrote to the Court on that topic, "When my mother had her accident she spent three months in the hospital.  She had both hips replaced and had rods in her legs.  It took her nearly two years to recover.  She still has a lot of trouble walking, climbing stairs, and even getting up.  My father is there to help her around the house, to get her up.  Because she cannot drive, he picks up the things they need like groceries."

Obviously, a sentence of incarceration in this case would punish not only Mr. Rigo but his family members as well, in particular his son Bladimir and his wife Angela.

1          Secondly, your Honor, Mr. Rigo's age and health make a
2  sentence of incarceration unnecessary in this case.  Mr. Rigo
3  is 75 years old.  Courts have repeatedly recognized the reduced
4  risk of recidivism in defendants of that age, especially those
5  having a Criminal History Category I, no criminal history
6  points, such as Mr. Rigo.
7          The reduced risk of recidivism associated with
8  Mr. Rigo's age is underscored or bolstered by the fact of the
9  strong family ties that exist, provide a network for him, a
10 routine for him, to keep him on the straight and narrow,
11 indoors if necessary, under home confinement, but that
12 structure exists in his life.  It's part of his daily routine
13 now.
14         The risk of recidivism in this case is reduced as well
15 by the fact that Mr. Rigo is so deeply sorry for his
16 participation in this scheme and for the distress that he has
17 put his family through as a result of this prosecution.
18         The risk that he will ever participate in criminal
19 activity during the remainder of his life, the court can and
20 should find on this record is negligible.  That is true as well
21 because I think court has seen enough to know that the scheme,
22 the conspiracy in this case has been dismantled by the
23 government.  Mr. Rigo's coconspirators have been prosecuted,
24 sentenced.  Some of them have been released.  He has no contact
25 with them.  And he is loathe to ever associate with any of them

F5J9RIGS

1   again.

2   A few words about the offense.  We acknowledge the
3   seriousness of the offense conduct here and no one at our table
4   has ever sought to downplay it.  Mr. Rigo is very sorry.  He's
5   ashamed -- as a former veteran who is grateful for the life
6   that this country has given him, he's ashamed to be in federal
7   court before your Honor for sentencing having violated the laws
8   of this country.

9   Just a few words, your Honor, before I wrap up, on
10  unwarranted sentencing disparities.  The coconspirators that
11  Mr. Rigo dealt with in this case, Mr. Fernandez,
12  Mr. Reyes Arias, and Mr. Leyba are all three.  Now we have
13  focused the court and asked the court to consider the
14  sentencing disparities point and the need to avoid unwarranted
15  sentencing disparities, we have focused on these three
16  conspirators because they are the individuals that the record
17  shows Mr. Rigo dealt with.  In its letter to the court -- and
18  our sentencing brief, at page 20, cites the case law from this
19  circuit that says it is appropriate for the court to focus on
20  the offender's coconspirators in making a determination about
21  whether there will be unwarranted sentencing disparities in the
22  case.  The government instead, in its letter yesterday, has put
23  before the court a list of defendants and sentences about which
24  we know nothing, about which this court knows virtually
25  nothing.  Only one of the names on that list has surfaced in

that case.  It's the first one, Conrado Vasquez.  And I'm referring to the list of names the government has given the court.  You may remember.  Conrado's name, I think, appears in the consensual tape recording between my client and Mr. Fernandez.  I think his name is mentioned there.  There's no reference to any of these other defendants.  I don't know anything about them.  I can tell you, because we pulled it, in the sentencing transcript for Conrado Vasquez the government represented that Mr. Vasquez -- pardon me.  The government represented that Mr. Fernandez, the gentleman in our case who had that massive stash house with $7 million worth of drugs and paraphernalia in it.  The government represented to Judge Cote that Mr. Fernandez was a lower level aggregator than Mr. Vasquez.  This is something we were able in 24 hours to pull together to point out why the names and sentences in the government's letter should be disregarded by the court and the court instead should focus on the fairness of putting Mr. Rigo in jail because he was the last man standing.

      The Court will recall that Mr. Fernandez, with his big stash house, I think he was the first person caught by the agents in this part of the case.  And he cooperated against Mr. Leyba and Mr. Reyes Arias.  Mr. Leyba tried to cooperate and couldn't.  Mr. Reyes Arias was signed up and cooperated.  Mr. Fernandez and Mr. Reyes Arias over a period of several months made the case against Mr. Rigo.  And there was no one

left for Mr. Rigo to cooperate against.  But he shouldn't be punished for that.

