UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

       - v. -                          :                    13 Cr. 897 (RWS)

BLADIMIR RIGO,                                    :
     a/k/a "Bladi,"
                                                  :
               Defendant.
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### RE-SENTENCING SUBMISSION OF THE UNITED STATES OF AMERICA


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Edward B. Diskant
Assistant United States Attorney
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

      - v. -                              :            13 Cr. 897 (RWS)

BLADIMIR RIGO,                      :
    a/k/a "Bladi,"
                                    :
           Defendant.
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**RE SENTENCING SUBMISSION OF THE UNITED STATES OF AMERICA**

The Government respectfully submits the following in advance of the re-sentencing of defendant Bladimir Rigot (the "defendant") currently scheduled for October 13, 2016 at 12pm. As detailed more fully herein, the defendant pled guilty in April 2014 to his role in a massive, nationwide conspiracy to in which the defendant and his co-conspirators fraudulently obtained tens of thousands of bottles of prescription medications used to treat illnesses such as HIV and AIDS before causing the same bottles to be fraudulently redistributed a second time as "new" to unsuspecting patients.  After holding a hearing pursuant to *United States* v. *Fatico*, 603 F.2d 1053 (2d. Cir. 1979) (the "Hearing") focused on the issue of the loss amount properly attributable to the defendant, this Court found that the defendant was a "principal player in the New Jersey branch" of this nationwide conspiracy and determined that the defendant, through his participation in the scheme, was responsible for causing a loss of $2.9 million.  (Opinion & Order dated January 28, 2015 (hereinafter "Ex. A") at 16.)  That loss figured stemmed principally from a drug ledger recovered from the defendant's bedroom at the time of his arrest and reflecting transactions involving approximately $2.4 million in second-hand medications.

(*Id.* at 16.)  The Court subsequently sentenced the defendant principally to a term of 38 months' imprisonment, or substantially below the bottom of the defendant's applicable Guidelines range of 57 to 71 months' imprisonment.[1]

On appeal, the defendant contended, for the first time, that this Court had failed to make "particularized findings" that the full $2.9 million loss figured attributed to the defendant constituted conduct that "was reasonably foreseeable to the defendant" and within the scope of the criminal "activity to which the defendant agreed."  *United States* v. *Studley*, 47 F.3d 569, 574 (2d Cir. 1995).   The Second Circuit agreed that the record below contained no explicit findings in those regards and thus remanded, making clear, however, that it did so "without placing a thumb on the scale with respect to what the District Court's particularized findings under *Studley* should be" and "recogniz[ing] that, on remand, the District Court's loss calculation may be no different than it was in the first instance."  *United States* v. *Rigo*, 2016 U.S. App. LEXIS 9354, at *2-3, *7 (2d Cir. May 23, 2016).[2]

Because this Court has already correctly and appropriately made loss findings limited to those losses that are (1) within "the scope of the criminal activity agreed upon by the defendant" and (2) "foreseeable to the defendant," *United States* v. *Rigo*, 2016 U.S. App. LEXIS 9354,  at *3 (quoting *United States* v. *Getto*, 729 F.3d 221, 234 (2d Cir. 2013), the Government submits this Court, on remand, should simply make explicit what was already strongly implied in its prior findings and then resentence the defendant to a custodial term of 38 months.

---

[1] As detailed further below, the Government does not dispute that, as a result of changes to the U.S. Sentencing Guidelines since sentence was initially imposed, the defendant's applicable Guidelines range is now 46 to 57 months' imprisonment.

[2] A copy of the Second Circuit's summary order is attached hereto as Exhibit B.

