UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

UNITED STATES OF AMERICA

               Plaintiff,

                                   13 Cr. 897 (RWS)

   - against -

                                   OPINION

BLADIMIR RIGO,

               Defendant.
----------------------------------------X

A P P E A R A N C E S :

        Attorney for Plaintiff

        UNITED STATES ATTORNEY OFFICE, SDNY
        One Saint Andrew's Plaza
        New York, NY 10007
        By:  Edward B. Diskant, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/29/15

        Attorneys for Defendant

        SPEARS & IMES LLP
        51 Madison Avenue
        New York, NY 10010
        By:  Joanna C. Hendon, Esq.
             Sharanya Mohan, Esq.
             Alicia K. Amdur, Esq.

**Sweet, D.J.**

      Defendant Bladimir Rigo ("Rigo" or "Defendant") sought and obtained a hearing under <u>United States v. Fatico</u> to contest the amount of loss attributable to him pursuant to his guilty plea to one count of Conspiracy to Commit Healthcare Fraud and one count of Conspiracy to Commit Adulteration Offenses and the Unlawful Wholesale Distribution of Prescription Drugs.  Upon the findings set forth below, the loss attributable to Rigo is $2.9 million.

**Prior Proceedings**

      Plaintiff the United States of America (the "Government") charged Rigo by criminal complaint in September 2013 and, in November 2013, a grand jury returned indictment 13 Cr. 897 (RWS) similarly charging the Defendant with one count of conspiracy to commit healthcare fraud and one count of conspiring to commit adulteration and unlawful wholesale distribution of prescription medications.  Rigo pled guilty to both counts on April 23, 2014 before the Honorable Kevin N. Fox, United States Magistrate Judge.  During the course of his allocution, Rigo admitted to his participation in the charged scheme as follows:

Case 1:13-cr-00897-RWS Document 53 Filed 09/26/16 Page 3 of 23

> During the years mainly 2010 to 2012, but also in
> previous years, I agreed with others to buy and
> to sell medicines that had been prescribed to
> patients with insurance, Medicaid, without having
> a license to sell them or to buy them.  On
> occasion the medications had the labels removed
> or cleaned up in order for them to be sold.

(Tr. 15:19-24.)

On September 11, 2014, Rigo requested a hearing

pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir.

1979), in order to resolve a dispute between the parties

concerning the amount of loss attributable to him as a result of

the offense conduct.  The hearing took place in November 2014

and final argument was heard on December 2, 2014, at which point

the motion was marked fully submitted.


**Evidence Adduced at the Hearing**


**The Conspiracy and the Government's Investigation**

Between 2010 and 2012, the Government conducted a

nationwide investigation into the unlawful diversion and

trafficking of prescription drugs that were previously dispensed

to Medicaid recipients into an underground secondhand market.

See Mohan Decl. Ex. A (Pre-Sentencing Report dated July 22,

2014, ("PSR")) ¶ 8.  Rigo was convicted as a result of this

investigation.

The scheme worked as follows: first, the lowest level participants in the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs at pharmacies throughout the country, including in the Southern District of New York and in the Newark, New Jersey area.  These Insurance Beneficiaries were typically HIV or AIDS patients who paid little or no money for the drugs in question because their insurance plans, typically Medicaid, covered the costs.  The Insurance Beneficiaries then sold their bottles of medications to other participants in the scheme, referred to in the investigation as "Collectors," for cash at locations like street corners and bodegas.  Mr. Arcadio Reyes-Arias ("Reyes-Arias" or "Chino") and Mr. Rogelio Leyba ("Leyba") were two such Collectors.  Collectors, in turn, sold the secondhand bottles they collected to Rigo and other "Aggregators," scheme participants who typically bought large quantities of secondhand drugs from multiple Collectors.  Eventually, the secondhand drugs made their way to corrupt distributors and pharmacies willing to re-dispense these drugs to unsuspecting consumers.

Health care benefit programs, such as Medicaid, were generally defrauded twice with respect to each bottle dispensed in the scheme.  On the front end, a health care benefit program was fraudulently induced into paying for these drugs under the

4

false representation that these drugs would be taken by the Insurance Beneficiary to whom they were dispensed. The scheme participants then also sought to defraud health care benefit programs again on the back end of the scheme. By concealing the source of the bottles and the fact that the bottles have been previously dispensed, the scheme participants attempt to have the bottles re-dispensed as new, legitimately obtained drugs by pharmacies, thereby fraudulently inducing health care benefit programs like Medicaid to pay for the same bottle a second time.

