UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

UNITED STATES OF AMERICA        :

                            : Case No.: 13 Cr. 897 (RWS)

           v.          :

                            :

BLADIMIR RIGO,               :

                            :

                  Defendant.  :

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## DEFENDANT BLADIMIR RIGO'S
## <u>MEMORANDUM OF LAW IN SUPPORT OF LOSS CALCULATION</u>

 

SPEARS & IMES LLP
Joanna C. Hendon
Alicia K. Amdur
51 Madison Avenue
New York, New York  10010
Tel:   (212) 213-6996
Fax:   (212) 213-0849
Email: jhendon@spearsimes.com

*Attorneys for Defendant Bladimir Rigo*

Dated:  October 11, 2016

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

RELEVANT BACKGROUND ................................................................................. 3

    I.    The Government's Investigation.................................................................... 3

        a.    The Alleged Co-Conspirators ....................................................... 4

        b.    The Records Recovered from Mr. Rigo's Home ............................ 6

    II.    The *Fatico* Hearing .................................................................................... 7

    III.    The Loss Opinion and Mr. Rigo's Sentence ............................................... 9

    IV.    The Appeal ................................................................................................. 10

ARGUMENT .......................................................................................................... 11

    I.    Legal Standard ........................................................................................... 12

    II.    Application.................................................................................................. 13

CONCLUSION........................................................................................................ 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*United States v. Ankamah*, No. S2 03 Cr. 206 (LBS),
2004 U.S. Dist. LEXIS 5816, 2004 WL 744487 (S.D.N.Y. Apr. 6, 2004) ...................... 17

*United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) .................................................... 12

*United States v. Gowing*, 481 F. App'x 1 (2d Cir. 2012) ............................................. 17

*United States v. Guzman*, 332 F. App'x 665 (2d Cir. 2009)......................................... 14

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) ........................................... 9, 10

*United States v. Johnson*, 378 F.3d 230 (2d Cir. 2004) ............................................... 12

*United States v. Khandrius*, 613 F. App'x 4 (2d Cir. 2015) ................................... 13, 15

*United States v. Martinez*, 987 F.2d 920 (2d Cir. 1993).......................................... 9, 10

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001).........................................12-13, 15

*United States v. Platt*, 608 F. App'x 22 (2d Cir. 2015) ............................................... 15

*United States v. Rigo*, 649 F. App'x 107 (2d Cir. 2016).........................................10-11

*United States v. Rizzo*, 349 F.3d 94 (2d Cir. 2003).................................................... 13

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) ............................................. 16

*United States v. Santos Batista*, 239 F.3d 16 (1st Cir. 2001).................................15-16

*United States v. Say*, 923 F. Supp. 611 (D. Vt. 1995)................................................. 16

*United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)........................................... *passim*

## United States Sentencing Guidelines

U.S.S.G. § 1B1.3(a)(1)(B) (2014)................................................................... 1, 11, 12

U.S.S.G. § 1B1.3 cmt. n.2.......................................................................................... 12

U.S.S.G. § 1B1.3 cmt. illus. (c)(3)............................................................................ 17,18

Defendant Bladimir Rigo respectfully submits this Memorandum of Law in support of a determination by the Court that the Government has not sustained its burden of proving that the $2.4 million in losses derived from handwritten records recovered from Mr. Rigo's bedroom are attributable to him as jointly undertaken activity under U.S.S.G. § 1B1.3(a)(1)(B) and *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995). Mr. Rigo submits this brief in advance of oral argument on the loss amount, scheduled for October 13, 2016 at 12 pm.[1]

## PRELIMINARY STATEMENT

At sentencing, the Court determined the loss attributable to Mr. Rigo to include $2.4 million, representing black-market transactions reflected in 12 pages of records recovered from Mr. Rigo's home. Relying upon the principle that conspirators may be responsible for jointly undertaken activity by other conspirators, the Court held Mr. Rigo responsible for all $2.4 million worth of transactions reflected in the records. Mr. Rigo appealed his sentence on the ground that the Court had applied the wrong standard for determining loss. Under *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), the Second Circuit held that, for purposes of calculating the loss attributable to a particular conspirator at sentencing, the trial court must make two findings: first, that the scope of activity to which *that* conspirator agreed included the relevant conduct at issue; and second, that the conduct was foreseeable to the defendant in light of that agreement. Here, Mr. Rigo argued, the Court erroneously applied the test for determining whether one conspirator is liable for the acts of another, for purposes of substantive conspiracy

---

[1] The Re-Sentencing Submission of the United States of America, dated September 26, 2016 (ECF No. 55) ("Gov. Br."), contends that Mr. Rigo's re-sentencing is scheduled for October 13, 2016. Our understanding is that the Court scheduled oral argument on the loss amount for October 13. Defendant Rigo reserves all sentencing arguments until after the Court has determined the appropriate loss amount and the Probation Department has issued an updated Pre-Sentence Report.

law.  Further, the record in this case does not support a finding that the scope of Mr. Rigo's criminal agreement reached all of the activity reflected in the records recovered from his home.

