UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

UNITED STATES OF AMERICA

               Plaintiff,

   - against -

BLADIMIR RIGO,

            Defendant.

------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/17/17
```

13 Cr. 897 (RWS)

OPINION

A P P E A R A N C E S:

Attorney for Plaintiff

UNITED STATES ATTORNEY OFFICE, SDNY
One Saint Andrew's Plaza
New York, NY 10007
By:  Edward B. Diskant, Esq.

Attorneys for Defendant

SPEARS & IMES LLP
51 Madison Avenue
New York, NY 10010
By:  Joanna C. Hendon, Esq.
     Alicia K. Amdur, Esq.

**Sweet, D.J.**

Defendant Bladimir Rigo ("Rigo" or "Defendant") was sentenced by this Court to 38 months of incarceration and ordered to pay $2.9 million in restitution upon his guilty plea to conspiracy to commit healthcare fraud and to commit adulteration and distribution of prescription medication. On appeal of his sentence, the Second Circuit Court of Appeals remanded the case to this Court for reconsideration of the loss amount attributable to Rigo, directing the Court to make particularized findings as to the foreseeability and scope of the criminal activity ascribed to Rigo. Upon the facts and conclusions set forth below, the loss attributable to Rigo is $2.9 million.

## I.   Prior Proceedings and Facts

Familiarity with the prior proceedings and facts set forth in the Court's prior opinions is assumed. *See United States v. Rigo*, 86 F. Supp. 3d 235 (S.D.N.Y. 2015); *see also United States v. Rigo*, No. 13 Cr. 897 (RWS), 2015 WL 2240309 (S.D.N.Y. May 12, 2015). A summary of relevant facts is set forth below.

2

On November 14, 2013, Rigo was charged in a two-count indictment. Count One charged Rigo with conspiracy to commit healthcare fraud and Count Two charged Rigo with conspiracy to commit adulteration and unlawful wholesale distribution of prescription medications.

The charges stem from Rigo's participation in a large-scale scheme to obtain various prescription medications—typically those prescribed to treat HIV and AIDS—which had previously been dispensed to individuals in Newark, New Jersey and elsewhere, and then to attempt to cause these bottles to re-dispensed as "new" to unsuspecting patients. The drugs involved in this scheme were not controlled substances, but rather brand-name pharmaceuticals used exclusively by patients with valid prescriptions and for which the price tags, almost always paid by insurance programs such as Medicaid, ran into the thousands of dollars per bottle.

The scheme worked, in general terms, as follows: *first*, the lowest level participants in the scheme (the "Insurance Beneficiaries") filled prescriptions for month-long supplies of drugs at pharmacies throughout the country, including in the Southern District of New York and the Newark,

3

New Jersey area. These Insurance Beneficiaries were typically HIV or AIDS patients who paid little or no money of their own for the drugs in question because their insurance plans, typically Medicaid, footed the bill. The Insurance Beneficiaries then sold their bottles of medication for cash at locations like street corners and bodegas to other participants in the scheme, referred to in the investigation as "Collectors." Collectors, in turn, sold the second-hand bottles to "Aggregators" who bought large quantities of second-hand drugs from multiple Collectors. Eventually, the second-hand drugs made their way to corrupt distributors and pharmacies willing to re-dispense these second-hand drugs to unsuspecting consumers.

Health care benefit programs, such as Medicaid, were defrauded twice in this scheme. On the front end, health care benefit programs were fraudulently induced into paying for these drugs under the false representation that the drugs were for the sole intended use of the program beneficiary, i.e., the Insurance Beneficiary. On the back end of the scheme, participants fraudulently concealed the true, illegitimate source of the bottles thereby fraudulently inducing health care benefit programs to pay for the exact same bottles a second time.

4

Rigo participated in this scheme as an Aggregator based in Newark, New Jersey. From at least 2000 up until his arrest in 2013, Rigo purchased large numbers of these bottles of second-hand medications before selling them to even high-level scheme participants for cash. To facilitate his activities, Rigo employed workers who would act as Collectors and purchase bottles of second-hand medications from the Insurance Beneficiaries. Among others, Rigo employed Arcadio Reyes-Arias and Rogelio Leyba who, for a period of approximately five years from at least 2000 through about 2005, bought significant numbers of bottles of these medications for Rigo to resell. After that time period, both Reyes-Arias and Leyba went off on their own, opening their bodegas from which they continued to work in furtherance of the the scheme with Rigo and others.