In addition, the record in this case shows that Mr. Rigo, if anything, was less involved in the scheme than the three coconspirators I've referred to, Mr. Fernandez did two undercover buys at least with the agents and had a massive stash house, very sophisticated operation.  Mr. Reyes Arias and Mr. Leyba as well had undercover sales either to cooperators or to agents.  They each had close to five hundred containers of medicines and related evidence of criminal activity in their homes or their stash houses when they were arrested.  Mr. Rigo engaged -- there is no evidence of him engaging in any hand-to-hand buys.  Nothing was recovered from his home other than the lists of medicines we spent so much time on.  The government was unable to connect -- and I think this is in the Court's opinion following the Fatico hearing -- the government was unable to connect Mr. Rigo to any of the seizures involving the other three conspirators I'm now referring to or the hand-to-hand buys involving those conspirators.

For him at age 75 with his physical problems and the family he has to be left at the end of the day going to prison when none of these other three did.  Mr. Reyes Arias spent time in jail only because he didn't make bail.  And I tried to elicit from him why it was that he didn't make bail as a cooperator.  Because it appeared, from all the materials we

1  had, that he was a U.S. citizen -- I may have been mistaken
2  about that, but I don't know why he didn't make bail.  But
3  that's the only reason Reyes Arias stayed in prison at all, was
4  because he didn't make bail.
5          Now, Mr. Fernandez was a cooperator.  He, the
6  government told the court at sentencing in that case, was
7  responsible for between 20 and 50 million dollars worth of
8  medicine.  He received a noncustodial sentence.
9          Mr. Leyba, not a 5K cooperator.  Mr. Leyba did
10 hand-to-hand sales and had his own little stash house.  He had
11 a noncustodial sentence.
12         Now, I don't want to spend too much time focusing on
13 this point but it is a valid and important one for the Court to
14 consider, the fairness and appropriateness in this case with
15 this conspiracy, these conspirators, of Mr. Rigo going to jail
16 because there was no one left for him to cooperate against when
17 others did not.
18         But, the real reason that the Court or the overriding
19 reason the Court should give serious consideration to a
20 noncustodial sentence in this case is because the interests of
21 society, the need for general and specific deterrence, the need
22 to take into account the seriousness of the offense, these
23 factors will not be served by putting this man in jail.  He can
24 be subject to home confinement -- well they won't be served
25 without offsetting very deleterious impact on his family who

1  have done nothing to deserve punishment and on him at this
2  point given his health.
3      So, he has been for nearly two years on supervision by
4  pretrial services.  I think they check in with him monthly.
5  He's been a model supervisee.  There was no reason to believe
6  he won't be a model supervisee if your Honor puts him on some
7  kind of supervision of home confinement or gives him community
8  service to do like Mr. Fernandez was given.  But putting this
9  man, with this constellation of family factors and health
10 factors, who was involved to the extent he was involved in this
11 crime, in prison, particularly when those he dealt with, who
12 were caught red-handed and at least, if not more, involved than
13 he did not receive custodial sentences would be unfair and
14 inconsistent with the court's obligations under Section 3553.
15      If your Honor has questions for me at this time, I'm
16 happy to answer them.
17      THE COURT:  Thank you very much.
18      Mr. Rigo, is there anything you'd like to tell me in
19 addition to what's been stated on your behalf by your lawyer?
20      THE DEFENDANT:  Yes.
21      Your Honor, I feel very remorseful about what I have
22 done.  For my crimes.  I am very sorry for what I have done,
23 what I have put my family through, who depends on me, but I
24 have failed them.  I implore you to be lenient when imposing
25 sentence.  Thank you, your Honor.

1           THE COURT:  Thank you, sir.

2           Anything from the government?

3           MR. DISKANT:  Only briefly, your Honor.

4           I think, as the Court has already sensed from the Fatico hearing and from its sentencing opinion, this was a very serious crime and this defendant was a very significant participant in it.  We are in accord with the Court's sentencing opinion.  We are in accord with the probation department's recommendation in this case for all of the reasons set forth both in the PSR and in the Court's opinion.

11          There are just a couple of points that Ms. Hendon raised that I did want to briefly respond to and I'm certainly happy to answer any questions if the Court has them.