## I. BACKGROUND

### A.    Offense Conduct

The following facts are taken primarily from this Court's Opinion & Order dated January

28, 2015 and attached hereto as Exhibit A ("Ex. A"), as well as the Presentence Report prepared

by the U.S. Probation Department (the "PSR")[3]:

The defendant was charged by Indictment 13 Cr. 897 (RWS) with one count of

conspiracy to commit healthcare fraud and one count of conspiring to commit adulteration and

unlawful wholesale distribution of prescription medications.  The charges stem from the

defendant's participation in a large-scale scheme to obtain various prescription medications—

typically those prescribed to treat HIV and AIDS—which had previously been dispensed to

individuals in Newark, New Jersey and elsewhere, and then to attempt to cause these bottles to

be re-dispensed as "new" to unsuspecting patients.   The drugs involved in this scheme were not

drugs of abuse—*i.e.*, controlled substances —but rather were brand name pharmaceuticals used

exclusively by patients with valid prescriptions and for which the price tags, almost always paid

by insurance programs such as Medicaid, ran into the thousands of dollars per bottle.  (Ex. A at

3-4.)

The scheme worked, in general terms, as follows:  *first*, the lowest level participants in

the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs

at pharmacies throughout the country, including in the Southern District of New York and the

Newark, New Jersey area.  These Insurance Beneficiaries were typically HIV or AIDS patients

who paid little or no money of their own for the drugs in question because their insurance plans,

---

[3] While, as discussed below, this Court has asked the Probation Department to revise its
PSR to reflect changes in the U.S. Sentencing Guidelines since the initial sentence was imposed,
the Government does not anticipate any changes to the Probation Department's factual findings,
which are relied upon above.

typically Medicaid, footed the bill.   (*Id.* at 4.)   The Insurance Beneficiaries then sold their bottles of medication—rather than taking them as prescribed—to other participants in the scheme, people like Arcadio Reyes-Arias, who testified at the Hearing, and who were referred to in the investigation as "Collectors," for cash at locations like street corners and bodegas. Collectors, in turn, sold the second-hand bottles they collected to the defendant and other "Aggregators" – *i.e.,* scheme participants who typically bought large quantities of second-hand drugs from multiple Collectors.  Eventually, the second-hand drugs made their way to corrupt distributors and pharmacies willing to re-dispense these "second-hand" drugs to unsuspecting consumers.  (*Id.*)

Health care benefit programs, such as Medicaid, were generally defrauded twice with respect to each bottle dispensed in the scheme: on the front end, a health care benefit program was fraudulently induced into paying for these drugs under the false representation that these drugs are for the sole intended use of the program beneficiary—*i.e.*, the Insurance Beneficiary. The scheme participants then sought to defraud health care benefit programs again on the back end of the scheme:  by taking great pains to fraudulently conceal (1) the true and illegitimate source of the bottles, and (2) the fact that the bottles have been previously dispensed, the scheme participants attempt to have the bottles re-dispensed as new, legitimately obtained drugs by pharmacies thereby fraudulently inducing health care benefit programs like Medicaid to pay for the exact same bottles a second time.  (*Id.* at 4-5.)

This defendant participated in this scheme as a significant Aggregator based in Newark, New Jersey who, from at least 2000 up until his arrest in 2013, purchasing large numbers of bottles of these second-hand medications before selling them to even higher-level scheme participants in return for cash.  (*Id.* at 5.)  To facilitate his activities, the defendant needed to

employ workers – *i.e.*, people who would operate as "collectors" and purchase bottles of second-hand medications from the Insurance Beneficiaries for the defendant to resell.   Among others, the defendant employed Reyes-Arias and Rogelio Leyba who, for a period of approximately five years from at least 2000 through approximately 2005, bought significant numbers of bottles of these medicines for the defendant to resell.  (*Id.* at 8.)  After that time period, both Reyes-Arias and Leyba went out on their own, opening their bodegas, from which they continued to work as collectors, buying bottles of second-hand medications to sell to the defendant, among others.

To make the scheme work, the bottles purchased by the defendant needed to be "cleaned," (*e.g.*, Plea Tr. at 15:19-24), that is, the patient labels affixed when the bottles were initially dispensed to the Insurance Beneficiaries needed to be removed so that the bottles would appear to be "new."  To "clean" the bottles, the defendant and his co-conspirators doused the medications with lighter fluid or a similar chemical to melt off the initial patient label.  As inspection of bottles recovered during the investigation confirmed, this process of "cleaning" the bottles was inherently dangerous – as the testing on some of these bottles confirmed, the chemicals used to "clean" the bottles frequently seeped into them, thereby contaminating the pills themselves with chemicals known to be dangerous or even fatal if swallowed.