**Rigo's Role**

Rigo was an Aggregator based in the Newark, New Jersey area, who operated as a part of the scheme between at least 2000 and his arrest in 2013. During that time period, Rigo aggregated bottles of these secondhand medications by employing Collectors in his bodega to purchase these medicines from Insurance Beneficiaries on the streets of Newark and by buying bottles from independent Collectors, i.e., scheme participants who worked on their own to buy these bottles from Medicaid patients before selling them to Aggregators. In July 2012, agents working with the Department of Justice arrested 48 individuals in 6 states and charged them with crimes related to the conspiracy. Just prior to those arrests, agents in New York engaged in an undercover operation designed to identify

5

additional targets.  In a month and a half, undercover agents twice purchased prescription medicines from Mr. Hermenegildo Fernandez ("Fernandez" or "Poncho").  The agents arrested Fernandez, and he became a cooperating witness for the Government.  Fernandez offered to set up additional targets, and in August and November 2012, while wearing a wire, he purchased drugs from Leyba.  Following Leyba's arrest, Leyba offered to set up additional targets in an effort to become a cooperating witness for the Government, but was unsuccessful and as a result not "signed up" as a cooperator.  Meanwhile, Fernandez set up Reyes-Arias as another target.  In October 2012 and again in December 2012, Fernandez, again wearing a wire, bought drugs from Reyes-Arias, whom agents arrested and charged following the second sale.

In connection with all three arrests, the Government executed search warrants at stash house locations used by Reyes-Arias, Leyba, and Fernandez.  On June 5, 2012, agents searched Fernandez's warehouse in North Bergen, New Jersey.  Hr'g Tr. 29:12-13, 141:11-15.  As a result of that search, they recovered over 10,000 bottles of prescription drugs, as well as bottles, bags, and other supplies for the drug business.  Id. at 29:14-20.  On December 20, concurrent with their arrests, agents searched the apartments of Reyes-Arias and Leyba.  Id. at

114:24-25, 121:6-11; Mohan Decl. Ex. C (Rao 3502-1) at 14:7-13, 20:10-15. From Reyes-Arias's apartment, agents seized 481 prescription-drug containers, which included bottles of medication, syringes and patches, as well as cleaning supplies. Mohan Decl. Ex. C (Rao 3502-1) at 20:19-26; Mohan Decl. Ex. D (GX-218); Hr'g Tr. 121:23-122:21. From Leyba's apartment, agents seized 482 prescription-drug containers. Mohan Decl. Ex. E (GX-219); Mohan Decl. Ex. C (Rao 3502-1) at 14:22-15:4.

During the course of their investigation, agents did not recover evidence tying Rigo to the searched stash houses, to the drugs the drugs seized during the six hand-to-hand transactions supporting the arrests of Fernandez, Leyba, and Reyes-Arias, or otherwise identifying Rigo as a co-conspirator. Hr'g Tr. 29:21-30:2, 135:3-12, 151:4-152:9. In July or August 2012, Fernandez contacted Rigo to schedule a meeting. Id. at 27:23-28:1. Rigo agreed to meet in a restaurant, where their conversation was recorded by Fernandez. This yielded inculpatory evidence with respect to Rigo.

On September 17, 2013, agents arrested Rigo at his home in Elizabeth, New Jersey. In Rigo's bedroom, agents recovered four notebooks, which the Government introduced in evidence as Government's Exhibits 204-207 at the hearing. Hr'g

7

Tr. 100:2-14. Found folded up in two of the notebooks were
twelve loose sheets of paper containing what appear to be
handwritten lists of prescription medications, some containing
dollar amounts or quantities. Hr'g Tr. 101:11-13; Mohan Decl.
Ex. L (GX-202).

Three witnesses offered by the Government provided
testimony during the Factico hearing regarding Rigo's role in
the conspiracy: Reyes-Arias, Detective Anthony Romero, and
Special Agent Antonio Rao.

Reyes-Arias's Testimony

Reyes-Arias, who was testifying pursuant to a
cooperation agreement with the Government, worked as a Collector
in two periods. Between approximately 1998 and 2005, Reyes-
Arias worked as a Collector in one of Rigo's bodegas in Newark,
New Jersey, buying medicines from Medicaid beneficiaries in
Newark that Rigo could resell to other scheme participants.
From approximately 2005 to 2012, Reyes-Arias became an
independent Collector, selling prescription drugs to Rigo and
others. Reyes-Arias's "main customer" during this later period
was Fernandez, and Reyes-Arias sold to Rigo "not too
frequently." Hr'g Tr. at 72:14-73:20.