With respect to those records, the Government established that they were found in Mr. Rigo's possession.  But they took no steps to analyze Mr. Rigo's handwriting or connect him to the transactions reflected in the records.  At the *Fatico* hearing in this case, the Government devoted much of its presentation to evidence unconnected to Mr. Rigo.  The prosecution called only one witness alleged to have conspired with Mr. Rigo, Arcadio Reyes-Arias.  Reyes-Arias initially identified Mr. Rigo's handwriting on four of the 12 pages but on cross-examination conceded he was mistaken about Mr. Rigo's handwriting.  The same witness was able to identify his own handwriting on only one of the 12 pages.  The Government failed to adduce any evidence about who created the records reflected on the remaining 11 pages or whether Mr. Rigo was a party to any of the transactions reflected there.  More broadly, the Government made virtually no effort between the arrest of Mr. Rigo in September 2013 and the *Fatico* hearing over a full year later to investigate the scope of his agreement, with a view to proving losses at sentencing, choosing instead to rely on the mere fact that Mr. Rigo possessed records – penned when or by whom, the record does not reflect.  The record does not substantiate the *Studley* finding the Government urges.  To avoid further error, the Court should ascribe losses to Mr. Rigo of no more than $550,000, reflecting the uncontested amounts established below, together with $80,197.46, reflecting the transactions noted on the single page of records recognized by Reyes-Arias.

## RELEVANT BACKGROUND

### I.    The Government's Investigation

Between 2010 and 2012, the Government conducted a nationwide investigation into the unlawful diversion and trafficking of prescription drugs that were previously dispensed to Medicaid recipients.  (Opinion at 3, dated Jan. 29, 2015 (ECF No. 33) ("Loss Opinion").)  Insurance beneficiaries (often Medicaid beneficiaries, who paid little or no money for the drugs in question) sold bottles of medication that they had been prescribed to other participants in the scheme, referred to in the investigation as "Collectors."  (*Id.* at 4.)  Collectors, in turn, sold the medications they purchased from beneficiaries to other participants, referred to as "Aggregators," such as Mr. Rigo.  (*Id.*)  Typically, the medications changed hands again, eventually finding their way to pharmacies, which then dispensed them to customers.  (*Id.*)  In July 2012, the Government arrested and charged 48 individuals in six states with crimes related to the scheme.  (*Id.* at 5.)

Hermenegildo Fernandez (a/k/a "Pancho"), a large-scale Aggregator, became a cooperating witness for the Government and assisted in identifying additional conspirators.  (*Id.* at 6.)  While wearing a wire, Fernandez purchased drugs on four separate occasions from Arcadio Reyes-Arias (a/k/a "Chino") and Rogelio Leyba, both of whom were arrested in late 2012, following the recorded drug sales.  (*Id.*)

It was also through Fernandez that agents discovered Mr. Rigo.  In September 2012, Fernandez set up a lunch with Mr. Rigo, where they discussed the possibility of working together again.  (*Id.* at 7, 12.)  Nothing came of that talk.  Approximately one year later, in September 2013, agents arrested Mr. Rigo.

a.    The Alleged Co-Conspirators

The Government alleged Mr. Rigo conspired with at least four people: Fernandez and Reyes-Arias, who became cooperating witnesses for the Government shortly after their arrests in 2012 (*id.* at 6, 8); Leyba, who offered to cooperate (*id.* at 6); and Conrado Vazquez, who was charged and pleaded guilty as part of the 48-defendant case (*id.* at 13).

i.    *Fernandez*

Agents arrested Fernandez in June 2012, after arranging undercover purchases from him. In connection with his arrest, agents recovered more than 10,000 bottles of prescription drugs, together with loose pills, voluminous drug ledgers, and other supplies for the drug business in a storage facility that Fernandez maintained.  (Loss Op. at 11-12; Hr'g Tr. 146.)[2]

Fernandez and Mr. Rigo engaged in only one transaction together.  (Loss Op. at 12.) They "'were competitors,' . . . and so 'they didn't sell to each other.'"  (*Id.* (quoting Hr'g Tr. 30:11, 31:6-7).)  The Government adduced no evidence "connecting Rigo to the [storage] facility" maintained by Fernandez or to any of the drugs or records found there.  (*Id.*; *see* Hr'g Tr. 29:21-30:2, 135:7-9.)