To make the scheme work, the bottles purchased by Rigo and others needed to be "cleaned"; that is, the patient labels affixed when the bottles were initially dispensed to the Insurance Beneficiaries needed to be removed so that the bottles would appear to be new. To "clean" the bottles, Rigo and his co-conspirators doused the medication bottles with lighter fluid or a similar chemical to melt off the initial patient label. As inspection of bottles recovered during the investigation confirmed, this process of "cleaning" was inherently dangerous:

5

testing of the bottles showed that the "cleaning" materials
frequently seeped into the bottles and contaminated the pills
themselves with chemicals known to be dangerous or even fatal if
swallowed.

Rigo was arrested on September 17, 2013 and pleaded
guilty to his participation in the conspiracy on April 23, 2014
without an agreement with the Government.

In October 2014, this Court held a hearing pursuant to
*United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) focused on
the issue of the loss amount properly attributable to Rigo. The
Government called three witnesses. One of its witnesses was
Reyes-Arias, who testified pursuant to a cooperation agreement
with the Government and who, as noted above, worked for and then
with Rigo as part of the conspiracy for many years prior to
their arrests. As the Court heard from each of the witnesses at
the Hearing and from Rigo himself via a consensual recording
made during the investigation, Rigo was a large-scale Aggregator
in the scheme between at least 2000 and his arrest in 2013.
During that time, Rigo aggregated bottles of these second-hand
medications by employing workers in his bodega to purchase the
medicines from Insurance Beneficiaries on the streets of Newark,
New Jersey and by buying bottles from other, independent

6

Collectors.

Based on the evidence presented at the *Fatico* hearing, this Court concluded that Rigo's involvement in this conspiracy spanned many years, that Rigo was a "principal player in the New Jersey branch" of this nationwide scheme, and that Rigo was consistently involved in planning and consummating transactions involving hundreds of thousands of dollars in second-hand medications. *Rigo*, 86 F. Supp. at 241-42. During the time period leading immediately up to the arrest—a period for which evidence of precise transactions was more readily available—this Court found that Rigo's conduct involved at least $2.9 million worth of second-hand medications.

In reaching that figure, the Court determined that: (1) Rigo was responsible for his December 2012 purchase of medications from Reyes-Arias having an approximate Medicaid value of $300,000; (2) Rigo was responsible for an unconsummated September 2012 purchase from Reyes-Arias and Leyba having an approximate value of $250,000. The Court treated these as roughly $500,000 of the total loss attributable to Rigo. These findings and this loss amount are not at issue on remand.

The Court's loss calculation also included nearly $2.4

7

million worth of sales of second-hand medications documented in
a series of drug ledgers. At the time of Rigo's arrest, agents
recovered four notebooks, and introduced them into evidence as
Government's Exhibits 204-207 at the *Fatico* hearing. Hr'g Tr.
100:2-14. Found folded up in two of the notebooks were twelve
loose sheets of paper containing what appear to be handwritten
lists of prescription medications, some containing dollar
amounts and quantities. Hr'g Tr. 101:11-13; Mohan Decl. Ex. L
(GX-202). The ledgers reflected logs of nearly 2,700 bottles and
over 168,000 pills of black market drugs.

Some of the pages in the ledgers seemed to be written
in Rigo's handwriting while other pages appeared to contain the
handwriting of other co-conspirators. At the *Fatico* hearing,
Reyes-Arias identified certain pages in the ledger as bearing
his handwriting and reflecting lists of second-hand medication
that he was offering for sale to Rigo. Rigo was deemed liable
for the value of all of the medications reflected in the ledgers
because he was responsible for the plans and intentions of the
conspiracy, whether consummated or not. The decision to include
the $2.4 million in value based on the drug ledgers was
"corroborated [by] Reyes-Arias' testimony regarding the
magnitude of Rigo's involvement in this conspiracy from 2005-
2012, as well as Rigo's self-characterization as a principal

8

player in the New Jersey branch of the market." *Rigo*, 86 F. Supp. at 241.