14          The first is this notion that Mr. Rigo was left with no one to cooperate against which, with great respect to defense counsel, is simple nonsense.  The very first conversations I had with defense counsel, the moment the defendant was arrested, was about cooperation.  Mr. Rigo had zero interest.  Because Mr. Rigo has never fully accepted responsibility for his conduct.  He has fought tooth and nail which, of course, is his right.  But it is simply not correct to stand up and say that the only reason he is being punished is because there is no one left for him to cooperate against.

24          With respect to the conduct itself, the government would disagree with the notion that any of the coconspirators

F5J9RIGS

1    Ms. Hendon discussed were more culpable or more involved than
2    the defendant was.  As the Court has heard testimony in the
3    Fatico hearing, Mr. Leyba and Mr. Reyes Arias worked for the
4    defendant.  They were his employees.  They were the people who
5    got their hands dirty so this defendant didn't have to for a
6    period over a decade.  He is significantly more culpable than
7    they are.
8         We did try to provide the Court with information, the
9    probation department already has, about sentences imposed by
10   Judge Cote.  I am happy to answer them if the Court has
11   questions.  Otherwise, I will rest on our submission.
12        THE COURT:  Anything further, Ms. Hendon?
13        MS. HENDON:  Only that Mr. Diskant was not present at
14   the arraignment of Mr. Rigo.  Another Assistant U.S. Attorney
15   was.  And it was that assistant that I had initial
16   conversations with.  I would not have represented to the Court
17   what I did had I had discussions with the government about the
18   possibility of cooperation.  I recall no discussions, no
19   serious interest by the government on this topic.  I'm getting
20   older.  It's been over a year.  But I wouldn't have stood up
21   and said what I said had there been a meaningful discussion on
22   this subject.
23        THE COURT:  Mr. Rigo, this is a painful moment for
24   you.  It's a painful moment for your family.  I have great
25   respect for your devotion to your wife and to your sons.  Those

family obligations are paramount in the society and do make a very significant difference to all of us. At the same time, I have to take into consideration the fact that for ten years you engaged in conduct which was harmful to the society. It harmed individuals and it harmed institutions. It harmed the program, the very program that was set up to help individuals deal with disease and difficulty. So that makes it very hard. I understand everything that your very skilled counsel has told me.

The issue of deterrence is one concept which is in the sky which everybody discusses, but nobody really knows how it operates. And I can't -- if it were a question of the deterrence alone and your family situation, I think I might be able to accept what your counsel has proposed. But it's because of the duration of the activity and the harm that was done to other people that compels me to reach the conclusion that there has to be a custodial sentence.

I will take into consideration the factors which have been brought to my attention, particularly your age and the family situation. And so instead of the 48 months that were suggested in my sentencing opinion, I am going to impose a sentence of 38 months. All of the other terms and conditions of the sentencing opinion will be in effect.

You have a right to appeal this sentence and to be represented free of charge on that appeal if you don't have

F5J9RIGS

1   funds.
2              Is there anything further?
3              MR. DISKANT:  Yes, your Honor.
4              We've handed up a proposed restitution order for the
5   Court.
6              THE COURT:  Yes.
7              MR. DISKANT:  And the only other remaining item is a
8   surrender date.
9              THE COURT:  Yes, I have signed that.
10             Is there anything further?
11             MR. DISKANT:  Surrender date, your Honor.
12             MS. HENDON:  Judge, I would ask that if the Court
13  would make a recommendation.  I know that the Bureau of Prisons
14  does as it sees fit.  But in order to facilitate family visits
15  if your Honor would recommend a facility in the New York
16  region.
17             THE COURT:  I will do so.
18             MS. HENDON:  Can I just confer with my client a moment
19  about a surrender date?
20             THE COURT:  Sure.
21             MS. HENDON:  Thank you.
22             (Pause)
23             MS. HENDON:  Your Honor we would ask Mr. Rigo be given
24  two months within which to make arrangements for care of his
25  son and wife and otherwise get his affairs in order before

F5J9RIGS

1  surrendering.
2           THE COURT:  That's agreeable.
3           MS. HENDON:  Thank you, your Honor.
4           THE COURT:  Anything else?
5           MR. DISKANT:  Nothing further, Your Honor.
6           MS. HENDON:  No, your Honor.  Thank you.
7           THE COURT:  Thank you all.
8           (Adjourned)