On April 23, 2014, the defendant pled guilty to his participation in this scheme without an agreement with the Government

**B. The *Fatico* Hearing and this Court's January 28, 2015 Opinion & Order**

In October 2014, this Court held a *Fatico* hearing focused on the issue of loss.  The Government called three witnesses, including Reyes-Arias, who testified pursuant to a cooperation agreement with the Government and who, as noted above, worked for and then with the defendant as part of the conspiracy for many years prior to their arrests.  As the Court heard

from each of the witnesses at the Hearing and from the defendant himself, who was captured on a consensual recording made during the course of the investigation, this defendant was a large-scale aggregator based in the Newark, New Jersey Area, who operated as a part of the scheme between at least 2000 and his arrest in 2013. (*E.g.*, Ex. A at 5-6, 8-9, 10-11 & 13-14.)   During that time period, the defendant aggregated bottles of these second-hand medications by employing workers in his bodega to purchase these medicines from Insurance Beneficiaries on the streets of Newark and by buying bottles from independent collectors – that is, scheme participants who worked on their own to buy these bottles from Medicaid patients before selling them to Aggregators like the defendant.

Based on evidence presented at that hearing, this Court, by Opinion and Order dated January 28, 2015, concluded that the defendant's involvement in this conspiracy spanned many years, a time period during which the defendant was repeatedly involved in planning and consummating transactions involving hundreds of thousands of dollars in second-hand medications.  (*Id.* at 16, 18-19.)   Indeed, the Court found that during this time period, the defendant was a "principal player in the New Jersey branch" of this nationwide conspiracy.   (*Id.* at 16.)

Moreover, and focusing principally on the period leading immediately up to the defendant's arrest – a time period for which evidence of precise transactions was more readily available – this Court determined that the defendant's conduct involved at least $2.9 million worth of second-hand medications.  In reaching that figure, the Court determined that the defendant purchased approximately $30,000 worth of second-hand medications from Reyes-Arias – drugs with a Medicaid value of closer to $300,000 – in December 2012, and that the defendant contemplated a separate purchase of approximately $250,000 worth of medications

from Reyes-Arias and Leyba in September 2012, for a total of roughly $500,000.  (*Id.* at 18-19).
None of those findings is at issue on remand.

The Court's loss calculation also included nearly $2.4 million worth of sales of second-
hand HIV/AIDS medications documented in a series of classic "drug ledgers" recovered from
the defendant's bedroom.   As the Court learned through the *Fatico* hearing, the ledgers had been
recovered from the defendant's bedroom at the time of his arrest and some pages appeared to
reflect the defendant's own handwriting, while other pages appeared to contain the hand writing
of other co-conspirators.  (*Id.* at 7-8, 16-17.)  Indeed, Reyes-Arias, who sold second-hand
medications to the defendant for many years prior to his own arrest, identified some of the pages
in the ledger as bearing his own hand writing.  (Tr. at 47).[4]  As Reyes-Arias further testified, the
pages containing his own handwriting reflects lists of second-hand medication that he was
offering for sale to the defendant.  (*Id.* at 47-48).

In holding this defendant responsible for the full value of all of the medications reflected
in the ledgers – nearly 2,700 bottles of black market drugs – this Court noted that the defendant's
involvement in handling quantities was "corroborated [by] Reyes-Arias' testimony regarding the
magnitude of [the defendant's] involvement in this conspiracy from 2005-2012, as well as [the
defendant's] self-characterization as a principal player in the New Jersey branch of the market."
(Ex. A at 16.)   Of particular issue on remand, this Court further noted that:

> The fact that the ledgers were not all written in Rigo's hand, or that some may
> have contained price bids rather than executed transactions, does not render the
> $2.4 million loss estimate unreasonable.  Rigo pled guilty to participating in a
> conspiracy, he is equally liable for the acts of his co-conspirators, including others
> who have written those lists, and the plans and intentions of the conspiracy,
> whether consummated or not.