With respect to the earlier 1998-2005 period, Reyes-Arias's recollection as to the number of medicine bottles he provided to Rigo fluctuated. On direct, he estimated supplying roughly 100 bottles per week to Rigo. Hr'g Tr. 33:14-34:6. On cross, he lowered his estimate to 60 to 80 bottles per week with respect to certain portions of the earlier time frame. Id. at 36:10-24. On re-direct, he estimated supplying 100 to 200 bottles a week. Id. at 95:13-16.

During the latter 2005-2012 period when he worked as an independent Collector, Reyes-Arias testified to selling Rigo anywhere from $3,000 to $9,000 worth of prescription medications every month. Id. at 39:14-23. When confronted with FBI Special Agent Rao's testimony that Reyes-Arias had told him that Reyes-Arias sold Rigo 70 bottles once every other month during this period, Reyes-Arias denied making those statements to Agent Rao and further denied having ever told Government agents or prosecutors "the amount of bottles I was selling him [Rigo]." Id. at 61:7-14, 90:22-91:1. Reyes-Arias further testified that he sold $30,000 of prescription drugs to Rigo in December 2012, a few weeks prior to Reyes-Arias's arrest. Id. at 40:5-11, 91:10. That testimony is contradicted by a tape recording made by the Government of a December 3, 2012 meeting between Reyes-Arias and Fernandez. At the meeting, Fernandez, already working

9

for the Government, purchased medicines from Reyes-Arias in the transaction that led to Reyes-Arias's arrest.  In the course of transacting the sale, Fernandez asked, "This guy [Rigo] doesn't get anymore from you?"  to which Reyes-Arias responded, "Bladimir? Bladimir [Rigo] hasn't been around here anymore." Id. at 92:7-11.  Confronted with that evidence at the hearing, Reyes-Arias claimed that he was lying on the tape recording. See id. at 92:12-13.

At the hearing, Reyes-Arias was also shown certain pages from the drug ledgers recovered from Rigo's bedroom at the time of his arrest, and recognized at least one page as bearing Reyes-Arias's handwriting.  That page contained a list of medications that Reyes-Arias had for sale and which Reyes-Arias had provided to Rigo who, in turn, filled in the prices per bottle Rigo was willing to pay for each.  Id. at 47:8-49:5. Defense counsel questioned Reyes-Arias on three of the lists that he claimed contained Rigo's handwriting.  Id. at 54:1-55:9; Mohan Decl. Ex. L (GX-202) at 5 (000060), 11 (000066), 12 (000067); see Mohan Decl. Ex. P (Reyes-Arias 3503-35).  In response to counsel's pointing out inconsistencies in the handwriting on those pages, in particular differences in the shape of the letters "E" and "R", Reyes-Arias conceded he was wrong in characterizing all the writing as Rigo's.  Hr'g Tr.

10

57:4-58:11.

As Reyes-Arias kept no records of his business dealings with Rigo, his testimony was entirely "based on [his] memory." Id. at 63:4-9, 64:13-18, 82:1-2. Reyes-Arias conceded that he had been addicted to alcohol for approximately 20 years; that he had unsuccessfully sought treatment; that his drinking has taken a great toll on his life; and that sustained alcohol abuse of this sort can impair one's brain function, including memory. Id. at 65:20-71:4.

Detective Anthony Romero's Testimony

Detective Romero testified to his participation in the broader investigation of the secondhand medication scheme, including the arrests of Fernandez and Reyes-Arias. Detective Romero testified about a recorded meeting between Fernandez and Rigo on September 28, 2012 and a search of the storage facility maintained by Fernandez in New Jersey.

With respect to the storage facility, Detective Romero testified that agents searched Fernandez's storage facility on June 5, 2012. Id. at 29:12-13. At that time, agents recovered over 10,000 bottles of prescription drugs, together with

medicine bottles, bags, lighter fluid, glue, and labels.  Id. at

29:14-20.  Fernandez and Rigo "were competitors," Detective

Romero explained, and so "they didn't sell to each other."  Id.

at 30:11, 31:6-7.  The agents recovered no evidence connecting

Rigo to the facility.  Id. at 29:21-30:2.  Fernandez told the

Government that "Rigo had never seen his storage facility" and

that Rigo "didn't know where [the storage facility] was."  Id.

at 30:15-17.  Fernandez told the Government that he and Rigo had

not spoken recently, and that he and Rigo "only had one

transaction between the two of them."  Id. at 30:9-14; 30:20-24.