ii.    *Leyba*

Agents arrested Leyba in the fall of 2012, after Leyba made two controlled buys with Fernandez.  In connection with that arrest, agents seized from Leyba's apartment 482 prescription-drug containers.  (Loss Op. at 7.)  As was the case with Fernandez, agents recovered no evidence linking Mr. Rigo to Leyba's stash house or the drugs in the controlled buys between Fernandez and Leyba.  (*Id.*)  At the *Fatico* hearing in this case held on October 7, 2014, Reyes-

---

[2] "Hr'g Tr." refers to the transcript of the *Fatico* hearing before the Court on October 7, 2014 (ECF No. 19).

Arias testified that, between approximately 2000 and 2005, Leyba sold medications to Mr. Rigo.
(Hr'g Tr. 36:25:37:22.)

        iii.    *Vazquez*

Vazquez was one of the 48 defendants arrested in July 2012. During the tape-recorded
conversation between Fernandez and Mr. Rigo in 2012, Mr. Rigo indicated that Vazquez and Mr.
Rigo's brother-in-law had stolen $200,000 from him and that he no longer dealt with either man
as a result. (Loss Op. at 13.) The Government adduced no other evidence about Vazquez or his
connection to Mr. Rigo.

        iv.    *Reyes-Arias*

The Government called only one conspirator, Reyes-Arias, to testify about the scope of
Mr. Rigo's activities. Agents arrested Reyes-Arias in late 2012, after he made two controlled
buys with Fernandez. Following a search of Reyes-Arias's apartment after his arrest, agents
recovered 481 prescription-drug containers, which included bottles of medication, syringes,
patches, and cleaning supplies. (*Id.* at 7.) The agents recovered no evidence linking Mr. Rigo to
the materials recovered from Reyes-Arias or the controlled buys between Reyes-Arias and
Fernandez. (*Id.*)

Reyes-Arias claimed to have dealt with Mr. Rigo for more than a decade, from the late
1990s until shortly before his arrest. (*Id.* at 8.) But the Court found his testimony about the
volume of medicine he purchased for, or sold to, Mr. Rigo was "inconsistent" and "variant and
unreliable." (*Id.* at 19, 21; *see id.* at 9-10, 20.) Reyes-Arias contradicted, and in places denied,
his own testimony or other statements he had made in his plea allocution, to law enforcement, or
in recorded conversations. (*See id.* at 9-10, 21.) He admitted he kept no records of his business

dealings with Mr. Rigo, and that his testimony was entirely "based on [his] memory" (*id.* at 11) – a memory that was potentially impaired by years of alcohol abuse (*id.*).

        b.      <u>The Records Recovered from Mr. Rigo's Home</u>

In contrast to the masses of pills, cleaning supplies, and medicine bottles recovered from the stash houses of Fernandez, Reyes-Arias, and Leyba, the Government recovered "no medications . . . from Mr. Rigo at any time" nor did the Government "find any bottles of secondhand prescription drugs" in Mr. Rigo's home or his bodegas or anything connecting him to the drugs recovered from Fernandez, Leyba, or Reyes-Arias.  (Hr'g Tr. 134:4-135:12.)

What the agents did find in Mr. Rigo's home were four notebooks on a dresser in his bedroom.  (*Id.* at 100:2-14.)  Among other things, the notebooks contained notes from Mr. Rigo's bodega business, cartoons possibly drawn by children, doodles, and grocery lists. (Mohan Decl. Ex. J (ECF No. 25-10) at Ledger 1_0003, _000128, _000151.)  The notebooks also contained old papers folded up and stuffed between their pages, including papers that have no connection to this case: a Sam's Club Supermarket receipt, a Cuban club membership card (*id.* at _000155, _000158), a gas bill from 2011, a Mega Sales Detergent Supplier flyer, and a receipt for a sandwich press from 2012 (Mohan Decl. Ex. K (ECF No. 25-11) at Ledger 4_00044, _00037, _00065).  (*See also* Hr'g Tr. 144:17-145:10.)

Interspersed in two of the notebooks were 12 loose sheets of paper containing what appear to be handwritten lists of prescription medications (hereinafter the "Records").  (Loss Op. at 8.)  Some pages list drug names, apparent quantities, and apparent dollar amounts (*see, e.g.*, Mohan Decl. Ex. L (GX-202) (ECF No. 25-12) at 000058-61, 000064, 000066, 000067); other pages list drug names and nothing further (*id.* at 000062); others contain the names of

drugs followed by apparent quantities, but no dollar amounts (*id.* at 00056-57, 63).[3]  From the pages of the Records reflecting drug names and apparent quantities, the Government calculates $2.4 million in Medicaid reimbursement losses.