By written opinion in May 2015, Rigo was sentenced to 48 months' imprisonment and ordered to pay $2.9 million in restitution following his release from federal custody. *Rigo*, 2015 WL 2240309 at *1. At the sentencing proceeding, Rigo's sentence was reduced to 38 months' imprisonment.

Rigo appealed from the June 2, 2015 judgment of conviction, arguing that his sentence was procedurally unsound because the Court did not make the two-pronged finding required by *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), before determining that the entire calculated amount of loss derived from the drug ledgers was attributable to him. On May 23, 2016, the Court of Appeals issued a summary order remanding the case to this Court for resentencing. *United States v. Rigo*, 649 F. App'x 107, 109 (2d Cir. 2016) (summary order). The Court of Appeals specifically noted that it was remanding "without placing a thumb on the scale with respect to what the District Court's particularized findings under *Studley* should be. We recognize that, on remand, the District Court's loss calculation may be no different than it was in the first instance." *Id.*

The hearing was completed and argument heard on
October 27, 2016, at which point the motion was marked fully
submitted.

## II.  **Applicable Law**

When the defendant has undertaken a criminal activity
together with others, he is held accountable for "all reasonably
foreseeable acts and omissions of others in furtherance of the
jointly undertaken criminal activity." U.S.S.G. §
1131.3(a)(1)(13). However, "[t]he scope of conduct for which a
defendant can be held accountable under the sentencing
guidelines is significantly narrower than the conduct embraced
by the law of conspiracy." *United States v. Perrone*, 936 F.2d
1403, 1416 (2d Cir. 1991); *see* U.S.S.G. § 1B1.3 cmt. n. 1. This
is because "the emphasis in substantive conspiracy liability is
the scope of the *entire conspiracy*," while "the emphasis under
[the Guidelines] is the scope of the *individual defendant's*
undertaking." *United States v. Spotted Elk*, 548 F.3d 641, 673-74
(8th Cir.2008) (emphases in original). As the commentary to the
relevant section of the Guidelines explains:

> the accountability of the defendant for the acts of
> others is limited by the scope of his or her agreement
> to jointly undertake the particular criminal activity.
> Acts of others that were not within the scope of the
> defendant's agreement, even if those acts were known
> or reasonably foreseeable to the defendant, are not

10

relevant conduct

for sentencing purposes. U.S.S.G. § 1B1.3 cmt. n. 3(B); *see also United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004) (mere knowledge of murder committed by coconspirator insufficient even where it was within scope of overall operation; murder must be within scope of specific conduct and objectives agreed to by defendant).

        To satisfy the Guidelines' narrower approach to sentencing conspirators, the Second Circuit announced in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), that "[i]n order to hold a defendant accountable for the acts of others . . . a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004) (quoting *Studley*, 47 F.3d 569 at 574); *see also United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013) ("Before sentencing a defendant based on the conduct of coconspirators, . . . a district court is required to make two particularized findings: (1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, coconspirator conduct in question; and (2) that the relevant conduct on the part of the coconspirator was foreseeable to the defendant." (alterations and internal

11

quotation marks omitted)). Particularized findings are required, and the determinations must be made sequentially: The sentencing court "'must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake' . . . before the issue of foreseeability, prong two, is reached." *Studley*, 47 F.3d at 573-74 (quoting U.S.S.G. § 1B1.3 cmt. n. 2).

## III.    The Losses Derived from the Drug Ledgers Are Properly Attributed to Rigo

Because Rigo concedes foreseeability, Def. Br. 11, the issue on this remand is limited to whether the drug ledger losses attributed to Rigo satisfy the first prong of *Studley*: that the activity was within the scope of the criminal activity that Rigo agreed to undertake. Rigo argues that the Government has not met its burden of proving that the $2.4 million in losses derived from the handwritten ledgers are attributable to him as "jointly undertaken activity" under U.S.S.G. § 1B1.3(a)(1)(B) and therefore the Court cannot make the particularized findings necessary to meet the *Studley* prong. As set forth below, the evidence elicited by the Government is sufficient to allow this Court to make particularized findings that the conduct reflected in the drug ledgers was within the scope of Rigo's conspiratorial agreement.