(*Id.* at 16-17.)

---

[4] A copy of the transcript of the *Fatico* hearing is attached hereto as Exhibit C.

C.    **Sentencing**

By written opinion dated May 12, 2015, this Court announced its intention to impose a sentence of 48 months' imprisonment.  A copy of that Opinion is attached as Exhibit D.  In reaching that conclusion, the Court reiterated many of the Court's findings following the *Fatico* hearing about the seriousness and scope of the defendant's criminal conduct, conduct which this Court concluded spanned more than a decade leading up to the defendant's arrest.  (*E.g.*, Ex. D at 5).  However, after hearing argument from defense counsel at the sentencing proceeding related primarily to the defendant's advanced age, health issues and other personal characteristics, this Court reduced that sentence to 38 months' imprisonment.

The defendant is currently serving his sentence.  According to the Bureau of Prisons, his projected release date is currently April 29, 2018.

D. **The Appeal**

On appeal, for the first time, the defendant argued that because the defendant was convicted of participating in a conspiracy, this Court should have made two specific and particularized findings with respect to the loss amounts derived from the drug ledger before imposing sentence:  first, that the criminal activity in question "was foreseeable to the defendant" and second that the conduct was within the "scope of the criminal activity agreed upon by the defendant."  *Studley*, 47 F.3d at 575-76.  The Second Circuit agreed that those findings were required and further concluded that this Court had not been asked to make those express findings below.   It thus remanded for this Court to do so.

In particular, and noting that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy," *Rigo*, 2016 U.S. App. LEXIS 9354, at *3, the Circuit expressed

concern that this Court might have improperly applied the broader law of conspiracy to the issue of loss because this Court observed, with respect to the ledger, that by virtue of his participation in the conspiracy, the defendant "is equally liable for the acts of his coconspirators, including others who may have written [the records found in Rigo's home], and the plans and intentions of the conspiracy, whether consummated or not." *Id.* at *4 (internal quotations omitted, alteration in original).

The Second Circuit thus remanded so that this Court could clarify its findings with respect to the loss amount derived from the ledger and, in particular, could address in the first instance whether the $2.4 million in loss derived from the ledger satisfied both requirements of *Studley*. In so doing, the Circuit made clear that it was remanding "without placing a thumb on the scale with respect to what the District Court's particularized findings under *Studley* should be. We recognize that, on remand, the District Court's loss calculation may be no different than it was in the first instance." *Id.* at *7.

**II. DISCUSSION**

The limited issue on remand, thus, is whether the $2.4 million in losses derived from the drug ledgers recovered from the defendant's bedroom satisfy the two *Studley* factors – that is, they constitute losses within the scope of the criminal conduct the defendant agreed to participate in and losses that were thus foreseeable to this defendant. Because the record evidence abundantly supports those findings – and because this Court's prior conclusions, as reflected in its Opinion and Order dated January 28, 2015, strongly imply that this Court has already determined that the loss amounts reflected in the drug ledgers meet those criteria – the Government believes this Court should simply make those "particularized findings" expressly before re-imposing the same sentence.

### A.  Applicable Law

Under Section 2B1.1 of the Guidelines—which applied to the offenses here—"loss" is defined as "the greater of actual loss or *intended* loss." U.S.S.G. § 2B1.1, comment. (n.3(A)) (emphasis added). The amount of loss attributable to a defendant at sentencing includes losses resulting from all relevant conduct. *See* U.S.S.G. § 1B1.3(a) (specific offense characteristics shall be determined on the basis of relevant conduct).

Pursuant to Section 1B1.3(a)(1)(B), relevant conduct includes: "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction [or] in preparation for that offense[.]"  U.S.S.G. § 1B1.3(a)(1)(B). The commentary to Section 1B1.3 explains that "[i]n order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake," and then should include "[t]he conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." U.S.S.G. § 1B1.3, comment. (n.2).