Detective Romero also confirmed Reyes-Arias' recollection that

the last time Rigo did business with Fernandez was 2010 or 2011.

Id. at 30:25-31:6.

Detective Romero further testified to a recorded

meeting Fernandez conducted with Rigo in September 2012, as part

of his cooperation with the Government.  See GX-211-T (meeting

transcript).  In the recordings, Rigo stated that he purchased

medications from both Reyes-Arias and Leyba, and discussed

future purchases from Reyes-Arias and Leyba.  GX-211-T at 13.

Rigo proposed that Fernandez provide him with a customer and

that Rigo would provide the medications, and that the two could

split the proceeds of this future $25,000 deal equally.  Id.

During other portions of same recorded meeting, Rigo discussed

his dealings with another known co-conspirator, Conrado Vasquez
("Vasquez"), a Miami-based Aggregator who was charged as part of
a large, forty-eight defendant case and has since pled guilty to
his participation in the charged conspiracy. See United States
v. Viera, et al., 11 Cr. 1072 (S.D.N.Y. 2011). Specifically,
during the recorded meeting, Rigo indicated that Vasquez and
Rigo's brother-in-law had stolen $200,000 from Rigo and that he
no longer dealt with them as a result. See GX-211-T at 20, 29.
Finally, the recorded meeting included a discussion of Rigo's
and Fernandez's relative importance in the prescription drug
trade. Rigo described himself and Fernandez as "two big people
in New Jersey" that were targets of the Government's
investigation. Id. at 20.

Special Agent Rao's Testimony

Finally, the Government called Special Agent Antonio
Rao who testified to his participation in the investigations of
Reyes-Arias and Leyba, about the arrest of Rigo in September
2013, and the simultaneous search of his residence in New
Jersey.

Agent Rao testified about the four journals seized
from Rigo, from which the Government obtained the handwritten

13

drug lists shown to Detective Romero and Reyes-Arias.  See GX-
202.  To determine the Medicaid reimbursement value of a given
prescription pill – and thus the loss suffered by Medicaid for
each bottle it was fraudulently induced into dispensing as part
of this scheme – the FBI has used the formulary tables to
determine the price-per-pill Medicaid will pay and then multiply
that value by the number of pills associated with any particular
defendant or scheme participant.  See Hr'g Tr. at 103:9-104:11.
Applying that method to the drug ledgers recovered from the
defendant's bedroom, Special Agent Rao determined that the total
Medicaid reimbursement value for the pills documented in the
ledger was approximately $2.4 million.  A summary chart
documenting Special Agent Rao's loss amount estimates was also
offered into evidence.  See GX-212.


        With respect to his interpretation of the ledger,
Agent Rao testified that "every time [he] saw the name of a drug
with a number next to it [he] considered it to be a sale or
contemplated sale" for the purposes of his loss calculation.
Id. at 130:25-131:4.  Upon reviewing the lists again, however,
he agreed that a "deal might or might not result" from the
information reflected on the lists, and indeed from the face of
the lists, he "[could not] tell that a transaction took place."
Id. at 8-16.  Therefore, he testified, the basis for including

                              14

the numbers from these lists in his loss calculation was an assumption he made about what these lists represent. Id. at 129:3-9.

Agent Rao testified that he did not "know for a fact where any of the prescriptions reflected [in his calculation summary] were filled." Id. at 134:1-3. He agreed that Medicaid reimbursement values "can vary between states for the same drug," and "[t]he Medicaid value that applies all depends on in which state's Medicaid program the beneficiary is enrolled or in which state the prescription is filled." Id. at 136:21-24, 137:22-25.

**Burden of Proof**

The Government carries the burden of establishing "disputed factual allegations . . . by a preponderance of the evidence," i.e., that the factual issue in question is "more likely than not true." United States v. Rizzo, 349 F.3d 94, 98 (2d Cir. 2003); see also United States v. Lee, 818 F.2d 1052, 1057 (2d Cir. 1987). A loss finding must be "grounded in the evidence," United States v. Coppola, 671 F.3d 220, 249 (2d Cir. 2012) and a reasonable estimate is permitted. However, loss amounts cannot be established on the basis of speculation. See

15

United States v. Deutsch, 987 F.2d 878, 886 (2d Cir. 1993); see
also United States v. Rutkoske, 506 F.3d 170, 180 (2d Cir. 2007)
(fixing of loss amounts not supported by the evidence is
reversible error).