## II.   The *Fatico* Hearing

On October 7, 2014, the Court held a *Fatico* hearing to determine the losses attributable to Mr. Rigo.  The Government called three witnesses: two members of law enforcement and one cooperating witness, Reyes-Arias.  The Government argued losses attributable to Mr. Rigo of between $7 million and $30 million.  (*See* Post-Hr'g Briefing of the United States at 23-24, dated Nov. 14, 2014 (ECF No. 26) ("Gov. Post-*Fatico* Br.").)  The defense contested that figure, asserting the Government could not prove losses in excess of $25,000.  (*See* Def. Bladimir Rigo's Post-Hr'g Mem. of L. at 35-36, dated Nov. 14, 2014 (ECF No. 24) ("Rigo Post-*Fatico* Br.").)

The evidence at the *Fatico* hearing established that, between the time of Mr. Rigo's arrest in September 2013 and the *Fatico* hearing, the Government made little effort to connect Mr. Rigo to the activity reflected in the Records.  Prosecutors failed to subpoena Mr. Rigo for handwriting exemplars in order to determine whether he had written any of the lists (Hr'g Tr.126:3-5, 126:20-127:1), nor did they engage a handwriting expert to determine who, if anyone, among the many defendants and cooperating witnesses in this case might have written them, in order to

---

[3] The two notebooks containing the Records and the Records themselves were marked as Government Exhibit ("GX") 204, GX-207, and GX-202 during the *Fatico* hearing, respectively. Excerpts of GX-204 and GX-207 (the notebooks), and a complete copy of GX-202 (the Records) are attached to the Declaration of Sharanya Sai Mohan in Support of Defendant Bladimir Rigo's Post-Hearing Memorandum of Law, dated Nov. 14, 2014 ("Mohan Decl."), as Exhibits J, K, and L, respectively (ECF Nos. 25-10, 25-11, and 25-12).  Although already in the record and not refiled with this brief, we enclose copies of Mohan Decl. Exs. J, K, and L with the courtesy copy of our brief delivered to chambers, for the Court's convenience.

connect the transactions to Mr. Rigo (*id.* at 126:25-127:1).  The Government did not even show

the Records to Fernandez or Leyba (*id.* at 131:5-19), and it was not until three weeks before the

*Fatico* hearing – in September 2014 – that the agents showed the Records to their star witness,

Reyes-Arias (*id.* at 55:19-22; *see id.* at 131:20-132:2).

Reyes-Arias testified that Mr. Rigo sometimes gave him lists of medications that he

(Rigo) wanted to buy and that Reyes-Arias sometimes gave Mr. Rigo lists of medications that

he (Reyes-Arias) had available for sale.  (*Id.* at 34:8-15, 46:22-47:7.)  The Government states

that Reyes-Arias "identified some of the pages in the ledger as bearing his own hand writing."

(Gov. Br. at 8 (citing Hr'g Tr. 47).)  That is incorrect.  At the *Fatico* hearing, Reyes-Arias only

identified *one* page – page 3 (000058) of GX-202 – as containing his own handwriting.  (Hr'g

Tr. 47:8-19.)  Reyes-Arias testified that he recognized Mr. Rigo's handwriting on four of the 12

pages.  (*See id.* at 47-48, 54-55 (testifying to recognizing Mr. Rigo's handwriting on pages 3, 5,

11, and 12 of GX-202).)  But when confronted on cross-examination with obvious

inconsistencies in the handwriting he claimed belonged to Mr. Rigo, Reyes-Arias admitted that

he was mistaken.  (*See id.* at 58:9-11.)  In the end, Reyes-Arias was able to identify his own

handwriting on one of the 12 pages and remained confused as to which, if any, notations in the

Records were made by Mr. Rigo.  Using the Government's loss calculation, the single page on

which Reyes-Arias was able to reliably identify any handwriting (his own) amounts to

$80,197.46 in Medicaid-reimbursement losses.[4]

---

[4] In its Post-*Fatico* Hearing Brief, dated Nov. 14, 2014 (ECF No. 26), the Government calculated
the New York Medicaid reimbursement value for page 3 of the Records to be $75,992.46.  (Gov.
Post-*Fatico* Br. at 23 & Ex. A (ECF No. 26-1).)  However, this computation omits the value of
two unidentified types of prescription drugs listed on page 3, "especials" and "serelta," which the
Government had originally valued at $3,900 and $305, respectively.  (*See* Mohan Decl. Ex. R
(GX-212) (ECF No. 25-18).)  Mr. Rigo concedes that this additional $4,205 from these