12

To determine the scope of the criminal activity that a
particular defendant agreed to jointly undertake, a court must
discern "the scope of the specific conduct and objectives
embraced by the defendant's agreement." *Studley*, 47 F.3d at 574
(quoting U.S.S.G. § 1B1.3 cmt. n. 2). "In determining the scope
of the criminal activity that the particular defendant agreed to
jointly undertake (i.e. the scope of the specific conduct and
objectives embraced by the defendant's agreement), the court may
consider any explicit agreement or implicit agreement fairly
inferred from the conduct of the defendant and others." U.S.
Sentencing Guidelines Manual § 1B1.3 app. n. 2. The defendant's
awareness of the scope of the overall operation is not enough to
hold him accountable for the activities of the entire operation;
rather, the "relevant inquiry is what role the defendant agreed
to play in the operation, either by an explicit agreement or
implicitly by his conduct." *Studley*, 47 F.3d at 575 (citing
U.S.S.G. § 1B1.3, cmt. n. 2 illus.(c)(7)).

Quantities of drugs for which a defendant may be held
liable must be proven by "specific evidence." *United States v.
Archer*, 671 F.3d 149, 165 (2d Cir. 2011). Specific evidence can
be found in drug records, admissions by the defendant, or live
testimony. *United States v. Shonubi* ("*Shonubi IV*"), 103 F.3d
1085, 1089-92 (2d Cir. 1997) (explaining that while there was

13

"specific evidence" for drug quantities for one of eight
narcotics trafficking trips in the form of drug records,
admissions, or testimony, that could not be multiplied by eight
to determine the quantities for all the trips).

The fraudulent activity captured in the drug ledgers
was known by Rigo individually and was fully within the scope of
the activity agreed upon by Rigo. At the *Fatico* hearing, this
Court heard extensive evidence that the scope of the criminal
activity agreed upon by Rigo was exactly the sort of conduct
reflected in the drug ledgers: bulk purchases of second-hand
medications from multiple Collectors prior to resale of those
medications. Three witnesses—Reyes-Arias, Detective Anthony
Romero, and Special Agent Antonio Rao—were offered by the
Government to provide testimony as to Rigo's specific role in
the conspiracy.

Reyes-Arias testified that he worked for Rigo in
furtherance of the scheme during the period of approximately
1998 to 2012, first as a Collector in one of Rigo's bodegas and
later as an independent Collector selling prescription drugs to
Rigo and others. Reyes-Arias' testimony with regard to quantity
of drugs he provided to Rigo varied, but when he was shown pages
from the drug ledgers he recognized at least one page as bearing

14

his own handwriting. That page contained a list of medications
that Reyes-Arias had for sale and which Reyes-Arias had provided
to Rigo who, in turn, filled in the prices per bottle Rigo was
willing to pay for each. Hr'g Tr. at 47:8-49:5.

            Detective Romero testified to a recorded meeting that
another participant in the scheme, Hermenegildo Fernandez,
conducted with Rigo in September 2012 as part of his cooperation
with the Government. *See* GX-211-T (meeting transcript). In the
recordings, Rigo stated that he purchased medications from both
Reyes-Arias and Leyba, and discussed future purchases from
Reyes-Arias and Leyba. GX-211-T at 13. Rigo proposed that
Fernandez provide him with a customer and that Rigo would
provide the medications, and that the two could split the
proceeds of this future $25,000 deal equally. *Id.* During other
portions of same recorded meeting, Rigo discussed his dealings
with another known co-conspirator, Conrado Vasquez ("Vasquez"),
a Miami-based Aggregator who was charged as part of a large,
forty-eight defendant case and has since pled guilty to his
participation in the charged conspiracy. *See United States v.
Viera*, et al., 11 Cr. 1072 (S.D.N.Y.2011). Finally, the recorded
meeting included a discussion of Rigo's and Fernandez's relative
importance in the prescription drug trade. Rigo described
himself and Fernandez as "two big people in New Jersey" that

15

were targets of the Government's investigation. GX-211-T at 20.

Finally, Special Agent Rao testified about the four journals seized from Rigo, from which the Government obtained the handwritten drug lists shown to Detective Romero and Reyes-Arias. *See* GX-202. With respect to his interpretation of the ledgers, Agent Rao testified that "every time [he] saw the name of a drug with a number next to it [he] considered it to be a sale or contemplated sale" for the purposes of his loss calculation. *Id.* at 130:25-131:4. Agent Rao noted that a "deal might or might not result" from the information reflected on the lists. *Id.* at 8-16. Therefore, he testified, the basis for including the numbers from these lists in his loss calculation was an assumption he made about what these lists represent. *Id.* at 129:3-9. Based on what entries in the drug ledgers Agent Rao considered to be a sale or contemplated sale, he prepared a loss calculation estimate. Agent Rao determined that the total Medicaid reimbursement value for the pills documented in the ledger was approximately $2.4 million. A summary chart documenting Agent Rao's loss amount estimates was offered into evidence. *See* GX-212.