Interpreting this provision of the Guidelines, and as noted above, in *United States* v. *Studley*, 47 F.3d 569 (2d Cir. 1995), the Second Circuit, similarly, concluded "that in order for a district court to sentence a defendant on the basis of criminal activity conducted by a coconspirator," the district court must, *first*, "make a particularized finding of the scope of the criminal activity agreed upon by the defendant," and then, *second*, "make a particularized finding as to whether the activity was foreseeable to the defendant."  *Id.* at 574-75.  "[I]n determining the

scope of the criminal activity that the particular defendant agreed to jointly undertake (*i.e.* the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* at 575 (quoting U.S.S.G. § 1B1.3 Applic. Note 2).

   **B.  Discussion**

   Here, the record amply supports a finding that the loss amounts reflected in the drug ledgers recovered from the defendant's bedroom meet both of the *Studley* requirements. With respect to the first – that is that the ledgers reflected conduct within "the scope of the criminal activity agreed upon by the defendant" – the Court heard extensive evidence that the criminal activity agreed upon by the defendant involved precisely the sort of conduct reflected in the ledgers, that is the purchase, in bulk, of second hand medications and then the resale of the same. (*E.g.*, Ex. A at 5-6, 8-10, 12-13) (describing Hearing evidence).  More specifically, the Court heard testimony that the defendant's involvement in the scheme entailed the purchase and resale of the very medications reflected in the ledgers, including many of the most commonly prescribed HIV/AIDS medications.  (*Id.*)  And the Court heard testimony from one of the defendant's primary co-conspirators, Reyes-Arias identifying some of the handwriting in those ledgers as his own, and describing how and why these lists were generated – that is, typically to reflect inventories of medications available for resale as part of the scheme.  (*E.g.*, Tr. at 47-48). On those facts, there should be no serious dispute that the ledgers reflect conduct within "the scope of the criminal activity agreed upon by the defendant."  *Accord United States* v. *Gowing*, 481 Fed. Appx. 1, 4 (2d Cir. 2012) (affirming, as sufficient to satisfy *Studley*, district court's findings that "I think it is fairly clear that, from the evidence in this case, clearly from January 2004, Mr. Gowing . . . knew pretty much the details of the type of activity that Mr. Scheringer was involved in and that Mr. Gowing was agreeing to be involved in."); *United States* v.

*Ankamah*, 2004 U.S. Dist. LEXIS 5816 (S.D.N.Y. 2004) (finding *Studley* requirements met where the conduct in question "went to the heart of the criminal activity jointly undertaken by the three" co-conspirators).  Critically, this Court has already made the finding – arguably itself sufficient to satisfy this first prong of *Studley* – that the ledgers were entirely consistent with, and corroborated by, "Reyes-Arias' testimony regarding the magnitude of [the defendant's] involvement in this conspiracy from 2005-2012, as well as [the defendant's] self-characterization as a principal player in the New Jersey branch of the market."  (Ex. A at 16.)

With respect to the second of the *Studley* factors – that is, that the conduct reflected in the ledgers was "foreseeable to the defendant" – the evidence supporting this prong is overwhelming.  In particular, and in addition to all of the evidence detailed above, there is no dispute that these ledgers were found *in the defendant's bedroom*, in a notebook that also contained certain of the defendant's personal effects, including a utility bill with the defendant's name on it.  (Tr. at 144-45.)  It simply blinks reality to suggest these sales, whether completed or merely proposed, were somehow beyond the scope of conduct known or foreseeable to this defendant.  To the contrary, as noted above, the Hearing evidence established that these lists ended up in the defendant's bedroom because they reflected transactions being proposed to (and potentially consummated with) this defendant.