**Loss Amount Attributable to Rigo**

         The evidence presented during the hearing, considered
in light of the credibility of the witnesses proffering it,
supports a finding of $2.9 million as the reasonable loss amount
attributable to Rigo.

         The drug ledgers discovered by agents in Rigo's
bedroom, cataloguing over 168,000 pills, reflect a loss amount
attributable to Rigo.  The ledgers were found in Rigo's bedroom,
along with other documents belonging to Rigo.  They corroborated
Reyes-Arias' testimony regarding the magnitude of Rigo's
involvement in this conspiracy from 2005-2012, as well as Rigo's
self-characterization as a principal player in the New Jersey
branch of the market.

         The fact that the ledgers were not all written in
Rigo's hand, or that some may have contained price bids rather
than executed transactions, does not render the $2.4 million

loss estimate unreasonable.  Rigo pled guilty to participating
in a conspiracy, he is equally liable for the acts of his co-
conspirators, including others who may have written those lists,
and the plans and intentions of the conspiracy, whether
consummated or not.  See generally United States v. Jackson, 335
F.3d 170, 181 (2d Cir. 2003) ("Under well-established law, [the
defendant] was responsible not only for the cocaine he himself
conspired to import but also for the cocaine his co-conspirators
conspired to import, provided he knew of his co-conspirators
illicit activities or the activities were reasonably foreseeable
by him."); United States v. Martinez, 987 F.2d 920, 923-26 (2d
Cir. 1993) (same).


     With respect to the value represented in the drug
ledgers, the Government used an appropriate and reasonable
multiple, New York State's multiple of ten, to estimate the
Medicare reimbursement value of the medications based on the
street value of the drugs.  Hr'g Tr. 140:11-17.  Rigo, by his
own admission, was based in New Jersey.  As discussed above,
Collectors sourced medicine locally from street corners and
bodegas, making it reasonable to conclude that the Insurance
Beneficiaries were local Medicare recipients.  The New Jersey
reimbursement rates for the medications reflected in the ledgers
are roughly 13 percent higher in than those in New York.  See

Pl.'s Mem. in Opp'n, Ex. A.  Thus, the multiple of ten, if
anything, understates rather than overstates the loss amount for
which Rigo is responsible.  Moreover, the New York State table
has been used to determine loss throughout this investigation,
one which has led to the prosecutions of more than 60 defendants
who have been sentenced based on those calculations by at least
three different in judges in this District.  Cf. 18 U.S.C. §
3553(a)(6) (directing courts, in imposing sentence, to "avoid
unwarranted sentence disparities among defendants . . . who have
been found guilty of similar conduct").  Therefore, the
Government's factor of ten applies to the over 168,000 pills
referenced in the ledger, yielding a loss estimate of roughly
$2.4 million.  See GX-212.

Additionally, Rigo's recorded September 2012
proposal to purchase medications from Reyes-Arias and Leyba is
factored into the loss estimate.  See Hr'g Tr. 11:6-25; see also
Def.'s Mem. in Supp't 35 (acknowledging culpability for this
proposed transaction).  Applying the same factor of ten as
described above, the loss amount associated this this proposed
transaction equals $250,000.

Finally, the $30,000 transaction between Reyes-Arias
and Rigo prior to Rigo's arrest factors into the loss amount

calculation. Hr'g Tr. 40:5-11, 91:10. This was a relatively recent and large-scale transaction for Reyes-Arias, and therefore is likely to have occurred as testified to by Reyes-Arias. The fact that Reyes-Arias did not reveal the transaction to Fernandez, a competitor of Rigo's, does not indicate that the transaction did not in fact take place. Moreover, Rigo admitted in recorded statements transacting with Reyes-Arias. See GX-211 T.