III.     The Loss Opinion and Mr. Rigo's Sentence

Following briefing and argument, the Court calculated $2.9 million in losses attributable

to Mr. Rigo.  Of that $2.9 million in losses for which the Court found Mr. Rigo responsible,

$2.4 million flowed from the Records.  In so ruling, the Court noted that the Records "were

found in Rigo's bedroom, along with other documents belong to Rigo" and that they

corroborated Reyes-Arias's testimony regarding the magnitude of Mr. Rigo's involvement in

the conspiracy, as well as Mr. Rigo's "self-characterization as a principal player in the New

Jersey branch of the market."  (Loss Op. at 16.)  That not all the Records were in Mr. Rigo's

handwriting or that they might not represent executed transactions was unimportant, because:

> Rigo pled guilty to participating in a conspiracy, he is equally liable for
> the acts of his co-conspirators, including others who may have written
> those lists, and the plans and intentions of the conspiracy, whether
> consummated or not.  See generally United States v. Jackson, 335 F.3d
> 170, 181 (2d Cir. 2003) ("Under well-established law, [the defendant]
> was responsible not only for the cocaine he himself conspired to import
> but also for the cocaine his co-conspirators conspired to import, provided
> he knew of his co-conspirators illicit activities or the activities were
> reasonably foreseeable by him."); United States v. Martinez, 987 F.2d
> 920, 923-26 (2d Cir. 1993) (same).

(Id. at 17.)  Mr. Rigo did not object to the Court's inclusion of the losses from the Records in its

loss calculation.

Following the Loss Opinion, the Probation Department issued its Revised Pre-Sentence

Report, in which it calculated a Guidelines range of 57-71 months' imprisonment and

recommended a sentence of 48 months' imprisonment.  On May 19, 2015, the Court sentenced

Mr. Rigo to 38 months' imprisonment.  Mr. Rigo surrendered to FCI Fort Dix on July 27, 2016

and has remained in federal custody for the fourteen-and-a-half months since.

---

unidentified medications should be included in the loss calculation for page 3, bringing its loss
value to $80,197.46.

## IV.    The Appeal

Mr. Rigo appealed his sentence to the Second Circuit Court of Appeals, arguing that the Court committed plain error by holding Mr. Rigo responsible for the losses in the Records without making the two particularized findings required by *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995): (1) that the scope of the criminal activity to which Mr. Rigo agreed was broad enough to include the conduct reflected in the Records, and (2) that the conduct was reasonably foreseeable to Mr. Rigo in connection with that criminal activity.  *See United States v. Rigo*, 649 F. App'x 107, 107-08 (2d Cir. 2016).  Specifically, Mr. Rigo argued that, rather than applying *Studley*, this Court applied the broader standard under substantive conspiracy law (as evidenced by its reliance on *United States v. Jackson*, 335 F.3d 170, 181 (2d Cir. 2003), and *United States v. Martinez*, 987 F.2d 920, 923-26 (2d Cir. 1993)), which requires only that the jointly undertaken activity be within the scope of the *entire conspiracy* and foreseeable in light of that.  In response, the Government contended, in relevant part, that (1) this Court did not apply the wrong standard in not expressly invoking *Studley* and instead relying on *Jackson* and *Martinez*; and (2) even if the Court did apply the wrong standard, there was no prejudice to Mr. Rigo because the voluminous record supported a finding of at least $2.5 million in losses attributable to Mr. Rigo under the correct standard.  (App. Br. for the United States of America at 19-28, *United States v. Rigo*, 649 F. App'x 107 (2d Cir. 2016) (No. 15-1914-cr).)

The Second Circuit agreed with Mr. Rigo and reversed and remanded Mr. Rigo's sentence, finding the Court had committed plain error.  *Rigo*, 649 F. App'x at 107.  The Second Circuit determined that it was "clear that the District Court erroneously applied the law of conspiracy [rather than sentencing] in calculating the loss amount attributable to Rigo," when it held that because he pleaded guilty to participating in a conspiracy, Mr. Rigo was "'equally

liable for the acts of his coconspirators, including others who may have written [the records found in Rigo's home], and the plans and intentions of the conspiracy, whether consummated or not.'" *Id.* at 108 (quoting Loss Op.) (second alteration in original).  Moreover, the Second Circuit held, there was a reasonable probability that the error affected the outcome, noting that $2.4 million of the $2.9 million in losses were attributable to the Records.  *Id.* at 108-09.  Had the District Court made the required *Studley* findings, and if those findings resulted in the exclusion of just $400,000 of the $2.4 million traceable to the Records, "the offense level would have been lower." *Id.* at 109.  In particular, in reaching the conclusion that the Court's failure to make the *Studley* findings might have affected the outcome of Mr. Rigo's sentencing, the Second Circuit highlighted the fact that not all of the Records were in Mr. Rigo's handwriting. "Given that the District Court seems to have accepted 'that the [records] were not all written in Rigo's hand,'" the Second Circuit observed, "we cannot say there is not a reasonable probability that the offense level would have been lower if not for the District Court's error." *Id.* (quoting Loss Op.)