From this specific evidence and the record before it, the Court makes the following findings regarding the scope of

16

Rigo's agreement. First, Rigo was one of at least "two big people in [the] New Jersey" area of the conspiracy. GX-211-T at 20. On the recording with Fernandez, it was Rigo himself who characterized his role as that of a principal player in the New Jersey branch of this illegal market. Second, Rigo's role was that of an Aggregator of the second-hand medications, working in cooperation with many other co-conspirators involved in the scheme. He employed Reyes-Arias and other Collectors, and he also bought the medications from independent Collectors. He considered himself on-par with Fernandez, another known Aggregator in the scheme. Third, the lists found in the four notebooks were drug ledgers belonging to Rigo. The lists contained handwritten lists of drugs along with quantities and pricing, and were found in Rigo's bedroom, in a notebook that also contained other personal documents belonging to Rigo, such as a utility bill. Hr'g Tr. At 144-45. At least one of the pages appeared to be written in Rigo's handwriting, and at least one of the pages contained the handwriting of one of Rigo's known Collectors, Reyes-Arias. Fourth, as Reyes-Arias confirmed in his testimony, the Collectors from whom Rigo purchased the second-hand medications sometimes wrote drug lists themselves, rather than Rigo noting down the transactions. Fifth, the drug ledgers and testimony from Government witnesses corroborate the magnitude of Rigo's involvement in the scheme and his scope in

17

the agreement to be a major buyer and seller of these second-
hand medications. The drug ledgers catalogue over 168,000 pills,
an amount that would reasonably be expected to be bought and
sold from a "big person" in the conspiracy. All of these
particular findings lead the Court to conclude that the acts
captured on the drug ledgers found in Rigo's bedroom were
squarely within the scope of the role that Rigo chose to take on
in this massive illegal scheme.

The contrast of these facts with those in *Studley* is
instructive. There, the Second Circuit held that a salesman who
was defrauding customers was not responsible for the frauds of
his co-workers because the defendant did not contribute
resources to the scheme, "had no interest in the success of the
operation as a whole, and took no steps to further the operation
beyond executing his sales." *Studley*, 47 F.3d at 576. There was
no evidence that the defendant "assisted other sales
representatives with their sales, shared in the profits, or
participated in any way in the management of the operation." *Id.*
at 573.

Unlike the defendant in *Studley*, who did not
"contribute[ ] resources to the telemarketing scheme," see
*Studley*, 47 F.3d at 576, Rigo provided critical resources to the

18

conspiracy: he employed and worked with Collectors to purchase

many bottles of second-hand medication. He played an integral

role in the conspiracy, particularly in New Jersey where he was

one of the "big people" making the operation happen.


Rigo's $2.4 million liability based on the drug

ledgers is limited only to the scope of his participation. The

scheme involved dozens of additional participants nationwide and

hundreds of millions of dollars' worth of second-hand

medications. This Court heard considerable evidence about the

conduct of other scheme participants—including Fernandez, Leyba,

and Reyes-Arias, who were all co-conspirators of Rigo—but based

on the scope of Rigo's involvement, he could reasonably be held

liable only for the drug ledgers recovered from his bedroom with

other personal effects, in which Reyes-Arias identified his own

handwriting, and reflecting the activities in which he was

engaged throughout his involvement with the conspiracy. This is

not a case in which Rigo is being held liable for a broader

array of conduct that he is merely "aware of." *See Studley*, 47

F.3d at 575 (noting that holding the defendant accountable for

all acts taken by the other conspirators requires evidence that

the defendant has pooled his profits or resources with the other

participants or otherwise "directly tied" his success to the

activities of the others, or has not only assisted in the

19

execution of the illegal scheme but in its design as well and citing U.S.S.G. § 1B1.3, cmt. n. 2 illus.(c)(2), (c)(6)); *see also United States v. Marsh*, 820 F. Supp. 2d 320, 340 (E.D.N.Y. 2011), *as amended* (Nov. 3, 2011) (holding co-defendants of an investor fraud scheme jointly and severally liable pursuant to *Studley* because "[t]he defendants in this case worked together to defraud their victims and encouraged each other to perpetrate the fraud . . . .").