In this respect, the contrast to the facts of *Studley* is instructive.  There, the Second Circuit considered the sentence imposed on a telemarketer who had participated, for just a month, in a scheme involving at least 10 to 20 other telemarketers/participants and spanning at least 12 weeks.   The Circuit held that the defendant there could not be held responsible for the full criminal proceeds of the scheme (including proceeds earned by the other telemarketers weeks and months before and after the defendant's limited participation in the scheme) unless

the District Court found that those full proceeds were within the scope of the conduct agreed to by the defendant and were reasonably foreseeable to him. *Studley*, 47 F.3d at 571-72. In particular, the Circuit expressed concern that there was no evidence that the defendant "assisted other sales representatives with their sales, shared in the profits, or participated in any way in the management of the operation." *Id.* at 572.

Here, by contrast, the Government is not seeking to hold the defendant responsible for the full criminal proceeds of the scheme, one that as the Court has previously noted, involved dozens of additional participants nationwide and hundreds of millions of dollars' worth of second-hand medications.   To the contrary, while this Court heard considerable evidence about the conduct of other scheme participants – including Hermenegildo Fernandez, a/k/a "Pancho," as well as Reyes-Arias and Leyba – the Court's loss finding was focused exclusively on the defendant's own conduct, rather than on the conduct of other co-conspirators, even conduct of which the defendant was aware.  For example, this Court heard evidence at the Hearing about the more than $6 million worth of second-hand medications recovered from a warehouse under the control of Fernandez, a co-conspirator the defendant clearly worked closely with over the years.  (Ex. A at 11-12.)  Indeed, as the Court may recall, it was Fernandez who made the recording with this defendant offered at the hearing and during which Fernandez and the defendant discussed specific drug sales and described themselves as the "two big people here in New Jersey."   (Tr. at 21.)   Certainly, under the broader law of criminal conspiracy, Fernandez would qualify as a co-conspirator and sales completed by Fernandez would be evidence of the conspiracy.  But consistent with the parameters of *Studley*, this Court did not hold the defendant responsible for that loss amount.  Similarly, the Court heard evidence of substantial quantities of medications sold by Reyes-Arias to others, including Fernandez, during "sting" operations conducted during

the Government's investigation, as well as medications recovered from Reyes-Arias home at the time of his arrest.   (Ex. A at 5-6.)  Once again, this defendant is not being held accountable for any of those medications at sentencing.

Critically, thus, this is not a case in which either the Government or this Court has suggested that the defendant should be held responsible for conduct simply because of his "knowledge of another participant's criminal acts."  *Cf. Studley*, 47 F.3d at 575 ("[A] defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts" at sentencing).   Nor is it a case in which the defendant is being held responsible for a broader array of conduct simply because he is "aware of the scope of the overall operation." *Id.*  To the contrary, this Court's loss finding, without expressly citing *Studley*, was nonetheless squarely focused on the concerns motivating that opinion, namely the need to ensure that the loss amounts attributed to this defendant accurately reflected conduct that was within the scope of the defendant's criminal agreement with others and which was reasonably foreseeable to him.

The other primary case relied upon by the defendant on appeal, *United States* v. *Getto*, 729 F.3d 221(2d Cir. 2013), is similarly inapposite.  *Getto*, like *Studley*, involved the sentencing of a lone telemarketer in a much broader scheme involving participants in three separate "boiler rooms," each of which had its own set of scheme participants, including managers.  *Id.* at 225. At sentencing, and without making any particularized findings about the scope of that defendant's criminal agreement or the foreseeability of the conduct of others, the district court held the defendant responsible for all of the losses caused by the full conspiracy.  In finding error, the Circuit noted that the district court had attributed "the activities of all [three] boiler rooms" to the defendant without making "the required particularized findings."  *Id* at 234.  Here, as noted, this Court has already taken great steps to develop a record supporting the

particularized findings required and has not, as was the case in *Studley* or *Getto*, simply held the defendant responsible for the full loss caused by the entire conspiracy.