Based on the facts found above, a reasonable loss estimate is $2.9 million. This estimate excludes Reyes-Arias's uncorroborated monthly estimates of medicines he provided Rigo, both for 1998-2005 and 2005-2012. Several considerations justify exclusion of this testimony. First, with respect to the 1998-2005 period, Reyes-Arias's testimony regarding the number of bottles of medications he provided to Rigo changed repeatedly: from his initial estimate of 100 bottles per week, to 60 to 80 bottles at times during this period, and up to 100 to 200 bottles per week. See Hr'g Tr. 34:1-6, 36:10-24, 95:13-16. Reyes-Arias's testimony was similarly inconsistent with respect to the 2005-2012 period. Reyes-Arias testified that he sold approximately $3,000 to $8,000 or $9,000 worth of prescription medication, approximately once a month. Hr'g Tr. at 39:14-23. However, Agent Rao's testimony in support of the

19

complaint against Rigo states that Reyes-Arias sold drugs to Rigo "approximately once every other month during the period 2005 to 2012." Compl. ¶ 7f.

Second, Reyes-Arias was testifying about volume of sales made as long as 17 years ago without any written records or other means of independent verification of these figures. See Hr'g Tr. at 63:14-64:12. Under these conditions, it is unlikely that Reyes-Arias would be able to provide reasonable estimates of monthly volumes.

Third, Reyes-Arias suffers from untreated alcoholism, which he acknowledged may impact memory. Id. at 65:20-71:4. Indeed, despite testifying previously that he had been addicted to alcohol, Reyes-Arias denied his addiction during the hearing, casting doubt on either his memory or his credibility as a witness. Compare Mohan Decl. Ex. Q (Reyes-Arias Plea Tr.) at 6:12-25 (testifying, "since I was very young I was drunk," "I went to several programs because I did have problems because I was drinking," and "I continued drinking") with Hr'g Tr. 66:7-17, 67:9-10, 69:19-23 (testifying that "I used to drink, but I was not an addict," that he drank just "once a week" or sometimes not even for a month, and that he only attended rehab twice because the Court ordered him to do so).

Fourth, and most troubling, Reyes-Arias's monthly volume testimony in this hearing conflicts with previous testimony he offered in other proceedings regarding to whom Reyes-Arias supplied secondhand medicines. In his plea allocution, Reyes-Arias testified that, from 2000 to 2012, he sold the prescription medications to just "one person, all of it." See Mohan Decl. Ex. Q (Reyes-Arias Plea Tr.) at 20:24-21:3 ("I sold it to one person, all of it."), 21:4-8 ("I sold it to him."), 25:6-7 ("The person that bought the medications is the one who did it [removed the pharmacy labels] sometimes."). This person was Fernandez, not Rigo. See Hr'g Tr. at 41:4-18, 73:9-20. Confronted by the contradiction between his testimony in his plea allocution and his current position that Rigo was a regular customer from 2000 to 2012, Reyes-Arias denied that the former statement was true and claimed to have never made it. Id. at 77:4-8). Reyes-Arias also testified, "I didn't tell the judge that I had sold everything to just one person," despite the fact that the plea transcript indicates the contrary. Id. at 77:7-8.

Reyes-Arias proved an unreliable witness, as discussed above, and his specific testimony regarding the frequency and volume of drugs he provided Rigo was variant and unreliable even though he did provide drugs while employed by Rigo. Under such

21

circumstances, Reyes-Arias's uncorroborated testimony regarding the monthly quantity of medicines he provided Rigo lacks credibility and is not a reasonable basis for a loss amount determination.  See United v. Morrison, 207 F.3d 962, 967 (7th Cir. 2000) (statements of co-conspirators may "require further testimony as substantial indicia of reliability" when "evidence of relevant conduct significantly increased drug calculations"); Transcript of Oral Argument at 215:19-216:19, United States v. Correa, No. 13-CR-289, ECF No. 21 (S.D.N.Y.) (the Honorable Alvin K. Hellerstein expressing "a great deal more comfort" in prescription-drug loss amounts established by a defendant's records than cooperator's testimony about drug sales).

Finally, the loss estimate does not factor in the $200,000 Rigo claimed was stolen from him by his co-conspirator, Vasquez.  It would be impermissible speculation to assume the $200,000 are proceeds from this conspiracy.  Rigo does not identify the source of the funds nor the time frame during which they were purportedly stolen.  That a fellow Aggregator and Rigo's brother-in-law purportedly stole these funds does not establish this amount as part of the loss estimate.

## Conclusion

For the reasons set forth above, the loss reasonably attributable to Rigo is determined to be $2.9 million.


It is so ordered.


New York, NY
January 28, 2015

ROBERT W. SWEET
U.S.D.J.