With its finding of plain error, the Second Circuit remanded for resentencing, making clear that it was doing so "without placing a thumb on the scale with respect to what the District Court's particularized findings under *Studley* should be." *Id.*

## ARGUMENT

The issue on this remand is whether the losses reflected in the Records satisfy *Studley* – that the activity was within the scope of Mr. Rigo's agreement and foreseeable to him in light of that agreement – to be properly attributable to Mr. Rigo as jointly undertaken activity under U.S.S.G. § 1B1.3(a)(1)(B).  While Mr. Rigo does not contest foreseeability, the Government has not provided sufficient evidence to allow the Court to make the particularized finding that

the activity reflected in the Records was within the scope of Mr. Rigo's conspiratorial

agreement to meet the first *Studley* prong.

## I.     Legal Standard

At sentencing, a district court may include in its loss calculation the losses caused by the

acts of persons other than the defendant if such acts constitute "relevant conduct" under

Guidelines Section 1B1.3(a)(1)(B).  "Relevant conduct" is a subset of conduct undertaken by co-

conspirators that includes "reasonably foreseeable acts and omissions of others in furtherance of

the jointly undertaken criminal activity, that occurred during the commission of the offense of

conviction, in preparation for that offense, or in the course of attempting to avoid detection or

responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1)(B) (2014).  The Guidelines commentary

provides that, to determine a defendant's accountability for the conduct of others under U.S.S.G.

§ 1B1.3(a)(1)(B), "the court must first determine the scope of the criminal activity the particular

defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives

embraced by the defendant's agreement)."  U.S.S.G. § 1B1.3 cmt. n.2.  Only conduct that "was

both in furtherance of, and reasonably foreseeable in connection with, the criminal activity

jointly undertaken by the defendant is relevant conduct under" U.S.S.G. § 1B1.3(a)(1)(B).  *Id.*

In this Circuit, pursuant to *United States v. Studley*, to hold a defendant responsible for

the conduct of others under Guidelines Section 1B1.3(a)(1)(B), the district court must apply a

"two-pronged test."  *Studley*, 47 F.3d at 574.  First, it must make particularized findings as to the

"scope of the criminal activity agreed upon by the defendant."  *Id.*; *United States v. Getto*, 729

F.3d 221, 234 (2d Cir. 2013); *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004); *United

States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001).  Second, and "only if it finds that the scope of

the activity to which the defendant agreed was sufficiently broad to include the conduct in

-12-

question[,] . . . the court 'must make a particularized finding as to whether the activity was foreseeable to the defendant.'" *Mulder*, 273 F.3d at 118 (quoting *Studley*, 47 F.3d at 574); *see also Studley*, 47 F.3d at 574 (the determination of the scope of the criminal activity the particular defendant agreed to jointly undertake "must be made before the issue of foreseeability" is reached). The Government bears the burden of establishing, by a preponderance of the evidence, the scope of the defendant's agreement and that the third party's acts are within that scope. *See United States v. Khandrius*, 613 F. App'x 4, 8 (2d Cir. 2015) (summary order); *United States v. Rizzo*, 349 F.3d 94, 99 (2d Cir. 2003) (government "was required to prove" the alleged co-conspirator activity "was in furtherance and within the scope of [defendant's] agreement").

In *Studley*, the Second Circuit "identified several principles and factors relevant to determining the scope of jointly undertaken criminal activity." *Mulder*, 273 F.3d at 118; *see Khandrius*, 613 F. App'x at 7. These factors are: "(1) 'whether the participants pool[ed] their profits and resources, or whether they work[ed] independently'; (2) 'whether the defendant assisted in designing and executing the illegal scheme'; and (3) 'what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.'" *Khandrius*, 613 F. App'x at 7 (alterations in original) (quoting *Studley*, 47 F.3d at 575). At the same time, "neither 'knowledge of another participant's criminal acts,' nor 'aware[ness] of the scope of the overall operation' alone is enough to deem the defendant responsible for the acts of co-conspirators." *Id.* (alteration in original) (quoting *Studley*, 47 F.3d at 575).