The fact that the ledgers were not all written in Rigo's hand does not render the $2.4 million loss estimate unsupported by specific evidence. Rigo pleaded guilty to participating in a conspiracy, and he is equally liable for the acts of his coconspirators, including others who may have written those lists, and the plans and intentions of the conspiracy so long as those acts were foreseeable to him and within the scope of his agreement. As the acts catalogued in the ledgers were fully foreseeable to Rigo and within the scope of Rigo's agreement to act as a "big person" and an Aggregator in the scheme, he is liable for the transactions reflected in the ledgers even though his co-conspirators may have written the lists. In the *Fatico* hearing, the Court heard testimony about why not all of the handwriting was the same, namely, because other co-conspirators, including Reyes-Arias, would prepare

hand-written lists of inventory that would then be supplied to
Rigo. Whether the lists were written by Rigo or by his co-
conspirators, they reflected precisely the sort of conduct that
he was engaged in, and they are thus within the scope of the
criminal activity to which Rigo agreed. *See* United States v.
Ankamah, No. S2 03 CR.206 LBS, 2004 WL 744487, at *5 (S.D.N.Y.
Apr. 6, 2004) (finding that holding the defendant liable for his
co-defendants' contribution to loss satisfied *Studley* because
"their efforts were not entirely isolated but rather
intertwined," there was "significant collaboration and
communication" among the co-defendants, and the co-defendants'
"conduct was in furtherance of a joint undertaking, in which
Defendant participated" to commit tax fraud); *see also United
States v. Eisner*, No. 10-1192-cr, 2011 WL 2411011 (2d Cir. June
16, 2011) (holding that defendant was responsible for co-
defendant's conduct in Ponzi scheme where the defendant knew
"the extent of the losses caused [by the] scheme . . . , was
instrumental in its initial development, and continued to
participate in and profit from the scheme throughout [its]
existence").

        The $2.4 million loss calculation also remains
supported by specific evidence even though some entries in the
drug ledgers may have contained price bids rather than executed

21

transactions. The Court considered all of the evidence at the *Fatico* hearing and chose to credit Agent Rao's testimony as to the determination of which records to include in the loss calculation estimate. There is nothing in the record before the Court to suggest that these lists containing drug names, quantities, and prices were anything other than Rigo's drug transactions. The record evidence, including the testimony of Reyes-Arias about the origins of these ledgers and the scope of Rigo's conduct, Rigo's self-characterization as a principal player in the scheme during his conversation with co-conspirator Fernandez, and Agent Rao's testimony regarding his interpretation of the transactions provide sufficient evidence for the Court to find that these were actual transactions completed or contemplated by Rigo and his co-conspirators. *Cf.* U.S.S.G. §2B1.1 cmt 3(A) (directing the sentencing court to use "the greater of actual *or intended* loss") (emphasis added).

In accordance with the requirements of *Studley*, the Court expressly finds that Rigo jointly agreed to participate in the fraudulent purchases and distribution of the second-hand medications in the drug ledgers. The evidence provided by the Government sufficiently supports that the $2.4 million in losses based on the drug ledgers were fully foreseeable to Rigo and within the scope of the activity to which Rigo agreed.

22

## IV.    Conclusion

For the reasons set forth above, and in accordance with the remand from the Second Circuit, the loss reasonably attributable to Rigo is determined to be $2.9 million.

Because this re-sentencing takes place after revisions to Guidelines Section 2B1.1 have been made effective, Rigo's new total offense level is 23 instead of 25, resulting in an applicable Guidelines range of 46 to 57 months' imprisonment. Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines and all of the factors set forth in 18 U.S.C. § 3553(a), and based on the same reasoning as in the prior sentencing opinion and hearing, the Court will depart downward from the Guidelines range, and Rigo is sentenced to 38 months' imprisonment.

It is so ordered.

New York, NY
January / 3 , 2017

ROBERT W. SWEET
U.S.D.J.