Finally, and given the record, this Court correctly rejected the defendant's arguments that some of the handwriting in the ledgers was not the defendant's and that some of the transactions reflected in the ledgers may only have been contemplated, because neither undercuts the sufficiency of the record to satisfy *Studley*.[5]  With respect to the first argument – the origins of the handwriting – as noted, this Court heard testimony about why not all of the handwriting was the same, namely, because various other co-conspirators, including Reyes-Arias, would prepare hand-written lists of inventory that would then be supplied to the defendant.  More generally, there is nothing about the fact that the handwriting belonged to others that renders them beyond the scope of the losses properly attributable to him pursuant to *Studley*.  Whether the lists were written by the defendant or not, they ended up in the defendant's possession, they reflected precisely the sort of conduct the defendant was engaged in, and they are thus both within the scope of the criminal activity to which the defendant agreed and foreseeable to him.

With respect to the second argument – *i.e.*, that the sales reflected in the ledgers may not have been completed – as an initial matter, there is nothing in the record before the Court to suggest these were anything other than the defendant's drug transactions.  In particular, the record evidence, including the testimony of Reyes-Arias about the origins of these ledgers and the scope of the defendant's conduct, as well as the defendant's own words as recorded in conversation with co-conspirator Fernandez, make it more likely than not that these were actual

---

[5] In initially rejecting these arguments, this Court cited *United States* v. *Jackson*, 335 F.3d 170, 181 (2d Cir. 2003) and *United States* v. *Martinez*, 987 F.2d 920, 923-26 (2d Cir. 1993), both of which the Second Circuit, on appeal, found non-controlling on these facts.  As set forth above, the Government believes the Court can and should reach the same conclusion when evaluating these arguments more expressly through the lens of *Studley*.

transactions completed by the defendant and his co-conspirators.  Indeed, that was the gravamen of this Court's initial finding with respect to these ledgers, and the defendants points to nothing to disturb that finding.   Moreover, even if these transactions were merely planned  or proposed at the time of the defendant's arrest, they would still be properly attributed to the defendant pursuant to *Studley* because: (1) Medicaid had already suffered the loss if these medications had come into the hands of co-conspirators willing to sell these medications to the defendant, and (2) the defendant's willingness to engage in the potential sale of them (as evidenced by his continuing possession of a ledger sheet reflecting their existence and sale price) brings them within the ambit of *Studley* for all of the reasons set forth above.  *Cf.* U.S.S.G. § 2B1.1 cmt. 3(A) (directing the Court is to use "the greater of actual *or intended* loss.")

 As such, the Government submits this Court's initial finding was entirely consistent with *Studley*.  Critically, this Court did not – as was the case in both *Studley* and *Getto* – reflexively hold the defendant responsible for the loss caused by the full conspiracy but instead carefully considered the evidence of this defendant's involvement in the conspiracy before determining that he should be held responsible solely for conduct that was within the scope of that involvement and foreseeable to him.  Accordingly, the Government would encourage this Court to expressly make the findings required of *Studley* and conclude again that the defendant should properly be held responsible for causing $2.9 million in loss.

### III.  THE NEW GUIDELINES CALCULATION

 Finally, because the resentencing will occur after November 1, 2015, the Government concedes that the defendant is entitled to the benefit of the revisions made to Section 2B1.1 of the Guidelines effective as of that date.  In particular, and assuming the Court confirms its prior loss calculation of $2.9 million, the defendant's new total offense level should be 23 (as opposed

to 25), resulting in an applicable Guidelines range of 46 to 57 months' imprisonment.   Because the sentence previously imposed is already significantly below the bottom of that range and because, the Government would encourage this Court to re-impose the same sentence for substantially the reasons set forth in the Court's initial sentencing memorandum.

Namely, and as argued at greater length to the Court in the Government's initial submission, the defendant's crimes were incredibly serious and potentially life threatening for those in need of the medications unlawfully tampered with and resold by the defendant, and his involvement in criminal conduct spanned more than a decade.  The sentence previously imposed by the Court appropriately addressed those facts and appropriately took account of the need to avoid unwarranted sentencing disparities.

### III.    CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should reaffirm its loss finding of $2.9 million by expressly making the findings required by *Studley*, and should then reimpose a sentence of 38 months' imprisonment.

Dated:  New York, New York
          September 26, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:    ___/s/_____
       Edward B. Diskant
       Assistant United States Attorney
       (212) 637-2294