## II.   Application

Here, the evidence elicited by the Government is insufficient to allow the Court to make the particularized finding *Studley* and its progeny require that the conduct reflected in the Records was within the scope of Mr. Rigo's conspiratorial agreement. Eliciting only minimal

-13-

information on the scope of Mr. Rigo's agreement (and whether it compassed the transactions in

the Records), the Government asks the Court instead to make the inferential leap that simply

because the Records were found in Mr. Rigo's bedroom and concern the *same type* of conduct to

which Mr. Rigo pleaded guilty, the losses therein *must* be within the scope of his conspiratorial

agreement.  (*See* Gov. Br. at 12.)  That inference is insufficient under *Studley*.

 The record establishes that at most one page of the Records – the single page bearing

Reyes-Arias's handwriting – was within the scope of Mr. Rigo's conspiratorial agreement.  Mr.

Reyes-Arias testified that he gave Mr. Rigo lists of medication he had available for sale.  (Hr'g

Tr. 47:4-7.)  Of the 12 pages recovered from Mr. Rigo's notebooks, however, Reyes-Arias

recognized his own handwriting on just one page.  (*Id.* at 47:8-14.)  Nor did he recognize any

handwriting on the remaining pages of the Records as belonging to any other alleged conspirator.

Reyes-Arias was unable to connect Mr. Rigo (or himself) to the activity reflected on any of these

pages, and the Government adduced no other evidence on this point.

 Between Mr. Rigo's arrest on September 17, 2013 and the *Fatico* hearing on October 7,

2014, prosecutors had ample time to investigate the scope of Mr. Rigo's conspiratorial argument.

They signed Fernandez up as a cooperator; they proffered Leyba extensively; they had at their

disposal handwriting experts, together with information concerning more than 48 other arrestees

allegedly connected to the scheme.  The Government's failure to adduce any evidence beyond

the thin reed provided by Reyes-Arias strongly suggests that no such evidence exists.  *Cf. United

States v. Guzman*, 332 F. App'x 665, 667 (2d Cir. 2009) ("'[W]hen a party has it peculiarly

within its power to produce witnesses and fails to do so, the jury may infer that the testimony [of

the missing witness], if produced, would be unfavorable to that party.'") (alterations in original)

(quoting *United States v. Myerson*, 18 F.3d 153, 159 (2d Cir. 1994)).

On remand, the Government ignores the factors relevant to this Court's determination of the scope of the agreement. *See Khandrius*, 613 F. App'x at 7 (discussing factors for determining scope of conspiratorial agreement); *Mulder*, 273 F.3d at 118.  The Government cites no evidence that Mr. Rigo pooled profits and resources with the authors of the Records. *See United States v. Platt*, 608 F. App'x 22, 31 (2d Cir. 2015) (noting that "it is less likely that an activity was jointly undertaken if the participants worked independently and did not 'pool their profits and resources'" (quoting *Studley*, 47 F.3d at 575)).  Nor does it cite any evidence that Mr. Rigo assisted in designing or executing any scheme with any of the unidentified authors of the Records.  The Government elicited this evidence with respect to Reyes-Arias only, and with respect to one of the 12 pages of Records.

The Government argues that its failure to identify the handwriting on the Records is immaterial, because "there is nothing about the fact that the handwriting belonged to others that renders them beyond the scope of the losses properly attributable to [Rigo] pursuant to *Studley*." (Gov. Br. at 16.)  The defense agrees that the presence of handwriting other than Mr. Rigo's in the Records does not, on its own, doom the Government's argument.  Fatal to the Government's position, however, is the absence of any evidence reflecting an agreement between Mr. Rigo and any person, other than Reyes-Arias, to engage in the criminal conduct reflected in the Records.

On remand, the Government makes two arguments: first, that the Records were found in Mr. Rigo's home, and second, that they concern the same type of activity to which Mr. Rigo pleaded guilty. (*See* Gov. Br. at 12; *see id.* at 16-17.)  Neither may support the *Studley* finding the Court must make here. *Cf. United States v. Santos Batista*, 239 F.3d 16, 19 n.4 & 21 (1st Cir. 2001) (finding the district court's inclusion of transactions from a drug ledger as proper under the relevant conduct guideline as part of a common scheme or plan where "[t]he judge

-15-

considered only those pages that [the defendant] had been perusing and marking when caught red-handed, *and not the rest of the ledgers found in the apartment*") (emphasis added). The Government urges the Court to assume that because the Records somehow "ended up in the defendant's possession" and "reflected precisely the sort of conduct the defendant was engaged in," that they are, *a fortiori*, within the scope of Mr. Rigo's agreement. (*See* Gov. Br. at 16.) But speculation or unsupported assumptions do not satisfy the Government's burden of proof and cannot be the basis of a loss finding. *See United States v. Say*, 923 F. Supp. 611, 614-15 (D. Vt. 1995) (refusing to attributed intended loss to defendant, who was convicted of unlawfully transporting counterfeit credit cards, because it would be "based upon speculation" due to a "dearth of information" as to the "origin or intended fate of the credit cards . . . or as to [defendant's] knowledge of or role in" the counterfeiting scheme); *cf. United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007) (district court's acceptance of Government expert's methodology to calculate loss, when not supported by the evidence the Government put forth, contributed to reversible error).

In this case moreover, the defense adduced evidence consistent with a finding that the scope of Mr. Rigo's criminal agreement did not extend to all 12 pages of Records. The manner in which the Records were maintained by Mr. Rigo – haphazardly stuffed into notebooks with miscellaneous papers, such as detergent flyers and two-year-old gas bills (*see* Hr'g Tr. 144:17-145:10) – permits an inference that from time to time he received copies of inventory lists from sellers or drugs-wanted lists from buyers, and, no longer involved with the scheme, simply shoved these lists into notebooks with other inconsequential papers from the past, to be forgotten or discarded.

-16-

The Government cites two cases for the proposition that on these facts "there can be no serious dispute that the ledgers reflect conduct within the scope of the criminal activity agreed upon by the defendant." (Gov. Br. at 12 (internal quotation marks omitted).)  Both are unavailing.  In *United States v. Gowing*, 481 F. App'x 1 (2d Cir. 2012) (summary order), the Second Circuit affirmed that the district court made proper *Studley* findings, *id.* at *4, which are absent in this case.  And in *United States v. Ankamah*, No. S2 03 Cr. 206 (LBS), 2004 U.S. Dist. LEXIS 5816, 2004 WL 744487 (S.D.N.Y. Apr. 6, 2004), the language to which the Government cites the Court – that the *Studley* findings were met "where the conduct in question 'went to the heart of the criminal activity jointly undertaken by the three' co-conspirators" (Gov. Br. at 2) – relates to the second *Studley* prong, the foreseeability of the alleged conduct, not the first *Studley* requirement, whether the conduct is within the scope of the defendant's agreement, *Ankamah*, 2004 WL 744487, at *6.  Neither case stands for the proposition that, because the co-conspirator conduct is of the *same type* to which the defendant pleaded guilty, it satisfies the first *Studley* prong, scope of the agreement.

The Guidelines themselves underscore the sentencing court's obligation to meticulously assess the defendant's agreed-upon scope of activity, even if it is of the same type as to which the defendant admitted to committing.  Commentary to Guideline 1B1.3 posits the following hypothetical:  "Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment."  U.S.S.G. § 1B1.3 cmt. illus. (c)(3).  The commentary instructs that Defendant J is only "accountable for the single shipment of marihuana he helped import . . . and any acts and omissions in furtherance of that shipment that were reasonably foreseeable."  *Id.*  He is not, however, "accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not

in furtherance of his jointly undertaken criminal activity (the importation of the single shipment of marihuana)." *Id.*

Mr. Rigo's situation with respect to the pages of handwritten notes in this case is no different than Defendant J's in the Guidelines commentary. The Government has shown that the scope of Mr. Rigo's agreement as to the Records encompassed, at most, the transactions on the single sheet Reyes-Arias recognized as bearing his own (Reyes-Arias's) handwriting. But, with respect to the 11 other pages of the Records – which, like the marihuana shipments, pertain to the same *type* of conduct to which the defendant agreed – the Government has presented nothing beyond conjecture, speculation, and its own *ipse dixit*, and has failed to show that Mr. Rigo's conspiratorial agreement was broad enough to include the conduct or losses therein.

## CONCLUSION

For the reasons stated above, the Court should find that, with respect to the $2.4 million of losses from the Records, the Government has met its burden of proof of showing that only $80,197.46 – the losses from the single page authored by Reyes-Arias – are properly attributable to Mr. Rigo under *Studley*. Added to the $550,000 in losses previously found by the Court and which were not the subject of the appeal, this results in losses of $630,197.46 attributable to Mr. Rigo.

Dated:  New York, New York
        October 11, 2016

                                   Respectfully submitted,

                                   SPEARS & IMES LLP

                              By:  /s/ Joanna C. Hendon
                                   Joanna C. Hendon
                                   Alicia K. Amdur
                                   51 Madison Avenue
                                   New York, New York  10010
                                   Tel:   (212) 213-6996
                                   Fax:   (212) 213-0849
                                   jhendon@spearsimes.com

                                   *Attorneys for Defendant Bladimir Rigo*